ERIKA BIRCH (Bar No.7831)
T. GUY HALLAM, JR. (Bar No. 6101)
LOURDES MATSUMOTO (Bar No. 9920)
**STRINDBERG & SCHOLNICK, LLC**
1516 W. HAYS STREET
BOISE, ID 83702
(t) 208.336.1788
(f) 208.344.7980
erika@idahojobjustice.com
guy@idahojobjustice.com
lourdes@idahojobjustice.com

Attorneys for Plaintiff

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

---

| | |
|---|---|
| **SHAAKIRRAH R. SANDERS,**<br><br>        Plaintiff,<br><br>vs.<br><br>**THE UNIVERSITY OF IDAHO, a public university governed by the BOARD OF REGENTS OF THE UNIVERSITY OF IDAHO aka the STATE BOARD OF EDUCATION, an executive department of the STATE OF IDAHO, and MARK ADAMS, former Dean of the College of Law, in his official and individual capacity, and JERROLD LONG, interim Dean, in his official capacity**<br><br>        Defendants. | **AMENDED COMPLAINT (JURY DEMANDED)**<br><br>Civil No. 3:19-CV-00225-BLW<br>Judge Winmill |

---

Plaintiff ("Professor Sanders"), by and through her attorneys, hereby complains against the

Regents of the University of Idaho ("University"), a public university governed by the State Board

of Education also known as the Board of Regents of the University of Idaho, a constitutional

corporate body , former Dean Mark Adams, ("Dean Adams") and Interim Dean Jerrold Long ("Dean Long") (collectively, "Defendants") as follows:

## I.      NATURE OF THE CLAIMS

1.      This suit is brought by a black female law professor who has been subjected to race and gender discrimination and retaliation by Defendants in violation of: Title VII of the Civil Rights Act of 1964, as amended and codified at 42 U.S.C. § 2000e, *et seq*. ("Title VII"); Title VI of the Civil Rights act, as amended and codified at 42 U.S.C. § 2000d ("Title VI"); the Civil Rights Act of 1866, as amended and codified at 42 U.S.C. § 1981 ("§ 1981"); Title IX, 20 U.S.C. § 1681 et seq. ("Title IX"); and under 42 U.S.C. § 1983 ("§ 1983") for violating her rights under the Equal Protection clause of the United States Constitution.

2.      Plaintiff seeks all available remedies including damages, attorneys' fees, costs, and interest, and compensatory damages.

## II.      PARTIES

3.      Professor Sanders resides in the State of Idaho, Ada County, and is and was employed by the University at all times relevant to the allegations in this Complaint.

4.      Defendant the Regents of the University of Idaho, is an educational institution under the governance of the State Board of Education, an executive department of the State of Idaho pursuant to Idaho Code § 33-101 and a constitutional corporation pursuant to Title IX Section 10 of the Idaho State Constitution.  At all times relevant to this Complaint, this Defendant was an employer pursuant to the pertinent laws and received federal financial assistance.

5.      Defendant Mark Adams served as the Dean of the University of Idaho College of Law ("College of Law") from June of 2014 until approximately June of 2018. He is being sued in

his official and individual capacity and either made or ratified employment decisions that impacted Professor Sanders.

6.     Defendant Jerrold Long is the interim Dean of the College of Law, having taken that role over after Dean Adams stepped down. He is being sued in his official capacity.

## III.     JURISDICTION AND VENUE

7.     This Court has original jurisdiction under the provisions of 28 U.S.C. § 1331 with respect to Plaintiff's claims arising under federal law.

8.     Venue is proper with this Court as the Defendants' business is within the jurisdiction of the Court and the alleged illegal conduct that occurred was within the jurisdiction of the Court.

9.     With regard to the claims arising under Title VII, Professor Sanders has complied with the administrative requirements set forth in 42 U.S.C. § 2000e-5.  Professor Sanders filed a Charge of Discrimination with the EEOC, received a right to sue notice, and has filed this Complaint within the 90 days.

## IV.     GENERAL ALLEGATIONS

10.     Professor Sanders graduated from Loyola University New Orleans College of Law in 2001. Her legal career has included serving as a federal court law clerk at the district court and appellate court levels, working for private law firms as an associate, working as a public defender, and eventually entering into legal academia.

