# ATTACHMENT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT IDAHO


SHAAKIRRAH R. SANDERS,                    )
                                          )
                    Plaintiff,            )
                                          )   Case No. 3:19-CV-00225-BLW
vs.                                       )
                                          )
THE UNIVERSITY OF IDAHO, COLLEGE          )
OF LAW, a public university               )
governed by the BOARD OF REGENTS          )
OF THE UNIVERSITY OF IDAHO aka            )
the STATE BOARD OF EDUCATION, an          )
executive department of the STATE         )
OF IDAHO, and MARK ADAMS, former          )
Dean of the College of Law, in            )
his official and individual               )
capacity, and JERROLD LONG,               )
interim Dean, in his official             )
capacity,                                 )
                                          )
                    Defendants.           )
_____)



REMOTE VIDEOTAPED DEPOSITION OF JERROLD LONG

October 14, 2020

Boise, Idaho




Reported by: Rebecca Martin, CSR #1108, RPR, CRR

```
 1          A.   That's okay.  I understand.
 2          Q.   Okay.  Do you have any materials in
 3     front of you or accessible to you?
 4          A.   I do not.
 5          Q.   Okay.
 6          A.   Other than water and coffee.
 7          Q.   Those are obviously acceptable.
 8          MS. BIRCH:  Bentley, who is in the room with
 9     you, for the record?
10          MR. STROMBERG:  Well, Tully just got here.
11     It's just Tully, me, and Jerry.
12          MS. BIRCH:  Good morning, Tully.
13          MR. FITZMAURICE:  Good morning, Erika.
14          Q.   (BY MS. BIRCH) Dean Long, you've
15     recorded an open forum that Professor Sanders
16     organized and moderated regarding diversity issues
17     in January of 2020 at the College of Law, correct?
18          A.   I asked Brad Neal, and he recorded it.
19          (Clarification by the court reporter.)
20          THE WITNESS:  Brad Neal.  He's our IT
21     manager.
22          Q.   (BY MS. BIRCH) You did not tell
23     Professor Sanders ahead of time that you had asked
24     Brad Neal to record the open forum?
25          A.   No.
```

1        Q.   And you did not ask Professor Sanders

2   for consent or permission to record the open forum,

3   correct?

4        A.   No.

5        Q.   I'm going to go to 1.41032.

6             Dean Long, you are looking at what has

7   been marked as Exhibit 124.  It's Bates 1.41032.

8             Do you recognize this e-mail?

9        A.   Yes.

10       Q.   It appears to be an e-mail that you sent

11  to Professor Sanders on January 23rd, 2020,

12  disclosing that you asked Brad if he could record

13  the meeting for you.

14            You say:  Since I would not be able to

15  be there but wanted to see what you discussed.

16            Why did you send this e-mail when you

17  sent it, at 5:13 p.m. on January 23rd?

18       A.   Because that's when I realized I hadn't

19  told her that I was going to record it.

20       Q.   Did anyone tell you that she or others

21  at the forum had noticed that they were being

22  recorded at some point during the forum?

23       A.   Yes, Sande Schlueter let me know.

24       Q.   When did she let you know?

25       A.   Sometime right -- I mean, it was

1  sometime in this period.  I don't know.  It was --

2  I was upstairs working, and I think she sent me an

3  e-mail sometime during the meeting.  I don't know

4  if it was, like, five minutes before this, 20

5  minutes before this, two minutes.

6        **Q.    Okay.  You said she sent you an e-mail**

7  **during the meeting?  Do you mean during the forum?**

8        A.    Yeah.  She was participating in the

9  meeting, at least that's what I understood.

10       **Q.    Okay.  Do you recall what she said in**

11 **her e-mail?**

12       A.    I don't -- no, I don't recall what the

13 e-mail said.

14       **Q.    You write in this e-mail to**

15 **Professor Sanders that you were sorry, you didn't**

16 **intend it to be a surprise.**

17            **You say:  It's only for me to see, but I**

18 **understand if that bothers you.  Please let me know**

19 **if you have concerns.**

20            **So did you appreciate why it might be**

21 **bothersome to Professor Sanders to have had this**

22 **open forum recorded without her knowledge or**

23 **consent?**

24       A.    To the extent -- I'm -- if you're asking

25 that I understood what -- I guess I can answer

```
 1    partly.
 2            So I can understand, yes, that -- that's
 3    why I told her.  The extent to which it upset her,
 4    no, I couldn't understand that.
 5            I don't know if that answer makes sense.
 6        Q.   I'm not sure it did.  So maybe explain
 7    it.
 8        A.   Well, so -- re-ask the question to make
 9    sure I'm responding to the right question because I
10    think I started thinking past it.
11        Q.   So I think the question was along the
12    lines of:  You could appreciate why it might be
13    bothersome to Professor Sanders to have had this
14    open forum recorded without her knowledge or
15    consent?
16        A.   Yes, I think that's appropriate.
17        Q.   You also said in here that "it," meaning
18    the recording, was only for you to see.
19            Was that a true statement?
20        A.   It was true so far as I could tell her.
21        Q.   I'm not sure I know what you mean by
22    that.
23            You wrote:  It's only for me --
24        A.   It was recorded for me -- sorry.  Go
25    ahead.
```

1        MR. STROMBERG:  I just cautioned him because

2   you guys are talking over one another.

3        **Q.   (BY MS. BIRCH) Yeah, and I should have**

4   **said at the beginning, just as a reminder from your**

5   **last deposition, Dean Long, that in order to have a**

6   **clean record, we need to try not to interrupt each**

7   **other.  So maybe --**

8        A.   I know.

9        **Q.   -- if we just try to take a pause before**

10  **you answer and before I ask my next question, we'll**

11  **hopefully avoid doing that.**

12          **So you wrote in the e-mail to**

13  **Professor Sanders that the video was only for you**

14  **to see, and that you asked that it would be**

15  **recorded because you would not be able to make it**

16  **there.**

17          **My question is:  Are those accurate**

18  **statements?**

19       A.   The second is.  I had too much work that

20  day, so I couldn't attend.

