ERIKA BIRCH (Bar No.7831)
T. GUY HALLAM, JR. (Bar No. 6101)
**STRINDBERG & SCHOLNICK, LLC**
1516 W. HAYS STREET
BOISE, ID 83702
(t) 208.336.1788
(f) 208.344.7980
erika@idahojobjustice.com
guy@idahojobjustice.com
Attorneys for Plaintiff

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **SHAAKIRRAH R. SANDERS,** | |
| Plaintiff, | **MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| **THE UNIVERSITY OF IDAHO, COLLEGE OF LAW, a public university governed by the STATE BOARD OF EDUCATION, et al.** | Civil No. 3:19-CV-00225-BLW Judge Winmill |
| Defendants. | |

Plaintiff, Shaakirrah Sanders ("Sanders"), by and through her undersigned attorneys, hereby submits this *Memorandum In Opposition To Defendants' Motion For Summary Judgment.* Filed concurrently are *Plaintiff's Statement of Disputed Facts* ("SOF") supported by the evidence in and attached to the *Declarations* of Erika Birch and Shaakirrah R. Sanders.

## I.    <u>INTRODUCTION</u>

Defendants assert they are entitled to judgment in their favor as to all claims prior to trial. As set forth below, Defendants are not appropriately shielded by the Eleventh Amendment nor is Defendant Adams entitled to qualified immunity. Additionally, Defendants' position that Sanders' Title VII claims preempt her other federal claims for discrimination/retaliation is untenable.

---

**1 | MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Perhaps most surprising is Defendants' position that there are no genuine issues of material fact. Defendants have unquestionably given short shrift to the evidence gathered during discovery in this case. As can be seen from the extensive *Statement of Disputed Facts*, Professor Sanders suffered through a long pattern of discriminatory/retaliatory actions at the College of Law ("COL") starting under Mark Adams tenure as Dean (June 2014-June 2018) and continuing at the hands of the current administration, particularly interim Dean Jerry Long. This includes being denied the same terms and conditions as her white colleagues and male colleagues, being passed over for promotions and denied funding for scholarly work and working within a hostile environment. In short, there are factual issues and credibility determinations that a jury, not the Court, must make. For the reasons herein, the Defendants' *Motion for Summary Judgment* should be DENIED.

## II.    SUMMARY JUDGMENT STANDARD

The Ninth Circuit has repeatedly made clear that very little evidence is required to survive summary judgment in a discrimination case, "because the ultimate question is one that can only be resolved through a 'searching inquiry' – one that is most appropriately conducted by the factfinder, upon a full record." *Sischo-Nownejad* v. *Merced Community College Dist.*, 934 F.2d 1104, 1111 (9th Cir.1991)(superseded by statute on other grounds). A trial permits a more particularized factual inquiry which is critical in discrimination cases, because the "intent to discriminate may be difficult to discern in depositions compiled for purposes of summary judgment, yet it may later be revealed in the face-to-face encounter of a full trial." *Lam v. University of Hawai'i*, 40 F.3d 1551, 1564 (9th Cir. 1994). Thus, "any indication of discriminatory motive ... may suffice to raise a question that can only be resolved by a factfinder," and for that reason "summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a Title VII dispute is the elusive factual question of

intentional discrimination." *Warren v. City Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995)(internal quotation marks omitted).

### III.    ARGUMENT

**A.  Plaintiff's Title VII Claims Are Supported By A Factual Record Demonstrating That A Reasonably Jury Could Find In Her Favor**

Plaintiff filed her charge of discrimination on June 26, 2018. Defendants' incorrectly assert that her charge only preserved claims in the prior 180-days. *See* Def. Memo., p.16. As set forth in the code cited by Defendants, her charge preserved claims in the prior 300-day window because Idaho has a state enforcement agency. *See* 42 U.S.C. §2000e-5(e)(1). Thus, discrete actions occurring on or after August 30, 2017, and a hostile work environment continuing or occurring in that period are all actionable Title VII claims.[1] *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 105 (2002). Moreover, the law is clear that untimely acts can be used as "background evidence in support of a timely claim." *Id*. at 113

Thus, Plaintiff's timely Title VII claims include: 1) discrimination in the terms and conditions of her employment; 2) discrimination in failing to consider her for a promotion to associate dean in 2018; 3) pay discrimination re: a 2018 stipend and discouraging her application in 2020; 4) subjecting her to a continued hostile work environment; and 5) retaliation linked to the terms and conditions, failure to promote, pay discrimination, and hostility in her workplace.[2] These claims are addressed separately below.

---

[1] Defendants argue that there is no continuing violation theory applicable to Plaintiff's claims. While true for discrete acts like promotions and one-time stipends, the law is clear that with respect to hostile work environment claims or ongoing pay disparities this is not the case. Defendants seem to concede this n. 7 of their Memo. *See also, Morgan*, 536 U.S. at 122 (a hostile work environment will not be time barred so long as at least one act in the same hostile environment falls within the period).

[2] Her other claims, whether they be pursuant to the §1983, §1981, Title IX and/or Title VI are the same except as otherwise indicated below, which includes that these other claims have a longer statute of limitations (reaching back 2 years from her *Complaint*, or to June 19, 2017).

Moreover, it is important to point out that the discrimination at issue here is based on Plaintiff's race *and* gender – *i.e.*, discrimination because she is a black woman. The Ninth Circuit has long recognized intersectional discrimination which requires the Court to appreciate that if black men or white women were treated favorably, it does not defeat Plaintiff's claims. *See e.g., Lam,* 40 F.3d at 1562 ("the attempt to bisect a persons' identity at the intersection of race and gender often distorts or ignores the particular nature of their experiences"). Additionally, Plaintiff alleges, as she is entitled to do, that much of the unfavorable treatment of her is a result of discrimination *and/or* retaliation.

**1.  Evidence of the broader culture and climate at the COL is relevant circumstantial evidence supporting Sanders' claims.**

Evidence of the broader culture and climate at the COL, and specific evidence of discrimination or retaliation against other COL employees/students, is relevant and admissible support for Sanders' claims that must be considered by the Court on summary judgment. "Recognizing that '[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes,' the Supreme Court held that evidence of the employer's discriminatory attitude *in general* is relevant and admissible to prove race discrimination." *Heyne v. Caruso,* 69 F.3d 1475, 1480 (9th Cir. 1995) (*quoting U.S. Postal Serv. v. Aikens,* 460 U.S. 711, 716, (1983)); *see also Spulak v. K Mart Corp.,* 894 F.2d 1150, 1156 (10th Cir. 1990) ("As a general rule, the testimony of other employees about their treatment by the [employer] is relevant to the issue of the employer's discriminatory intent."). Evidence of discrimination of others can be admissible circumstantial evidence of discrimination. *See Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008).

There have been thirty-five (35) documented reports to the Office of Civil Rights and Investigations ("OCRI") of sex or race/national origin discrimination at the COL over the last ten

years. Notably the majority of those reports have occurred in the last several years, *i.e.*, 2018-2020. In addition to these reports, the COL has been on notice of other concerns of sexism and racism within its community. This includes: 1) reports documented in 2012 as a result of the ABA's site visit; 2) as mentioned by Defendants the racially derogatory costumes worn by law students which were excused by some faculty as mere naivety; and 3) concerns raised by women faculty members in 2014 including a call for more inclusive governance and salary equity.[3]

After multiple complaints, the University's Human Resources office conducted a comprehensive review of the COL in 2018. The review substantiated "[a]n overarching concern that gender bias and/or sex discrimination plays a role by disproportionately affecting female faculty and staff negatively," and that the "perception that racial diversity is not highly valued by the College of Law administration and faculty body. A number of participants identified potential racial bias within the COL." Jennifer Cossel, HR Business Partner conducted the review that included interviewing 32 faculty and staff. Cossel said that gender and/or racial bias was a "constant concern" that kept coming up.  Cossel knew that it was important for the COL to address these issues. In fact, the report provided to the Provost in April of 2018 said, "Please note: Human Resources is aware of the possibility that some of the concerns raised during the course of the [Review] could rise to the level of what is considered discrimination, retaliation, gender or sex discrimination." COL administrators received the full report, as did OCRI.[4]

Even though HR's report documented these issues and the need to act, HR is not aware of any remedial actions. Additionally, OCRI took no remedial actions. Instead, the Provost allowed Adams to voluntarily resign from being Dean.[5] The Provost then passed the buck to Adams'

---

[3] SOF ¶¶ 10-12, 25.
[4] SOF ¶¶ 18-22.
[5] Thereafter, Adams had a paid semester off and returned as the highest paid full professor on faculty where he remains today, without any discipline or blemish to his performance record. SOF ¶ 14.

