ERIKA BIRCH (Bar No.7831)
T. GUY HALLAM, JR. (Bar No. 6101)
**STRINDBERG & SCHOLNICK, LLC**
1516 W. HAYS STREET
BOISE, ID 83702
(t) 208.336.1788
(f) 208.344.7980
erika@idahojobjustice.com
guy@idahojobjustice.com
Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| **SHAAKIRRAH R. SANDERS,**<br><br>Plaintiff,<br><br>vs.<br><br>**THE UNIVERSITY OF IDAHO, COLLEGE OF LAW, a public university governed by the STATE BOARD OF EDUCATION, et al.**<br><br>Defendants. | **PLAINTIFF'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Civil No. 3:19-CV-00225-BLW<br>Judge Winmill |

Plaintiff, Shaakirrah R. Sanders, by and through her undersigned attorneys, hereby submits this *Statement of Disputed Facts in Opposition to Defendants' Motion for Summary Judgment*. The materials cited here in are contained within or attached to the *Declarations* of Shaakirrah R. Sanders and/or Erika Birch unless otherwise stated.

**STATEMENT OF DISPUTED FACTS**

**<u>Background Information</u>**

1.      Professor Shaakirrah Sanders ("Sanders") is a black, African American, female professor of law at the University of Idaho College of Law ("COL"). Currently, she is the only

black professor, and the only professor who outwardly identifies as a woman of color. (Sanders Dec., ¶ 2.)

2.      Sanders was hired as a tenure-track professor at the law school in Moscow for the 2011-12 academic year under former COL Dean Don Burnett. Her teaching package included Constitutional Law II and [Constitutional] Criminal Procedure. (Sanders Dec., ¶ 2-3; Dkt. #38-3). Her offer letter recognized that her "scholarly interests broadly reflect constitutional law." (*Id.*). Professor Sanders developed several novel courses at the law school including: Advanced Criminal Procedure; Criminal Sentencing Seminar; and First Amendment. (Sanders Dec., ¶ 4.)

3.      Sanders was hired at the same time as two other law professors: John Rumel and Stephen Miller (both white men). Sanders and Rumel taught at the main Moscow campus, while Professor Miller taught at the Boise campus which, at the time they were hired, only offered third-year law school classes. (Sanders Dec., ¶ 5.)

4.      In the fall of 2014, Sanders and Rumel relocated to Boise to teach on the Boise campus when the COL expanded the law school program to offer classes to second-year students in Boise. As of the fall of 2017, the Boise campus has been in full operation with all three years offered. (Sanders Dec., ¶ 6.)

5.      Sanders was granted tenure in 2016 and promoted to a full professor in 2018. Both Rumel and Miller also received tenure and promotion in the same years. (Sanders Dec., ¶ 7.)

6.      Since her hire, Sanders has been a consistent voice on topics of diversity, inclusion and anti-discrimination at the COL. (Cosens Dep. 133:11-16; Couture Dep. 116:21-117:5.)

7.      Sanders has been described as follows by three Associate Deans:

a.   Current Associate Dean Wendy Couture described her as a "distinguished scholar" and mentioned her having published in the Cornell Law Review which is one of the "most

prestigious law reviews in the country, and that's a real feather in the cap for her and for the college." (Couture Dep. 130:23-4). Couture also said Sanders was a "very effective" professor in the classroom." (*Id.*, 131:5-10).

b. Former Associate Dean Richard Seamon agreed that Sanders has had some "great article placements" and some "high-level law reviews." (Seamon Dep. 31:20-32:1). He added that her course evaluations developed over time into "very positive ones." (*Id.*, 32:2-4; 33:14-18).

c. Former Associate Dean Barbara Cosens described Sanders as an "excellent colleague." (Cosens Dep. 11:3-11). She assessed Sanders' teaching as excellent and noted that students had high praise for her. (*Id.*, 11:19-12:11). Cosens testified that Sanders is a "fabulous presenter; very engaging, very dynamic. And her scholarship was taking on very important and difficult issues, and she always had very novel and interesting approaches." (*Id.*, 12:18-13:8). In fact, Cosens recommended Sanders for a merit-based increase in April of 2018. (*Id.* at 82:2-82:7, 83:1-84:1). Adams did not follow this recommendation. (Sanders Dec., 21¶ )

8.     Additionally, Sanders has held/holds a variety of leadership positions such as Chair of the American Association of Law Schools ("AALS") section on constitutional law and now Chair of the sexual orientation and gender section; President of American Inns of Court (Richard C. Fields Inn); and Chair of Idaho State Advisory Committee to the U.S. Commission on Civil Rights.  (Sanders Dec., ¶ 8).

9.     Sanders has fulfilled many service roles at the COL and the University including: chairing the Diversity and Human Rights Committee (2013-2014); serving on the time consuming and important Admissions committee from 2014-2018; and serving on and chairing the

Administrative Hearing Board, a University-wide committee (2016-18); faculty advisor for the Crit Law Journal from 2014-18; Symposium Coordinator in 2017 and 2018; coach for moot court teams 2013-2016; coordinating the Region 13 moot court competition in 2017; and she has been a writing advisor for nearly 50 students writing for the Idaho Law Review, Directed Studies and/or the First Amendment Seminar (2011-2020). (Sanders Dec., ¶ 9.)

## Overall Culture and Climate at the College of Law

10.     From 2011 (when Professor Sanders was hired) through April 2018, there were at least fifteen (15) documented separate reports of sex, race or national origin discrimination within the COL logged with the University's Office of Civil Rights and Investigations ("OCRI"). (30(b)(6) deposition (Agidius) at 9:1-10:22; Exh. 13).

11.     In June 2012, the COL received results from the American Bar Association's site visit in late 2011. The report noted that while efforts had been made to hire more female and minority faculty, the COL failed to have any unique initiatives in place to retain them. (Exh. M at 1.26818). The Report also documented that a "sizeable minority of male students denigrate the role of women in the legal profession which may contribute to a disruptive atmosphere for women at the school." (*Id.,* 1.26821; Couture Dep. 101:3-16).

12.     A February 2014 Diversity Report documented that women faculty members presented a list of issues to the Administration including the need for more inclusive governance and salary equity issues, among others. (Exh. 39, p.3; Seamon Dep. 63:16-64:6; 68:20-69:1).

13.     The COL hired Mark Adams as the COL Dean in June 2014. Adams served in that capacity until he was asked by the Provost, John Wiencek, to step down in June 2018. The Provost testified that he asked Dean Adams to step down because of concerns with Dean Adams' leadership including issues of discrimination "in terms of racial, gender, disability." (30(b)(6) Dep.

(Wiencek) at 33:16-34:7). Adams confirmed that he was asked to resign because of reports about the culture and climate. (Adams Dep.116:20-118:5; 119:7-11).

14.     At the end of the day, the Provost allowed Adams to "voluntarily" resign from his position, gave him a paid semester off, and returned Adams to the faculty as the highest paid professor. (Adams Dep. 127:17-128:10; 129:15-23). The Provost did not discipline Adams but instead Adams received a positive review. (*Id.,* 134:1-9; Exh. 213; Long Dep. 432:14-433:3). No one explained to the replacement Dean (Long) why Adams stepped down. (Long Dep. 216:11-17).

15.     During Adams' tenure as Dean, two women of color faculty left the COL (not through retirement). (Adams Dep. 124:11-19). Since then, Sanders has been the only black tenure/tenure track professor at the COL. (Sanders Dec., ¶2. )

16.     Faculty member Jerry Long, who had been serving as an Associate Dean in Moscow since June 2017, was appointed the interim or "term" Dean in August of 2018. Dean Long still serves in that capacity. (30(b)(6) Dep. (Long) 5:16-23; Long Dep 74:25-75:2).