11.     After serving as a visiting professor at Seattle University School of Law, Professor Sanders was hired by the University of Idaho College of Law as a tenure track associate professor in June of 2011. She earned tenure in 2016 and became the first African-American and second person of color to achieve the rank of full professor at the College of Law in 2018.

12.     Professor Sanders focuses her teaching and research in areas of criminal procedure, the First Amendment, and torts. She has published scholarship in various law reviews/journals and has contributed to and/or edited various publications and collections.  For example, she has publications forthcoming in 2019 regarding tort law (Cambridge University Press) and First Amendment law (Cornell Law Review).

13.     Professor Sanders is regularly invited to speak at colloquium, symposium and legal conferences. She has developed a nationally recognized reputation in her area of academic expertise and has appeared in or contributed to news stories in *The New York Times*, *Washington Press*, *Associated Press*, and *Al Jazeera America* among others. She has appeared on local and regional television and radio news programs.

14.     Professor Sanders has also taken on various service-oriented special assignments and leadership positions for the College of Law and the University. During the 2016-18 academic years, she served as Chair of the University's Administrative Hearing Board. She co-coached the National Moot Court competition teams the fall semesters of the 2013-16 academic years, and in 2017, she organized the regional National Moot Court Competition in Boise. She served as faculty advisor for the Idaho Critical Legal Studies Journal during the 2014-18 academic years, and, in the spring semesters of 2017-18 academic years, she helped students plan symposiums. In addition, Professor Sanders was a member of the College's Admissions Committee from 2014-17, and the only faculty member to serve on that committee from the Boise campus during that time.

15.     Professor Sanders also serves in various law-related leadership positions outside of the University. For example, she serves as Chair of the Idaho State Advisory Committee to the U.S. Commission on Civil Rights; she has been an officer and will serve as President (2019-20) for the Richard C. Fields Inn of Court; she has and continues to hold leadership positions within

the American Association of Law Schools. She is on the Board of Directors of the Idaho American Civil Liberties Union and the Idaho Black History Museum.

16.     In June of 2014, nearly three (3) years after her hire at the University, Mark Adams became the new Dean of the College of Law. At the time, there were approximately three professors of color, of which two were female. As of the 2018-2019 academic year, Professor Sanders is the second female professor of color who has the rank of full professor.

17.     In July of 2014, Dean Adams informed Professor Sanders that he intended to change her teaching package for the 2014-2015 academic year, such that Professor Sanders would be teaching 13 credit hours as opposed to the expected 12 credits per semester. Professor Sanders agreed to the additional credit based on the needs of the College but also inquired as to additional compensation or a future course release. Importantly, 2014-2015 year was the year prior to when Professor Sanders qualified to apply for tenure.  As a result, it was a critical year for her to work on completing her tenure application and its requirements.

18.     Dean Adams told Professor Sanders that he could not offer additional compensation or course release for a one-credit overload. However, Professor Sanders was aware of another white professor who was promised a future course release based on a one-credit overload for the same academic year. When she questioned Dean Adams about this, he confirmed that she was correct but explained that the overload of the other professor was "different" such that in his view, it "justif[ied] the release."

19.     This was the beginning of a pattern of disparate terms and conditions of employment that Defendants subjected Professor Sanders to at the College of Law. As further described below, she raised concerns about this disparate treatment and the lack of clear and objective criteria for making decisions that negatively impacted her as a woman of color.

Unfortunately, instead of addressing her concerns, the College chose to retaliate against Professor Sanders.

20.     For example, in February of 2015, Professor Sanders learned that her teaching load for the 2015-2016 academic year would include an additional credit hour, and that there would be no release credit provided to her despite the fact that release credits had been or were being provided to others.  Additionally, 2015-2016 was the year when Professor Sanders would apply for tenure, putting her on similarly-situated terms with the white female colleague who was promised a future course release based on a one-credit overload in the fall of 2014. So, for two years in a row, the College of Law proposed to assign Professor Sanders to teaching packages that resulted in credit overloads and proposed to deny to Professor Sanders the same or similar type of compensation or course release as provided to those who also taught an overload.