21          I was working with the university

22  ombuds, which is a confidential process, and -- so

23  if we back up, Professor Sanders had indicated

24  after her first community forum that she did not

25  feel comfortable moderating and thought we should

```
 1   find somebody else to moderate.

 2           So I had asked the ombuds if this was

 3   the type of thing -- I had met with -- was meeting

 4   with the ombuds about how to manage this entire --

 5   biases, as to how to manage all of this.  And

 6   during that I asked her if she would be capable of

 7   moderating these meetings.

 8           And recommended to Professor Sanders

 9   that the ombuds wouldn't be able to moderate, not

10   on the days that Professor Sanders had requested,

11   and that I couldn't attend those either.

12           Then the ombuds asked if it would be

13   possible for me to have it recorded so she could

14   see how things went, what the issues were.  And

15   that was, in fact, the motivation to have it

16   recorded.

17           I wanted to see it as well.  It wasn't

18   just for the ombuds.  I wanted -- since I couldn't

19   be there.  But that was the first I thought of

20   actually -- that was kind of the -- what crossed

21   the threshold.

22       Q.   So just so I understand your testimony,

23   are you saying that the reason you asked Neal to

24   record the forum was upon request of the

25   ombudsperson?
```

1        A.   It was a combination of factors, but I
2   think that was kind of the primary factor, yes.
3        **Q.   And the name of the ombuds person?**
4        A.   Laura Smythe.
5        **Q.   And so when you told Professor Sanders**
6   **in this e-mail on January 23rd that the recording**
7   **was only for you to see, that was not accurate, was**
8   **it?**
9        A.   Well, not strictly accurate, no.  I was
10  protecting the confidential communication with the
11  ombuds.
12       **Q.   Okay.  So but just to be clear:  The**
13  **statement that you -- the representation that you**
14  **made to her was not an accurate one?**
15       A.   No.
16       **Q.   You're looking at what's been marked as**
17  **Exhibit 125.  It's Bates 1.41048.**
18            **This is a response e-mail from**
19  **Professor Sanders back to you that same date,**
20  **January 23rd, at 8:18 p.m.**
21            **She told you in this e-mail that she**
22  **felt discomfort in the room and specifically**
23  **mentioned the lack of notice if we were recorded.**
24            **She writes:  I also questioned whether**
25  **meeting participants could be recorded without**

```
 1   consent.
 2             She told you in this e-mail on
 3   January 23rd that the lack of notice or consent was
 4   a very serious issue for her.
 5             And she listed specific questions that
 6   she had that are outlined in this request.
 7             Did you ever respond to this e-mail from
 8   Professor Sanders?
 9        A.   Would you scroll down so I can see the
10   whole e-mail before I respond?
11        Q.   You bet.
12        A.   I don't think so, I think is my answer,
13   at least that I can see.  I don't think I responded
14   to this.
15        Q.   Okay.  The questions that she asked
16   included:  What was the process for considering the
17   request to record?  Can anyone make a request or
18   only the dean?  Do you have thoughts about how to
19   address the failure to notify participants of the
20   recording and the failure to seek consent of the
21   recording?  And then she also asked if there were
22   any in the meeting who were aware of the recording.
23             So you don't recall responding to any of
24   those questions?
25        A.   We did have a conversation at one point
```

```
 1   were.
 2          But to your direct question:  Yeah, I
 3   think there's all kinds of things that happen
 4   that -- you know -- although, I frankly don't know
 5   that I could conjecture right now what they would
 6   be.
```

 7   **Q.   So you said you wanted to understand**
 8   **that if there were issues and concerns.**
 9          **For these particular forums, you**
10   **understood, did you not, Dean Long, that the issues**
11   **and concerns being discussed in these forums were**
12   **related to concerns about gender, race, and perhaps**
13   **other categories of discrimination or harassment**
14   **within the College of Law?**

```
15          A.   I think that's too narrow.  I wouldn't
16   say -- they were broadly characterized as being
17   about the climate and culture at the college, and
18   that's a much bigger issue than specifically
19   discrimination or harassment.
```

20          **Q.   Did you go to the first forum?**

```
21          A.   I did.
```

22          **Q.   And there were topics discussed during**
23   **the first forum that dealt with issues of**
24   **discrimination, correct?**

```
25          A.   Yeah, among others.
```

1      Q.   You are looking at what's been

2  previously marked as Exhibit 126.  It's Bates

3  1.41073.  It's an e-mail that Professor Sanders

4  sent to you the following day, on January 24th,

5  2020.

6           It looks like she CC's several people,

7  including the president of the university and the

8  faculty.  It does not appear that any students were

9  copied on this e-mail communication; is that

10  correct?

11      A.   It doesn't look like it.  I can't see

12  the BCC line, but --

13      Q.   Well, do you have any knowledge that

14  this e-mail was ever blind-copied to students?

15      A.   No.  I'm just saying I don't know.  I

16  mean, I can't know that it wasn't, is all I meant.

17      Q.   Were you upset that Professor Sanders

18  had copied the president and faculty on this

19  e-mail?

20      A.   I suppose.  But it's -- I mean -- I

21  don't know if upset is the right word.  Yeah, I

22  don't know.  I'd have to -- thinking about what my

23  reaction would have been a year ago, I'd say

24  frustrated maybe.

25      Q.   Okay.  What was frustrating about it to

1  you?

2      A.   This is part of -- for whatever reason,

3  we have this -- developed this pattern at the

4  college, some people, and myself probably in the

5  past as well, that we kind of blanket everybody,

6  the faculty listerv being the primary one, with

7  everything.

8           And it feels like there are

9  conversations that don't need to be blasted out to

10  the whole world.  And this is a frustration for

11  many members of the faculty, that we use our

12  faculty listerv far too much.

13      Q.   Any other frustrations you had?

14      A.   That's the primary one, I think.

15      Q.   Well, let me know if you think of

16  anything else.

17      A.   Certainly.

18      Q.   So this e-mail string was initially

19  started with an e-mail from you earlier in the day,

20  at 7:51 a.m., where you sent an e-mail to all

21  students, all faculty, and all staff.

22           Do you remember sending this e-mail?

23      A.   I do.

24      Q.   You say:  Yesterday, I realized that I

25  would not be able to attend Professor Sanders'

1   public meeting on the College's culture and

2   climate.

3            What happened on that day that prevented

4   you from attending?

5       A.   There were two things going on.  It's --

6   well, two big things going on.  There's much

7   more -- (phone ringing) -- in my days.

8            But that was the middle of the faculty

9   evaluation kind of season at the beginning of the

10  year, which means I had in addition to about 30 --

11  I don't remember what we had last year.  I think we

12  had 37 last year, so 37 faculty evaluations that I

13  have to do, which includes reading all their course

14  evaluations, and this is hundreds and hundreds of

15  pages of course evaluations.  So it's just -- that

16  period had been overwhelming in addition to the

17  other things that I do.

18           And then I had to leave -- I believe

19  this is -- I believe this is I had to leave to pick

20  my wife up at the airport.

21      Q.   Where was she flying -- she was flying

22  back to Pullman or Moscow?

23      A.   No.  No.  I was in Boise.  She was

24  coming to Boise.  We had a -- I apologize.  We had

25  all these flow together, but I had an event -- I

1   It just -- that wasn't something that I imagined.

2        **Q.   Professor Sanders then responds to this**

3   **e-mail -- keeping in mind that you still had not**

4   **responded to her e-mail from the previous day --**

5   **and asks if future meetings would be recorded.  If**

6   **so, a clarification of the college's recording**

7   **policy in this context would be helpful.**

8            **Do you recall responding to this**

9   **particular e-mail from Professor Sanders?**

10       A.   I don't think so, but my answer would

11  be -- I know had conversations about that.  Like I

12  said before, I don't recall exactly how those

13  conversations occurred.

14       **Q.   Okay.  I'll represent to you that, at**

15  **least in an e-mail form, we don't have any response**

16  **from the university to this e-mail.**

17           **So are you saying you responded not in**

18  **e-mail to her?**

19       A.   Like I said, I remember having a -- it

20  probably was over the phone.  I'm pretty sure I did

21  not respond to this e-mail though.