replacement, Dean Long to take remedial actions. Although Cossel researched and found an outside consultant for Long to hire, she said things "sort of just stopped at some point . . . It didn't seem to go anywhere." Indeed, COL never retained a consultant. Long blames the Provost for telling him he could not have $120,000 for the consultant. However, that price quote was based on hiring a consultant who would deal with broader organizational issues at the COL, not focusing just on the discrimination and diversity issues. Long admits that he did not ask the Provost for money or permission to hire a diversity-focused consultant. In fact, in October 2018, Long made clear to Sanders that he and the Provost had decided to focus on the big-picture organizational issues first. That is consistent with Long's communication to the COL in November 2018 where his proposal for moving forward has no mention of the EEO issues or corrective measures.[6]

As further set forth below in **Section A.3.c.**, since this April 2018 HR report, the COL has taken little remedial action and its efforts all post-date Sanders lawsuit being filed. "Given the obvious incentive in such circumstances for an employer to take corrective action in an attempt to shield itself from liability, is it clear that nondiscriminatory employer actions occurring subsequent to the filing of a discrimination complaint will rarely even be relevant as circumstantial evidence in favor of the employer." *Lam* 40 F.3d at 1561 n. 17.[7]

Moreover, starting in the fall 2019 the COL environment has worsened. There have been a series of events surrounding race and gender discrimination at the COL, including posts of racist rhetoric on a COL sponsored Facebook page, that led to faculty discussions about how minority students feel unwelcomed and a call by some to "really step up and commit to doing something to attack these problems." This incident was closely followed by a student suggesting that genocide

---

[6] SOF ¶¶ 14, 22-23.
[7] This concept also applies to the fact that post-lawsuit the COL has hired female associate deans. *See also, Chuang v. University of California David*, 225 F.3d 1115 (9th Cir. 2000)(hiring three Asian professors after plaintiff filed a lawsuit eliminates "any probative value the evidence might otherwise have.")

might be a solution to climate change which caused some students to "genuinely come to school feeling total anxiety that this commenter, who is in class with them, might just walk into class with a gun."[8] As more fully set forth in the pleadings supporting *Plaintiff's Motion for Partial Summary Judgment*, Sanders efforts to host open forums to discuss these issues, which several faculty supported, were squelched. Long was unsupportive, tried to replace her as moderator, and then recorded the January 2020 forum without notice and consent, knowing it would upset her. He then lied to Sanders about why he had recorded it and ignored her communications regarding the legality of the same. Finally, he silenced her speech by accusing her communications of creating a negative and unprofessional culture and climate at the COL. He then gave Sanders her first negative performance evaluation.[9]

As the Court evaluates Sanders' claims, it must keep in mind that this evidence is admissible as part of the totality of circumstances and as circumstantial evidence supporting her claims of discrimination and retaliation. The impact of work behavior "often depends on a constellation of surrounding circumstances, expectations, and relationships." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998). *See also Harris v. Forklift Systems,* 510 U.S. 17, 23 (1993)(requiring a look at the totality of the circumstances in hostile work environment cases).

   2.   **A reasonable jury could find that Defendants discriminated against Sanders in the terms and conditions of her employment.**

Defendants suggest that any discrimination or retaliation against Sander has been minimal and thus must be disregarded, ignoring that Title VII covers not just terms and conditions in the narrow sense, "but 'envinces a congressional intent to strike at the entire spectrum of disparate treatment . . . in employment.'" *Oncale,* 523 U.S. at 78 (quoting *Meritor Savings Bank, FSB v.*

---

[8] These facts are outlined in Plaintiff's Statement of Facts support her motion for partial summary judgment. Dkt. #37, ¶¶ 2-4, 15.
[9] Dkt. #37, ¶¶ 8, 19-22, 25, 28, 32, 35, 37, 41, 45.

*Vinson*, 477 U.S. 57, 64 (1986)). Thus, just because Sanders has succeeded in gaining tenure and promotion to full professor, despite the discrimination and retaliation she has faced, does not detract from the legitimacy of her claims. That is especially true where the decisions about her tenure and promotion were outside the control of the main perpetrators. Notably, had it been up to Adams and his associate dean Richard Seamon, both involved in her initial complaints about disparate treatment, Sanders clearly would ***not*** have been granted tenure as they were the only two faculty who voted against it. SOF ¶¶ 42-44.  Moreover, Long rated Sanders' performance as not meeting expectations for 2019, a first in her career, and seems likely to do the same for 2020. SOF ¶ 80. Negative evaluations are the path the COL has to subject a protected tenured professor like Sanders to further discipline including possible termination.

### a. *2018 Associate Dean Position*

It is undisputed that Plaintiff: (1) belongs to a protected class, (2) applied for and was qualified for a job for which the employer was seeking applicants, (3) despite being qualified, she was rejected, and (4) after her rejection, the position remained open and the employer continued to seek applicants from people of comparable qualifications. *McDonnell Douglas Corp. v. Green* 411 U.S.792, 802 (1973). Additionally, a jury could easily find sufficient evidence of pretext.

First, as set forth below in **Section B.2.**, Plaintiff has presented a more than plausible claim of promotional discrimination regarding Adams' rejection of her for the 2017 Boise Associate Dean position. That evidence[10] is relevant to informing Adams' rejection of her for the same position in 2018 when he selected Stephen Miller. As more fully explained below it is undisputed that Sanders met the listed qualifications for the Associate Dean position in both 2017 and 2018. Even though Sanders was the only candidate to express interest in the position, and filling the

---

[10] Although untimely for purposes of Title VII.

position is one of "twisting arms," Adams told Sanders she did not have adequate leadership experience and she should wait to apply later. Instead, the 2017 position went to a white, male candidate who did not meet the minimum qualifications.[11]

Adams knew that Sanders may still be interested in filling the position in 2018, but he did not approach her about it.[12]  Instead, he once again sought out other willing candidates and selected Miller, a white male contemporary of Sanders. Notably, the Provost office could not approve Miller's appointment without obtaining an EEO/AA waiver because it was clear Adams had not used a competitive process. Thus, Adams had to explain and support his decision. His initial response for selecting Miller was: "Full professor, tenured, in Boise, works well with Lee Dillion, willing to serve. Lacks admin experience." Sanders met all the same criteria including working well with Dillion. Additionally, Adams later pointed to Miller's excellent service in organizing a law review symposium as qualifications for the position. Yet, Sanders had organized two such symposiums *and* a regional national moot court competition which Adams knew was rated as a "great success" by participants.[13] This evidence, including that surrounding her rejection in 2019, is sufficient to support a jury's finding that Adams' passing Sanders over for promotion again in 2018 was discriminatory. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)(establishing pretext by showing "that the discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence.")

### b.  2018 Stipend

All eligible applicants for summer stipends at the COL have been funded except in 2018. In fact, in 2017 the COL planned to award 12 stipends but received 16 applications. Adams decided

---

[11] SOF ¶¶ 58-62.
[12] Here, where there was no posting or competitive application process, Sanders does not have to show that she applied. *See, e.g.*, *Jones v. Firestone Tire & Rubber Co.,* 977 F.2d 527, 533 (11th Cir.1992).
[13] SOF ¶¶ 65-68, 80.

**9 | MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

to fund all applications. Notably, Sanders did not apply in 2017, as she was teaching summer school. However, in 2018 Sanders was one of four applicants not funded even though it is undisputed she had a viable application. Additionally, even though these stipends are meant to support scholarly work particularly for less senior professors, Sanders was the most junior applicant rejected. In fact, her two white male contemporaries were funded, and three professors (all white, two women, one man) with *more* seniority were also funded.[14]

Adams allegedly rejected her because she was going on a sabbatical, something noted by him in the contemporaneous documents. This is a pretextual excuse as two other white professors were either going on or returning from sabbaticals. SOF ¶ 74. *Heyne*, 69 F.3d at 1479-80 (disparate treatment of similarly situated employees can also provide evidence of pretext). Additionally, after Sanders inquired as to her rejection, Adams suggested that she lacked a heavy enough service load, ignoring his own 2017 performance evaluation of Sanders ("she's doing quite a bit of service."). Sanders' stipend application also outlined her extensive service all of which was of the type the COL specifically clarified fulfilled the service criteria the following year. When Sanders pointed some of this out to Adams he refused to respond to her further.[15]

Moreover, in supposedly comparing applicants' service, Adams cannot point to any documentation about how he did so nor any objective measures used. Instead, a former associate dean confirmed that comparing people's service load is "impossible and an approach that leads to comparing apples to oranges." SOF ¶ 72. *See Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1424 (9th Cir.1990) (evidence of discretionary or subjective terms can be evidence of pretext).