17.     About a year before Adams stepped down, in May 2017, the faculty requested Adams retain a consultant to address issues at the COL specifically related to sexism and racism. (Adams Dep. 110:13-23; 111:2-114:6; Cosens Dep. 58:16-25). COL never retained a consultant and some faculty were told that they were unable to find someone with the right skill set who was willing to do the job. (Couture Dep. 108:9-20; Adams Dep. 112:1-4; Long Dep. 231:22-24).

18.     Several months before Adams was asked to step down, the Provost's office directed University Human Resources to perform a Climate & Culture Review ("Review") of the law school. This process was triggered "following multiple complaints being brought to the attention of" the Provost, the Dean and HR. (Exh. 176; Cossel 37:1-14; 85:12-23). Jennifer Cossel was one of the HR Business Partners assigned to lead the Review process. (Cossel Dep. 36:1-17).

19.     During the Review, HR interviewed 32 COL faculty and staff including Sanders in February and March 2018. (Exh. 176, p. 1-2). Cossel testified that gender and/or racial bias was a constant concern that kept coming up during the HR review. (Cossel Dep. 64:10-13).

20.     On April 17, 2018, HR sent Provost Wiencek a report of the Review. According to the Review, these complaints included "[a]n overarching concern that gender bias and/or sex discrimination plays a role by disproportionately affecting female faculty and staff negatively." (Exh. 176 at p. 1). The report also documented that:

a.  the gender bias played out with regard to "who is allowed to speak at the meetings and in what way." (*Id.,* p. 5; Cossel Dep. 61:7-62:1)

b.  "Several faculty members feel strongly that females are disproportionately 'shut down' or admonished by those in the senior leadership group for their aggressive communication." (*Id.;* Cossel Dep. 63:1-9).

c.  several people were concerned with the "gender bias as it relates to the lack of female or diverse senior leadership." (*Id.,* p. 6).

d.  the "perception that racial diversity is not highly valued by the College of Law administration and faculty body. A number of participants identified potential racial bias within the COL." (*Id.,* p. 4; Cossel Dep. 59:4-59:20).

e.  that there is no space to discuss "important issues regarding gender and race." (*Id.,* p. 4).

f.  that the COL "is not actively supportive of faculty, staff, and students of color." (*Id.,* p. 4; Cossel Dep. 60:8-13).

g.  And that the COL "leadership is perceived to lack cultural intelligence" (*Id.,* p. 4).

21.     Cossel testified that it was important for the COL to address the gender and racial bias issues. (Cossel Dep. 64:14-17). In the report to the Provost, HR wrote "Please note: Human

Resources is aware of the possibility that some of the concerns raised during the course of the [Review] could rise to the level of what is considered discrimination, retaliation, gender or sex discrimination." The report then said that a referral to the University's Office of Civil Rights and Investigations ("OCRI") or another appropriate department "may be necessary and communication with the subject matter experts in those areas will be key." (Exh. 176, p. 1).

22.     According to Cossel, the entire report was given to OCRI to investigate. (Cossel Dep. 60:14-25; 64:8-65:9). At the conclusion of the review, the record reflects the following actions taken in response:

a.  Cossel testified that she has no knowledge of what actions OCRI took in response to her report. (Cossel Dep. 65:18-66:6).

b.  The Director of Human Resources, Brandi Terwilliger, on behalf of the University testified: "We provide that report to the provost and between him and his supervisory chain they determine what action, if any, is going to be taken." (30(b)(6) Dep. (Terwilliger) 31:18-32:20). Once the report was handed off to the Provost office, HR is not aware of what, if any action was taken. (*Id*. 32:17-33:10).

c.  The Provost testified that he essentially passed the buck to Dean Long who, according to the Provost, sought out experts in the field to create action plans to move forward. The Provost said that the cost quotes were "well over $100,000. . . so I think that was shelved because of the cost. And [Long has] focused on internal resources and trying to facilitate a more positive environment. . ." (30(b)(6) (Wiencek) Dep. 49:2-50:12).

d.  Cossel testified she "did some research and made a recommendation and even facilitated some conference calls with a consultant agency with [Long]." (Cossel Dep. 66:7-21; 96:19-97:15). Then, according to Cossel, "[i]t sort of just stopped at some point . . .. then I don't

know what happened from that point forward. It didn't seem to go anywhere." (*Id.*, 66:22-67:11).

e.  Meanwhile, Long testified that "the Provost said I wasn't getting $120,000," for a consultant. (Long Dep. 231:25-232:8). As of October 2018, Long told Sanders that he and the Provost had chosen to bring a consultant to campus to focus on the climate and culture review (as opposed to the diversity issues), which he viewed as largely being an issue of the locational divide, *not* racial or gender bias. (Exh. 161; Long Dep. 227:18-228:13; 232:24-234:3; 242:19-23). Long admits that the quoted cost of the consultant was for the bigger picture, organizational concerns and that he could have chosen to focus on the diversity issues first. (Long Dep. 219:15-220:1; 229:22-230:14). And he admits that he did not ask the Provost if he could have any money (*i.e.*, less than $120,000) for a consultant. (*Id.* at 232:5-18).

23.  In November 2018, Dean Long met with the faculty and provided an executive summary of the HR Report and then outlined his thoughts on moving forward. (Exh. 7; Exh. 42). Long's proposal does not specifically mention any gender, race, diversity or EEO issues or efforts. (Long Dep. 241:12-24). He admitted in his deposition that for some inarticulable reason, he believed it was just one or two people[1] who complained to the Provost about diversity issues. (Long Dep. 221:21-222:22). Not surprisingly, at least some faculty saw the big takeaway from the review as fractionalization between the two campuses. There was no renewed attention given to a diversity consultant. (Couture Dep. 170:15-171:6; 171:10-171:19).

24.  The University purports to have taken several remedial actions in response to HR's documentation of possible gender and race discrimination at the COL: revising the diversity plan,

---

[1] Notably he thought the two people were Sanders and Katherine Macfarlane.

**8 | PLAINTIFF'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

implementing implicit bias training, and adding a required diversity and inclusion statement as a requirement for prospective employment. *See* Def. Memo. P. 8. However, there is no evidence that any of those actions were taken until *after* Professor Sanders filed her lawsuit in June 2019. (Long Dep. 234:24-235:17; 237:18-238:12). The following facts also put Defendants' intentions at issue:

a.  In early 2018, the COL realized that it was non-compliant with certain requirements of its own Diversity Plan which were cited as remedial actions in response to the ABA's concerns about "inflammatory comments about whether women should be in law school" discovered during site visit in 2011 (*see* ¶ 11, above). (Exh. 35; Couture Dep. 100:6-101:10). Then, again in the fall of 2018, there was a call to review the Plan for possible non-compliance and amendment given the concern with ABA visit (which was expected in 2019). (Exh. 37; Couture Dep. 125:13-25; Adams Dep. 66:19-25). Thus, the plan was revised provisionally in May 2019 and finalized in Sept. 2019. (Couture Dep. 126:1-13).

b.  The faculty received a one hour implicit bias in hiring training on September 9, 2020 as a result of initiatives coming from faculty-led work groups inspired by George Floyd's murder in May 2020.[2] (Sanders Dec., ¶ 23 ; Couture Dep. 109:17-110:13).

c.  The diversity and inclusion statements only came to fruition in 2020, and came after Long expressed dissatisfaction with faculty asking candidates about their commitment to diversity and inclusion in the interview process. Long informed the faculty that in lieu of questioning candidates about this topic, the statements would be available (but not required) to be reviewed. Notably, these statements were not provided to the faculty

---

[2] There was voluntary implicit association testing and roundtable sponsored by the Diversity Committee in late November 2018 but no indication that this was responsive to the specific gender and race issues documented in HR report. Notably, in response to the announcement of the event, Seamon pulled an article that questioned the viability of measuring implicit bias which was then circulated with the invitation, he did not take the testing, did not attend the roundtable, and has "never found time" for the testing. (Exh. 53; Seamon Dep. 70:4-8, 71:10-12, 72:16-22, 76:21-77:6 ).