21.     In communicating with Dean Adams and Associate Dean Richard Seamon about this issue, Professor Sanders pointed out how the lack of neutral criteria to assign and assess faculty workloads led to results lacking in fundamental fairness. She also clearly told them that the justifications provided insufficiently explained the different treatment between similarly-situated faculty members. Professor Sanders also explained her concern that these decisions reflected a bias that was being ignored by the leaders.

22.     Less than 24-hours later, Professor Sanders was told that instead of teaching Constitutional Law I, she would be assigned to teach her normal package of 12 credits. It was clear from the communication from the Deans that this change was not provided in recognition that the original assignment was inappropriate or unfair. Instead, Professor Sanders' concerns were challenged. The Deans wrote that Professor Sanders actually had not been keeping pace with her colleagues during her first three years of teaching. This allegation was not factually correct,

something Professor Sanders explained to both Dean Adams and Associate Dean Seamon. She reiterated that she just wanted to be treated the same as her similarly-situated junior colleagues. Professor Sanders also told them that she was willing and happy to teach Constitutional Law I but believed that a course release or other compensation was appropriate. Dean Adams made clear in response that she would not be teaching Constitutional Law I.

23.     Further, except for disagreeing with Professor Sanders' articulated concerns about discrimination, the Deans did not address or forward her complaint for any investigation. Instead, she was chastised for not complaining "forthrightly" enough and challenged to make a written complaint to the University-wide Office of Human Rights Access and Inclusion.

24.     Unfortunately, this was not the end of the College's interference with Professor Sanders' teaching-package assignments. She was again initially passed over for assignment of Constitutional Law I in the following year (2016-17) despite the fact that she had taught Constitutional Law I before and she had expressed the willingness and desire to teach that course again. Additionally, Constitutional Law I was a class in her area of academic research. That course was first offered to a white professor with less seniority, who had not taught the class, did not have scholarship in that area, and did not want to teach it. Similarly, the University then reassigned the First Amendment class from Professor Sanders to a white, male visiting professor, who had not taught the subject and who was allowed to teach it remotely from Moscow, something Professor Sanders had been told she was not allowed to do. Then, Advanced Criminal Procedure, also in her area of academic research, was removed from her teaching package for 2017-18 without any discussion regarding the same and provided to a white professor with less tenure and experience.

25.     Professor Sanders continued to raise concerns about these assignments and to request clarity on the criteria used in making decisions. Dean Adams chastised her for doing so,

telling her that her "continue efforts to get what you want with little concern for the impact of [sic] the effect of any changes on your colleagues or the College sows bad feelings and distrust by continuing to spread a false narrative."

26.     The College also subjected Professor Sanders to other disparate terms and conditions of employment such as: denying her work related travel requests; accusing her of being dishonest about attendance to conferences; taking away travel funds; assigning her an office that was segregated from other faculty; delaying her sabbatical by one year; assigning her to less attractive committees; denying her reimbursement for travel; questioning the use of the p-card on her behalf; focusing on negative versus positive feedback in her student reviews (including an obviously racially-tinged comment from a student that said, "STOP HIRING BASED ON AFFIRMATIVE ACTION").

27.     In May of 2017, the College had a faculty retreat. During this retreat, faculty were told that the College was creating two (2) Associate Dean of Faculty Development positions – one in Moscow and one in Boise. During the retreat, Professor Sanders expressed concern about the lack of female leadership within the College and asked Dean Adams how he planned to make sure there was gender representation in the College of Law leadership. Dean Adams was extremely dismissive of Professor Sanders and her concerns to the point that several faculty members expressed dismay at his treatment of her afterwards.

28.     On May 23, 2017, Professor Sanders emailed Dean Adams to let him know that she wanted to be considered for the Associate Dean position and that she was willing to delay her sabbatical planned for 2018-19 for another year so that she could serve in that position for two academic years.

29.     On June 7, 2017, Dean Adams sent out a document that set forth the qualifications for the Associate Dean positions which included the following: that the candidate be tenured or tenure-tracked, preferably tenured full professor, and a two-year commitment preferred. Professor Sanders met the listed qualifications as she was a tenured professor up for full professor in 2018 and willing to commit to two years.

30.     Upon information and belief, Dean Adams approached several white and/or male professors about serving in the Associate Dean position in Boise. Dean Adams did not approach Professor Sanders despite her earlier email.