22       **Q.   Does the college have a recording**

23  **policy?**

24       A.   Other than what I -- this is what I told

25  Professor Sanders -- other than the -- for valid

1  educational purposes and public events, that is how

2  I've understood the policy and implemented the

3  policy.

4         Q.    Is there a written policy that exists?

5         A.    No.

6         Q.    So we talked at the beginning about this

7  top e-mail that she sent where the students were

8  not included.

9               Do you recall responding to that e-mail

10 from Professor Sanders?

11        A.    Excuse me.  I don't recall if I

12 responded to that.

13        Q.    In that e-mail she says that you -- your

14 classification of the meeting as public -- she does

15 not believe that your classification of the meeting

16 as public is sufficient to explain your failure to

17 notify and seek consent.

18              Do you see that?

19        A.    Yeah.

20        Q.    She also writes that:  Several students

21 have approached her today about this singling out

22 of the culture and climate meetings.

23              Do you see where she writes that?

24        A.    Yeah.  Third line, second or third line.

25        Q.    Yep.  She then writes that she finds

1    this prospect more than disturbing and now fears

2    students no longer want to participate.

3              That's the next sentence, correct?

4        A.   Yeah.

5        Q.   Did you say yes?

6        A.   Yes.  Sorry, I'm having allergy issues,

7    so my voice kind of disappears sometimes.

8        Q.   At the end of that paragraph she writes

9    that it would be helpful for you to explain why

10   your actions won't have a chilling effect on the

11   speech of the meeting participants.

12             Could you appreciate her perspective

13   about being concerned that recording without

14   disclosing ahead of time could have -- particularly

15   in this context, could have a chilling effect on

16   participation at future meetings like this?

17       A.   I'm kind of torn on this one, to be

18   honest, because the -- what I understood -- and I

19   did attend the first one.  The purpose of the

20   meetings was so that the faculty administration

21   could hear the students' concerns.

22             And so -- and maybe I misread this, but

23   I -- you know, the fact that they want to come to

24   us to express their concerns, maybe I thought that

25   recording was -- I don't know.  I mean, I'm not

1          MS. BIRCH:   Thank you.

2          Q.   (BY MS. BIRCH) So could you appreciate

3     why Professor Sanders would be concerned about the

4     chilling effect of having this meeting recorded

5     without notice or consent given?

6          A.   I think the answer is yes and no.

7          Q.   Okay.   Why could you appreciate it?

8          A.   Well, because she told me that it -- so

9     I try to take into account the perspective of

10    others on the faculty, and she told me that's the

11    way she felt, and so I thought about it and I think

12    I could understand her perspective.

13         Q.   She also writes in this e-mail that you

14    should feel free to attach any Idaho Code, Idaho

15    rules, or U of I protocols that you feel support

16    your right to have -- having recorded this without

17    notice and consent.

18              Did you ever communicate to

19    Professor Sanders any code, rules, or protocols

20    that you feel like legitimized your recording of

21    the event?

22         A.   No.

23         Q.   We're looking at what's been marked as

24    Exhibit 127.   It's Bates -- starts with Bates

25    1.41065.

1               This is an e-mail exchange.  If I can

2       get my mouse to work.

3               So in this chain is an e-mail from you

4       to Neal Bradley, who I think is the person you said

5       you directed to record it on January 23rd at

6       10:09 a.m.

7               And you asked:  Brad, can we record

8       this?  The ombudswoman has a meeting that conflicts

9       but would like to watch it later.

10               So you represented to Brad that the

11      reason you wanted it recorded was so that the

12      ombudswoman could watch it later, correct?

13          A.   Yeah.

14          Q.   You referred to the ombudsperson, I

15      think what you said was, "managing all of this."

16               What did you mean by that?

17          A.   That is not what I said she was doing.

18      I was reaching out to her for help with how to

19      manage the climate and culture issues facing the

20      college -- (inaudible.)

21           (Clarification by the court reporter.)

22          THE WITNESS:

23               I'm sorry.  I was moving in my chair and

24      it was making noise.

25               For help -- so there were ongoing

```
 1  climate and culture issues at the college, and I

 2  was asking for her help with how to manage those.

 3       Q.   (BY MS. BIRCH) So you disclosed that to

 4  Neal.

 5            Had you had conversations or was he

 6  aware that the ombuds was somehow advising you or

 7  involved in the process?

 8       A.   Other than this, no.

 9       Q.   "Other than this," meaning your e-mail?

10       A.   I think so.  Yeah, that's what I meant.

11  I think that other than this, he wouldn't have

12  known.

13       Q.   If we go up just a bit, it looks like he

14  says:  Sure thing.  It will show that it's being

15  recorded on the screen.

16            And you mentioned that before.

17            Then you write:  That's fine.  If she

18  notices and complains, it's because I want to be

19  able to view it later.  I probably won't be able to

20  attend.

21            When you say "she notices and

22  complains," you're referring to Professor Sanders,

23  aren't you?

24       A.   That's correct.

25       Q.   So you were directing Neal to tell her
```

1    culling and genocide as a way to deal with climate

2    change?

3          A.    Yeah, I guess.  Like I said, that's how

4    it's been interpreted.  I think he had something

5    else in mind, but --

6          Q.    And it's your understanding that it was

7    this same student or a friend of that student who

8    asked about bringing guns on campus?

9          A.    Yes, he asked what the university's

10   policy was about having guns on campus.

11         Q.    So my understanding is that the Bellwood

12   Lecture happened at some point in October of 2019.

13                This is January 29th of 2020, which is

14   certainly closer in time to these issues

15   surrounding the recording of the open forum.  So I

16   just want to make sure your recollection is

17   accurate when you say that this exhibit that we

18   looked at, 129 -- we can put it back up if you need

19   us to -- was related to the Bellwood events as

20   we're sort of short-handing them or was it related

21   to the recording?

22         A.    Oh, it wasn't related to the recording.

23         Q.    Okay.

24         A.    So the Bellwood events -- event is still

25   going on.  The students are still upset about it.

1   And two of the students came up with another way to

2   piss everybody off just this week.

3           But there are a number of issues that

4   had happened, and we were dealing with it

5   throughout the winter, and the students continued

6   to be upset about it.

7           It wasn't just the -- I think it was the

8   24th or the 23rd of October.  It wasn't just that

9   event.  It was a number of events that continued

10  and still continue.

11      **Q.   What happened just -- did you say this**

12  **week or last week?**

13      A.   Yeah.  They changed their profile pics

14  to shrimp, which I didn't think was anything, but I

15  guess there's some cartoon in which there were Nazi

16  shrimp, and so the other students believed that

17  they are making their profile pictures shrimp to

18  support fascism is my understanding of it.