Finally, Defendants now suggest that the COL did not fund Sanders because she had asked for a lighter committee load the following year. This is factually inaccurate (she very clearly asked

---

[14] SOF ¶¶ 69-75.
[15] SOF ¶¶ 76-80.

for fairer load given her overwhelming committee service, which Associate Dean Cosens said was warranted). SOF ¶ 77. Importantly this was never a reason articulated by Adams. Thus, the changing reasons for her rejection is additional evidence of pretext. *See e.g., Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996) (acknowledging that employer's shifting reasons may show pretext). Given all of the above evidence, this claim must survive summary judgment.

### c. 2020 Stipend

Sanders was eligible for, but did not apply for the 2020 stipend because "[g]iven the deterioration of my relationship with the current Dean, Jerrold Long, given his performance evaluation where I did not even get acknowledgement for the scholarship that I had done in the past few years, I thought there was a very low probability that I would be awarded a summer stipend, and I did not want to go through any type of additional humiliation…" SOF ¶ 82. This fact, combined with the way Long scrutinized her 2019 application, allows a reasonable jury to conclude that applying in 2020 would have been futile. *Stiefel v. Bechtel Corp.*, 624 F.3d 1240, 1246 (9th Cir. 2010)(recognizing the validity of the futile gesture doctrine). Specifically, the faculty (including Sanders) not funded in 2018 were promised they would be a top priority for 2019 stipends. Although associate deans recommended that Sanders be funded in 2019, Long stalled approving her application because he questioned her representation that her summer project differed from her sabbatical project. One of the associate deans to stepped in and said:

> If she says it's 'unrelated' isn't that good enough? We can take her at her word, right? . . . I think you've got bigger issues to fight over with SRS. Fighting over this one could be counterproductive, if she is the *only* one of the applicants who got pushback from you on her proposal. It plays all too well to her arguments that she is singled out, or held to different standards.

The bigger issues referred to her EEOC charge. Long reluctantly funded Sanders in 2019.[16]

---

[16] SOF ¶ 81.

**11 | MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

### d.  Other terms and conditions

Under Title VII, discriminating with respect to an individual's "compensation, terms, conditions, or privileges of employment" because of her race and/or sex is unlawful. *See* 42 U.S.C. §2000e-2(a). Defendants suggest that because Sanders is still employed as a full professor, she can show no adverse actions sufficient to support her claims. However, all that is required for an adverse action in disparate treatment cases is a showing that the action "materially affects the terms, conditions, or privileges of employment." *Chuang*, 225 F.3d at 1126 (holding that forcible relocation of Chuang's laboratory was an adverse action).[17] This is different from a tangible job action which requires an official act that consists of a significant change in employment status. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 137-38 (2004).

In addition to the associate dean position and stipends, a reasonable jury could conclude that the following acts constitute actions which "materially affect" the terms, conditions or privileges of her employment: (1) Long's negative 2019 performance evaluation; 2() denial of merit increases in 2018 & 2019; (3)Long's insistence that Sanders teach First Amendment as part of her Constitutional Law course; (4) the 2018 "policy" that Sanders would not be reimbursed for travel costs until after the travel occurred, and Long's demand that she reimburse the College for travel he categorized as personal and accused her of acting inappropriately; and (5) Long's recent report to OCRI accusing Sanders of slander because she raised concerns about possible bias in

---

[17] *See also, Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 818-19 (9th Cir. 2002) (holding that plaintiff established prima facie case of disparate treatment when defendant subjected the plaintiff "to a number of adverse employment conditions, including severe verbal and physical abuse, discriminatory overtime, and termination, that constituted 'a material change in the terms and conditions' of [the plaintiff's] employment"); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)("[t]ransfers of job duties and undeserved performance ratings, if proven, would constitute 'adverse employment decisions'"); *Strother v. Southern California Permanente Group*, 79 F.3d 859, 869 (9th Cir. 1996) (exclusion from meetings, denial of administrative support, and transfer of duties deemed adverse actions).

hiring (Sanders in now under investigation by an outside investigator related to Long's report and the investigation is still pending).[18]

### 3. A reasonable jury could find that Defendants subjected Sanders to a hostile work environment and failed to take prompt remedial actions.

Defendants tie Sanders hostile work environment to the brown-face incident in 2012 and make a point that she has not been called any racially derogatory terms (to her face). This misconstrues her hostile environment claim and ignores that it is "abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise." *McDonnell Douglas Corp.,* 411 U.S. at 801. The Supreme Court has recognized that "[a] discriminatorily abusive work environment . . . can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers," *Harris*, 510 U.S. at 22. Here, Sanders repeatedly testified about how the discrimination and retaliation she has faced has demoralized, humiliated and otherwise negatively impacted her well-being. For example, she said, "there were a lot of efforts to go out of the way to make me feel insecure and unworthy of the position that I had been in. It was very difficult and humiliating." SOF ¶ 103. She wondered about the University and its respect for her and her rights given that they "continue to allow [Long] to supervise me after discovering his atrocious, his demeaning and his unconstitutional behavior toward me." *Id.* As set forth below, despite her successes through her own perseverance, a jury could find that Sanders has experienced a hostile work environment.

#### a. *The temporal scope of her hostile environment claims*

As detailed in the *Statement of Facts*, Sanders began to consistently experience a hostile environment after Adams was hired as Dean in 2014. The continuing nature of the harassment allows Sanders to include all these acts as part of her claim, as they "collectively constitute one

---

[18] SOF ¶¶ 7, 86(c) & (d), 104-116; Dkt. # 37, ¶ 45; Dkt. # 30-1, pp. 5-6.

unlawful employment practice." *Morgan*, 536 at 116. Additionally, once Long became Dean in August 2018, after she filed her EEOC charge, the hostility continued and has escalated. For example, Long as continued to interfere with her teaching package and academic freedom and has now negatively rated her performance.[19]

### b. *The hostility was sufficiently severe or pervasive.*

"The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships," *Oncale*, 523 U.S. at 81–82, and "what might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character, causing a worker to feel demeaned, humiliated, or intimidated on account of her [race and/or] gender." *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1109 (9th Cir. 1998).

Here, Sanders has had a much different experience than her white colleagues and her male colleagues, including the two white male colleagues hired at the same time as her. For starters, the COL resisted her requests to be considered for the same course release as her white colleague. This resistance included misrepresenting the truth to her initially, and then providing changing rationales and insulting distinctions between her and the similarly situated colleague. Then the COL chastised her for raising concerns about disparate treatment and unfairness.[20] While Defendants suggest that all should be forgiven because she eventually got the course release, this ignores that it took years of her advocating for equal treatment *and* importantly the involvement of two others – Associate Dean Cosens and Ombudsperson Barbara Beatty helping advocate for

---

[19] SOF ¶¶ 108-116; Dkt. # 37, ¶¶ 45-49.
[20] *McDonnell Douglas*, 411 U.S. at 804 (an employer's "reaction" to plaintiff's "legitimate civil rights activities" might be relevant to a showing of pretext).

her. Ultimately, Long made clear she should not expect a course release going forward suggesting she had received special treatment by obtaining a release.[21]

Administrators continually interfere with her teaching package in ways that are inconsistent with the practices at the COL and the understanding that courses should not be removed from a professor's package absent special circumstances. This has included: 1) removing advance criminal procedure from her package to give it to a more junior, white colleague; 2) not assigning her a preferred course she had taught before and was within her area of expertise in favor of assigning it to a different more junior, white colleagues; 3) denying her request to rotate the advanced criminal procedure course with the other professor even though they pitched a different set of professors rotate a course on the suggestion of a white male colleague; 4) denying her request to teach her First Amendment class via distance to Moscow students, but later assigning a more junior, white male, visiting professor to teach that class via distance to Boise students; 5) telling her that her "refusal" to teach a course that a white professor no longer wanted to teach could be insubordination and lead to discipline; and 6) interfering with her academic freedom in demanding that she incorporate teaching First Amendment in her Constitutional Law II course consistent with the recommendation of a white male colleague, and at the risk of requiring Sanders to sacrifice important race and gender equal protection materials.[22] Associate Dean Cosens continuously confirmed that some of these changes to her teaching package were "odd." SOF ¶ 47.