**9 | PLAINTIFF'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

regarding the COL Dean position they are currently in the process of filling and Sanders' request to review them was rejected. (Sanders Dec., ¶ 24).

25.     Not surprisingly, there continue to be issues surrounding race and gender at the law school after Sanders' suit. Some of the significant events are summarized in *Plaintiff's Statement of Facts* in support of her Partial Motion for Summary Judgment and will not be repeated, but are incorporated by reference, herein. (*See* Dkt. # 37 ¶¶ 2-23).  Since HR's April 2018 Report, there have been at least **twenty (20)** more reports of sex or race/national origin discrimination to OCRI through fall 2020. (Exh. 186).[3]

### Specific Discriminatory Events Re: Professor Sanders' Employment

26.     In the summer 2014 newly hired Dean Adams and his Associate Dean, long-time professor Richard Seamon (both white men), asked Sanders to teach a new course (Constitutional Law I) in the 2014-2015 year. (Adams Dep. 209:22-210:13). This new course added an extra credit to her teaching load so that she would teach 13 credits as opposed to the standard 12 credits. (Sanders Dep. 53:1-21; Sanders Dec., ¶ 10). Sanders knew that this increased course load was a result of a number of last-minute transfer students into the law school, and she expressed willingness to take on the new course. (Sanders Dec., ¶ 10)

27.     Shortly thereafter Sanders learned that a white female professor had also taken on a new course (making her load 13 credits as well) but had been promised a future course release in return. (Sanders Dec., ¶ 12). Thus, Professor Sanders asked the deans about a course release or other compensation. (Adams Dep. 211:2-16).

28.     Adams initially told her: "I understand that we do not offer additional compensation or course release for a one-credit overload. Thank you again for making the adjustment to your

---

[3] This includes a report that the n-word was being used "at least three times" in the same class without intervention by the professor. (Exh. M at 1.24361-2).

**10 | PLAINTIFF'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

teaching package." (Exh. 109; Exh. N at RFA No. 3). Seamon told Sanders that Adams was "very firm in resisting any faculty member 'banking' extra credits." (Seamon Dep. 157:9-18).

29.     Sanders followed up with Adams disclosing that she had been told that a colleague would receive a course release for the one-credit overload. Adams thus had no choice but to admit the same: "You are correct that a colleague will have a course release for a one-credit overload," and then he changed the rationale for denying Sanders' request saying that the "circumstances and burden of that overload are different and in my view justify the release." (Exh. 109; Adams Dep. 213:18-214:9).

30.     In fact, this other professor, Wendy Couture, was not *asked* to take on a new course, but rather *volunteered* to do so *if* she could get a future course release, something that Adams accepted without hesitation. (Couture Dep. 38:11-23; 39:3-14; Adams Dep. 212:18-24).

31.     Additionally, the 2014-2015 academic year was just prior to when Sanders submitted her tenure application (in the summer 2015) and as such was a crucial year for scholarly achievement. Couture had already achieved tenure and in fact had already submitted her application for promotion to full professor. (Adams Dep. 215:6-22).

32.     These changing explanations did not sit well with Sanders and triggered a series of communications with the deans via email and in person regarding her concerns about disparate treatment. (*see, e.g.*, Exh. 64; Seamon Dep. 160:17-162:12; Exh. 68)

33.     Despite Professor Sanders' advocacy for fair treatment, the deans refused to grant Sanders a course release similar to the release granted to Couture. (Adams Dep. 215:23-216:4)

34.     Then in February 2015 Sanders was told that she would be assigned Constitutional Law I again the following academic year (fall of 2015), giving her 13-credit overload for a second year in a row. This was again prior to receiving tenure or promotion when extra time is needed to

develop her scholarly portfolio. (Seamon Dep. 165:10-166:3; Adams Dep. 216:5-12). This was despite the fact that she had been told that one of the reasons she was not getting a course release was because the 2014-15 overload was a "one-time thing." (Sanders Dep. 96:2-5).

35.    Seamon agreed that this assignment was not "optimal for an untenured junior faculty to have a 13-credit teaching loads while the current expected teaching load is 12 credits." (Seamon Dep. 175:4-175:17). He also told her that other faculty had gotten a release for having planned conferences or symposiums, as he was aware that Stephen Miller had gotten a release for hosting a symposium. (Seamon Dep. 181:8-17).

36.    Sanders objected to this assignment under the circumstances *without* consideration of a release or compensation in some form. (Adams Dep. 216:13-21; Sanders Dep. 96:21-25). Sanders reiterated her concerns of disparate treatment. (Adams 218:05-219:16). This was especially true given that "the two individuals who started with me did not have an overload . . .so the fact that I would be [overloaded] in that way leading up to my tenure was troubling." (Sanders 96:9-14).

37.    For example, Sanders raised concerns about the lack of neutral criteria leading to arbitrary results and a lack of fundamental fairness. Sanders further questioned that the explanations given to her were inadequate to explain different treatment between similarly situated faculty members. (Exh.68; Exh. N at RFAs No. 6-8)

38.    Seamon labelled her complaints as being "passive aggressive," and admitted he was frustrated by her general allegation of unfair treatment. Yet he also testified that he could appreciate how an untenured female professor of color would be hesitant to raise concerns about racial bias. (Seamon Dep. 196:5-8. 212:16-22). In his response email to Sanders, he suggested she actually had a lighter teaching load than her colleagues; accused her of being less than truthful in

her assertions; and told her that the term "'bias' is a loaded term . . . if you are claiming illegal bias by the College of Law, then it is incumbent on you to make the charge forthrightly, so we can respond." (Seamon Dep. 209:25-211:10; 212:23-213:13; Exh. 68).

39.     Seamon did not report her concerns to the OCRI. (Seamon Dep. 213:3-21). Rather than provide her with a course release, the deans reassigned the course to someone else. (Adams Dep. 216:19-21; 219:12-18).

40.     Adams told Sanders that her "continuing efforts to get what [she] want[s] with little concern for the impact of the effect of any changes on your colleagues or the College sows bad feelings and distrust by continuing to spread a false narrative." (Exh. N at RFA 15; Exh. L at 1.23041).

41.     When asked why she thought these actions were discriminatory, Sanders testified: "So the implausibility of some of the rationales that were used, the humiliating nature of those rationales, the revolving excuses that I was giv[en] in e-mail, in writing, the inconsistent excuses I was given, it left me with little other choice but to suspect…race and gender." (Sanders Dep. 64:10-15).

**<u>Retaliation/Ongoing Discrimination</u>**

42.     Seamon and Adams took some suspect actions vis-à-vis Professor Sanders after her complaints. For one, Seamon was the only member of her eight-person tenure committee that voted no on recommending her for tenure. (Seamon Dep. 116:24-117:8; 123:4-21; Exh. 58). He was also one of two faculty who voted negatively on her tenure recommendation.[4] (*Id*. 123:15-21).  His

---

[4] At the COL, a professor submits a tenure packet in late summer/early fall. Their scholarship is sent to external reviewers. A tenure review committee then reviews all the materials and meets with the candidate before making a recommendation to the Dean on whether the candidate should be granted tenure. However, the full faculty also get to vote on whether to recommend tenure as well. Then, the Dean makes a formal recommendation to the Provost, who makes the final decision the next spring. (Seamon Dep. 111:4-115:8).

rationale at the time of his deposition was that he doubted that the quality of her scholarship was excellent even though four external reviewers gave positive recommendations for her tenure. (*Id*. 122:10-15). Seamon admits that Sanders has had some "great article placements" and some "high-level law reviews." *See* ¶ 7b above.

43.     Moreover, Seamon did not vote negatively for a white male candidate, Stephen Miller, who was also up for tenure at the same time, even though Seamon admitted that he also thought Miller's scholarship was "fairly lightweight," and he regarded him as "uncollegial" at the time. (Seamon Dep. 124:7-13; 125:16-21; Exh. 59).