31.     On June 26, 2017, Dean Adams sent an email faculty wide indicating that one individual in each location had expressed a *willingness* to serve as the Associate Dean. Both individuals were white men. The individual selected for the Boise associate deanship was a not tenured track professor and was set to retire as of December 2018. Thus, the email indicated that he would only serve in that position for one, instead of two years.

32.     On June 29, 2017, Professor Sanders responded to the announcement of the two men selected for Associate Dean positions by making a point that this selection meant all of the College of Law Deans were men. In response, several other faculty members also expressed concerns about the lack of female leadership.

33.     On July 6, 2017, Dean Adams send out another faculty wide email. He admitted that he had discussed the associate dean positions with many faculty -- female and male. However, he had not, in fact, discussed the position with Professor Sanders, the only female professor of color, and someone who had explicitly expressed interest.

34.     Dean Adams also not so subtly called Professor Sanders out for her concern about the gender disparity noted above by saying that he hoped faculty could refrain from the "insidious

gossip and efforts to 'stir things up' that lead to a toxic atmosphere and discourage people from serving."

35.     After the July 6, 2017 email, Professor Sanders requested an in-person meeting with Dean Adams. When he asked the purpose of the meeting request, she explained that she would like a formal explanation of why she was not chosen for the Associate Dean position.

36.     During a meeting with Dean Adams on October 31, 2017, in which he also invited the new Associate Dean who had been selected instead of Professor Sanders, she asked why she was not considered and for any insight on what she could do to be a successful candidate in the future. Dean Adams told Professor Sanders that there were three reasons she was not considered: 1) he did not believe she was serious; 2) her committee service was not strong enough; 3) he did not want to interrupt her sabbatical plans.

37.     In early February 2018, University Human Resources initiated a "climate review" of the College of Law. This review was allegedly the result of multiple complaints brought to leadership. Upon information and belief, several dozen faculty and staff were interviewed. Professor Sanders was interviewed in March of 2018. During her interview, she raised concerns about gender and racial equity.

38.     In February 2018, Dean Adams also announced that another white, male professor was selected to become the Boise Associate Dean for the following academic year (*i.e.,* 6 months later). Notably, this white male professor was hired at the same time as Professor Sanders and was on sabbatical at the time the announcement was made. As was the case in 2017, Dean Adams chose not to discuss this position with Professor Sanders despite the fact that he knew she was interested.

39.     In April of 2018, Professor Sanders applied for a summer stipend to support her academic scholarship. In the past, qualifying professors had been provided with a stipend with

priority going to those who had not yet attained full professor status. Professor Sanders had received a stipend in 2016 but taught summer school in 2017 and hence did not apply for a stipend in that year.

40.     The criteria for awarding the stipends included: years of service, project proposed (*i.e.,* extraordinary effort listed as two law review length articles, or one article plus work on a casebook, etc.); and service to the college (including, notably, serving as an Associate Dean).

41.     Professor Sanders' application indicated that she expected to author two full-length law review articles and a book chapter. She also planned to present a two-hour CLE at the Idaho State Bar's Annual Meeting, and outlined additional work that was planned for the summer. Professor Sanders also outlined her College and University service which was substantial in the 2017-2018 years.

42.     Professor Sanders was informed via a group email in May 2018 that she was not among those selected for the stipend. Two professors who started the same time as her and were of equal rank, both white men, were granted stipends.

43.     Professor Sanders asked Dean Adams for an explanation on why she was not granted a stipend. Dean Adams said that first priority is given to junior faculty and that the other priority is given to those will a heavy service load, like the Associate Dean position that she was passed over for. However, there were several tenured full professors, white and/or white and male, who received the stipend and who did not serve in those positions. When Professor Sanders raised some of these points, Dean Adams told her that because she was raising issues of pay disparity and disparate impact he would not be responding further via email. Professor Sanders then asked how her concern would be addressed if not via email. There was no further response from Dean Adams on this topic.

44.    On June 8, 2018, it was announced that Dean Adams was stepping down as Dean and would go back to being a regular faculty member.