19      **Q.   Is it your understanding that**

20  **Professor Sanders initiated these open forums, the**

21  **first of which happened in November, as a result of**

22  **those events that were causing issues amongst the**

23  **students related to not only the Bellwood but some**

24  **other racially-insensitive issues?**

25      A.   Well, certainly the Bellwood.  Her first

Jerrold Long                                    October 14, 2020

```
 1   at times.
 2        Q.   Do you still have a copy of the recorded
 3   forum and the transcript?
 4        A.   It would be at the SharePoint link that
 5   was in the previous e-mail or this e-mail.  I don't
 6   remember where that was.
 7        Q.   Did you download the recording and the
 8   transcript?
 9        A.   No.
10        Q.   But you still have access to it?
11        A.   Yeah.
12        Q.   Did you go back and watch the video?
13        A.   No, I never ended up watching it.
14        Q.   You're looking at what's been marked as
15   Exhibit 131.  It starts with Bates 1.41103.
16             It's an e-mail between you and
17   Professor Sanders in April of 2020.  This is where
18   you're discussing a policy about recording.
19             Is this the communication that you
20   referred to earlier where you had some follow-up
21   communication about the policy?
22        A.   I believe so.
23        Q.   Okay.  So you told her:  The policy
24   remains to record all public events and other
25   events where there is a legitimate educational
```

```
 1            MS. BIRCH:  All right.  Let's take a break.
 2       (A recess was taken from 10:20 a.m. to 10:27 a.m.)
 3            (Deposition Exhibit No. 132 was marked.)
 4       Q.   (BY MS. BIRCH) We're back on the record.
 5  I think we got our technology to work, so let me
 6  put this exhibit in front of you.
 7            It's an e-mail -- it starts with an
 8  e-mail -- Oh, I'm sorry, it's been marked as
 9  Exhibit 132, and the initial Bates is 1.24522.
10            The e-mail chain starts with an e-mail
11  from you to Laura Smythe, the ombudsperson, on
12  January 9th, 2020.
13            You write:  Dear Laura, as you might
14  know, there is a perception among some at the
15  College of Law that we have some significant issues
16  with our culture and climate, particularly as it
17  relates to diversity and inclusion.
18            What did you mean by "a perception among
19  some"?
20       A.   Just what it says.  I -- you know, we're
21  an institution.  There are some people that think
22  we have significant problems and there are others
23  that think we don't, and then there are others that
24  think -- that are on the other side that kind of
25  perceive the issues quite differently.
```

```
 1            You say you're not in a position where
 2   it's really possible to tell her not to proceed,
 3   but I could ask her to let you -- meaning Laura --
 4   moderate if you're open to it.
 5            So was your intent as of January 20th --
 6   I'm sorry, January 9th, 2020, to have Laura take
 7   over as moderator for these forums?
 8       A.   That was my hope, yes.
 9       Q.   You understand that the deposition
10   notice you received required you to do a search for
11   text and e-mail on your personal devices for
12   anything related to Professor Sanders or her
13   lawsuit?
14       A.   That's not how I understand it.
15       Q.   Okay.  What did you understand you were
16   to do?
17       A.   Well, I'm not personally part of the
18   suit, and so I -- my employer cannot tell me to
19   reveal personal information.
20       Q.   Okay.  So did you not look on your
21   personal devices for discoverable information?
22       A.   I did.
23       Q.   Okay.  So I'm confused.
24       A.   I said I don't agree that I was required
25   to share anything, but I did search for it.
```

1   or the other.  I didn't discover anything that
2   would allow me to determine what happened one way
3   or the other.  I mean, there's just -- I couldn't
4   tell.  Because the students -- if they gave a
5   report, obviously is evidence.
6        **Q.   And what about Professor Sanders, what**
7   **she told you?**
8        A.   Well, that was part of what I
9   considered.  I mean, that's why this didn't end up
10  in her final evaluation.
11       **Q.   You also in that last paragraph say:  We**
12  **will need to discuss your use of community**
13  **listservs, specifically student listservs.  Your**
14  **recent e-mails have caused a number of our students**
15  **to question what is appropriate in our profession.**
16            **How many students raised those concerns?**
17       A.   I don't know, I think maybe four or five
18  or so.  It kind of came from multiple directions.
19       **Q.   Who did they raise those concerns to?**
20       A.   I had one, I think, sent directly to me.
21  That might not -- to Dean Ball, to Rebekah Cude.  I
22  kind of heard these comments from different
23  directions.
24       **Q.   What, if anything, did you do to**
25  **investigate the things that didn't come to you**

1  directly?

2      A.    Probably nothing.  This is how the

3  structure works.  It kind of has to work this way.

4  When Associate Dean Ball tells me that a student

5  came to her with a concern, that -- as dean of

6  students that's her job is to receive those

7  concerns.  And there's literally not enough time in

8  the -- we have two deans of students, and if I

9  re-investigated every concern that was presented to

10  them, that would be all I did.  So I trust their

11  assessment of it.

12      Q.    Okay.  Fair enough.

13          You say:  Your approach to communicating

14  with me is having a negative effect on our climate

15  and culture.  So you were referring to

16  communications that she was having with you

17  creating a negative effect.

18          What communications were you referring

19  to?

20      A.    I think probably the ones around the

21  recording.  I think that's probably what I was

22  thinking of, the open forum.

23      Q.    You say "probably."

24          Do you not remember?

25      A.    Not with certainty, no.

1          Q.   Can you think of other communications

2     that she was having with you that you would have

3     thought were causing a negative effect on the

4     climate and culture?

5          A.   I think that the original -- I might

6     have been speaking loosely when I said "with me."

7     I think the original response to the Bellwood was

8     not helpful, her original response to the Bellwood.

9          Q.   You tell her that the communications are

10    harming her relationships with students, her

11    colleagues, and the entire legal community.

12               Who were you referring to when you said

13    that it was referring -- it was harming her

14    relationships with her colleagues?

15         A.   A number of faculty expressed to me

16    concerns about how she was interacting, both staff

17    and faculty both.

18         Q.   Give me the list.

19         A.   I don't have a list.

20         Q.   Well, tell me who expressed concerns.

21         A.   I'm thinking.  So let's see.  Maureen

22    Laflin regularly -- she was regularly.  Monique

23    Lillard.  There was some which you might

24    characterize as implied:  John Rumel, David

25    Pimentel, Katie Ball.  I think those are the ones

```
 1   answer.
 2        Q.   (BY MS. BIRCH) Are you guessing, Dean
 3   Long?
 4        A.   No, I'm not guessing.  I'm trying to
 5   remember, and I don't have perfect recall of
 6   everything I was thinking about when this happened.
 7   But I know it was an issue that concerned me, and
 8   so it is likely that it was part of my assessment.
 9        Q.   And I understand you're not going to
10   have a perfect memory, and so if you don't -- if
11   you really don't recall, that's perfectly fine for
12   you just to tell me that you don't recall.  I just
13   don't want you to guess at things because that's
14   where we get inaccurate information.
15             So it sounds like you're saying that
16   you -- to the best of your recollection, you
17   believe it likely did factor in?
18        A.   Yes.
19        Q.   Okay.  Then your response was that you
20   were tied up in meetings, didn't have time to
21   review her e-mail carefully before we are scheduled
22   to meet this afternoon.
23             So it sounds like you were going to meet
24   about the evaluation that afternoon, so you were
25   going to reschedule to a later date.
```

1              Is it fair to say that the first time

2    Professor Sanders got a substantive response to any

3    of these issues was during the review session that

4    she had with you?