Sanders has suffered an array of attacks on her performance and/or character including: 1) the summary of her teaching evaluations going from positive to focusing on the negative, and ignoring clear racism underlying a review until years later when Cosens demanded it be removed so as not to be considered in Sanders' promotional efforts; 2) rejecting her for the Associate Dean

---

[21] SOF ¶¶ 26-41, 47-48, 52-53, 83
[22] SOF ¶¶ 46, 49-51, 108-116; Exh. 166.

position on the basis that she lacked of "leadership" and not funding her research with a stipend because she had inadequate service were offensive as they reflected a complete lack of recognition of her experience, skill set and service record; 3) continually and wrongfully accusing her of misusing travel funds and denial of a travel request with insinuations that she lied about attendance at conferences, and novel reimbursement "policies" created to make things difficult for her.[23]

Adams has treated her disrespectfully including in communications with her. As an example, his response to a question about diversity in leadership positions at the faculty retreat was dismissive and hostile and he flat out refused to communicate with her  about the denial of her stipend in 2018 and the pay disparity that caused between her and her contemporaries. SOF ¶¶ 54, 80. Sanders testified Long's communications have been "inhospitable, have been disrespectful, and have borderline been accusatory of improper behavior without any follow-up or evidence to back it up." Long's attitude toward Sanders can further be captured by the following facts: (1) he recorded her on three occasions without providing notice or consent (two phone calls and the open forum);( 2) he asked the associate deans to document their conversations with her for him; and (3) he admits that he could have made derogatory comments about Sanders including calling her a bitch, demanding, incompetent, aggressive, dishonest, and disparaging her intellect.[24]

Administrators have accused her of being unprofessional, selfish and creating a negative atmosphere even though faculty voted to award Sanders the Diversity Award for her engagement in productive dialogue and the University President and the COL faculty have recently affirmed that in order to combat racism it takes uncomfortable discussions. For example: (1) Adams told her she was being selfish and "sowing bad feeling and distrust" by asking about course release/changes to her course assignments; (2) Seamon told her if she was claiming illegal bias it

---

[23] SOF ¶¶45-46, 54-82, 86(c) & (d).
[24] SOF ¶¶ 85, 93; Dkt # 37, ¶ 19-22; Dkt # 30-1, pp. 3-4.

was incumbent on her to "make the charge forthrightly;" (3) Long warned her that her communications were creating a negative climate and also accused her of being unprofessional; and, (4) recently Associate Dean David Pimentel told a former colleague that Sanders' lawsuits "cast a shadow over everything," and makes hiring a new dean a "difficult sell." Additionally, because Long made it clear he intended to use her communications to negatively rate her performance, Sanders was forced to silence herself.[25]

Additionally, the things Sanders has observed in the broader COL community have contributed to the hostility of her environment. For example: (1) the 2019 student question about genocide; (2) the use racial slurs, including the n-word, being used in class on multiple occasions without faculty interference in 2019; and (3) students' use of horrific language and actions displaying anti-semitism, racism and sexism including sexual violence.[26] Offensive comments do not all need to be made directly to an employee for a work environment to be considered hostile. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008); *see also Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1198, 1202 (9th Cir. 1991) (concluding harassment was sufficiently severe or pervasive, even though the plaintiff "heard about most of the incidents through other employees," rather than being directly targeted).

Moreover, the COL and University administration's response (or lack thereof) to events involving sexism or racism must also be considered as evidence supporting Sanders' claims. "Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant [to a finding of harassment]." *Vance v. Ball State Univ.*, 570 US 421, 449 (2013).

---

[25] SOF ¶¶ 38, 40, 86(b), 101; Dkt # 37, ¶¶ 37, 39.
[26] SOF ¶¶ 2-16, 25, Exh. 185.

Finally, there is admissible evidence of Defendants' discriminatory attitude in general and toward other employees. *See Heyne,* 69 F.3d at 1480; *Sprint/United Mgmt.*, 552 U.S. at 388. In addition to the broad culture and climate issue discussed here, this includes: (1) another employee's concerns about Adams' discrimination and retaliation, which included "odd" changes to her teaching package; (2) other female faculties' concerns and at least one formal complaint to OCRI about Long's disparate treatment of women; (3) during the 2020 culture and climate review, two female employees emailed the University Chief Diversity Office about gender-related issues; and (4) concerns about bias in hiring against women, and women and men of color, including statements that an Asian female candidate was not a good "cultural fit."[27]

Clearly, considering the above cumulatively, and from the perspective of a reasonable black woman, a jury could find a pervasive and escalating environment "making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." *Davis*, 520 F.3d at 1095 (*quoting Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994)).

### c. Defendants failed to take prompt remedial action.

Defendants can be held liable for harassment "where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Folkerson v. Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997).[28] Further, "[T]he employer's corrective measures must be reasonably calculated to end the harassment; the reasonableness of the corrective action will depend on, *inter alia*, the employer's ability to stop the harassment and the promptness of the response." *Freitag v. Ayers*, 468 F.3d 528, 539–40 (9th Cir. 2006), *as amended* (Nov. 3, 2006) (internal quotation marks omitted).

---

[27] SOF ¶¶ 87, 90-91, 96, 98-99.
[28] Moreover, the University can also be held vicariously liable for harassment by Adams and Long. *Vance*, 570 U.S. at 424.

Effectiveness is measured not only by ending the current harassment but also by "deterring future harassment—by the same offender or others. If 1) no remedy is undertaken, or 2) the remedy attempted is ineffectual, liability will attach." *Fuller v. City of Oakland, Cal.,* 47 F.3d 1522, 1528–29 (9th Cir. 1995) (internal citation omitted).

As set forth above in **Section A.1.**, it cannot be credibly denied that the University has been on notice of wide-spread gender and race problems within the COL for many years. Further, the HR report documented the same in April 2018. Additionally, Sanders has raised issues of discrimination, bias and retaliation on many occasions throughout the relevant time period.[29] Thus, there can be no question that the COL had a duty to take prompt corrective measures calculated to end the hostile environment. A reasonable jury could easily conclude they have failed to do so.

Specifically, ***no one*** took prompt remedial actions in response to HR's 2018 report. HR did nothing. OCRI did nothing. The Provost said he relied on Long to deal with it. Long said the Provost refused to give him money to hire a consultant. However, Long admits the consultant he wanted to hire was for broader organizational issues, not the EEO issues. SOF ¶ 22. Defendants point to three actions taken by Long as "remedial actions" in response to HR's report.[30] There is no evidence that these actions were taken until *after* her lawsuit in 2019, and a jury could find the impetus for these actions was not remedial because: (1) the revisions to the diversity plan were taken because the COL was non-compliant and worried about the impact it could have on the ABA's site visit, particularly given the ABA's diversity concerns earlier; (2) the implicit bias

---

[29] This includes, but is not limited to, her 2014 complaints to COL administration, her 2017 comments at the faculty retreat, her 2018 comments about hiring all men for the associate dean positions, her 2018 concerns about not funding her stipend, and her ongoing protected activity beginning in the fall of 2019 and through 2020. SOF ¶¶ 32, 37, 54, 80; Dkt. # 37, ¶¶ 6-37. This also includes reports to OCRI made in 2016, 2018 and 2020. Exh. 186.
[30] *See* Def. Memo, p.8.

training was a result of faculty-led work groups post-George Floyd's murder;[31] and (3) diversity and inclusion statements were just recently implemented as a way to stop faculty from probing areas with candidates during the hiring process.[32] SOF¶ 24.

Additionally, when faculty and students raised concerns about racist rhetoric in the fall 2019, Long's communications focused on First Amendment rights of the speakers, as opposed to the equal protection rights of those harmed. Dkt. # 37, ¶¶ 9-14. Defendants' suggestion that Sanders wanted offending students punished has no foundation.[33] Rather, the COL and Long could have communicated disapproval of racist speech without punishing the student. Long's attitude toward these events is best captured by his laughing out loud when hearing a student's report about extreme hate speech including that all Jews should burn and throwing the heil Hitler salute. Long had no problem silencing ***Sanders' speech*** on these topics including her speech about his recording without notice or consent.[34]

Further, former Associate Dean Barb Cosens has consistently advocated that the COL needs to have a trained and designated EEO/HR officer who can help advise and address these issues that plague the law school. Cosens' recommendations reach as far back as 2017 and have yet to be implemented. Additionally, Cosens reiterated this recommendation as part of the 2020 Culture and Climate review and in April 2020, when she wrote the "most difficult email" to the Chief Diversity Officer review raising concerns that Long treats women less than men and specific issues related to Sanders. No one followed up with Cosens.[35]

---

[31] Notably, Long objected to the faculty making a specific public statement because Sanders "is looking for a faculty statement in support of everything that she's claimed in her lawsuit. If that happens, I won't be able to lead the college anymore." Dkt. # 30-1, p. 5.
[32] Notably, the University refused to produce these statements for faculty review related to its dean hiring process in late 2020.
[33] Although at least one professor believed honor code violations were implicated.
[34] SOF ¶ 97; Dkt. 37, ¶ 37-38.
[35] SOF ¶¶ 90, 102.

Plaintiff's expert witness, who has not been rebutted with a counter-expert, will testify consistent with the conclusions in her report[36] that: Defendants' responses to a the adverse actions in this case did not meet the standard of care; the University's policy and procedures do not meet the standard; the COL's actions are not consistent with a commitment to diversity and reflect a lack of understanding of implicit bias and intersectional discrimination; and the University has failed to take actions to prevent and respond to retaliation. Ms. Oppenheimer's conclusions include that, "Defendants' actions discouraged Sanders from raising concerns, were punitive and critical in nature and served to isolate and stigmatize Sanders rather than encouraging her as they should have done." Am. Report, p. 15-16.