44.     The only other faculty member who voted negatively on Sanders' tenure was Dean Adams. (Adams Dep. 141:4-142:4; Exh. 94).

45.     Seamon also provided Sanders with a less favorable summary of her 2015 teaching evaluations as part of her annual performance review. (Seamon Dep. 42:1-43:19). Notably, at least one of those student evaluations clearly reflected racial bias as admitted by Seamon. (*Id*. 47:21-49:9). Despite this, he did not flag or remove this evaluation, nor did Adams, even after Professor Sanders objected to the same. (Seamon Dep. 49:10-20; 44:7-9, 45:7-46:3, 46:20-47:9; Adams Dep. 103:23-104:2).

46.     Instead, it was the next Associate Dean who advocated for its removal stating "[d]ue to the clear racial bias, this review should be removed from Professor Sanders' file" so as to not negatively impact her promotion. (Cosens Dep. 16:23-17:24; Exh. 98). This dean said she was surprised to see the evaluation had not already been flagged and removed. (*Id*.18:19-19:13).

47.     Once Associate Dean Seamon stepped down, Professor Barbara Cosens became the new associate dean (in June 2016). Sanders told Cosens about her concerns with the changes to her teaching package including that she believed that Adams and Seamon had deliberately engaged

in misrepresentations and deliberately attempted to delegitimize her teaching and scholarship. (Cosens Dep. 22:21-23:13; 34:9-22; Exh. 216). Cosens was convinced that the changes made to Sanders' teaching package were odd. (Cosens Dep. 56:07-17; Exh. 157). While Cosens did not question Adams about *why* he had done what he did to Sanders' teaching package, she did ask him if she could try to fashion a solution. (Cosens Dep. 27:11-28:19).

48.    At the same time, on the recommendation of a female colleague Sanders had enlisted the help of the University Ombudsperson to attempt to get her teaching package back on track. (Couture Dep. 151:1-16; Adams Dep. 220:5-9; 223:11-25).

49.    Typically, faculty would continue to teach the same courses they had previously taught unless there was a course that opened up because of a retirement or other separation. (Seamon Dep. 145:17-25). This is especially true once a professor has established scholarship in their area of expertise. (Sanders Dep. 34:19-35:3). However, Sanders was notified in April 2016 that another course she developed and introduced – Advanced Criminal Procedure, was being assigned to a white female professor with less experience and tenure. (Adams Dep. 222:3-16). The School denied Sanders' request that she and this professor rotate teaching the course. (Seamon Dep. 152:8-22; 233:23-235:17; 237:21-239:17; Adams Dep. 206:11-18). Yet, Sanders later found out that another white male faculty's proposal to rotate a course was pitched by Seamon in late 2015. (Exh. 77).

50.    When the Boise campus expanded to include first year students, Sanders indicated that she would be interested in teaching Constitutional Law I as an additional course if necessary as she had taught the course before. Instead, she heard that non-black junior faculty were offered to teach that class first, which was confirmed by Seamon who said that, while it was "relevant that

you'd taught the course, that did not guarantee you'd be assigned it." (Exh. 71; Seamon Dep. 223:1-228:10).

51.     Sanders was also told that she could not teach her First Amendment course as a distance course to Moscow students. (Sanders Dec., ¶ 15). However, the COL later assigned a visiting professor (white, male) to teach the class as a distance course to Boise students. (Seamon Dep. 241:14-21; Exh. 75; Adams Dep. 206:19-207:5).

52.     Professor Sanders was ultimately successful in obtaining a course release and getting her teaching package back on track thanks to the intervention of Associate Dean Cosens and the University Ombudsperson, Barbara Beatty. (Exh. 111; Adams Dep. 221:4-18; 226:10-16).

53.     Thus, in spring 2018, Professor Sanders finally received a course release (three years after the overload). (Cosens Dep. 40:14-22; Exh. 217; Adams Dep. 221:4-18).

### The Associate Dean Openings in 2017 & 2018

54.     During a faculty retreat in early May 2017, Dean Adams discussed the newly created dual-Associate Deans of Faculty positions – one in both locations. (Adams Dep. 108:3-15). During the retreat, Sanders raised the lack of female/racial diversity representation in leadership positions and asked Adams what steps he would take to address that issue. (Adams Dep. 108:16-19; Couture Dep. 105:9-15; Sanders Dep. 99:1-2). Adams was dismissive of her question to the point that several faculty members noted his hostility toward her. (Sanders Dep. 99:22-100:16).

55.     The Associate Dean positions were announced with the following listed qualifications: "Tenured or tenure-track faculty from existing ranks, preferable tenured full professor," and "two-year commitment preferred." (Exh. 99).

56.     There was no official application process, rather Adams asked that people inform him of their interest. Adams admitted that these positions can be hard to fill, and there are not a lot of people clamoring to take these positions. (Adams Dep. 109:5-11; 160:16-161:1).

57.     Associate Dean Cosens had encouraged Sanders to consider serving as an associate dean in the past. (Cosens Dep. 68:15-69:11). Cosens believed Sanders was very smart and had other characteristics essential to administration. (*Id*. 69:12-22). After the faculty retreat in May 2017, Sanders told Cosens she would be willing to serve as an associate dean to which Cosens told her that was "an amazing offer and you would be fabulous." (*Id*. 71:22-72:15).

58.     On May 23, 2017, Sanders emailed Adams to express her interest in the Boise Associate Dean position and offered to postpone her sabbatical for a year to fill the position for two years. (Adams Dep. 161:16-162:1; Exh. 100). At this time, Adams had evaluated Sanders' performance on several occasions and was aware of her various leadership positions which included: chairing the COL diversity committee; leadership roles on non-profit boards; a member of the executive committee of the Association of American Law Schools (AALS) section on Constitutional law (an "important position" according to Adams); an officer position within the Inn of Courts; and chairing a University wide committee. (Adams Dep. 97:11-97:24; 100:21-101:14; 104:3-105:20).

59.     Adams met with Sanders about the position. Sanders explained why she was interested in the position and why she was qualified for the position. (Sanders Dep. 109:23-110:2; 115:20-118:20). Adams told her that she should "wait two years to reapply for the position" and suggested that she take a leadership training course but declined to answer when Sanders explicitly asked if "any other individuals who met the minimum qualifications had applied for or expressed an interest in the position." (Sanders Dep. 109:23-110:12).

60.     Adams claims that Cosens agreed that Sanders was not ready to fill a leadership role. (Adams Dep. 163:21-164:22). However, Cosens does not recall any communications with Adams about Sanders' interest and testified that she would have been supportive of her serving in that role. (Cosens Dep. 73:19-74:2). She does not recall any communications from Sanders saying that she was not serious about serving as associate dean. (Cosens Dep. 76:20-24). Further, Cosens cannot think of any reason why Sanders would not have done as good a job as Lee Dillion (the ultimate selection) in the dean role. (*Id*. 77:16-20).

61.     Adams admits that Sanders was the only person who expressed interest in the Boise position. (Adams Dep. 172:18-25). Despite this, Adams started talking to a select group[5] of professors about who should be associate dean and encouraged Wendy Couture to apply. (Couture Dep. 66:19-67:1). Couture considered it, but ultimately decided not to. (Couture Dep. 64:4-8). Couture was aware that Sanders was interested in the position. (Couture Dep. 85:11-21). She denies having any communications with Adams about Sanders applying for the position or Sanders' qualifications for the position. (*Id.,* 85:22-86:4). Couture also said she would not be surprised if she encouraged Sanders to apply for the position. (*Id.,* 86:22-87:1).

62.     Ultimately, Adams solicited a non-tenured/non-tenure track faculty member, Lee Dillion (white male), who was set to retire and therefore would be unable to serve preferred two-year term. Thus, Dillion did not meet either of the listed qualifications for the associate dean position. (Adams Dep. 173:1-10; 176:21-177:16; 178:2-6).