45.    An Executive Summary of the climate and culture review of the College of Law, dated September 20, 2018, documented that leadership was aware of multiple complaints including concerns of "disrespectful, uncivil and abusive communication, gender bias and/or sex discrimination, poor leadership, lack of transparency in process, a perception of favoritism in the allocation of resources and poor morale amongst staff and faculty members." The Executive Summary noted that the review had been sent to John Wiencek, Provost & Executive Vice President in April of 2018.

46.    The Executive Summary documented a perception that "racial diversity is not highly valued by the College of Law administration and faculty body," and gender bias specific to communication issues and lack of female or diverse senior leadership within the College.  Despite recognizing the assertions of racial/gender bias, human resources divested itself of the "purview . . . to make an overall judgment on," and instead referenced referring those issues to the Office of Civil Rights and Investigations "as appropriate."

47.    In November of 2018 the Executive Summary was shared with the College of Law faculty by Interim Dean Jerry Long ("Dean Long" or "interim Dean") along with a cover letter from Dean Long. The cover letter was characterized by him as "a 'moving forward' document," and listed out goals or ideals the College might have moving forward. This letter contained no recognition of any issues with racial or gender disparities or biases and instead focused largely on the divisions between the two campuses – Boise and Moscow. The goals and ideals did not include any racial or gender diversity or anti-discrimination topics.

48.     During a faculty meeting on November 14, 2018 regarding this same topic, there was only minimal discussion of the race/gender concerns, which were presented as "perceptions" versus realities. Dean Long essentially told Faculty that they needed to take those issues to the University's Office of Civil Rights and Investigations.

49.     Additionally, during the 2017 faculty retreat and thereafter, Professor Sanders and others were led to believe that the College was working on hiring a consultant who would review and perhaps train the College on race, gender and perhaps other diversity issues. Just prior to this November 2018 faculty meeting and thereafter, it became clear that any consultant hired would address broader operations and culture issues, instead of a diversity consultant. The University further noted that only after working through the climate and culture review would it determine if further efforts on diversity might be warranted.

50.     In other words, the University and College of Law specifically were willing to have the diversity and discrimination concerns that clearly existed at the college take a seat at the back of the bus until after they could sort through other concerns.

51.     During Professor Sanders' February 2019 performance review, the interim Dean specifically referenced her EEOC charge on more than one occasion. He specifically told her that his opinion was that certain incidents were the result of miscommunications rather than serious problems. The interim Dean also specifically questioned Professor Sanders about whether she was attempting to get a permanent job at the law school where she was serving as a visiting professor during part of her sabbatical.

52.     The interim Dean made clear during the review and in his written performance evaluation that he did not believe that Professor Sanders should have received a course release in the spring of 2018 and that he would not grant course releases going forward except in rare

circumstances. Professor Sanders felt obligated to justify her course release, which only came about as a result of negotiations with the University Ombudsman Barbara Beatty and then Associate Dean Barbara Cosens. The performance review also acknowledged Professor Sanders' interest in leadership positions within the College. The interim Dean noted that the "transition for faculty to administration . . . requires a set of skills, attitudes, and perspectives that often aren't required of faculty."

53.     Merit raises were provided by the interim Dean in the spring of 2019. Professor Sanders did not receive a merit increase. According to the interim Dean, he used excellence in teaching and service to the College beyond what is normally required as his two criteria. Professor Sanders' February 2019 review noted that she "is an excellent teacher and scholar, and we value her contributions to the College of Law." Professor Sanders was on sabbatical in 2018-19 and hence did not have service obligations that year.

### FIRST THROUGH FIFTH CLAIMS FOR RELIEF
**[Discrimination in the Terms and Conditions of Employment in Violation of: 1) § 1981; 2) § 1983; 3) Title IX; 4) Title VI; and 5) Title VII]**

54.     Plaintiff realleges and incorporates by reference all paragraphs set forth above.

55.     The University operates an educational program and receives federal financial assistance.

56.     The University, by and through its administrators, acted under color of law with respect to the employment related decisions it made vis-à-vis Professor Sanders as outlined herein.

57.     Those decisions were made and/or ratified by the Dean of the College of Law.

58.     The University acted with deliberate indifference toward its obligation to provide a workplace free from race and gender discrimination.