5         A.   Yeah.

6            (Deposition Exhibit No. 166 was marked.)

7         Q.   (BY MS. BIRCH) Professor Long, this

8    appears to be -- it's been marked as Exhibit 166

9    and appears to be the 2019 review you did for

10   Professor Sanders?

11        A.   That's correct.

12        Q.   Okay.  So the choices are either:  Meet

13   or exceeds expectations.  Yes or no.

14              So for Teaching and Advising, you said

15   no.

16              For Scholarship and Creative Activities,

17   you said yes for the fall, but to be determined for

18   the spring.

19              Outreach and Extension, you said yes.

20              University Service and Leadership, you

21   said no.

22              And Overall, faculty member met or

23   exceeded the expectations defined in the position

24   description, you also said no.

25              Correct?

```
 1          A.    That's correct.
 2          Q.    Okay.  And that's your signature?
 3          A.    Yes.
 4          Q.    Did you have input from anyone in
 5   composing this attachment that you put together?
 6          A.    I did.
 7          Q.    From who?
 8          A.    I asked for the vice provost's help.
 9          Q.    Is that still Torrey?
10          A.    Yes.
11          Q.    Anyone else?
12          A.    No.
13          Q.    You knew at this point in time obviously
14   that Professor Sanders had filed a federal lawsuit
15   in June of 2019 and she had named you as a
16   defendant in the case by this time?
17          A.    I don't remember when you amended the
18   complaint.  So, you know, for an extended period of
19   time I was not named, and I'm not named now in
20   my -- I'm only named in my official capacity.
21          Q.    That's right.  But you knew that she had
22   filed a lawsuit against the university?
23          A.    Yes.
24          Q.    Okay.  And her colleagues, including the
25   faculty and staff, knew that she had filed a
```

```
 1        A.   I don't remember.  I don't think so.  I
 2   mean, I was being over-cautious.  I didn't think it
 3   would happen, but I didn't know.
 4        Q.   So I want to ask you about some of the
 5   things in the evaluation narrative.  Under Teaching
 6   and Advising, you say that:  It's typical -- this
 7   is a typical request -- you're referring to her
 8   being asked to teach Con Law I to help the college
 9   manage some vacancies.
10             You say:  This is a typical request
11   under those circumstances, and the authority to do
12   so is clearly stated in university policy.
13             So a couple of questions:  What
14   university policy were you referring to?
15        A.   There's the provision in the FSH that
16   articulates the authority of the dean, which is
17   assign duties to faculty.
18        Q.   When we looked at this issue earlier, I
19   think we came to the conclusion that when
20   Professor Sanders was asked about the possibility
21   of taking over Con Law I, it wasn't due to a
22   vacancy issue.
23             Is that true?
24        A.   Yeah.  I'm -- apparently misremembered
25   when I wrote this.
```

1                On the second justification, you say:

2     It's untrue and inconsistent with the relevant

3     decisions of the faculty as recorded in our

4     minutes.

5                Do you believe that to be an accurate

6     statement?

7          A.    It is.

8          Q.    Okay.   Is it also true that the

9     curriculum committee considered and voted favorably

10    to support Professor Sanders' proposal to create

11    the First Amendment Seminar?

12         A.    That is true.

13         Q.    It looks like you do include in here

14    that students complained about Professor Sanders'

15    lack of office hours and unresponsiveness to

16    e-mail.

17                So I know you thought you probably did

18    include the office hours, but I thought you told me

19    that you didn't include the e-mail issue.

20         A.    I didn't think I had.   And you'll see

21    the rest of the paragraph focuses on the office

22    hours and the meetings.   I was remembering, like,

23    the body of the e-mail, I think.

24         Q.    And so in your mind, was this not

25    responding to student e-mails an issue that should

```
 1   have been considered in her performance evaluation?
 2          A.   If I -- I'm trying to remember how this
 3   went down.  So you asked:  Should it have been?  If
 4   I -- and apparently at least there you can see at
 5   the end I didn't start to feel comfortable about
 6   it.  If in reviewing it I felt comfortable that it
 7   was a problem, then yes, this is absolutely where
 8   it belongs.  It should be part of this.
 9          Q.   But do I understand your earlier
10   testimony correctly that you didn't provide
11   Professor Sanders with specifics and you didn't go
12   looking to verify specific examples?
13          A.   Yeah, I think that's accurate.
14          Q.   On the Outreach, you write that:  I
15   received reports from members of the legal
16   community, including several judges.
17               Did those reports go directly to you?
18          A.   It came through Rebekah Cude.
19          Q.   Okay.  And are the two judges we're
20   talking about Lorello and Moody?
21          A.   Yes.
22          Q.   Okay.  And were those both involving
23   issues that did not in fact occur during 2019?
24          A.   That's true.
25          Q.   Did you ever talk directly to either of
```

```
 1   proceed.
 2        MR. STROMBERG:  I think you should proceed
 3   how you intend to proceed, and I'm certainly
 4   willing to have that conversation with you.
 5        MS. BIRCH:  Okay.
 6        Q.   (BY MS. BIRCH) So, Dean Long, before you
 7   provided Professor Sanders with what we were just
 8   looking at, her written performance evaluation,
 9   Exhibit 166, you actually met with her in person --
10   yeah, it was in person in Moscow, correct?
11        A.   That's true.
12        Q.   And during that meeting, you did not
13   provide a draft of her written review; is that
14   correct?
15        A.   That's correct.
16        Q.   Do you recall during that meeting
17   telling her that you felt like we were not in a
18   space where we feel like it's working?
19        A.   Something along those lines, yeah.
20        Q.   And is the "we" --
21        A.   I don't know -- sorry.  I don't know if
22   that's direct quote, but --
23        Q.   Fair enough.
24             Is the "we" -- who do you mean by the
25   "we"?  The College of Law?  The university?
```

1        A.    No, me and her.  It felt like we,

2   Shaakirrah and I, were not in a space where our --

3   this relationship is working.

4        **Q.    Okay.  Do you recall telling her that**

5   **since her return from sabbatical things had become**

6   **increasingly complicated and it was difficult to**

7   **know how to act?**

8        A.    Yeah.

9        **Q.    Do you recall her telling you that you**

10  **had failed to respond to many of her e-mail**

11  **communications?**

12       A.    I don't recall that specifically, but

13  that wouldn't surprise me.