When viewing the totality of circumstances, a jury could easily find that Defendants took neither prompt nor remedial actions reasonably calculated to deter future discrimination or retaliation. In fact, a jury could find the actions and reactions Defendants did take sent a strong message of ratification of the hostility, contributing to the abusiveness of Sanders' environment.

### 4. A reasonable jury could find Defendants retaliated against Sanders.

It is undisputed that Sanders raised concerns about discrimination – both unique to her own situation and on a broader scale regarding the environment at large for faculty, staff and for students.[37] *See*, n.29 above. In fact, she was described by several faculty as being a "consistent voice" on issues of discrimination, diversity, and inclusion. SOF ¶ 6. In May 2020 she was voted by faculty to receive the Diversity Award for "promoting meaningful dialogue . . . around culture and climate issues." SOF ¶ 86(b). Thus, she clearly meets the protected activity element.

---

[36] Amy Oppenheimer's Amended Report is attached to the *Declaration of Erika Birch* filed herewith.

[37] The anti-retaliation protections are triggered as long as the plaintiff raises concerns about discrimination in good faith, even if the underlying discrimination claims fail. *Jackson v. Birmingham Bd. Of Educ.,* 544 U.S. 167, 188-189 (2005); *Crawford-El v. Britton,* 523 U.S. 574, 588 (1998).

An "adverse action" for purposes of retaliation is distinguishable from adverse actions in disparate treatment. Defendants state "even if she did experience retaliation . . .that retaliation did not stop her from attaining tenure or being promoted to a full professor."[38] However, for purposes of retaliation, an action is sufficiently adverse if it would have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006). Reasonableness must be judged based on the particular circumstances at hand because, "[c]ontext matters." *Id.* at 69. *White* held that reassignment of duties (even within the same job description) was adequately material. *Id.* at 70.[39] Moreover, a hostile work environment can be the basis for a retaliation adverse action. *Ray*, 217 F.3d at 1245.

Thus, all of the actions described above as discriminatory can also be found by a reasonable jury to have been retaliatory adverse actions. This specifically includes: the 2018 rejections of her for the Associate Dean position and a summer stipend; her 2019 negative performance evaluation; the 2020 summer stipend; and all of the events compromising her hostile work environment claim primarily perpetrated by Defendant Adams and now Defendant Long.

The causal connection element is typically a question of fact. *See e.g., Eng. v. Cooley*, 552 F.3d 1062, 107 (9th Cir. 2009). Here, Sanders can present a variety of evidence supporting the causal connection element. First, there is direct evidence of retaliation,[40] examples which include: (1) Associated Dean Seamon's reaction to Sanders' complaints, which he admits he was frustrated

---

[38] Def. Memo., p. 26.

[39] *See also, Yartzoff*, 809 F.2d at 1376 (involving transfer of job duties and "undeserved" performance ratings); *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 500-01, 506 (9th Cir. 2000) (involving low rating on job performance review, decreased job responsibilities, and failure to receive promotions; *Ray v. Henderson,* 217 F.3d 1234, 1243-45 (9th Cir. 2000)(involving revoking of flex-time, falsely accusing of misconduct and cataloging other cases taking an expansive view of adverse actions); *Coszalter v. City of Salem,* 320 F.3d 968, 975 (9th Cir. 2003)("a government act of retaliation need not be severe and it need not be of a certain kind.")

[40] "When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Goodwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998).

with and called passive aggressive, was aggressive and accusatory;[41] (2) after Sanders commented publicly on the visual of an all-male leadership team, Adams then wrote the following public admonition: "I hope we can approach the shared goals and challenges by listening with openness and respect and mutual good faith, refraining from the insidious gossip and efforts to 'stir things up' that lead to a toxic atmosphere and discourage people from serving";[42] (3) Dean Long publicly chastised Sanders in direct response to her raising concerns about bias filtering into the faculty's hiring process and asking what she should do, calling her actions "unprofessional, demeaning, and potentially dishonest." He also reported to OCRI that she had "slandered" two fellow faculty and asked how "unfounded allegations of bias are considered or investigated."[43] and, (4) Long's illegal phone recordings.[44]

Second, there is circumstantial evidence of retaliatory motive (discussed above) that includes but is not limited to: (1) Seamon's downgraded summaries; (2) Seamon and Adams were the only two faculty not to support Sanders for tenure; and (3) Long directing others to "always take careful notes of your communications with [Sanders] and share them with me;"[45] Additionally, the temporal proximity between Sanders' protected activity and adverse actions is compelling. *Ray,* 217 F.3d at 1244. In addition to the direct evidence examples above where the adverse action came nearly immediately on the heels of her protected activity, Long's January 31, 2020 email to Sanders about his intent to negatively rate her performance came within several months of her communications about the need for the open forums about the culture and climate

---

[41] SOF ¶ 38.
[42] SOF ¶ 63.
[43] Dkt. # 30-1, pp. 5-6.
[44] Long admits that he illegally recorded phone calls with Sanders in early 2019 because he knew she had filed an EEOC charge and was worried about being dragged into a lawsuit. He also admits that he singled Sanders out for recording. Dkt. # 30-1, pp. 3-4.
[45] SOF ¶¶ 42-45, 93; Dkt. # 30-1, p.4.

issues and within a week of her communications questioning the legality of his recording. Further, as outlined above, the evidence of pretext as to her discrimination claims also applies in this context.[46] Finally, at least one other professor complained about retaliation by Adams.[47]

Considering the totality of the evidence above, it is unquestionable that a reasonable jury could find that Defendants retaliated against Sanders in a myriad of ways.

**B. Defendants' Arguments Related to Plaintiff's Section 1983 Claims Are Without Merit.**

Defendants raise several arguments in support of their request for summary judgment as to Plaintiff's claims under 42 U.S.C. § 1983 including: (1) Plaintiff's §1983 claims are barred by Eleventh Amendment Immunity; (2) a two-year statute of limitations period bars some of the claims; (3) Plaintiff cannot use the same factual basis to support §1983, Title VI, VII and IX claims; and (4) Defendant Adams is entitled to qualified immunity from individual capacity claims. Each of these arguments is addressed below.

**1. Plaintiff's Claims Against Defendants in Their Official Capacity Are Not Barred by Eleventh Amendment Immunity.**

Claims under §1983 are limited by the scope of the Eleventh Amendment. *See Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997). Generally, the Eleventh Amendment bars suits against the State and shields state officials from being sued in their "official capacity" for damages. *Krainski v. Board of Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963, 967 (9th Cir. 2010). However, the Eleventh Amendment "does not bar suits seeking to impose

---

[46] That would include for example, all the evidence placing Adams' denials of the associate dean positions and the 2018 stipend and Long's negative performance evaluation of Sanders.

[47] Adams testified that after Professor Katherine Macfarlane asked a male staff member if he had trouble taking direction from a female professor, Adams reported that the male employee felt discriminated against. Adams then accused Macfarlane of being "unprofessional and abusive." SOF ¶¶ 87-89. Additionally, Long directed the present Boise Associate Dean to document conversations she had with both Sanders and MacFarlane – the two people he specifically believed made complainants in the 2018 culture and climate review process. SOF ¶ 93.

personal liability against state officers sued in their individual capacities for alleged violations of federal constitutional or statutory rights." *Central Reserve Life of N. Am. Ins. Co. v. Struve*, 852 F.2d 1158, 1161 (9th Cir. 1988).

The Eleventh Amendment also does not bar "actions against state officers sued in their official capacities, where the relief sought is prospective in nature and is based on an ongoing violation of the plaintiff's federal constitutional or statutory rights." *Central Reserve*, 852 F.2d at 1161; *see also Ex Parte Young*, 209 U.S. 123, 159-60 (1908). Concomitantly, the Supreme Court has held that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under §1983 because official-capacity actions for prospective relief are not treated as actions against the State." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n.10 (1989).

Here, the *Complaint* specifies that Sanders seeks prospective injunctive and declaratory relief under §1981 and §1983 against Defendants Adams and Long in their official capacities. Indeed, Sanders is still employed at the COL and continues to face discrimination and retaliation. As such, she is seeking prospective injunctive relief such as the expungement past discriminatory disciplinary records and an injunction to cease the ongoing discrimination and retaliation with court monitoring to ensure compliance therewith. This type of prospective relief is appropriate and valid under the *Ex Parte Young* doctrine[48]

---

[48] *See Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (expunging past disciplinary constitutes prospective injunctive relief because it "[is] not limited merely to past violations," but instead "serve[s] the purpose of preventing present and future harm to [plaintiff]"); *Holm v. Wash. State Penitentiary*, 19 Fed.Appx. 704, 705 (9th Cir.2001) (recognizing "injunctive relief, such as expungement or revision of employment records or reinstatement,"); *Motoyama v. Hawaii, Dep't of Transp.*, 864 F. Supp. 2d 965, 988 (D. Haw. 2012), *aff'd*, 584 Fed. Appx. 399 (9th Cir. 2014) ("Plaintiff's requests for reinstatement, restoration of benefits eligibility, and expungement, are sufficient prospective relief for purposes of *Ex Parte Young*."); *Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858 (9th Cir. 2016) (policy changes are a form of prospective relief not barred by Eleventh Amendment).