---

[5] Defendants say Adams heard "near universal support from faculty members" for Dillion and Couture. Def. Memo, p. 5.  However, Adams admits that he only disclosed Sanders' interest in the position to a select few faculty. (Adams Dep. 183:7-185:13). Although Adams said that Dillion was not supportive of Sanders, the contemporaneous documents show that Dillion said: "I'm not sure I am the right person for this, but no one else down here was willing to step up." (Compare Adams Dep. 175:22-176:7 with Exh. 203 at 1.35451). *See also* ¶ 60 disputing Adams' testimony that Cosens was not supportive of Sanders.

**18 | PLAINTIFF'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

63.     On June 29, 2017, Dean Adams announced his selection of two white men for the two associate dean positions saying "Lee Dillion and Jerry Long have expressed a willingness to serve as Associate Dean for Faculty Development in their respective locations." (Adams Dep. 178:11-23; Exh. 102). In response, Sanders again raised the concern about lack of women in leadership, concerns which were echoed by another female Professor, Katherine Macfarlane. (Exh. 102; Couture Dep. 135:21-24). Thereafter, Adams emailed the following admonition to all faculty: "I hope we can approach the shared goals and challenges by listening with openness and respect and mutual good faith, refraining from the insidious gossip and efforts to 'stir things up' that lead to a toxic atmosphere and discourage people from serving." (Exh. 103; Adams Dep. 181:1-25).

64.     That fall Sanders asked Adams for a meeting as to why she was passed over for the associate dean position. Dean Adams met with her, inviting the new Associate Dean, and told her that she was not selected because: 1) he did not believe she was serious; 2) her committee service was not strong enough such that she lacked leadership experience; and 3) he did not want to interrupt her sabbatical. (Adams Dep. 187:8-188:2; 190:2-5; 191:16-18; 192:8-13; 194:14-22; Sanders Dec., ¶ 16).

65.     When filling the position in 2018 (planning for Dillion's retirement), Adams once again just expected people to express interest as there was no formal application process. (Adams Dep. 195:16-196:8). Adams was aware that Sanders was still potentially interested in the position, but he cannot recall talking to her about it. (*Id*. 196:9-17). Sanders denies that he approached her about the position. (Sanders Dec., ¶ 17).

66.     Adams did talk to Stephen Miller (white male), one of Professor Sanders' contemporaries who was on sabbatical at the time, about the position. Adams testified that Miller had "done an excellent job in the service roles he had had with leadership, particularly the law

review symposium," and that three other professors expressed support for him. (Adams Dep. 199:18-200:4). Sanders had led two critical legal studies symposiums and had organized the regional competition for national moot court in Boise, which Adams heard from alumni, judges and coaches from other schools was a "great success." (Adams Dep. 107:19-108:1).

67.     The Provost's office later informed Adams that Miller's appointment was not approved and additional justification and rationale for the decision was needed before a recommendation of support to the AA/EEO Office could be made. (Exh. L at 1.05257-61). Because Adams had not used an open and competitive approach, the University had to obtain an AA/EEO waiver. (Exh. L 1.05250-52).

68.     Through this process, Dean Adams indicated that Miller was selected because he was a "Full professor, tenured, in Boise, works well with Lee Dillion, willing to serve. Lacks admin experience." He later clarified that Miller was the only individual to express "sincere" interest. (Exh. L at 1.05259-60). Internal emails show that Lee Dillion informed Adams that Sanders had indeed expressed interest in the position (Exh. 104), and Adams admits that she also had a "pretty good working relationship" with Dillion. (Adams Dep. 187:21-188:2).

### The Summer Research Stipends

69.     When Professor Sanders was hired in 2011, she was told that she would be eligible to receive a summer research stipend in the amount generally available to faculty in 2012 and in subsequent years. (Sanders Dec., ¶ 18; Dkt. #38-3). These stipends are meant to help encourage, support and reward professors' scholarly work, which is one of the factors for evaluating tenure and promotion. (Seamon Dep. 84:21-85:14).

70.     The University has offered summer research stipends every year that Professor Sanders has worked at the law school.  Sanders received a stipend for every year she applied until

2018 when she was the most junior professor rejected. 2018 was the first (and only) year that not all applicants received stipends.  (Sanders Dec., ¶ 18-19).

71.    In fact, for the 2016 stipends, the COL had planned to award 12 stipends but received 16 applications. (Seamon Dep. 83:24-84:3; Exh. 54). Associate Dean Seamon recommended several ways to vet the applications including asking the most senior professors (who are also the highest paid and have had more time to develop their scholarship) to forego a stipend. (Seamon Dep. 85:18-87:12). Ultimately, Dean Adams merely reduced the dollar amount of the stipends in order to fund all applicants. (Seamon Dep. 86:24-87:7).

72.    Sanders did not apply for a stipend in 2017 as she taught summer school instead. (Sanders Dec., ¶ 19).

73.    All of the 2018 stipend applicants had viable applications. (30(b)(6) Deposition (Adams) at 27:18-23). In 2018, Sanders did not receive a stipend but both of her white male contemporaries (*i.e.*, professors hired at the same time she was, granted tenure and promotion the same time she was) did receive stipends. (Exh. 8 at ¶ 26; Adams Dep. 233:3-7).

74.    The contemporaneous documents reflect that the "basis" for rejection of Sanders' stipend request was because Sanders was going on sabbatical. Adams confirmed this "basis." (Exh. 115; Adams Dep. 232:21-233:2). However, two successful stipend candidates, both white, were in the same position – one man (Stephen Miller – returning from sabbatical), and one woman (Barbara Cosens – entering sabbatical). (*Id.*)

75.    After Sanders asked Adams to explain the areas in which she failed, he told her that the priority was to support junior faculty first, and also referenced "heavy service load" specifically referencing serving as associate dean as criteria used by the COL. (Exh. 116). There were three successful professors who had *more* seniority than she did, and two that had the same

seniority. (Sanders Dec ¶ 20; Exh. 115). None of the successful candidates had served as associate

dean in the academic year prior to summer of 2018. (*Id.*)

76.     Additionally, Sanders' extensive service at the COL/University was ignored. For

example, her stipend application specifically referenced the following service:

> I chaired the University's Administrative Hearing Board for four semesters. I was
> a member of the Admissions Committee for the 2014-2017 academic years and
> until the fall of 2018 was the only faculty member in Boise to have served on this
> committee during my time at that location. This past academic year, coached the
> Moscow National Moot Court team for one semester and coached its Boise
> counterpart for three semesters. This past academic year, I recruited 100 local
> attorneys to judge the regional competition for the National Moot Court
> Competition. I have advised the Idaho Critical Legal Studies Journal since 2014,
> and organized and planned the journal's 2017 and 2018 symposiums.

(Exh. K at 341-44, Exh. L at 1.05960-62). Moreover, Adams had just completed Sanders' 2017

performance evaluation and admitted that "she's doing quite a bit of service." (Adams Dep. 106:1-

107:2).

77.     Defendants suggest that Sanders requested and was granted a lighter committee

load prior to her application. *Def. Memo*, p. 21, n. 9. First, that is an inaccurate recitation of her

complete testimony: "I believe Barb Cosens and I discussed my committee assignments in the fall

of 2017 **and I should say our conversation was not about lighter committee load, it was about**

**unloading – I was overwhelmed with committee service, far more than my colleagues, so our**

**comment was about lightening the overwhelming amount of committee service** that I had been

asked to perform in the spring of 2017."  (Sanders Dep. 44:21-45:7 emphasis added). She went on

to say that "I requested a more fair load and that request was granted." (*Id.,* 46:5-9) Second, Cosens

agreed that her request was warranted. (Cosens Dep. 92:24-93:4). Third, this was never articulated

by Adams as a reason for her rejection.