59.    Defendants treated Professor Sanders differently because of her race and/or gender in the terms and conditions of her employment. This includes but is not necessarily limited to:

a.   Changes to her teaching package – added course credits, removing and/or changing the courses she taught or requested to teach;

b.   denying her work-related travel requests;

c.   accusing her of being dishonest about attendance to conferences;

d.   assigning her to office space segregated from the other professors;

e.   taking away travel funds;

f.   delaying her sabbatical by one year;

g.   assigning her to less attractive committees;

h.   denying her reimbursement for travel;

i.   questioning the use of the p-card on her behalf; and,

j.   focusing on negative versus positive feedback in her student reviews.

60.    Professor Sanders has suffered and has damages such as lost compensation and benefits and emotional harm.

61.    Plaintiff seeks only prospective and/or injunctive relief under §1981 and §1983 against Defendants Adams and Long in their official capacity, unless other relief if permitted by law.

62.    Plaintiff seeks all available damages including punitive damages against Defendant Adams in his personal capacity under §1981 and §1983 as his actions were taken in reckless disregard for Plaintiff's civil rights.

## SIXTH THROUGH TENTH CLAIMS FOR RELIEF
### [Failure to Promote in Violation of: 6) § 1981; 7) § 1983; 8) Title IX; 9) Title VI; and 10) Title VII]

63.     Plaintiff realleges and incorporates by reference all paragraphs set forth above.

64.     The University operates an educational program and receives federal financial assistance.

65.     The University, by and through its administrators, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

66.     Those decisions were made and/or ratified by the Dean of the College of Law.

67.     The University acted with deliberate indifference toward its obligation to make employment decisions including promotions without regard to race and/or gender.

68.     Defendants discriminated against Professor Sanders based on her race and/or gender by failing to consider for promotion and/or promote her to the Associate Dean position in favor of a white men.

69.     Professor Sanders suffered and has damages such as lost compensation and benefits and emotional distress.

70.     Plaintiff seeks only prospective and/or injunctive relief under §1981 and §1983 against Defendants Adams and Long in their official capacity, unless other relief if permitted by law.

71.     Plaintiff seeks all available damages including punitive damages against Defendant Adams in his personal capacity under §1981 and §1983 as his actions were taken in reckless disregard for Plaintiff's civil rights.

## ELEVENTH THROUGH FIFTEENTH CLAIMS FOR RELIEF
### [Pay Discrimination in Violation: 11) § 1981; 12) § 1983; 13) Title IX; 14) Title VI; and 15) Title VII]

72.     Plaintiff realleges and incorporates by reference all paragraphs set forth above.

73.     The University operates an educational program and receives federal financial assistance.

74.     The University, by and through its administrators, acted under color of law with respect to the employment related decisions such as the pay decisions outlined herein.

75.     Those decisions were made and/or ratified by the Dean of the College of Law.

76.     The University acted with deliberate indifference toward its obligation to make employment decisions including pay decisions without regard to race and/or gender.

77.     Defendants denied Professor Sanders a summer stipend in 2018 and a consideration for merit increases in 2016-2018 because of her race and/or gender and race.

78.     Professor Sanders has suffered and has damages such as lost compensation and benefits and emotional harm.

79.     Plaintiff seeks only prospective and/or injunctive relief under §1981 and §1983 against Defendants Adams and Long in their official capacity, unless other relief if permitted by law.

80.     Plaintiff seeks all available damages including punitive damages against Defendant Adams in his personal capacity under §1981 and §1983 as his actions were taken in reckless disregard for Plaintiff's civil rights.

## SIXTEETH THROUGH TWENTIETH CLAIMS FOR RELIEF
### [Hostile Work Environment in Violation of 16) § 1981; 17) § 1983; 18) Title IX; 19) Title VI; and, 20) Title VII]

81.     Plaintiff realleges and incorporates by reference all paragraphs set forth above.

82.    The University operates an educational program and receives federal financial assistance.

83.    The University, by and through its administrators, acted under color of law with respect to creating, maintaining and/or condoning a hostile work environment for Professor Sanders based on her race and/or gender and/or in retaliation for her protected activities.

84.    These actions and in actions were made and/or ratified by the Dean of the College of Law.

85.    The University acted with deliberate indifference toward its obligation to not subject employees to a hostile work environment on the basis of race, gender and/or for retaliatory reasons.