14       **Q.    Do you recall telling her that you did**

15  **not intend to respond to her communications?**

16       A.    I might have said that.

17       **Q.    Do you recall telling her that you were**

18  **upset that she had informed others outside the**

19  **College of Law about your recording her forum?**

20       A.    I don't think -- when that came up -- so

21  I don't think that's what it was about.  And I

22  don't think "upset" was the right word.  So what I

23  had said -- I said something like, you know -- I

24  can't remember exactly what it was, but I said it

25  was difficult for me to know how to respond to

```
 1   e-mails when you CC the president and OCRI and
 2   everybody.  That makes it hard, like, it's not just
 3   a communication between the two of us at that
 4   point.
 5            I don't recall an e-mail about the
 6   recording.  I thought it was about something else.
 7        Q.   Could it have been about the recording?
 8        A.   I doubt it.  I don't -- well, I wasn't
 9   bothered that she told everyone.  That was not
10   something I was hiding.  I told everyone.
11        Q.   I'm just asking what you recall from the
12   conversation with Professor Sanders.  So do you
13   recall telling her that you would have preferred
14   that she kept the recording issue between you and
15   she -- or her concerns about the recording between
16   the two of you?
17        A.   I mean, what I was trying to say was,
18   you know, we can work -- I think we could have
19   worked this out, I guess.  I mean, she might have
20   heard it differently than I thought I was saying
21   it.
22        Q.   Did you read from an e-mail from a
23   student who was questioning Professor Sanders'
24   e-mail that she sent about the recording?  Do you
25   recall that?
```

1          A.    Maybe.

2          Q.    **Did you only read from that one student**

3    **complaint?**

4          A.    Probably, if I did, yeah.  Again, I

5    think -- I think I was concerned that she would

6    think I was making stuff up, so I wanted an example

7    of what I had heard.

8          Q.    **So the example that you picked was a**

9    **student who was questioning the professionalism of**

10   **Professor Sanders' e-mail that she sent about the**

11   **fact that you had recorded the forum?**

12         A.    Yeah, I think so.

13         Q.    **Do you recall having any discussion with**

14   **her during the review about her service inside or**

15   **outside of the College of Law or university?**

16         A.    We certainly should have discussed that,

17   yeah.

18         Q.    **But do you remember discussing it?**

19         A.    Not specifically, no.

20         Q.    **Okay.  Do you have a general**

21   **recollection of having any discussion on those**

22   **topics?**

23         A.    We likely would have discussed her

24   attendance at faculty meetings -- or lack of

25   attendance.  But, again, I don't specifically

```
 1   remember, no.
 2        Q.   Okay.  What about discussion of her
 3   scholarship, including the fact that she had a
 4   recent publication in the Cornell Law Review?
 5        A.   You're asking if we discussed that?
 6        Q.   Yes.  Her scholarship in general or that
 7   publication in particular.
 8        A.   I don't know.  At that point, she had
 9   not provided me any information about her
10   sabbatical activities.
11        Q.   Okay.  But you knew she had gotten an
12   article published in the Cornell Law Review, right?
13        A.   If she had put it in her
14   self-evaluation, I would have known, yeah.
15        Q.   Would you agree that that's a
16   prestigious journal to be published in?
17        A.   I guess so.  I didn't express any
18   concerns about her scholarship.  Do I agree?  Yeah,
19   sure, Cornell is a prestigious school.
20        Q.   Do you know where they rank as far as
21   law reviews?
22        A.   No.
23        Q.   You mentioned the attendance at faculty
24   meetings.  Are you referring to her attendance at
25   these job-related meetings, job talks and faculty
```

1  | roughly half the faculty?

2  |       A.   It's about half.  That's the -- I think

3  | that might be incomplete if that's the one I'm

4  | thinking about.  But yeah, that's about half the

5  | faculty.

6  |       (Deposition Exhibit No. 167 was marked.)

7  |       Q.   (BY MS. BIRCH) So we're looking at

8  | what's been marked as Exhibit 167.  This is a

9  | response that Professor Sanders made to your

10 | attachment to her annual performance evaluation.

11 |           You recall receiving this document?

12 |       A.   Yeah, I do.

13 |       Q.   Okay.  What, if anything, did you do in

14 | relation to her performance evaluation once you

15 | received this?

16 |       A.   I sent it to the provost's office.  I

17 | asked Torrey if he thought there was any response I

18 | should give.  Torrey took a while to respond to me.

19 | He said, "Well, you can if we want, but then she

20 | has a chance to respond to that and ultimately she

21 | gets the final response."

22 |           And so I filed it --

23 |       Q.   Meaning you --

24 |       A.   -- with the provost.

25 |       Q.   So it's now part of her official

```
 1   personnel record?

 2        A.   Yeah.

 3        Q.   You mentioned earlier that you had a

 4   personal relationship with Torrey or some previous

 5   relationship?

 6        A.   Yeah, we served on the university

 7   curriculum committee together, so we knew each

 8   other and had a good working relationship.  I don't

 9   know him outside of work.

10        Q.   You didn't make any changes to the

11   evaluation before you submitted it to the provost?

12        A.   No.  If I had, I would have restarted

13   the entire process.  I would have had to have

14   shared it with Shaakirrah, and she would have had

15   the opportunity to respond to it.  I mean, this

16   is -- normally this is the final day that this

17   happens.

18        Q.   So there was that one rating where it

19   was a "to be announced."  Is that going to --

20   obviously, if you said you didn't change it, it's

21   still a "to be announced" rating in her official

22   file?

23        A.   To be determined.

24        Q.   Or to be determined?

25        A.   I don't -- well, so what -- what I --
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT IDAHO

SHAAKIRRAH R. SANDERS,               )
                                     )
                  Plaintiff,         )
                                     )   Case No. 3:19-CV-00225-BLW
vs.                                  )
                                     )
THE UNIVERSITY OF IDAHO, COLLEGE     )
OF LAW, a public university          )
governed by the BOARD OF REGENTS     )
OF THE UNIVERSITY OF IDAHO aka       )
the STATE BOARD OF EDUCATION, an     )
executive department of the STATE    )
OF IDAHO, and MARK ADAMS, former     )
Dean of the College of Law, in       )
his official and individual          )
capacity, and JERROLD LONG,          )
interim Dean, in his official        )
capacity,                            )
                                     )
                  Defendants.        )
_____)

REMOTE VIDEOTAPED DEPOSITION OF JERROLD LONG

VOLUME II

November 3, 2020

Boise, Idaho

Reported by: Rachel Nicole Barkume, CSR No. 1128, RPR, CRR