An alternative argument precluding 11th Amendment immunity is waiver/estoppel, despite Defendants attempts to escape the same. As the Court recently recognized in *Duffin v. Idaho State University*, 2017 WL 6543873 *3 (D. Idaho December 21, 2017), Defendants' belated substantive assertion of immunity flies "in the face of the Rule 1 admonition that the Court construe and apply the rules and procedures in a manner that secures the just, speedy and inexpensive resolutions of all disputes." Here the Defendants responded to the Complaint and Amended Complaints, have answered discovery and taken or defended eight (8) depositions without filing a motion to dismiss on immunity grounds. This case has been pending before the Court for over a year-and-a half. Each step of the way the Defendants have fully participated on the merits. Thus, pursuant to *Johnson v. Rancho Santiago Comm. Coll. Dist.*, 623 F.3d 1101,1021 (9th Cir. 2010), Defendants have unequivocally evidenced the intention to submit to the jurisdiction of this Court.

Further, as noted above, the individual Defendants can be personally liable for damages under §1983 based on actions taken in their individual capacity. *See Hager v. Melo, Jr.*, 502 U.S. 21, 25-26 (2000). Thus, the pending claims against Defendant Adams, in his individual capacity, and the potential pending claims against Defendant Long, in his individual capacity,[49] are appropriate and not barred by the Eleventh Amendment.

## 2.   The statute of limitations does not bar Plaintiff's claims pursuant to §1983.

Section 1983 claims are subject to Idaho's two-year statute of limitations applicable to personal injury actions. *Samuel v. Michaud*, 980 F.Supp. 1381, 1410 (D. Idaho 1996), *aff'd*, 129 F.3d 127 (9th Cir.1997)(citing *Wilson v. Garcia*, 471 U.S. 261 (1985)). Sanders filed her *Complaint* on June 19, 2019. Thus, she can recover for *discrete* discriminatory acts and wrongs after June 19, 2017 as part of her §1983 claims. "A discrete retaliatory or discriminatory act

---

[49] If this Court grants Sanders' pending *Motion to Amend* to allow claims against Defendant Long in his individual capacity.

'occurred' on the date that it 'happened.'" *Morgan,* 536 U.S. at 110. As set forth in Section A above, the evidence sufficiently supports Plaintiff's claims based on a variety of discrete discriminatory/retaliatory actions.

Although it is not clear that Defendants raise this as part of their summary judgment motion, Defendant Adams' rejection of Sanders for the Boise Associate Dean position in 2017 (untimely under Title VII) is a discrete act which is actionable under §1983. A plaintiff in a §1983 equal protection must prove that the defendant acted in a discriminatory manner and that the discrimination was intentional. *See Federal Deposit Ins. Corp. v. Henderson*, 940 F.2d 465, 471 (9th Cir. 1991). Discriminatory intent may be proved by direct or indirect evidence, and in order to survive summary judgment, a plaintiff must only produce evidence establishing a genuine issue as to the defendant's motivations. *Id.*

There is ample evidence from which a jury could find that Adams discriminated against Sanders and was motivated by discriminatory intent when he rejected Sanders for the 2017 Boise Associate Dean position. Sanders had been previously encouraged to apply for an associate dean position and met the qualifications for service.[50] Although Sanders was the only person who expressed an interest in the Boise position, Adams ignored her qualifications and told Sanders that she should take a leadership training course and wait two years to reapply.[51] After summarily dismissing Sanders' application, Adams attempted to drum up a candidate while ultimately soliciting a white male faculty member who did not meet either of the listed qualifications for the associate dean position.[52] Further, Adams reaction to Sanders' inquiries about diversity immediately prior to her application for promotion and after announcing the two white male

---

[50] SOF ¶¶ 57, 55.
[51] SOF ¶¶ 61, 59.
[52] SOF ¶¶ 61-62.

appointees[53] is evidence by which a jury might find discriminatory intent by Adams. Thus, Sanders

has met her burden of proof under §1983 and summary judgment should be denied.[54]

Plaintiff also can establish an "on going" hostile environment[55] that continued into the two-

year limitations period (and continues still) such that she can recover even for some component

acts of the environment that pre-date the statutory time period. *Morgan*, 536 U.S. at 117.

### 3.   Section 1983 does not require factually independent conduct to form the basis of a claim.

The Defendants' contention that Plaintiff cannot pursue a §1983 claim and a claim under

Title VII because they are not "factually independent" (*Def. Mem*. pp. 13-14) is without merit. The

Ninth Circuit held long ago, in *Roberts v. College of the Desert*, 870 F.2d 1411 1415-16 (9th Cir.

1988), that Title VII does not preempt a claim under § 1983, and those claims can be brought, and

pursued together. Moreover, the cases cited by the Defendants simply do not stand for the

proposition that a 1983 claim and a Title VII claim cannot be brought together. In fact, *Great*

*American Federal Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 378 (1979), *Day v. Wayne County*

*Bd. Of Auditors*, 749 F.2d 1199, 1204 (6th Cir. 1984), and *Allen v. Denver Public School Dist.,* 928

F.2d 978, 982 (10th Cir. 1991) simply stand for the proposition that a plaintiff cannot bring a §1983

claim as the vehicle to "assert the violations of rights created only by Title VII" as opposed to a

violation of a constitutional right (such as discrimination under the equal protection clause). *See*,

*e.g.*, *Allen*, 928 F.2d at 982. Additionally, the Fifth Circuit case cited by Defendants, *Rivera v.*

*Wichita Falls*, 665 F.2d 531, 534, n.4 (5th Cir. 1982) predates a subsequent 5th Circuit case,

---

[53] SOF ¶¶ 54, 63.

[54] Further, analysis of an employment discrimination claim under §1981 follows the same legal principles as those applicable in a Title VII disparate treatment case. Manatt v. Bank of Am., NA, 339 F.3d 792, 797-98 (9th Cir. 2003). For the reasons stated above, because there are genuine issues of material fact as to Sanders' Title VII claims, summary judgment should be denied as to Sanders' §1981 claims as well. *Fonseca v. Sysco Food Services of Az., Inc.*, 374 F.3d 840, 850 (2004).

[55] *See* argument regarding hostile work environment at **Section A.3**.

*Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1575-76 (5th Cir. 1989), which made clear that *Rivera* did <u>not</u> stand for the proposition that Title VII was an exclusive remedy.

Thus, Ninth Circuit precedent stands in direct opposition to this argument made by Defendants. The outside jurisdiction cases cited by Defendants do not support their position. As a result, Plaintiff is not precluded from asserting her equal protection and §1981 claims via §1983 – as they provide different remedies[56] and cover conduct untimely for purposes of Title VII.

### 4.   Defendant Adams is not entitled to qualified immunity.

Defendants argue that Defendant Dean Adams is entitled to qualified immunity because his conduct did not violate a clearly established statutory or constitutional right. The doctrine of qualified immunity protects state officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable and does not violate an individual's clearly-established federal rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Contrarily, a state official may be held personally liable in a §1983 action if he knew or should have known that he was violating a plaintiff's clearly-established federal rights. *Id*.

A qualified immunity analysis consists of two prongs: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan*, 555 U.S. 223 (2009). As set forth above in **Section A**. and **Section B.2.**, the facts viewed in a light most favorable to Plaintiff support that Adams has violated her equal protection and §1981 rights by discriminating and/or retaliating against her.

To determine whether the right was clearly established, the Court turns to Supreme Court

---

[56] Both § 1983 and § 1981 provide for uncapped emotional distress damages and punitive damages against individuals in their individual capacity.

and Ninth Circuit law existing at the time of the alleged act. *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996). For the law to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand" that his conduct violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). It is not necessary that the "very action in question has previously been held unlawful," but "in the light of preexisting law the unlawfulness must be apparent" to the official. *Id.* A court need "not require a case directly on point;" however, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011).

Defendant Adams incorrectly suggests that the ***only*** discriminatory act before the Court against him in his individual capacity is "failing to offer Plaintiff the Boise Associate Dean position."[57] Adams claims he is entitled to qualified immunity because Sanders cannot prove that "she had a clearly established constitutional right to that [Associate Dean] position and cannot identify a case where a law school dean acting under similar circumstances was held to have violated a professor's constitutional rights."[58] This misconstrues the rights at issue.