78.     Indeed, the COL specifically revised the criteria for 2019 stipends to acknowledge that the service criteria includes things like "assisting with the law review symposium or moot court competitions, supervising a high number of [Upper Division Writing Requirement], and active advising of clubs," all things that Sanders did. (Exh. L at 1.06309).

79.     According to Cosens, Sanders was "one of our faculty who gave to students in abundance," despite facing racism from some of them. (Cosens Dep. 19:25-20:9). Additionally, as one of the only faculty of color, Sanders carried the "bulk of our diversity" meaning that she would have taken on extra service-related duties like dealing with student concerns, hiring issues, serving on diversity committees and panels. (Cosens Dep. 61:20-63:2). Cosens also testified that comparing people's service loads is "impossible and an approach that leads to comparing apples to oranges." (*Id.,* 90:18-92:7; Exh. 219).

80.     When Sanders pointed to some of these facts and raised concern about the pay disparity this caused, Adams told her "[a]s you are now raising issues of pay disparity and disparate impact, I will not be responding further via email." When Sanders asked how it would be addressed if not via email, Adams ignored her and admitted that he did not forward her complaints on to anyone, including OCRI. (Exh. 116; Adams Dep. 235:10-236:10)

81.     Sanders applied for a stipend again in 2019 (after Dean Long had taken over for Adams, and after she had filed her EEOC charge). Adams represented in 2018 that faculty passed over were supposed to receive priority for a 2019 stipend. (Exh. 115). While ultimately Sanders did receive a 2019 summer stipend, the documents reflect that Long was reluctant to give her one. His associate deans recommended that Sanders receive a stipend, but Long told them that "I have a question about [Sanders'] that I haven't decided how to handle and haven't gotten around to asking you about it." (Exh. 214; Long Dep. 443:11-444:2). Apparently, Long was hung up on the

fact that her application said that her summer project was unrelated to her sabbatical projects without further explanation. Associate Dean David Pimentel responded by saying:

> If she says it's 'unrelated' isn't that good enough? We can take her at her word, right? . . . I think you've got bigger issues to fight over with SRS. Fighting over this one could be counterproductive, if she is the *only* one of the applicants who got pushback from you on her proposal. It plays all too well to her arguments that she is singled out, or held to different standards.

(Exh. 214; Long Dep. 444:4-19). The "bigger issues" referenced her EEOC compliant. (*Id*.).

82.    Professor Sanders testified that she was discouraged from applying for a 2020 summer stipend "[g]iven the deterioration of my relationship with the current Dean, Jerrold Long, given his performance evaluation where I did not even get acknowledgement for the scholarship that I had done in the past few years, I thought there was a very low probability that I would be awarded a summer stipend, and I did not want to go through any type of additional humiliation…" (Sanders Dep. 124:7-17). It should be noted that all applicants received a 2020 summer stipend making 2018 the only year in COL history where an applicant was *not* funded. (Exh. K at 3974-76).

## Ongoing Discrimination/Retaliation under Dean Long

After filing her lawsuit in June 2019 and returning from a year-long sabbatical during the 2018-2019 school year, Sanders has continued to face ongoing retaliation and/or discrimination at the hands of Dean Long. Some of these events are set forth in *Plaintiff's Statement of Facts in Support of her Partial Motion for Summary Judgment* and are incorporated herein. *See* Dkt. # 37. Additional relevant facts are also outlined in *Plaintiff's Memorandum in Support of her Motion to Add Defendant Long in his Individual Capacity*. *See* Dkt. # 30-1, p. 3-6, also incorporated herein. Additional facts include:

83.     During her 2018 evaluation (given in February of 2019), Long specifically mentioned that Sanders had filed an EEOC charge and told her that some of the issues were miscommunications. (Dep. Long 246:13-25). He also brought up the fact that she had negotiated a course release with the previous dean and made sure she understood she should not expect future course releases suggesting that she gotten some special treatment. (*Id*. 245:8-23).

84.     Long emailed the entire faculty and staff about Sanders' lawsuit but specifically excluded her from the group emails. (Exh. 38; Long Dep. 267:3-23).

85.     Sanders testified that Long "devalues my teaching . . . I think he has no interest in my scholarship . . . I also have come to believe that he does not respect or believe how I feel about the culture and climate at the law school including the student experience, our hiring process, and my personal experiences as a faculty member." (Sanders Dep. 75:3-14). She went on to say that Long's communication to her on certain issues have been "inhospitable, have been disrespectful, and have borderline been accusatory of improper behavior without any follow-up or evidence to back it up." (*Id*. 75:15-21). And she said his felonious recordings of their conversations tells me "how he views me, his lack of respect for me, my constitutional rights, my statutory rights. And his belief that I belong or I have earned my place on this faculty." (*Id*. 76:6-11).

86.     Defendants maintain that Long's negative 2019 evaluation of Sanders was based on: her inconsistent attendance at faculty meetings; his perception that her communications negatively affect the culture and climate of the COL; her "persistent refusal" to comply with travel and reimbursement policies; and her refusal to cover First Amendment in her Constitutional Law II course. (*Def. Memo*, p. 10). In addition to facts already presented or incorporated, the following facts are relevant to these issues:

a.  Long made faculty meetings related to hiring mandatory in fall 2019.  Many of these have been set with short notice, *i.e.,* just a couple of days. (Long Dep. 437:14-19; 441:2-9; Sanders Dec., ¶ 22). Many of these have conflicted with Sanders' other obligations at the COL like her preparation time between classes or meetings with students or events in this lawsuit such as depositions. (Sanders Dec., ¶ 22). There have been other faculty who have been late or not present at these meetings. In fact, according to an email in November 2019 half the faculty was absent from a job talk; five faculty were late. (Long Dep. 287:23-289:5). Yet, there is no evidence that they have been targeted in the same fashion as Sanders. In fact, at the time of his deposition in November of 2020, Long said "there are some who have not been attending, and I need to follow up with them, and they're – you know, we're going to address this across the board." (Long Dep. 439:1-5).

b.  Long's January 31, 2020 email to Sanders accusing her of unprofessional communications came just days after she questioned the legality of his undisclosed recording of the community forum in January. *See* Dkt. #37, SOF ¶ 37. Additionally, in May 2020 (after her negative review) Sanders was given the Diversity Award by vote of the faculty which specifically noted "Sanders' work this academic year in promoting meaningful dialogue among faculty, staff, and students around culture and climate issues." (Long Dep. 72:20-74:16; Exh. 133). She has also been thanked by other faculty for speaking out on difficult topics like racism within the COL including the genocide comment which some students and faculty felt was threatening violence. (Exh. K at 2739). The COL faculty and the University President have committed on paper to welcoming uncomfortable and difficult communications on these topics. (Birch Dec., Exh. R). Long somewhat reluctantly agreed that faculty and administrators have a responsibility to speak out when they see injustice

and that it would be wrong to silence people just because concerns might create an uncomfortable discussion. (Long Dep. 98:1-99:13). He also testified that he does not believe there is any institutionalized racism at the University. (*Id*. 101:21-24).

c. Defendants have not produced a shred of evidence that Sanders has violated travel/reimbursement policies in any meaningful way. Long admits that the basis of his concerns (with one exception) was based on hearsay, not events he was personally involved in. (Long Dep. 279:12-280:10). After receiving an accounting of travel expenditures in June 2018, Long immediately concluded that Sanders was abusing personal travel and asked for a report with as "much detail as possible" about approval of her travel. In response, Long was told "I researched each trip to ensure approval was requested and received and it was." (*Id.* 417:24-419:23). He admitted that he never discussed these travel issues with Sanders directly nor with the Boise Associate Dean at that time, Dillion. (*Id*. 421:13-422:10). In fact, the only specific policies referenced in the materials produced by Defendants in discovery are policies that were being cited by Dillion to defend Sanders' travel. (Exh. 82; Adams 80:12-84:10). Adams admitted that there were delayed bookings for travel and conferences for Sanders that were not her fault. (Adams Dep. 81:12-24). He also admitted that he was never aware of any increased costs to the University based on travel changes that Sanders made. (*Id*. 64:14-20).