86.    Professor Sanders was subjected to insulting, humiliating and/or discriminatory conduct related to her gender or race. Such conduct was unwelcomed.

87.    The discriminatory and hostile acts described here in were severe and/or pervasive and altered Professor Sander's the conditions of her employment making it more difficult for her to do her job, take pride in her work and to desire to stay in her position.

88.    Professor Sanders perceived the environment to be abusive or hostile.

89.    A reasonable black woman in her circumstances would consider the environment to be abusive or hostile.

90.    The University is vicariously liable to the hostile environment created, maintained and/or condoned by its supervisors including Dean Adams.

91.    Professor Sanders has suffered and has damages such as emotional harm.

92.     Plaintiff seeks only prospective and/or injunctive relief under §1981 and §1983 against Defendants Adams and Long in their official capacity, unless other relief if permitted by law.

93.     Plaintiff seeks all available damages including punitive damages against Defendant Adams in his personal capacity under §1981 and §1983 as his actions were taken in reckless disregard for Plaintiff's civil rights.

### TWENTY-FIRST THROUGH TWENTY-FOURTH CLAIMS FOR RELIEF
[Retaliation in Violation of: 21) § 1981; 22) Title IX; 23) Title VI; and, 24) Title VII]

94.     Plaintiff realleges and incorporates by reference all paragraphs set forth above.

95.     The University operates an educational program and receives federal financial assistance.

96.     The University, by and through its administrators, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

97.     Those decisions were made and/or ratified by the Dean of the College of Law.

98.     The University acted with deliberate indifference toward its obligation to not subject employees who engage in protected activity to adverse actions.

99.     As early as July of 2014, Professor Sanders raised concerns about unequal treatment, discrimination and bias.  Since then, Professor Sanders has continued to raise concerns about employment related decisions she suspected, in good faith, were discriminatory because of race and/or gender. For example:

      a.     At various times beginning after the fall of 2015 Professor Sanders spoke to the University Ombudsman about concerns of discrimination/retaliation;

      b.     In June of 2017, Professor Sanders pointed out the lack of female leadership in response to the news that the Dean had found two white men willing to fulfill the

role of Associate Deans, even though Professor Sanders had specifically indicated interest in doing the same;

    c.  In March of 2018, Professor Sanders was interviewed as part of Human Resources Climate and Culture review;

    d.  In June of 2018, Professor Sanders filed a charge of discrimination with the Equal Employment Opportunity Commission.

100.    In response to raising these concerns, she has been subjected to a pattern of retaliatory behaviors including but not limited to the following:

    a.  disparate treatment in the terms and conditions of her employment such as teaching assignments, denying her work related travel requests; accusing her of being dishonest about attendance to conferences; taking away travel funds; delaying her sabbatical by one year; assigning her to less attractive committees; denying her reimbursement for travel; questioning the use of the p-card on her behalf; focusing on negative versus positive feedback in her student reviews, chastising her to having received a course release;

    b.  insults, demeaning behaviors, and, otherwise being subjected to hostile terms and conditions which negatively impacted her work atmosphere; and,

    c.  being passed over for promotion, pay increases and summer stipend;

101.    There is a causal link between Professor Sanders' protected activity and the adverse actions, pattern of discrimination and harassment she has suffered.

102.    Professor Sanders has suffered and has damages such as lost compensation and benefits and emotional harm. Plaintiff seeks only prospective and/or injunctive relief under §1981

and §1983 against Defendants Adams and Long in his official capacity, unless other relief if permitted by law.

103.    Plaintiff seeks all available damages including punitive damages against Defendant Adams in his personal capacity under §1981 and §1983 as his actions were taken in reckless disregard for Plaintiff's civil rights.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants, and award the following relief:

a.      Back pay, in amounts to be determined at trial;

b.      Compensatory and consequential damages;

c.      Front pay;

d.      Injunctive and/or declaratory relief;

e.      Prospective relief;

f.      Punitive damages;

g.      Pre-judgment and post-judgment interest at the highest lawful rate;

h.      Attorneys' fees and costs of this action, including expert witness fees, as appropriate; and

i.      Any such further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 23rd day of December, 2019.

**STRINDBERG & SCHOLNICK, LLC**


/s/ Erika Birch
Attorneys for Plaintiff