```
 1   Natives, which he characterizes as racist rhetoric.
 2           Do you recall getting involved related to any
 3   of those kinds of issues in the fall of 2019?
 4       A.   As I've noted, I don't recall specifically
 5   what this was about.
 6       Q.   Okay.  So you just have no recollection?  Is
 7   that right?
 8       A.   I -- not at the moment.  I can't think of what
 9   this might be about.
10       Q.   Okay.  Fair enough.
11           Do you recall that Professor Sanders proposed
12   hosting open forums for students to describe concerns
13   like this to faculty?
14       A.   There was a meeting -- there was a meeting of
15   the diversity committee which possibly was around this
16   time in which I believe she did.  And maybe did via
17   e-mail before that.  But it -- you'll -- you'll
18   undoubtedly show me an e-mail where I said I don't think
19   they're necessarily the best approach.
20       Q.   I'm not sure I am going to show you that
21   e-mail, but I was going to ask you that question.
22           So you recall that Professor Sanders proposed
23   hosting open forums.  And then my question was, were you
24   supportive of that effort.  And it sounds like, based on
25   what you previewed, you were not?
```

1          A.   I think there might be better ways to go about

2     it.  I don't think it's a -- it's a binary -- it's not

3     good, bad.  They obviously have their place.  My concern

4     was that they can often silence as well as encourage

5     people to talk, and so I'd hoped that there might be

6     maybe closer ways, if you will.

7          Q.   Closer ways?

8          A.   Like one-on-one, like, you know, ways to

9     support the students.  I didn't object.  I mean, she

10    had -- we -- she ended up doing them, but I just didn't

11    think it was the best approach.

12         Q.   And you said that publicly to the --

13         A.   I did.

14         Q.   -- faculty and staff.

15              Did you feel that Professor Sanders advocating

16    for these open forums was threatening towards you?

17         A.   Toward me?  No.

18         Q.   Did you feel like her entire plan with hosting

19    these open forums was to generate criticism of you?

20         A.   No.  I mean, I wouldn't say it that way.  I

21    don't know what she was thinking.  It's possible I felt

22    it at times, but I don't know.

23         Q.   But -- but you didn't think that was her --

24    the purpose behind her wanting to host these open

25    forums, to generate criticism of you?

```
 1        A.   I don't recall.
 2        Q.   Other faculty disagreed with -- with your --
 3   your thoughts about it and thought that it was a -- a
 4   good idea to have these open forums; is that fair to
 5   say?
 6        A.   I can't disagree with it.
 7        Q.   Okay.  Let's look at what's been marked as
 8   Exhibit 192.
 9             (Exhibit No. 192 marked for
10             identification.)
11        Q.   (BY MS. BIRCH) So this is October 3rd, 2019.
12   This is the e-mail from Professor Sanders proposing that
13   the college host an open forum for students to express
14   concerns about culture and climate.  She also says, "No
15   response from the faculty and college is problematic in
16   light of what Sam Newton shared at yesterday's faculty
17   meeting."
18             Do you -- do you remember what he shared at
19   the faculty meeting in October of 2019?
20        A.   No.  I remember him sharing it, but I don't
21   remember what it was.
22        Q.   Okay.  Then it looks like Michael Carney, he's
23   a faculty member, yes?
24        A.   He is.
25        Q.   Okay.  He chimes in.  He says, "I would
```

1   highly," and it's in italics, "support Shaakirrah's

2   proposal.  I have had more than one student come to me

3   in the last two weeks alone to express concerns about

4   lack of support (perceived or otherwise) of cultural

5   differences in the college.  I feel blessed these

6   studies feel comfortable enough to come to me to express

7   their concerns and encouraged them to share these

8   concerns with other faculty, staff, deans, students, et

9   cetera."  He -- he adds that, "Besides an open forum, I

10  believe multi-cultural training for all would be

11  extremely beneficial."

12          So at least we know Professor Carney was

13  supportive of Professor Sanders's proposal; correct?

14      A.   That's what it says, yes.

15      Q.   We're looking at what's been marked as

16  Exhibit 193.

17          (Exhibit No. 193 marked for

18          identification.)

19      Q.   (BY MS. BIRCH) This picks up sort of where the

20  last exhibit left off, so it's in that same chain of

21  e-mails, and this is Professor Sam Newton chiming in.

22          Do you recall receiving this e-mail message

23  from Professor Newton?

24      A.   I think so.

25      Q.   Okay.  He -- he starts with this first, number

```
 1    one, "People feel valued when there are safe spaces and
 2    they feel their concerns are heard."  He writes, "I
 3    think we need to create safe spaces for students to
 4    share worries and concerns."  He also writes, "Listening
 5    has a powerful impact."  He writes that, "Systemic
 6    change will not happen until whites, until those with
 7    power first acknowledge their privilege and consciously
 8    work to dismantle a system of oppression that their
 9    ancestors built to maintain their own dominance and that
10    they continue to support, often through ignorance."
11              How did you feel about Sam Newton's e-mail?
12        A.    I don't know.
13        Q.    Why don't you know?
14        A.    It's hard to recollect feelings a year out.  I
15    respect Sam and respect what he has to say.
16        Q.    He says, "We should use both formal and
17    informal measurement tools.  And I think we try a
18    variety of approaches, an open forum as Shaakirrah has
19    suggested, anonymous solicited surveys or an anonymous
20    submission form online, personal interviews with willing
21    students, small group chats, informal lunch meetings, et
22    cetera."
23              So it appears that Professor Newton was also
24    supportive of this open forum concept; correct?
25              I'm sorry.  Did you answer?
```

1          A.    That sounded like a statement rather than a
2    question, but it appears so.
3          Q.    Okay.  Let's look at what has been marked as
4    Exhibit 194.
5               (Exhibit No. 194 marked for
6               identification.)
7          Q.    (BY MS. BIRCH) So -- so it starts with an
8    e-mail from Professor Sanders in November of 2019, you
9    know, inviting people to the open forum, community forum
10   on culture and climate today.  And I think you testified
11   last time you attended that forum.
12         A.    That's correct.
13         Q.    Okay.  She follows up after the forum with an
14   e-mail, and then she forwards a redacted form of an
15   e-mail that she received from a student after the forum.
16              Do you recall receiving this?
17         A.    I do.
18         Q.    Did you do anything to try to reach out to
19   Professor Sanders or to decipher who this student was
20   and reach out to the student related to the student's
21   concerns?
22         A.    The student had already raised these concerns
23   prior to receiving this e-mail, and Jeff Dodge when he
24   was here had talked to her and the professor involved
25   about it.  This of course is the incident subject to

1   later OCRI investigation that determined that there

2   was -- I don't know what their ultimate determination

3   was, but they didn't find anything.

4        Q.   Did you make any efforts to reach out to

5   Professor Sanders or identify and reach out to the

6   student after receiving this e-mail?

7        A.   No.

8        Q.   Okay.

9        A.   I mean, I -- no.

10       MS. BIRCH:  Okay.  Let's just quickly go off the

11  record so the court reporter can mark another set of

12  exhibits.

13           (Off the record.)

14       MS. BIRCH:  Okay.  Back on the record.

15       Q.   (BY MS. BIRCH) So we -- we've talked, sort of,

16  around this Bellwood event that happened in the fall of

17  2019, but we haven't spent a lot of time talking

18  specifically about what happened.  So I've -- I've

19  listened to the video that's available online.  This was

20  the Bellwood lecture when Ken Salazar was the featured

21  speaker and you were -- moderated the -- the speech, I

22  guess, or presented Salazar; correct?

23       A.   Yes.

24       Q.   Okay.  And a student during that -- the Q and

25  A asked if -- a potential culling of the population.  He

 1  said, so that's my question.  How do you feel about
 2  genocide as a solution?  And he was referring to the
 3  issue of climate change, which is what Salazar was
 4  speaking on.
 5          What did you think when he asked that
 6  question?
 7      A.   Just to clarify, you heard that in the
 8  recording?
 9      Q.   Yeah.
10      A.   Okay.  It's my understanding that the audio
11  was garbled, and it was in -- inaudible what he said at
12  the time, but you -- you apparently got a better version
13  than I heard.
14          What -- so again, what did I think?  I
15  thought, what the heck kind of question was that?  It
16  was a little like, oh, you got to be kidding me.  And I
17  thought Salazar handled it really well.
18      Q.   Okay.  Do you recall there being gasps from
19  the audience when that question was asked?
20      A.   The way the sound is -- and it's hard to tell.
21  I mean, the way the speakers are, you can't really hear,
22  so I don't know.
23      Q.   Okay.  Do you recall later saying that you
24  felt like his statement wasn't really as bad as it was
25  made out to be?