The rights that Sanders alleges were violated are: (1) the right to be free from race and gender discrimination and retaliation in employment decisions including promotions, pay and terms and conditions; and (2) the right to be free from a race and gender-based hostile work

---

[57] As noted above, there is evidence of the ongoing series of separate discriminatory acts committed by Defendant Adams between the dates of 2014 and 2017 that collectively constitute one unlawful employment practice in addition to his rejection of her funding for a summer stipend in 2018.

[58] *See Def. Memo*, p. 14. Contrary to Defendants' argument, "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances" where there are no prior cases with "fundamentally similar" or "materially similar" facts. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The exact factual circumstances, or even "materially similar" facts, need not have been replicated in prior decisions for the law to be clearly established. *Eeeliot-Park v. Manglona*, 592 F.3d 1003, 1008 (9th Cir. 2010) (*quoting Hope,* 536 U.S. at 741). "**This is especially true in equal protections cases because the non-discrimination principle is so clear**." *Id.* (emphasis added). Thus, this Court must simply determine whether the official had "fair notice" that his actions were unconstitutional. *Hope, supra.*

environment. As can be seen from the cases cited above in **Section A**., these rights have *long* been clearly established.[59] Defendants have not, and cannot, point to any unique circumstances or novel claims which would remove Plaintiff's routine claims from being clearly established. As a result, Defendants' summary judgment motion on these grounds must be DENIED.

C. **This Court Should Deny Defendants' Summary Judgment as to the Title IX Claims.**

Defendants do not dispute that the COL is subject to Title IX, but instead argues that Title VII provides Plaintiff's sole remedy for employment discrimination. *Def. Memo.*, p. 27. Although Sanders acknowledges the circuit split,[60] the Ninth Circuit has been clear as recently as 2020 that it is not willing to hold that Title VII is an exclusive remedy for gender discrimination at federally funded educational institutions.

---

[59] By the mid-1970s, the Supreme Court had announced that the Equal Protection Clause proscribes purposeful discrimination by state actors, in the workplace and elsewhere, based solely on an individual's membership in a protected class. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 264–68 (1977); *Washington v. Davis,* 426 U.S. 229, 239 (1976). The Ninth Circuit held in 1980 that "[t]he constitutional right to be free from such invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it." *Flores v. Pierce,* 617 F.2d 1386, 1392 (9th Cir. 1980). The Ninth Circuit held that by 1988 it was clearly established that denial of a promotion, adverse alteration of job responsibilities, and other hostile treatment were impermissible sex discrimination in violation of the Equal Protection Clause. *Lindsey v. Shalmy*, 29 F.3d 1382, 1385–86 (9th Cir. 1994) *accord Roberts v. College of the Desert,* 870 F.2d 1411, 1413–14, 1417 (9th Cir.1988) (sex discrimination shown by demotion). Similarly, it has long been clearly established that the right to be free from racial discrimination is "so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it." *Flores v. Pierce*, 617 F.2d 1386, 1391 (9th Cir. 1980) *citing Cooper v. Aaron,* 358 U.S. 1 (1958).

[60] As acknowledged but incompletely analyzed by Defendants, the federal courts are divided. The First, Third, and Fourth Circuits have concluded that plaintiffs may pursue a lawsuit under Title IX for employment discrimination notwithstanding the availability of a Title VII remedy. *See Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545 (3rd Cir. 2017); *Preston v. Commonwealth of Virginia ex rel. New River Community College*, 31 F.3d 203 (4th Cir. 1994); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988). These courts are persuaded that employment discrimination actions are within the scope of Title IX based on the statute's broad language covering any "person" alleging discrimination, its legislative history, and Supreme Court precedent. However, the Fifth and Seventh Circuits have concluded that Title IX does not provide a private right of action for employment discrimination. *See Waid v. Merrill Area Public Schools*, 91 F.3d 857 (7th Cir. 1996) *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.,* 555 U.S. 246 (2009), *Lakowski v. James*, 66 F.3d 751 (5th Cir. 1995).

---

It is crucial to recognize that the US Supreme Court in *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) acknowledged that "Title VII . . . is a vastly different statute from Title IX" when it recognized an employee's private right of action under Title IX, despite that the same conduct would be prohibited by Title VII. "Title VII aims centrally to compensate victims of discrimination," while "Title IX focuses more on protecting individuals from discriminatory practices carried out by recipients of federal funds." *Gebser v. Lago Visa Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998). Importantly in *Jackson*, the Supreme Court did not indicate that Title VII displaced relief under Title IX. Further, the Supreme Court concluded 40 years ago that the prohibitions against sex discrimination in "such crucial aspects as admissions procedures, scholarships, and *faculty employment* . . ." was at the heart of Congress's intent in enacting Title IX. *See N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 524 (1982) (emphasis in original).

The Ninth Circuit has not definitively ruled whether an employee can sue for employment discrimination under Title IX. However, a case cited by the defense is compelling evidence that the Ninth Circuit agrees with those circuits that determine Title IX claims can exist alongside Title VII claims. *Def. Memo.*, p. 27. In *Campbell v. Hawaii Dept. of Educ.*, 892 F.3d 1005, 1023 (9th Cir. 2018), the court determined that the defendant employer in a case of Title IX sex discrimination, harassment, and retaliation that "mirror those she raised under Title VII" was entitled to summary judgment on the same basis as the Title VII claims. Thus, the court disposed of the Title IX claims on the merits even though plaintiff also brought Title VII claims.

Defendants also cite to a California district court case, *Nguyen v. Regents of University of California*,[61] where the lower court granted summary judgment on a professor's sexual orientation discrimination claim brought under only Title IX and 42 USC § 1983, finding that he should have

---

[61] No. 8:17-CV- 00423, 2018 WL 5886018 * 6 (C.D. Cal. September 17, 2018).

proceeded under Title VII. However, reliance on this case is misleading, as it ignores the subsequent Ninth Circuit decision which assiduously sidestepped that portion of the lower court's holding and analyzed the Title IX claim on its merits. It explained:

> We need not determine, as the district court did, whether Title IX's implied cause of action extends to sex discrimination claims brought by employees of federally-funded institutions because we affirm on alternate grounds.

*Nguyen v. Regents of the University of Cal.,* 823 Fed.Appx. 497, 502 n.1 (9th Cir. August 13, 2020) (internal citation omitted). Instead, the court applied the reasoning used to dismiss the §1983 claim to dismiss the Title IX claims on the merits. *Id.* at 502. The ongoing willingness of the Ninth Circuit to consider employees' Title IX claims of gender-related discrimination on the merits is persuasive indication of which side of the circuit split the Ninth Circuit is on.

Moreover, there is adequate reason for the Ninth Circuit to recognize both Title IX and Title VII claims brought by Sanders, as the harms she alleges under Title IX cannot be adequately redressed under Title VII. For one thing, Sanders seeks injunctive relief unique to Title IX, which could include a declaration that the Defendants' practices violate Title IX, leading to a loss of federal funding. Additionally, the limitations period for Title VII is just 300 days, as compared to two years for Title IX. Further, the egregious conduct to which Sanders was subjected may give rise to a large non-economic damages award. Such damages would not be capped under Title IX. *See, e.g.*, *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 73 (1992) (declining to find that "Congress has limited the remedies available to a complainant . . . under Title IX"). Accordingly, Sanders's Title VII and Title IX claims are not duplicative. *See Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 461 (1975)(holding federal civil rights laws independent, with different procedures, different remedies, and different statutes of limitations).

Thus, this Court should decline the invitation to dismiss Sanders' Title IX claim. Rather, it should conclude that employees who suffer sex discrimination in federally-funded educational institutions may seek refuge in Title IX, as well as, or instead of, Title VII.

**D.   Title VI's Primary Objective Limitation Does Not Apply to Plaintiff's Claims**

Defendants argue that Plaintiff's Title VI claims must be dismissed because "Plaintiff has not alleged, and cannot possibly demonstrate, that the primary purpose or objective of the federal funding [the University] receives is to provide employment." Title VI provides two enforcement mechanisms: (1) a private cause of action for intentional discrimination "under any program or activity receiving Federal financial assistance" (§601), and (2) administrative action by federal departments or agencies under §602. *Alexander v. Sandoval*, 532 U.S. 275, 279-280 (2001). The limitation (referred to as the "primary objective limitation,") relied on by Defendants appears in §604, which is explicitly limited to §602 actions:

> Nothing contained in this subchapter shall be construed to authorize action under this subchapter <u>by any department or agency</u> with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

42 U.S.C. § 2000d–3 (emphasis added). Regardless of this clear statutory language, courts have misapplied this restriction to §601 private causes of action.