d. In contrast, Sanders testified at length about a number of occasions where she was accused of improper behavior regarding her travel without evidence, follow-up, or citations to policies or rules. (Sanders Dep. 194:18-206:25). She also said that there was at least one

occasion where she felt like travel was approved and then rescinded.[6] (*Id.*) And, she said that administrative staff treated her inappropriately. (*Id.*)  In fact, one staff member told her he created a new reimburse rule such that she would not be reimbursed for travel purchases until after the trip occurred. This rule was not implemented after she questioned it, and another faculty member believed that there were gender connotations underlying his communications. (*Id.*; Adams Dep. 84:20 – 86:12).

e.   Her supposed refusal to teach First Amendment is addressed in ¶¶ 104-116, below.

f.   Long included other reasons for her negative evaluation including that her evaluation for scholarship was "to be determined." (Dkt. #38-19). Long was aware of her publication in the Cornell Law Review and when asked if it was a prestigious journal he said, "I guess so." (Long Dep. 287:11-17.)

g.   He also included third-hand information about Sanders from events prior to 2019 and never asked Sanders for her side of the story. (Long Dep. 272:14-273:10).

h.   Sanders testified that the "lasting impression for me about that performance eval was how upset [Long] was that I notified OCRI and the President about his illegal, nonconsensual recording. . .. (Sanders Dep. 186:11-15).

i.   The facts set forth in *Plaintiff's Statement of Facts* supporting her partial motion for summary judgment detail additional information about Long's review of Sanders. (Dkt. #37, ¶¶ 37-47.)

---

[6]This was an incident in which she had been told her travel would be approved by Cosens but was later denied by Adams who suggested she had not provided adequate information about presenting at the conference and insinuating  she lied about having attended the same conference the year before. (Adams Dep. 72:11-73:2; 76:4-77:16; Exh. 80)

**Other evidence of discrimination/retaliation**

87.     Another female professor, Katherine Macfarlane, raised multiple discrimination and retaliation concerns involving Adams. (Adams Dep. 30:9-13, 115:14-24; Exh. 13). This included concerns about changes to her teaching package, changes that then Associate Dean Cosens was convinced were odd. (Exh. 157).

88.     Wendy Couture recommended both Sanders and Macfarlane enlist the ombudsperson for help dealing with Adams. (Couture Dep. 151:1-152:11).

89.     The only report that Adams could recall making to OCRI was on behalf of a male employee who complained that Macfarlane accused him of sexism. (Adams Dep. 17:25-18:14). In addition to contacting OCRI on behalf of the male employee, Adams also emailed Macfarlane to tell her that her communication with the male employee was "inappropriate and unprofessional, specifically the reference to him having a problem with, 'taking direction from a woman professor' is both unprofessional and abusive." (*Id.,* 20:19-21:12; Exh. 79).

90.     At least two other female faculty members have gone on record about concerns that Long disparately treats women versus men. Distinguished (and now retired) Professor Cosens emailed the University's Chief Diversity Officer in April 2020 and disclosed that "Long treats women very differently than men; specifically as less than men. He has a rather sharp and intimidating temper when disagreed with by a woman. . ." (Exh. 222; Cosens Dep. 111:18-112:5).[7] Cosens testified that Long has "always treated her as less than him" and recently became aware that another female colleague experienced similar treatment by Long. She went on to say that two other female professors mentioned Long's dismissiveness of their work, scholarship or teaching,

---

[7] Cosens' email also discussed issues unique to Sanders and she offered to provide additional information and concluded her email with the following, "I am happy to answer questions to what is the most difficult email I have ever written." No one followed up with her. (Cosens Dep. 112:13-15.)

when compared to his constant praise of senior male faculty. (Cosens Dep. 114:21-115:11, 118:8-11, 123:15-25).

91.     In 2020, Professor Barbara Lock also raised concerns about Long's interactions with her and specifically about his gender bias. (Couture Dep. 93:18-94:8). Lock reported to Associate Dean Couture that she felt bullied by Long. (*Id*.). Couture encouraged Lock to make a report to OCRI, which she did. (Couture Dep. 181:20-182:4; Exh. 186 at 1.46902).

92.     Couture reported to HR during the 2018 culture and climate review that she felt that she had been treated in an unduly harsh manner by Long. (Couture Dep. 154:24-156:18).

93.     After she became an Associate Dean, Couture was directed by Long to document conversations she had with Sanders and MacFarlane (who also raised EEO concerns in the past). (Couture Dep. 194:1-9).

94.     In Long's 2019 self-evaluation he wrote "The college continues to struggle the most with our ongoing cultural divide. This was complicated by Sanders' lawsuit which she filed during the summer." (Exh. 211; Long Dep. 430:1-14).

95.     In September 2018, when Long replaced himself as Associate Dean in Moscow with David Pimentel, the "lack of gender diversity among college leadership" was once again recorded. (Long Dep. 427:21-428:19).

96.     In April 2020, Professor Anastasia Telesetsky reported to the University's Chief Diversity Officer that based on her observations over the past 10 years, there has been a dynamic in which female voices are undervalued in favor of male opinions. (Exh. L at 1.45405).

97.     In July 2020 a former law student sent an open letter regarding his experiences in which he documented specific instances of racism and sexism which he reported to the COL

administration and to OCRI. (Exh. 185; Long Dep. 330:24-332:2; 334:14-335:6). One of the examples documented in his letter includes a November 2019 encounter with a law student who:

> exclaimed anti-Semitic rhetoric such as "the Jews deserved to burn," "the Holocaust never happened," and that "Jews were ruining the world." He openly mocked Jewish peoples' voices, made racist jokes about our Asian and Latino classmates, and then proceeded to throw a Nazi salute in our faces. "Heil Hitler! Throw them up, you little bitches," he exclaimed. Finally, he proclaimed that women should be violently subjugated for the personal benefit of men.

(*Id*.). As outlined in Dkt. # 30-1, p.5., Long laughed out loud when this report was read to him during his deposition. (Long Dep. 334:14-335:10).

98.     Sanders identified four hiring processes that raised concerns about racism or sexism. (Sanders Dep. 32:21-33:16).

99.     It is undisputed that during a recent hiring process, some faculty questioned whether an Asian-female candidate would fit in with the culture at the COL. (Adams Dep. 135:22-136:21).

100.    In another recent hiring situation, a female candidate's screening was questioned based on information Long had gathered about her. This female candidate initiated a lawsuit against her former institution, and Long admittedly contacted her Dean to ask for information about her. (Long Dep. 301:15-306:4). During the screening process, Associate Dean Pimentel commented about how "scary this candidate was because she had gotten into disputes with the Deans at her law school." (Sanders Dep. 77:19).

101.    Recently, Associate Dean Pimentel emailed a former colleague and said Sanders' lawsuit "cast a shadow over everything." He went on to say the leadership get "abused" and "accused" of many things and "we can't shoot back, because 'retaliation,' and that can be a little demoralizing." He went on to blame Sanders' lawsuit as making recruiting a new dean a "difficult sell." (Exh. K at 3474-75).

102.    Former Associate Dean Cosens recommended to Adams in 2017 that the COL have an HR officer involved in hiring to address sensitive/EEO issues. (Exh. 203) Adams never took any actions to put this in place. (Adams Dep. 259:7-22). Cosens has made similar recommendations about the need to have trained, professional EEO/Diversity personnel at the COL on several occasions, including as recently as January 2020 to the President's Culture and Climate review team. (Exh. 221; Cosens Dep. 105:9-111:7). No one followed up with her about this recommendation. (*Id*. 111:12-17).