```
 1    quell the protected speech of one of my students.
 2         Q.   Okay.  Did --
 3         A.   So...
 4         Q.   Do you recall taking any action in response
 5    to -- and I'm not saying you have to punish the student
 6    or that you did or didn't punish the student, but do you
 7    recall taking any actions in response to his question?
 8         A.   Nothing happened until the students started
 9    debating it on Facebook.
10         Q.   Okay.  So let's look at some e-mails related
11    to that.  This has been marked as Exhibit 195.
12              (Exhibit No. 195 marked for
13              identification.)
14         Q.   (BY MS. BIRCH) It looks like it's
15    Stephen Miller e-mailing on October 24th at 9:03 a.m.,
16    saying, "I don't know what happened at Bellwood in
17    Moscow, but it has blown up on the students' Facebook
18    page.  Just worth knowing.  53 comments, mostly civil,
19    about how to talk to fellow students about controversial
20    comments."
21              And then you responded to Stephen's e-mail at
22    9:39 saying, "Yesterday one of our students asked what
23    might have been an ill-advised and certainly
24    oddly-worded question about how we might address climate
25    change.  I sincerely hope that this one moment does not
```

1    permanently affect his experience at the college and his

2    career as a lawyer."  The "his" in that sentence is the

3    student; right?

4         A.   That's correct.

5         Q.   Okay.  You then say -- you make reference to

6    this zero population growth as a best approach to

7    solving our environmental problems and --

8         A.   I did not articulate it as the best approach.

9         Q.   No, no, no.  You say -- well, here's -- here's

10   what the sentence says.  "Or he might have been

11   remembering, and then poorly articulating, a common

12   argument about zero population growth as the best

13   approach to solving our environmental problems."

14             Did I read that correctly?

15        A.   That's correct.

16        Q.   Okay.  "The Sierra Club once had a zero

17   immigration policy, and my own grandfather lectured my

18   mother about population growth when he found out about

19   my soon-to-be-arriving younger brother.  This is -- this

20   also is a perfectly legitimate argument."  And then you

21   cite to an Atlantic article.

22             So is this the first response you can recall

23   having to this student's comment or the -- the blowup

24   related to the comment?

25        A.   So -- yes.  As I recall, and my -- my memory

1              (Exhibit No. 196 marked for

2              identification.)

3         Q.   (BY MS. BIRCH) -- from Stacy Etheredge.  She

4    writes, "For my part, and with all respect for free

5    speech, I was frankly ashamed of our student for asking

6    that question.  I was there in the front row.  You could

7    hear the gasps in the audience.  I thought

8    Secretary Salazar handled it with grace."

9              So -- so according to Professor Etheredge,

10   there were gasps in the audience.  But you couldn't hear

11   that from up on the stage?

12        A.   No.

13        Q.   Then let's look at -- what's been marked as

14   Exhibit 197.

15             (Exhibit No. 197 marked for

16             identification.)

17        Q.   (BY MS. BIRCH) This is an e-mail from you on

18   October 24th, 2019, at 11:52 a.m.  The subject is

19   Bellwood appreciation.

20             It's to "Dear Colleagues," which I think means

21   it went out to the entire law school community about the

22   Bellwood lecture.

23             Do you remember sending this e-mail?

24        A.   I do.

25        Q.   Did you take any action to shut down the

1       A.   I don't think so.  I mean, maybe.  I don't
2   know.  I don't think so.  It was not -- no, I don't -- I
3   don't recall.
4       Q.   You don't recall one way or the other?
5       A.   Yeah -- yes.  That's what I mean when I say
6   that.
7       Q.   Okay.  Then we get to an exhibit that has been
8   marked as 198.
9            (Exhibit No. 198 marked for
10           identification.)
11      Q.   (BY MS. BIRCH)  It's a later e-mail, same day,
12  October 24th, 5:32 p.m.  It looks like it's from you to
13  the students.  The subject is the "Bellwood lecture and
14  our First Amendment responsibilities."
15           Do you remember sending this e-mail?
16      A.   I certainly do.
17      Q.   Okay.  We're looking at what's been marked as
18  Exhibit 199.
19           (Exhibit No. 199 marked for
20           identification.)
21      Q.   (BY MS. BIRCH) It's an e-mail string that
22  starts with an e-mail -- looks like Professor Sanders
23  forwards a message she received from a student, a
24  redacted form, the night that you sent that e-mail to
25  the students.

1          The student writes, "Plainly, I am upset,
2   annoyed, and frustrated with Dean Long's response to the
3   comments made at the Bellwood lecture in Moscow
4   yesterday."  And she goes on from there.
5          Do you remember receiving this e-mail
6   communication?
7        A.   Only generally.
8        Q.   Okay.
9        A.   And there was a -- a whole bunch going on at
10  this time about the -- about those e-mails.
11       Q.   Did you understand that at least some students
12  were upset with the way that you handled the
13  communication about what was said at the Bellwood
14  lecture?
15       A.   I am.  I am very aware of that.
16       Q.   Okay.  And then Professor Newton chimes in
17  saying, "A few students made similar comments to me
18  yesterday."  He says, "I sent an e-mail out yesterday,
19  but I didn't see it go through."
20          Does -- does the e-mail system at the
21  university have some way to vet e-mails before it goes
22  to the listserv?
23       A.   Not from a faculty member to the faculty
24  listserv, no.
25       Q.   Okay.  He says, "Free speech is an important

```
 1    right and we need to respect it, but there has to be
 2    some line drawn over comments that threaten violence
 3    against others."  He goes on from there and concludes
 4    that paragraph with this statement, "Some students
 5    genuinely come to school feeling total anxiety that this
 6    commenter, who is in class with them, might just walk
 7    into the class with a gun."  And he ends his e-mail
 8    with, "I would think at minimum, a conversation with the
 9    student is in order."
10         Did you understand before receiving
11    Professor Newton's e-mail that there were some students
12    on campus who were fearful and experiencing total
13    anxiety that this commenter may walk into class with a
14    gun?
15         A.   Again, I don't know.  I don't know when -- I
16    mean, we obviously were hearing this.  I don't know when
17    during these conversations I would have become aware of
18    that.
19         Q.   Okay.  But you would -- at some point, if not
20    before his e-mail, at least by his e-mail, you became
21    aware of that.
22         A.   Yes.
23         Q.   We're looking at what's been marked as
24    Exhibit 200.  Looks like it's an e-mail --
25         THE REPORTER:  Sorry, Counsel.  I only have 199.
```