Specifically, the case relied on by Defendants, *Temengil v. Trust Territory of Pacific Islands*, 881 F.2d 647, 653 (9th Cir. 1989), not only ignored the plain language of the statute but actually omitted the pertinent language when holding that the doctrine applied to private claims. *Temengil's* holding is therefore based on an incomplete interpretation and no substantive analysis of the statutory language. Moreover, in *Association of Mexican-American Educators v. State of Cal.*, 195 F.3d 465, 475 (9th Cir. 1999), the Ninth Circuit considered a Title VI claim on its merits without importing §604 limitations and cited to *Grimes v. Superior Home Health Care,* 929 F.

Supp 1088, 1092 (M.D.Tenn 1996), an opinion which specifically analyzed the pertinent statutory language. *Grimes* grappled with the fact that many courts' interpretation of the primary objective limitation is contrary to the plain statutory language and catalogued the split between circuit courts. *Grimes*, 929 F. Supp. at 1092-93. At the end of the day the *Grimes* court felt restrained by dicta in Supreme Court cases implying that §604's limitation is applicable to private actions. We suspect this Court may feel similarly constrained despite the clear statutory language.

**E.  Defendants Are Not Entitled to Summary Judgment as to Plaintiff's IPPEA Claim.**

Defendants also move for summary judgment as to Sanders' claim pursuant to the Idaho Protection of Public Employees Act. Although not a model of clarity, it appears that Defendants are arguing that: Sanders (1) did not engage in protected activity because her communications were not reasonable; and (2) has not suffered adverse action.[62]

As noted in *Plaintiff's Motion for Partial Summary Judgment* (Dkt. #36-1), this Court should grant summary judgment ***to*** Sanders as to the protected activity and adverse action elements. Sanders will not repeat the entirety of her arguments herein.[63] Under the IPPEA, a communication is made in good faith "if there is a reasonable basis in fact for the communication." I.C. § 6–2104(1)(b). The reasonable bases for Sanders' communications included (a) Idaho and federal law requiring consent for recording communications; (b) Fourth Amendment constitutional restraints on government activity; and First Amendment implications. Thus, Defendants' argument that Sanders' communications "simply are not protected" is without merit.

Similarly, Defendants' suggestion that Sanders "has not been disciplined at all" misinterprets what qualifies as an "adverse action." The IPPEA broadly defines "adverse action"

---

[62] Defendants argue that "Any reports concerning that recording [of the forum regarding student concerns about the culture and climate at the College] simply are not protected under the IPPEA" and "no 'adverse action' was taken against Plaintiff." *Def. Memo.*, p. 28.
[63] Sanders incorporates her arguments from her *Memorandum in Support* herein by this reference.

to include "to discharge, threaten, or otherwise discriminate against an employee *in any manner* that affects the employee's employment, including compensation, terms, conditions, location, rights, immunities, promotions or privileges." I.C. § 6–2103(1) (emphasis added). As set forth above in *Section A.4.*,[64] there are a variety of adverse actions which have "affected" Sanders' terms, conditions, rights and privileges at the COL including the 2019 negative evaluation and having had to silence her speech on important culture and climate issues at the COL. Further, the negative 2019 evaluation has the potential to impact Sanders future pay/promotional opportunities and could have a lasting impact on her career and reputation. Dkt. # 37, ¶ 49. Finally, to the extent Defendants argue that the negative performance evaluation was "plainly based on the manner, rather than the content, of her communications," this Court cannot decide whether that assertion is true, particularly given that the contemporaneous communications do not support this contention. *Id.* at ¶¶ 37-38, 42-45. In short, Defendants' summary judgment should be DENIED.

## F. Sanders' Academic Freedom Claim Survives Summary Judgment On Immunity And Factual Grounds

Defendants assert that Plaintiff's alleged academic freedom claim (a state law claim) is barred by Eleventh Amendment immunity. Defendants did not assert this immunity as an affirmative defense to this claim in their Answer to the Second Amended Complaint.[65] The Ninth Circuit has held that Eleventh Amendment immunity should be treated as an affirmative defense. *ITSI T.V. Productions, Inc. v. Agricultural Associations*, 3 F.3d 1289 (1993). Federal Rule of Civil Procedure 8(c) requires Defendants to timely plead affirmative defenses. Thus, by waiting until summary judgment to raise this affirmative defense, this Court can find waiver. *See e.g., Morrison*

---

[64] The language under the IPPEA is broader than the language in Title VII such that adverse actions for purposes of Title VII unquestionably qualify under the IPPEA.

[65] *See* Dkt. #27 p. 25 (fourth affirmative defense of 11th Amendment immunity was limited to Plaintiff's §§ 1983 and 1981 claims).

*v. Mahoney*, 399 F.3d 1042 (9th Cir. 2005)(requiring affirmative defenses to be filed in the first responsive pleading to avoid waiver). Additionally, by proceeding through all of discovery, the Court could also find Defendant is estopped from raising this defense. *See* **Section B.1.**, above. Moreover, Eleventh Amendment immunity does not bar claims for damages against a state official sued in his individual capacity. *Ashker*, *supra*. Thus, should the Court grant Plaintiff's motion to add Long in his individual capacity, this claim clearly survives.[66]

Defendants once again mischaracterize the factual basis of Plaintiff's claims, ignoring the totality of supportive evidence. Specifically, the Constitution of University Faculty, the COL Bylaws, and University policy on Academic Freedom, all support that curricular decisions are vested with the faculty, not the deans. Moreover, the COL Bylaws specify that the faculty has "the right to be consulted on all decisions affecting the affairs of the College" which specifically included "curriculum." There is a very clear process in place to discuss curricular changes requiring involvement by the curriculum committee and faculty. Finally, a professor's freedom to teach their subjects is protected by University policy.[67]

Here, there have been several pertinent curricular decisions made by the COL faculty compliant with the above referenced documents and following the appropriate processes. In 2011, the course description for Constitutional Law II was revised to remove specific reference to the coverage of the First Amendment with the stated rationale of not tying the faculty to "teach particular constitutional provisions and statutory material." Then, in 2012 Sanders developed a Freedom of Speech and Press seminar because there was not sufficient time to cover these topics

---

[66] Because Defendants did not raise this defense until now, and because this cause of action clearly pleads Long's individual actions in violating her academic freedom, the Court should permit this claim to proceed against Long individually. However, even if the Court applies Eleventh Amendment immunity to this claim, these same actions are viable as part of her discrimination/retaliation claims.
[67] SOF ¶¶ 104-107.

**37 | MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

in the Constitutional Law II course. Finally, in 2014, Sanders proposed that all First Amendment content be put in a First Amendment seminar. The rationale for this change specifically noted that First Amendment "cannot be adequately covered in Constitutional Law II." This proposal was vetted and approved by the curriculum committee, voted on favorably by the faculty, and approved at the University level. The First Amendment seminar has been a permanent course offering since 2014 and it is taught every year.[68] A reasonable jury could determine that the dean does not have authority to require Sanders to teach specific content in her Constitutional Law II class.

Even if Long's actions do not technically violate Sanders' academic freedom or the documents above, she can still support claims of discrimination/retaliation based on evidence of Long's motivation for making demands on Sanders. This includes that: (1) despite the formal curricular decision above, Long's demand is that Sanders teach the course the way her white male colleague has chosen to teach it, ignoring and devaluing her expertise on this issue; (2) Long has refused to tell her how or what portions of the First Amendment he expects her to incorporate even though he knows she can't cover it all; (3) Sanders has raised legitimate concerns that his demand would require her to sacrifice important equal protection content which has been ignored by Long; (4) although Long maintain he is attempting to prepare students for the bar exam, there are many bar topics that are not required courses; and (5) Long was told in mid-2019 that the majority of responding law schools teach First Amendment as a separate course.[69] All of this evidence considered together supports a jury finding that Long's demand is motivated by discriminatory or retaliatory intent which is equally applicable to his negative evaluation of her performance.

*/// /// ///*

---

[68] SOF ¶¶ 108-110.
[69] SOF ¶¶ 108-116.

**38 | MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

## CONCLUSION

For the aforementioned reasons, Defendants' *Motion for Summary Judgment* should be DENIED.

DATED this 11th day of January 2020.

**STRINDBERG & SCHOLNICK, LLC**

/s/ Erika Birch
Erika Birch
T. Guy Hallam Jr.
Attorneys for Plaintiff

### CERTIFICATE OF SERVICE

I hereby certify that on the above referenced date a true and correct copy of the forgoing pleading was served on the following via the CM/ECF system:

Bentley G. Stromberg
Tully Fitzmaurice
Sonyalee R. Nutsch
CLEMENTS, BROWN & McNICHOLS, P.A.
Attorneys at Law
321 13th Street
Post Office Box 1510
Lewiston, Idaho 83501
bstromberg@clbrmc.com
snutsch@clbrmc.com
tfitzmaurice@clbrmc.com

/s/ Dunja Subasic
Dunja Subasic, of the firm