103.    Sanders testified on many occasions about how "there were a lot of efforts to go out of the way to make me feel insecure and unworthy of the position that I had been in. It was very difficult and humiliating." (Sanders Dep. 63:11-65). She wondered about the University and its respect for her and her rights given that they "continue to allow [Long] to supervise me after discovering his atrocious, his demeaning and his unconstitutional behavior toward me." (Id., 76:6-11).

**Academic Freedom/Discrimination/Retaliation regarding teaching First Amendment**

104.    The Constitution of the University Faculty provides that faculty are charged with the authority to create and approve courses of instruction and make/approve curricula decisions. (Birch Dec., Exh. P, Article IV Sec 3).

105.    The Constitution also provides that the constituent faculty of each college is authorized to establish its own curriculum in accordance with its bylaws. (*Id*. Article I, Sec. 4, clause A).

106.    The College of Law Amended and Restated Bylaws, Procedures and Rules have the following relevant provisions:

a. That to "ensure compliance . . .with the Articles of Association of the Association of American Law Schools and the American Bar Association Standards for Approval of the Law Schools" the law faculty must have "primary and substantial control of the education program of the law school." (Birch Dec., Exh. L at 1.00071, Art. I Sec. B).

b. "The right of the Faculty to participate in the management of the affairs of the College of Law (College) is fully recognized. The right of the Faculty includes, without limitation, the right to vote on all major policy decision and the right to be consulted on all decisions affecting the affairs of the College. The affairs of the College include, without limitation, . . . curriculum . . .." (*Id.* at 1.00072, Art. I Sec. C).

c. "The Curriculum Committee shall lead curricular planning and development of proposals for curricular change, shall provide a forum for investigation and discussion of innovation in teaching, and shall consider any proposals for changes to the curriculum developed independently of the Committee." (*Id.* at 1.00078, Art. II, Sec. G.6.b).

d. "The curriculum of the College shall consist of such courses as may be designated by the Faculty. The adding or dropping of courses . . . require Faculty approval." (*Id.* at 1.00136, Art. XI, Sec. A).

e. The Curriculum Committee is "charged with continuing examination of the curriculum with a view to initiating and recommending improvements and changes and with the study of all suggested changes." (*Id.* at 1.00137, Art. XI, Sec. B).

107. The University Policy on Academic Freedom, Rights and Responsibility states the following: "Teachers are entitled to freedom in the classroom in discussing their subjects, but they should be careful not to introduce into their teaching controversial matter that is unrelated to their subjects." (Birch Dec., Exh. Q, at B-2).

108.   Sanders has long been consistent in her position that there is insufficient time to cover the First Amendment (especially in any bar preparatory manner) as part of the Con Law II course. (Sanders Dep. 83:4-13; 88:3-11; *see e.g.,* Exh. 63; Seamon Dep. 137:11-138:23).

109.   Her position is consistent with the way that many comparable colleges offer First Amendment content in their curriculum. In fact, in July 2019 (prior to Sanders' negative review) Long received information from one of his associate deans supporting that a majority of responding schools covered First Amendment in a separate course. (Long Dep. 428:22-429:21).

110.   It is also consistent with the way the COL faculty considered, and voted with approval, that the students at the law school should receive that content in late 2014 when they approved the creation of a First Amendment Seminar.[8] (Exh. K at 2848-49; Adams Dep. 44:10-15; Seamon Dep. 129:6-130:19). The rationale specifically noted that the First Amendment "cannot be adequately covered in Constitutional Law II." (Exh. K at 2849).

111.   Sanders believes that it is critical to cover equal protection which includes jurisprudence on race and gender in her Con Law II class, and that expanding the First Amendment content would require her to sacrifice that important content. The administration has discounted the value of this equal protection content, something Sanders explained to Long on several occasions, yet he "continued to ignore those concerns, which is a disturbing pattern." (Sanders 88:16-89:10; Exh. 141).

112.   It was only after Seamon began teaching Constitutional Law II (after Sanders relocated to the Boise campus) with a new overemphasis on the First Amendment that the

---

[8] Back in 2012 Sanders created a Freedom of Speech and Press Seminar but continued to teach the rest of the First Amendment in her Constitutional Law II course. (Exh. K at 2846-47). As stated above, in 2014, her proposal to expand that class into one comprehensive of all First Amendment content was approved. Even further back, in 2011 the Constitutional Law II course description was revised to remove reference to coverage of the First Amendment so as to no "tie the faculty to teach particular constitutional provisions and statutory material." (Exh. K at SANDERS002844-45).

**34 | PLAINTIFF'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

leadership thought it was something Sanders should do.[9] (Sanders Dep. 90:15-20).  As Sanders said, "it is clear to me that my expertise and my voice on this issue are being ignored and devalued. And I do believe that that is because I am a woman, a woman of color, who have [sic] brought issues and concerns about race, gender discrimination, bias and harassment at the law school  . . .." (*Id.* 90:21-91:4).

113.   Long has refused to tell Sanders what components of the First Amendment (which spans 600 pages in her text book) she should teach despite her asking him that specific question on numerous occasions. (Sanders Dep. 84:14-18; Long 79:17-21; Exh. 141). In fact, he testified he understood she could not cover all of it, but still did not have any specific portions of he thought she should focus on in mind when he demanded she add it. (Long Dep. 79:23-81:22).

114.   Long has refused to have a serious discussion about Sanders' concerns regarding his demand or the opportunity to discuss what she does cover in her courses. (Sanders Dep. 84:19-6). Sanders does include light coverage of the First Amendment in Constitutional Law II as per the course catalogue. (Sanders Dep. 83:23-5).

115.   Long admits that there are a number of bar tested topics that are not part of required courses at the COL. (Long Dep. 150:23-151:25).

116.   Sanders believes that there is room for academic debate about how much Constitutional Law II should focus on equal protection versus the First Amendment and explained that was why she went to the faculty with her proposals consistent with the by-laws on faculty governance of curriculum changes. (Sanders Dep. 91:20-92:6). She went on to explain:

> Which is why it really concerned me that Jerry Long, in particular, would seek to
> bypass the faculty. And not only that, but at a time during a lot of racial and gender

---

[9] Seamon told Long that he thought First Amendment should be taught as part of Con Law II, after Long asked him for his advice. (Seamon Dep. 131:14-17; 132:20-25). However, in 2014 Seamon said he could (and did) cover First Amendment at the end of Con Law I. (Seamon Dep. 163:2-16; Exhs. 61, 65).

insensitivity at the law school that Jerry Long would be advocating that we decrease the coverage of race and gender in the one class that has mandatory coverage of race and gender under our constitution was extremely suspicious, disheartening, it felt retaliatory, it certainly felt very targeted towards me. And again, it felt as if his only source of information was Richard Seamon, who did not teach Con Law II prior to his doing so, and including an overwhelming amount of First Amendment. It seemed like that's the only voice that Jerry Long cared about. And if that is the basis for him giving me a negative rating in my teaching, then it's pretty clear to me that there is a discriminatory bias and retaliatory motive for his behavior taken in context.

(*Id.* 92:7-93:1).

DATED this 11th day of January, 2021.

**STRINDBERG & SCHOLNICK, LLC**

/s/ Erika Birch
Erika Birch
T. Guy Hallam Jr.
Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on the above referenced date a true and correct copy of the forgoing pleading was served on the following via the CM/ECF system:

Bentley G. Stromberg
Tully Fitzmaurice
Sonyalee R. Nutsch
CLEMENTS, BROWN & McNICHOLS, P.A.
Attorneys at Law
321 13th Street
Post Office Box 1510
Lewiston, Idaho 83501
bstromberg@clbrmc.com
snutsch@clbrmc.com
tfitzmaurice@clbrmc.com

/s/ Dunja Subasic
Dunja Subasic, of the firm

**36 | PLAINTIFF'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**