UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHAAKIRRAH R SANDERS, | Case No. 3:19-cv-00225-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| UNIVERSITY OF IDAHO, et al., | |
| Defendants. | |

## INTRODUCTION

Plaintiff, Shaakirrah R. Sanders, filed this action claiming discrimination, retaliation, and violation of her academic freedom in violation of federal and state law, against Defendants University of Idaho (UI), Mark Adams, and Jerrold Long. Before the Court is Sanders' Motion to Amend in which she seeks to add defendant Jerrold Long in his individual capacity (Dkt. 30). Also before the Court are the parties' cross motions for summary judgment (Dkts. 36, 40). The Court heard oral argument from the parties on May 26, 2021. For the reasons discussed below, the Court grants the motion to amend (Dkt. 30); denies Sanders' motion for partial summary judgment (Dkt. 36); and grants in part and denies in part

Defendants' motion for summary judgment (Dkt. 40). The Court also grants the parties' unopposed motions to seal (Dkts. 35, 41, 53).

## MOTION TO AMEND

### A.    Procedural Background

Sanders filed her initial complaint in this action in June 2019. (Dkt. 1.) The complaint alleged claims against two defendants: UI and Mark Adams in his official capacity as the former Dean of the UI College of Law. (Dkt. 1.)

In November 2019, Sanders filed a motion to amend her complaint. (Dkt. 16.) Defendants did not oppose the motion. (Dkt. 17.) The Court granted the motion based on the facts that Defendants did not oppose the proposed amendment, that the motion to amend was filed within the deadline set by the scheduling order, and that there was no indication of bad faith, undue delay, or prejudice to Defendants. (Dkt. 18.) Sanders filed her first amended complaint in December 2019 (Dkt. 19). Through this amendment, Jerrold Long, was added to the action as a defendant in his official capacity as the Acting Dean of the College of Law.

In June 2020, Sanders filed a second motion to amend, seeking to amend the complaint to add new factual allegations and claims based on events that occurred subsequent to the pleading amendment deadline (Dkt. 23). Again, Defendants did not oppose the motion. (Dkt. 24.) The Court found good cause for and accordingly

granted the motion (Dkt. 25), and Sanders filed her second amended complaint (SAC) in early July 2020 (Dkt. 26). The SAC included factual allegations related to individual actions taken by Defendant Long but did not include claims against Long in his individual capacity.

In mid-November 2020, Sanders filed a third motion to amend, seeking to add individual capacity claims against Defendant Long. (Dkt. 30.) Defendants oppose the motion. (Dkt. 31.)

### B.   Legal Standard

The deadline for amending the pleadings has passed. Thus, the motion to amend is governed not by the liberal provisions of Rule 15(a) of the Federal Rules of Civil Procedure but by the more restrictive provisions of Rule 16(b), which require a showing of "good cause." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604 (9th Cir. 1992). The focus of Rule 16(b)'s good cause standard is the diligence of the moving party. *Id.* at 608. A court should find good cause only if the moving party shows it "could not reasonably meet the established timeline in a scheduling order despite [its] diligence." *DIRECTV, Inc. v. Busdon*, No. CV-04-265-S-LMB, 2005 WL 1364571, *1 (D. Idaho June 8, 2005). "Moreover, carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." *Johnson*, 975 F.2d at 609 (citing *Engleson v. Burlington N. R.R.*, 972 F.2d 1038, 1043 (9th Cir. 1992)).

When determining whether to grant a motion to amend outside the deadline imposed in the scheduling order, a court may also consider "the existence or degree of prejudice to the party opposing the modification." *Id*. However, the court's inquiry should focus "upon the moving party's reasons for seeking modification." *Id*. If the party moving to amend "was not diligent, the inquiry should end." *Id*.

### C.    Analysis

Sanders contends that there is good cause to allow her to amend her complaint to bring claims against Defendant Long in his individual capacity. She explains that she did not seek to add these individual capacity claims through the previous amendment in June 2020 because she believed it to be prudent to depose Long about his individual actions and the purported reasons for those actions prior to determining whether he was an appropriate defendant in his individual capacity. This prudence was based on the fact that Long was, at the time, Sanders' Dean and thus had the ability to take adverse actions against her and otherwise impact her employment.

Within days of filing the June 2020 motion seeking leave to file a second amended complaint, Sanders requested deposition dates for Long. However, for various reasons, Long's deposition did not occur until October 14, 2020, and November 3, 2020. Sanders explains that the deposition testimony of Long

revealed information about his individual actions, and motivations behind those actions, that compelled Sanders to bring claims against him in his individual capacity. Sanders filed her motion to amend on November 13, 2020, less than two weeks after Long's deposition.

Defendants oppose the motion to amend, contending that Sanders has not shown that she was diligent in seeking this amendment and thus has not shown good cause exists for granting leave to amend. Defendants contend that the factual allegations of the proposed third amended complaint are not novel but are instead, for the most part, already included in the second amended complaint. They further contend that Sanders knew, or should have known, in July 2020 that these allegations formed the basis of her individual capacity claims against Long. Defendants contend that, as a result, Sanders has not shown good cause for the proposed amendment.

Defendants also contend that they "would clearly be prejudiced if good cause to modify the scheduling order were found here, and further amendment allowed." (Dkt 31 at 8.) They explain that discovery has closed and that, if the Court were to grant leave to amend while the motions for summary judgment are pending, additional briefing and perhaps additional discovery will be required. Finally, Defendants contend that amendment of the complaint would be futile.

The Court finds that, contrary to Defendants' argument, Sanders has demonstrated that good cause exists for allowing the proposed amendment, that any prejudice resulting from the amendment will be minimal, and that amendment would not be futile.

First, Sanders did not unreasonably delay in seeking to add claims against Defendant Long in his individual capacity. As Sanders has explained, she was hesitant to add individual capacity claims against Long and wanted to conduct Long's deposition to make sure that such claims would be appropriate. After conducting Long's deposition, Sanders determined that the claims were appropriate and, less than two weeks later, filed her motion seeking to amend the complaint to add the individual capacity claims against Long.

Second, Defendants have not demonstrated they would suffer prejudice as a result of the proposed amendment. Long has been a defendant in this action since December 2019. Although he was a defendant only in his official capacity, Defendants have provided no specific reason why additional discovery would be needed if Long were to now become a defendant in his individual capacity as well. Thus, this is not a case in which a plaintiff is seeking to add a new defendant, a novel claim or theory of relief, or new factual allegations that will require additional discovery. To the contrary, as Defendants themselves point out, the

factual allegations upon which Sanders relies in bringing the individual capacity claims against Long are virtually identical to the allegations already included in the second amended complaint.

Third, the Court is not convinced that granting leave to amend will require additional briefing. However, even if it does, the Court does not find that this would result in undue prejudice to Defendants. If Defendants seek leave to file a second motion for summary judgment aimed specifically at the individual capacity claims against Long, the Court will rule on that motion in due course.

Finally, leave to amend would not be futile because, as discussed below, the Court finds that genuine issues of material fact preclude granting summary judgment in favor of Long on many of the claims brought against him. The Court will accordingly grant Sanders' motion to amend the complaint.

## CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

In deciding whether there is a genuine dispute of material fact, the Court must view the facts in the light most favorable to the nonmoving party. *Id.* at 255; *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) ("Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.") (citing *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000) (en banc)). The court is prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

### B.    Background[1]

Sanders is a black, African-American female professor of law at the UI College of Law. She is currently the only black professor, and the only professor who outwardly identifies as a woman of color at the College of Law.

Sanders was hired in June 2011 as a tenure track professor to teach

---

[1] In setting forth the case background, the Court has, consistent with the standard on summary judgment, construed the evidence and all reasonable inferences that can be drawn from the evidence, in the light most favorable to Sanders, as the nonmoving party. In doing so, the Court recognizes that Sanders has also moved for partial summary judgment on her IPPEA claim. However, as will be discussed below, the Court finds that the IPPEA claim is barred by Eleventh Amendment immunity, and thus does not reach the evidence submitted in support of that claim.

Constitutional Law II and Constitutional Criminal Procedure courses at the UI

College of Law in Moscow, Idaho. She was hired at the same time as two other

law professors: John Rumel and Stephen Miller, both white males. Both Sanders

and Rumel taught at the Moscow campus; Miller taught at the Boise campus

which, at the time Sanders, Rumel, and Miller were hired, offered only third-year

law school classes.

In the fall of 2014, when the College of Law expanded the law school

program to offer classes to second-year students in Boise, both Sanders and Rumel

relocated to Boise to teach on the Boise campus. In the fall of 2017, the Boise

campus began full operation with all three years of law school offered.

Sanders was granted tenure in 2016 and promoted to full professor in 2018.

Rumel and Miller also received tenure and promotion in these same years.

Since being hired, Sanders has been a consistent voice on topics of diversity,

inclusion, and anti-discrimination at the College of Law. She has been described

by Associate Deans as a distinguished scholar; an "excellent colleague"; as having

"great article placements," and some "high-level law reviews"; as having published

in the Cornell Law Review, "one of the most prestigious law reviews in the

country"; as being a "fabulous presenter," "engaging," "very dynamic," with

scholarship that takes on "very important and difficult issues, and she always had

very novel and interesting approaches"; as a "very effective" professor in the classroom; as having course evaluations that have developed over the time to "very positive ones"; as having "excellent" teaching; and as students having high praise for her.

Sanders has also fulfilled many service roles at the College of Law and UI including chairing the Diversity and Human Rights Committee (2013-2014); serving on the Admissions committee (2014-2018); serving and chairing the Administrative Hearing Board (2016-2018); faculty advisor for the Crit Law Journal (2014-2018); Symposium Coordinator (2017, 2018); coach for moot court teams (2013-2016); coordinating the Region 13 moot court competition (2017); and writing advisor for nearly 50 students writing for the Idaho Law Review, Directed Studies, and the First Amendment Seminar (2011-2020).

### 1. Overall Culture and Climate at the College of Law

From the time Sanders was hired in 2011 through April 2018, there were at least 15 documented separate reports of sex, race, or national origin discrimination within the College of Law that were logged with the UI Office of Civil Rights and Investigations (OCRI). In June 2012, the College of Law received the results from an American Bar Association (ABA) site visit that occurred in late 2011. The ABA report noted that while efforts had been made to hire more female and minority faculty, the College of Law did not have any unique initiatives in place to retain

them. The report also stated that a "sizeable minority of male students denigrate the role of women in the legal profession which may contribute to a disruptive atmosphere for women at the school." In 2014, a Diversity Report documented that women faculty members provided a list of issues to the Administration, including, among other things, the need for more inclusive governance and salary equity.

In June 2014, the College of Law hired Defendant Mark Adams as the Dean of the College of Law. While Adams was Dean, two women of color faculty members left the College of Law (and not through retirement). Since then, Sanders has been the only black tenure/tenure track professor at the College of Law.

In May 2017, the faculty requested that Adams retain a consultant to address issues at the College of Law specifically related to sexism and racism. The College of Law never retained a consultant. Some faculty were told that the College of Law was unable to find someone with the right skill set who was willing to do the job.

In early 2018, the College of Law realized that it was not in compliance with certain requirements of its own Diversity Plan, which were cited as remedial actions in response to the ABA's concerns regarding "inflammatory comments about whether women should be in law school" that were discovered during the ABA's site visit in 2011.

In late 2018, a call was made to review the Diversity Plan for possible non-

compliance and amendment because of concern with an ABA site visit expected to occur in 2019. The Diversity Plan was revised provisionally in May 2019 and was finalized in September 2019, following the filing of the present lawsuit.

During the 2017-2018 academic year, the UI Provost's office directed UI Human Resources to perform a Climate & Culture Review of the law school. This process was triggered after multiple complaints were brought to the attention of the Provost, the Dean, and HR. During this review, HR interviewed 32 College of Law faculty and staff, including Sanders. Gender and/or racial bias was a constant concern that kept coming up during the HR review.

In April 2018, HR sent the Provost a report of the HR review. According to this HR Report, complaints included:

- An overarching concern that gender bias and/or sex discrimination plays a role by having a disproportionate negative impact on female faculty and staff.

- That gender bias played out in relation to "who is allowed to speak at the meetings and in what way."

- Several faculty members felt strongly that "females are disproportionately 'shut down' or admonished by those in the senior leadership group for their aggressive communication."

- Several people were concerned with "gender bias as it relates to the lack of female or diverse senior leadership."

- There is a "perception that racial diversity is not highly valued by College of Law administration and faculty body. A number of participants identified potential racial bias within the" College of Law.

- There is no space to discuss "important issues regarding gender and race."

- College of Law "is not actively supportive of faculty, staff, and students of color."

- College of Law "leadership is perceived to lack cultural intelligence."

The HR Report to the Provost stated:

Please note: Human Resources is aware of the possibility that some of the concerns raised during the course of the [review] could rise to the level of what is considered discrimination, retaliation, gender or sex discrimination. A referral to OCRI (Office of Civil Rights & Investigations) or another appropriate department may be necessary and communication with the subject matter experts in those areas will be key.

(Dkt. 54 at 25.)

The HR Report was provided to the Provost and it was up to him and his supervisory chain to determine what action, if any, was going to be taken. The HR Report was also provided to administrators at the College of Law and to the OCRI. It does not appear that the OCRI took any action in response to the report.

In June 2018, Adams was asked by the Provost to step down due to concerns regarding Adams' leadership in relation to the culture and climate at the College of Law, including issues of racial, gender, and disability discrimination. However, Adams was allowed to voluntarily resign and was not disciplined. Instead, he was given a paid semester off, a positive review, and was returned to the faculty as the highest paid professor.

Defendant Jerrold Long, who had been serving as an Associate Dean in Moscow since June 2017, was appointed as the interim replacement Dean in August 2018. No one explained to Long why Adams had stepped down. As of the date the cross-motions for summary judgment were filed, Long was still serving in that capacity.

The Provost passed on to Dean Long responsibility for addressing the issues in the HR Report, including seeking out appropriate experts/consultants on the issues raised in the HR Report, and creating an action plan to move forward. Long met with HR personnel regarding the process of finding an independent consultant, and HR personnel provided Long with recommendations for a qualified independent consultant and facilitated some conference calls between Long and a consultant agency. However, everything just sort of stopped, and a consultant was never hired.

According to Long, the consultant that he conferred with was going to look into many things at the College of Law, "culture and climate includes the two locations [Boise and Moscow] and competition for resources and a whole bunch of different things." (Dkt. 52-9 at 16.) The cost for hiring the consultant to address all of these issues was $120,000. Long was told by the Provost that there was not $120,000 in funds available to pay for a consultant. However, Long never considered hiring a consultant that would just focus on the diversity component of the HR Report at a lower cost, even though he knew that former Dean Adams had committed to bringing in a diversity consultant back in 2017, and also that College of Law faculty supported and wanted the college to bring in a diversity consultant. (*Id.* at 17-18.)

In November 2018, Long met with College of Law faculty and provided an executive summary of the HR Report, and outlined his proposal for moving forward.  (*See* Dkt. 54 at 1-4; Dkt. 52-12 at 22-23.) Nothing in Long's proposal for addressing the issues raised in the HR Report mentions gender, race, diversity, or equal employment opportunity issues. (*See* Dkt. 52-12 at 22-23.) Further, Long believed that it was just two people—Sanders and Kat Macfarlane—who had complained to the Provost about diversity issues. (Dkt. 52-9 at 18-19.)  Ultimately, no renewed attention was given to hiring a diversity consultant.

Although the College of Law claims to have taken remedial actions in response to the HR Report and the documentation of possible gender and race discrimination, these actions were taken only after Sanders filed this lawsuit. And there continued to be issues surrounding race and gender at the College of Law. Between the time the HR Report was issued in 2018 and the fall of 2020, the OCRI received at least 20 additional reports of sex or race/national origin discrimination, including a report that the n-word had been used at least 3 times in the same classroom without any intervention by the professor.

### 2. Credit Overload and Course Release

In the summer of 2014, Dean Adams and Associate Dean Richard Seamon asked Sanders to teach a new course—Constitutional Law I—in the 2014-2015 academic year. This new course added an extra credit to Sanders' teaching load, meaning that she would teach 13 credits as opposed to the standard 12 credits during that academic year. Sanders understood that this increased course load was a result of last-minute transfer students into the law school and expressed her willingness to take on the new course.

Shortly thereafter, Sanders learned that a white female professor—Wendy Couture—had also taken on a new course for the 2014-2015 year such that her load was also 13 credits, but that she had been promised a future course release in return, which is something that Sanders had not been offered.

After Sanders learned that Couture had received a future course release in return for teaching the extra credit, Sanders asked Adams and Seamon for a course release or other compensation for teaching the one credit overload. Adams initially responded that the College of Law does not offer additional compensation or course release for a one credit overload. When Sanders pointed out to Adams that Couture had been granted a course release for a one credit overload, Adams admitted that was true. Adams then told Sanders that Sanders' request was denied because Couture's circumstances and burden for the overload were different and that difference justified the course release for Couture.[2]

Sanders was bothered by the changing explanation of why she was refused a course release or other compensation, and this triggered a series of communications between herself and Adams and Seamon regarding her concerns of disparate treatment. Adams and Seamon continued to refuse Sanders a course release similar to that granted to Couture.

---

[2] Couture had apparently volunteered to take on the new course on the condition that she receive a future course release, and Adams agreed to this condition without hesitation. However, Couture had already achieved tenure by this time and had already submitted her application for promotion to full professor. In contrast, Sanders had not yet submitted her application for tenure and the 2014-15 academic year, which was just prior to when Sanders submitted her tenure application, was thus a crucial year for Sanders' scholarly achievement.

In February 2015, Sanders was told that she would again be assigned Constitutional Law I for the following academic year (2015-2016), giving her a 13-credit overload for a second year in a row. This was despite being told that she was not being given a course release for the previous 1-credit overload for the 2014-2015 year because it was a "one time thing."  And, again, this was prior to Sanders receiving tenure or promotion so it was during a period when Sanders needed additional time to develop her scholarly portfolio. Sanders objected to this assignment under the circumstances without a course release or some other compensation. She also reiterated her concern that she was being treated disparately. This was especially troubling given that the two individuals who started with her—John Rumel and Stephen Miller—did not have an overload leading up to their tenure. Also, other faculty had gotten a release for having planned conferences or symposiums, including Stephen Miller, who had gotten a release for hosting a symposium. Sanders raised concerns about the lack of neutral criteria, which lead to arbitrary results and lack of fundamental fairness and questioned the explanations she had been given for the disparate treatment between similarly situated faculty members, finding the explanations to be inadequate.

Sanders' complaints about disparate treatment were labeled by Seamon as "passive aggressive," and Seamon was frustrated by Sanders' allegations of unfair

treatment. In his response to Sanders' email, Seamon suggested that Sanders had a lighter teaching load than her colleagues and accused Sanders of being less than truthful in her assertions. He told Sanders that her claim of "bias" was a loaded term and that if she was claiming illegal bias, it was incumbent on her to make the charge forthrightly. Seamon did not report Sanders' concerns of bias to the OCRI. He also later admitted that he could appreciate how an untenured female professor of color would be hesitant to raise concerns about racial bias.

Rather than grant Sanders a course release, Adams and Seamon reassigned the course to someone else. Adams told Sanders that her continuing efforts to get what she wanted showed little concern for the impact on her colleagues or the College of Law and sowed "bad feelings and distrust by continuing to spread a false narrative."

Sanders believed that these actions were discriminatory because of the implausibility of some of the rationales used for the actions, the humiliating nature of those rationales, and the revolving and inconsistent excuses she was given, which she believed left her with little other choice but to suspect that the actions were based on her race and/or gender.

When Seamon stepped down as Associate Dean, Barbara Cosens became the new Associate Dean (in June 2016). Sanders told Cosens about her concerns with

the changes that had been made to Sanders' teaching package, and that she believed Adams and Seamon had been deliberately engaging in misrepresentations and deliberately attempting to delegitimize Sanders' teaching and scholarship. Cosens found the changes that had been made to Sanders' teaching package to be odd and asked Adams, who was still Dean at the time, if she could try to fashion a solution.

Typically, faculty continue to teach the same courses they previously taught unless a course has opened up because of retirement or other separation. This is especially true once a professor has established scholarship in the area of expertise. Despite this typical practice, Sanders was notified in April 2016, that a course she had developed and introduced—Advanced Criminal Procedure—was being assigned to a white female professor with less experience and tenure. Sanders requested that she and this professor rotate teaching the course, but that request was denied. Yet, the College of Law had approved another, white male faculty member's proposal to rotate a course that was pitched by Seamon in late 2015.

When the Boise campus of the College of Law was expanded to include first year students, Sanders expressed interest in teaching Constitutional Law I as an additional course if necessary since she had taught the course previously. However, rather than allow her to teach the course, a non-black junior faculty member was

offered the class to teach. Seamon told Sanders that, while it was relevant that she had previously taught the course "that did not guarantee you'd be assigned it."

In the spring of 2018, Sanders was finally able, with the assistance of Associate Dean Cosens and the UI Ombudsperson, to obtain a course release and get her teaching package back on track.

3. <u>Tenure and Apparent Retaliation/Discrimination by Seamon and Adams</u>

At the College of Law, a professor submits a tenure packet in late summer/early fall. The professor's scholarship is sent to external reviewers. A tenure review committee reviews all the materials, meets with the candidate, and makes a recommendation to the Dean regarding whether the candidate should be granted tenure. The full faculty also get to vote on whether to recommend tenure. Then the Dean makes a formal recommendation to the Provost, who makes the final decision the following spring.

Sanders applied for tenure following the above referenced incidents regarding her course overload. Among the eight-person tenure committee that voted on whether to recommend Sanders for tenure, Seamon was the only member to vote "no." From the full faculty vote on whether to recommend Sanders for tenure, there were only two members that voted "no"—Seamon again voted no, as did Adams.

Seamon's rationale expressed during his deposition for voting "no" was that he doubted the quality of Sanders' scholarship. This was his reasoning even though four external reviewers of Sanders' scholarship gave positive recommendations for Sanders' tenure, and even though he admitted that Sanders had some "great article placements" and some "high-level law reviews."

Further, despite Seamon's explanation that he voted no on Sanders because he was concerned regarding the quality of Sanders' scholarship, Seamon did not vote negatively for a white male candidate—Stephen Miller—who was also up for tenure at the same time and who, Seamon admitted, had scholarship that was "fairly lightweight" and was "uncollegial" at the time.

In addition, Seamon provided Sanders with a less favorable summary of her 2015 teaching evaluations as part of her annual performance review. This is true even though at least one of the student evaluations clearly reflected racial bias. Sanders objected to this student evaluation yet neither Seamon nor Adams flagged or removed the evaluation from Sanders' file. In contrast, the next Associate Dean—Barbara Cosens—advocated for the removal of that evaluation on the ground of "clear racial bias," to ensure that the evaluation did not negatively impact Sanders' promotion. Indeed, Cosens expressed surprise that the racist evaluation had not already been flagged and removed.

4.  Associate Dean Openings in 2017 and 2018

At a faculty retreat in May 2017, Dean Adams discussed newly created dual-Associate Deans for Faculty Development positions, with one position in Moscow, and one in Boise. During the retreat, Sanders raised the lack of female/racial diversity representation in leadership positions. She asked Adams what steps he would take to address the issue. Adams acted dismissively of her question with sufficient hostility that several faculty members noted Adams' hostility toward Sanders.

The announcement for these new associate dean positions included the following qualifications: "Tenured or tenure-track faculty from existing ranks, preferable tenured full professor," and "two-year commitment preferred." An application was not required. Instead, interested faculty were to inform Dean Adams of their interest. These associate dean positions can be hard to fill and there are not generally a lot of people interested in the positions.

Associate Dean Cosens had encouraged Sanders to consider serving as an associate dean in the past—Cosens believed Sanders was very smart and had other characteristics essential to administration. Following the faculty retreat, Sanders told Cosens she would be willing to serve as an associate dean. Cosens responded to Sanders, stating that it was "an amazing offer and you would be fabulous." Later that month, Sanders emailed Dean Adams to express her interest in the new Boise

associate dean position and offered to postpone her sabbatical for a year so that she could fill the position for two years. Adams had evaluated Sanders' performance on several occasions and was aware of Sanders' various leadership positions. When Adams met with Sanders about the position, Sanders explained why she was interested in the position and why she was qualified for the position. Adams told her to "wait two years to reapply for the position" and suggested Sanders take a leadership training course.

Adams claims that Cosens agreed that Sanders was not ready to fill a leadership role. However, Cosens testified that she would have been supportive of Sanders' serving in the position. Further, Cosens could not think of any reason why Sanders would not have done as good a job as Lee Dillion, a white male who was ultimately selected for the Boise associate dean position.

Adams admits that Sanders was the only faculty member to express an interest in the Boise associate dean position. Despite this, Adams started talking to a select group of professors about who should be associate dean and encouraged Wendy Couture (a white female) to apply. Couture considered it but ultimately decided not to apply. Couture was aware that Sanders was interested in the position but did not have any communications with Adams about Sanders applying for the position or about Sanders' qualifications for the position. Couture may have even

encouraged Sanders to apply for the position.

Adams ultimately solicited Lee Dillion (a white male) for the position. Dillion was a non-tenured/non-tenure track faculty member and was set to retire and would therefore be unable to serve the preferred two-year term. Thus, Dillion did not meet either of the listed qualifications for the associate dean position— tenured or tenured-track and preferred two-year commitment. Adams announced his selection of Dillion and Jerry Long—both white males—for the two new positions of Associate Dean of Faculty Development.

In response to this selection, Sanders again raised the concern about the lack of women in leadership, concerns that were also echoed by another female professor, Katherine Macfarlane. Adams then emailed the following admonition to all faculty: "I hope we can approach the shared goals and challenges by listening with openness and respect and mutual good faith, refraining from the insidious gossip and efforts to 'stir things up' that lead to a toxic atmosphere and discourage people from serving."

In the fall of 2017, Sanders requested a meeting with Dean Adams to discuss why she was passed over for the associate dean position. Adams met with Sanders and told her that she was not selected because (1) he did not believe she was serious, (2) her committee service was not strong enough such that she lacked

leadership experience, and (3) he did not want to interrupt her sabbatical.

In 2018, when again filling the Boise associate dean position (in anticipation of Dillion's retirement), Adams again expected people to merely express interest and there was no formal application process. Adams was aware that Sanders was still interested in the position, but he did not talk with her about it. Instead, Adams approached Stephen Miller (a white male), one of Sanders' contemporaries who was on sabbatical at the time, about the position. Adams testified that Miller had done an excellent job in the service roles he had with leadership, and in particular the law review symposium, and that there were three other professors who had expressed support for him. However, Sanders had also engaged in leadership roles at the College, including leading two critical legal studies symposiums and organizing the regional competition for national moot court in Boise. As to the moot court, Adams heard from alumni, judges, and coaches from other schools that the moot court was a "great success."

Through a follow-up process to obtain an AA/EEO waiver,[3] Adams indicated Miller was selected because he was a "Full professor, tenured, in Boise, works well with Lee Dillion, willing to serve," but lacked administrative

---

[3] The waiver was needed because the associated dean position was filled without going through the regular competitive process.

experience. Adams also later clarified that Miller was the only faculty to express "sincere" interest in the position. However, internal emails demonstrate that Lee Dillion informed Adams that Sanders had expressed an interest in the position and that Sanders has a good relationship with Dillion as well.

     5.  <u>Summer Research Stipends</u>

When she was hired in 2011, Sanders was told she would be eligible for a summer research stipend in the amount generally available to faculty in 2012 and subsequent years. The stipends are intended to encourage, help support, and reward professors' scholarly work, which is in turn one of the factors for evaluating tenure and promotion.

The College of Law has offered summer research stipends every year that Sanders has worked there. Sanders received a stipend every year she applied for it until 2018, the first and only year that not all applicants received stipends.

In 2016, the College of Law had planned to award only 12 stipends but received 16 applications. Seamon recommended ways to vet the applications, including asking the most senior professors—who are also the highest paid—to forego a stipend.  Ultimately, Adams instead reduced the dollar amount of the stipends in order to fund all applicants.

Sanders did not apply for a stipend for summer 2017 because she taught summer school.

In 2018, all stipend applicants—including Sanders—had viable applications. Sanders did not, however, receive a stipend even though both of her white male contemporaries[4] received stipends. The stated basis for rejecting Sanders' stipend request was that she was going on sabbatical. Yet, two other (white) applicants for stipends were in the same position yet were awarded stipends: Stephen Miller, a white male who was just returning from sabbatical, and Barbara Cosens, a white female who was entering sabbatical.

When Sanders asked Adams to explain the areas in which her application had failed, he told her that (1) priority was to support junior faculty first, and (2) he also referenced "heavy service load," specifically referencing service as associate dean as criteria used in the stipend decision. However, and inconsistent with that explanation, (1) stipends were awarded to three professors who had more seniority than Sanders and two professors that had the same seniority (Miller and Rumel), and (2) none of the faculty awarded stipends had served as an associate dean in the prior academic year. Further, Sanders' extensive service at the College of Law was ignored, despite being specifically set out in her application for a stipend. Adams

---

[4] Sanders' contemporaries—John Rumel and Stephen Miller—started at the same time as Sanders and received tenure and promotion at the same time as she did.

did represent however, that faculty passed over were supposed to receive priority for a 2019 stipend.

When Sanders pointed out some of these facts and the inconsistencies with Adams' explanation, and raised a concern regarding pay disparity that the lack of a stipend created, Adams responded: "As you are now raising issues of pay disparity and disparate impact, I will not be responding further via email." When Sanders asked how the issues would be addressed if not through email, Adams ignored her. He did not forward her complaints to anyone else, not even to the OCRI.

In 2019, after Long had taken over as interim Dean and after Sanders had filed her EEOC charge, Sanders again applied for a summer stipend. Sanders did ultimately receive a 2019 summer stipend, but documents reflect that Long was reluctant to award it to her. Specifically, the associate deans recommended that Sanders receive a stipend, but Long told them that he had "a question about [Sanders] that I haven't decided how to handle and haven't gotten around to asking you about it." This was apparently in reference to the fact that Sanders had stated in her application that her summer project was unrelated to her sabbatical projects and did not provide any further explanation. One associate dean responded to Longs' question: "If she says it's 'unrelated' isn't that good enough? We can take her at her word, right? . . . I think you've got bigger issues [i.e., the EEOC charge]

to fight over with [Sanders]. Fighting over this one could be counterproductive, if she is the *only* one of the applicants who got pushback from you on her proposal."

Sanders did not apply for a 2020 stipend. She was discouraged from doing so due to the deterioration of her relationship with Long, who was at the time the acting Dean. Given her performance evaluation, in which she did receive acknowledgement for the scholarship she had completed in the previous few years, she thought there was a very low probability that she would be awarded a summer stipend, and she "did not want to go through any type of additional humiliation." Every applicant received a 2020 summer stipend. This means that 2018 is the only year in which an applicant was not funded.

### 6.  Ongoing Culture and the Community Forums

Sanders filed an EEOC charge in June 2018 and took a year-long sabbatical during the 2018-2019 school year. She filed this lawsuit in June 2019. Since then, Sanders has faced numerous incidents that she alleges are discriminatory and/or retaliatory.

In September 2019, a law professor sent an email to College of Law faculty and staff regarding chatter on the Class of 2022 Facebook page which included "racist rhetoric." The email generated responses back and forth from faculty regarding how to best address these cultural and diversity issues. For example, Cosens, which was then a former associate dean and a long-time faculty member,

recommended that the College have two HR/diversity officers (one in Boise, one in Moscow) who are trained in diversity and employment law to handle these issues with students and faculty, and in the hiring process. Another, newer professor empathized about how this "racist rhetoric" must have made other students feel, and disclosed he had a discussion with two minority individuals about how certain aspects of the College of Law make them feel unwelcome. He expressed the hope that the College would "really step up and commit to doing something to attack these problems."

These issues were also discussed during a Diversity Committee meeting. During that meeting, a law student disclosed that they feared retaliation by faculty if they spoke out regarding diversity concerns. Sanders found this very troubling.

In early October 2019, the faculty had a meeting to further discuss the topic. After the meeting, Sanders proposed that the College host an open forum for students to express concerns regarding culture and climate. She expressed her willingness and eagerness to help organize the effort, and noted how it could be organized and held, stating failure of the faculty and the College to respond to the issue would be problematic. Faculty and administrators expressed varying views regarding Sanders' proposal. Some were highly supportive, and others expressed the need to be cautious and careful about such an event. Interim Dean Long

expressed the view that he did not believe forums were the best approach, but that he would not prohibit them.

On October 23, 2019, during the Bellwood Lecture in Moscow, a law student asked whether we should consider culling or genocide as a solution to address climate change. In an email sent out to faculty, Long characterized the student's question as "an ill-advised, and certainly oddly worded, question about how we might address climate change." Another faculty member stated she was "frankly ashamed of our student for asking that question" explaining that the faculty member was in the front row and "you could hear gasps in the audience" in response to the question.

Mid-morning on the day following the lecture, Long sent a College-wide email thanking everyone for "an incredibly successful Bellwood Lecture," and commenting that "our students consistently displayed grace and wisdom." After concerns continued to be raised regarding the impact of the student's "genocide" question on the climate at the College, Long sent another email to the students that evening regarding "The Bellwood Lecture and our 1st Amendment responsibilities." In this email, Long stated: "In your professional lives, you will be confronted on a regular basis with speech you find offensive, or with people you find distasteful." He also stated that having an open marketplace of ideas means

"that we will often be confronted with speech that we do not like, or even speech that is offensive and hurtful."

Later that night, a student emailed Sanders, expressing that the student was "upset, annoyed, and frustrated with Dean Long's response" to the genocide question at the Bellwood Lecture. After receiving permission from the student, Sanders shared that student's email with the faculty. The faculty again had discussions via email about what actions, if any, should be taken. One of the professors disclosed that some students "genuinely come to school feeling total anxiety that [the student who asked the genocide question], who is in class with them, might just walk into the class with a gun." Indeed, a few months later, either the student who asked the genocide question, or a friend of that student, asked about bringing guns onto campus.

Sanders moved forward with her proposal to host a forum for students to talk about their experiences with culture and climate issues within the College of Law. The first forum was scheduled for November 14, 2019, and Sanders invited the College of Law community (students, staff, faculty, and administration). During this first forum, students raised concerns regarding discriminatory incidents at the College, including race, gender, and disability discrimination. Long attended the forum in person at the Boise campus, which was connected via Zoom video

conference to the participants at the Moscow campus.

Sanders scheduled a follow-up community forum for January 23, 2020, and invited Lindsay Ewan, Deputy Director of the OCRI, to participate. Again, participants from the two campuses were connected via Zoom. Prior to the forum beginning, Long had emailed the IT manager and asked whether the forum could be recorded, explaining that the ombudsperson "has a meeting that conflicts but would like to watch it later." The IT manager responded that it could be recorded but that it will show that it is being recorded on the screen. Long told the IT manager that was fine, and that "If [Sanders] notices and complains, it's because I want to be able to view it later. I probably won't be able to attend." Long did not tell Sanders that he had asked for the forum to be recorded, nor did Long attempt to seek permission for or consent to the recording.

The forum took place as scheduled. During the forum, Sanders and others in attendance noticed that the video conferencing screen indicated that the forum was being recorded. Many in attendance appeared to be shocked and uncomfortable upon learning of the recording. Sanders asked if anyone had consented to the recording, and no one responded. An assistant to the Dean was apparently watching the forum via Zoom and notified Long that the recording of the forum had been discovered by Sanders. This prompted Long to email Sanders to say that

he had asked IT to record the forum since he would not be able to attend but wanted to see what was discussed. Long also stated, "Unfortunately, I got distracted and never let you know, which I meant to do. I'm sorry. I didn't intend it to be a surprise. It is only for me to see, but I understand if that bothers you. Please let me know if you have any concerns." Long admits this representation to Sanders as to why he recorded the forum was not true, and that he made the recording at the request of the University's ombudsperson so she could watch it later per Long's request that she help the College with its diversity and inclusion, culture, and climate issues.[5]

Sanders responded to Long's email admitting that he had recorded the forum without telling her, copying the four associate deans on her response. Sanders told Long that she felt discomfort in the room, and she questioned whether meeting participants could be recorded without consent. She expressed her concern regarding the lack of notice or consent to record the forum, especially given the

---

[5] Long has admitted that he can appreciate why it would bother Sanders to have had the forum recorded without her knowledge or consent. Indeed, the College's Diversity and Human Rights Committee's May 2020 report confirmed that the recording generated mistrust between the meeting participants, some of whom were underrepresented students, and the administration. This report also recommends that future events where students voice concerns about matters of diversity, culture, and climate not be recorded in order to provide some confidentiality protection to participants.

lack of trust students participating in the forum consistently express, and that the lack of notice or consent was a very serious issue for her. She also listed specific questions she had, including questions regarding the procedure for requesting and approving the recording of meetings, thoughts on how to address the failure to notify participants of the recording and failure to obtain consent, and whether any participants in the forum were aware of the recording.

Long did not respond to this email or to Sanders' questions.[6] Instead, the following day, Long sent out an email copying all students, all faculty, and all staff, explaining that he had recorded the meeting but had forgotten to inform Sanders because it was a "forget-to-eat-lunch kind of day," and he apologized for his "misstep." Sanders responded to this group email, again inquiring whether future meetings would be recorded, whether there was a policy on recording, and commented again about her concern that the recording had taken place without consent. Again, Long did not respond to her email.

Later in the day, Sanders sent another email, but excluded the students, so sent it only to faculty, the OCRI, and the President. In this email, Sanders informed

---

[6] Sanders' experience in participating in University related meetings and public events is that none of the meetings or events had ever been recorded without explicit notice and consent. Long admits that there is no written policy on recording.

Long that several students had approached her regarding singling out the culture and climate forum for recording, that she was concerned about how that could have a chilling effect on the speech of participants, and again asked for responses to her previous questions. Sanders also asked Long to attach sections of the Idaho code, Idaho rules, or University protocol that supported his response. Once again, Long did not respond to Sanders' email. Neither he, nor anyone else at the University, ever communicated to Sanders any code, rules, or protocols that he believed legitimized the recording of the forum.

### 7. Performance Reviews

#### a. 2018 Performance Review

During her 2018 performance review (which was given in February 2019), Long specifically mentioned that Sanders had filed an EEOC charge and told her that some of the issues raised in the charge were miscommunications. Long also brought up the fact that Sanders had negotiated a course release with the previous Dean (Adams) and made sure she understood that she should not expect future course releases. This indicted to her that Long believed she had gotten special treatment. Long also emailed the entire faculty and staff about Sanders' lawsuit but specifically excluded her from the group emails.

#### b. 2019 Performance Review

On January 31, 2020, a few days after the second forum, Long emailed

Sanders about her upcoming 2019 performance review meeting and outlined issues he intended to discuss with her. These items included Sanders' use of community list-serves, specifically student list-serves and Sanders' recent emails. Long stated that Sanders' emails had "caused a number of students to question what is appropriate in our profession," and that Sanders' approach to communicating with Long was having a negative effect on the climate and culture and "falls short of the standards of professionalism we expect of our faculty" and are "harming [Sanders'] relationships with the students, your colleagues, and this entire legal community." Long's reference to Sanders' communications having a negative impact was in reference to Sanders' communications about the recording of the forum without notice or consent.

A week later, on February 6, 2020, Sanders responded to Long's email regarding the listed issues for her performance review and inquired as to why none of these purported concerns had been raised with her earlier and why she had not been provided with an opportunity to provide a response. After receiving Sanders' email, Long postponed Sanders' performance review even though it was schedule for later that same day. Long did not, however, provide a substantive response to Sanders' email.

On the following day, February 7, 2020, Sanders sent a message to faculty

and staff, outlining some of the experiences she faced in being a consistent voice on issues of diversity and discrimination while on the faculty; that she had been warned about her communications; and that she had chosen to silence her own voice on these topics, explaining that her "silence now is not a choice, is not acceptance, and is not apathy on this topic. It is the only method of self-preservation I have left. To make clear, however, this silence is antithetical to a core belief of mine: 'Our lives begin to end the day we become silent about things that matter.' "

Long did not meet with Sanders regarding her 2019 performance review until February 25, 2020. During the meeting, Long told Sanders he felt that they were "not in a space where our – this relationship is working," and that since Sanders had returned from her sabbatical (in the fall of 2019, which was after filing her lawsuit in June 2019), "things had become increasingly complicated and it was difficult to know how to act." Long also raised as an issue that Sanders had expressed her concerns about recording the forum with others, such as the President and the OCRI. Sanders felt that Long was admonishing her for informing the Provost and the President about the recording. Long opined that Sanders should have kept the issue between Long and Sanders only. However, Long also admitted that there was only one example of a student complaint regarding Sanders' emails

about the recording of the forum.

The day after the 2019 performance review meeting, Sanders received her written review with an attachment. The attachment includes the following:

> Professor Sanders has had a challenging 2019. Unfortunately, throughout the year it became increasingly apparent that Professor Sanders is uninterested in working with the College administration on many important aspects of her position description. This has continued in 2020, where the simple sharing of information in preparation for the evaluation process is met with hostility and claims of retaliation.

For the first time since she began her career with the University, Sanders was rated as not meeting expectations in several categories including teaching and advising, university service and leadership, and for her overall rating in meeting performance expectations. Long also stated that her rating for scholarship for the spring was to be determined despite Sanders having placement in the Cornell Law Review.

In March 2020, Sanders submitted a 10-page written rebuttal to Long, asking for reconsideration of her 2019 evaluation and raising concerns regarding retaliation and discrimination. Long conferred with the Provost on whether he should respond to Sanders' rebuttal. The Provost told Long he could respond but that would give Sanders another chance to respond as well. Long filed the evaluation with the Provost without making any changes or doing any further

investigation. The negative evaluation is now part of Sanders' official personnel record.

### C.    Title VI Claims—Summary Judgment will be Granted in Favor of Defendants

Sanders brings claims under Title VI, Section 601, which provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving *Federal financial assistance.*" 42 U.S.C. § 2000d (emphasis added).

It is undisputed that UI receives federal financial assistance. However, for liability to attach under Title VI, the "primary objective" of that federal financial assistance must be to "provide employment." 42 U.S.C. § 2000d-3.[7] Here, Sanders has not provided evidence that the primary objective of the federal financial assistance received by UI is to provide employment.

---

[7] Section 2000d-3 provides:

Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

42 U.S.C. § 2000d-3.

Sanders points out, however, that § 2000d-3 refers to an action brought by a "department or agency." *See id.* She contends that because she is neither a "department" nor an "agency," but is instead a private individual bringing a private action under Title VI, that the "primary objective" requirement of § 2000d-3 does not apply. Although her argument is appealing and appears to be consistent with the plain language of § 2000d-3, her argument is foreclosed by binding precedent.

In *Temengil v. Tr. Territory of Pac. Islands*, 881 F.2d 647, 653 (9th Cir. 1989), the Ninth Circuit affirmed a district court's dismissal of a private action for discrimination under Title VI on the ground that the plaintiff did not meet the burden of demonstrating that providing employment was a primary purpose of the federal financial assistance received by the employer. In reaching this conclusion, the Ninth Circuit did not analyze the issue of whether the "primary objective" requirement applies to actions brought by private, as opposed to public plaintiffs and did not cite to the full language of § 2000d-3. *See id.* The U.S. Supreme Court has also assumed, without analyzing, that § 2000d-3 applies to private rights of action. *See, e.g., Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 636-37 (1984); *North Haven Board of Education v. Bell*, 456 U.S. 512, 528-30 & n.20 (1982); *Johnson v. Transportation Agency, Santa Clara County, California*, 480

U.S. 616, 626-27 n.6 (1987).[8]

Although the Ninth Circuit's decision in *Temengil* failed to recognize or analyze whether § 2000d-3 applies to a private, as opposed to a public action, the case is binding on this Court. Under *Temengil*, to proceed on a claim under Title VI, Sanders must provide evidence demonstrating that a primary objective of the federal financial assistance UI receives is to provide employment. Because Sanders has failed to present such evidence, the Court will grant summary judgment in favor of Defendants on Sanders' Title VI claim.

### D.   Title VII Claims

Sanders also brings claims under Title VII, 42 U.S.C. § 2000 *et seq.*, which prohibits employment discrimination on account of "race, color, religion, sex, or national origin." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e–2(a)(1)).

Defendants contend that they are entitled to summary judgment on Sanders' Title VII claims because (1) Sanders failed to timely present her EEOC complaint;

---

[8] Other courts have also recognized the failure to consider the distinction between public and private employers in applying § 2000d-3. *See, e.g., Grimes v. Superior Home Health Care of Middle Tennessee, Inc.*, 929 F. Supp. 1088, 1092 (M.D. Tenn. 1996) (discussing the apparent failure of courts to properly apply § 2000d-3 and acknowledging that the U.S. Supreme Court's decisions imply that the § 2000d-3 limitation applies to private actions).

and (2) Sanders failed to establish a genuine dispute of material fact on her claims of discrimination.

### 1. Timeliness of EEOC Complaint

Sanders filed her EEOC charge on June 26, 2018. Defendants contend that Sanders was required to present her claim to the EEOC within 180 days of the alleged unlawful employment practice and that she therefore is limited to proceeding on alleged conduct that occurred after December 28, 2017, which is 180 days prior to June 26, 2018, the date on which she filed her EEOC charge. Sanders argues that her filing of the EEOC charge preserved her claims for the prior 300-day period, rather than the 180-day period contended by Defendants because Idaho has a state enforcement agency.

Both Defendants and Sanders rely on § 2000e-5(e)(1), which provides, in relevant part:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . *except* that in a case of an unlawful employment practice with respect to which the person aggrieved *has initially instituted proceedings with a State or local agency* with authority to grant or seek relief from such practice . . . , such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred . . . .

42 U.S.C. § 2000e-5(e)(1) (emphasis added).

Under the plain language of § 2000e-5(e)(1), it is not the existence of a state

or local agency with the appropriate authority that triggers the longer 300-day period. Instead, it is the institution of proceedings with that state or local agency that triggers the 300-day period. *See id.*

Here, Sanders has not argued, nor cited to any evidence demonstrating, that she *initially instituted proceedings* with an appropriate state or local agency rather than directly with the EEOC. She has thus failed to demonstrate that the longer 300-day period, rather than the 180-day period, applies to her Title VII claims.[9]

As to Sanders' claim of an ongoing hostile work environment, the entire period of the hostile environment, even the period outside the 180-day window, can be considered for purposes of determining liability, "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the [statute of limitations]." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002); *see id.* at 117 (As long as an "act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining

---

[9] If Sanders has evidence demonstrating that she initially instituted proceedings with a state or local agency with the appropriate authority, the Court may be willing to reconsider its determination that the 180-day window applies to her Title VII claims. However, the evidence cited by Defendants (Dkt. 42-2 at 125-39) appears to indicate that the charge was filed directly with the EEOC.

liability.").

2.   <u>Merits of Title VII Race and Gender Discrimination Claims</u>

Sanders is alleging discrimination on the basis of her race and gender, i.e.,
discrimination because she is a black woman. She alleges that Defendants'
unfavorable treatment of her is the result of discrimination and/or retaliation. She
brings 5 distinct race and gender discrimination claims: (a) discrimination in terms
and conditions of employment; (b) discrimination in failing to consider her for a
promotion to associate dean in 2018; (c) pay discrimination regarding a 2018
stipend and discouraging her application in 2020; (d) hostile work environment;
and (e) retaliation linked to the terms and conditions, failure to promote, pay
discrimination, and hostility in the workplace.

To determine whether Sanders' claims withstand summary judgment, the
Court uses the framework established in *McDonnell Douglas v. Green*, 411 U.S.
792 (1993). Under this framework, Sanders must first establish a prima facie case
of discrimination by showing that: (1) she is a member of a protected class; (2) she
suffered an adverse employment action; (3) she was qualified for the position; and
(4) similarly situated men or white women were treated more favorably. *See*
*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002). In
conducting this analysis, the Court must keep in mind that the requisite degree of
proof necessary to establish a prima facie case for Title VII discrimination on

summary judgment is minimal and does not even rise to the level of a preponderance of the evidence. *Id.*

If a plaintiff establishes a prima facie case, the burden shifts to the defendants to articulate a legitimate, nondiscretionary reason for the challenged action. *Id.* at 1064. If the defendants meet their burden, the plaintiff must then show that the reason articulated by the defendants is pretextual either through direct evidence of discriminatory intent or circumstantial evidence showing that the defendant's proffered explanation is unworthy of credence. *Id.*

Here, it is undisputed that Sanders, as a black woman, belongs to protected classes and thus this element will not be further discussed.

### a.  *Failure to consider/select Sanders for associate dean position*

Sanders alleges that she suffered promotional discrimination on account of her gender and/or race in relation to the openings for associate dean in Boise.

The evidence, viewed in the light most favorable to Sanders, shows that Sanders applied for the associate dean position in 2017 by expressing her interest in the position; that Sanders met the minimum qualifications for the position; that her application for the position was rejected, and that, after the rejection, the position remained open, and her employer continued to seek applications from people with comparable qualifications. The evidence also shows that filling the

position is one of "twisting arms," and that Adams told Sanders that she did not have adequate leadership experience and that she should apply again later. Finally, the evidence shows that the position went to Dillion, a white male candidate who did not meet the minimum qualifications for the position.

As to the associate dean position in 2018, the evidence shows that Adams knew that Sanders was still interested in the position but that he did not approach her about it and, instead, sought out other willing candidates. As with the 2017 opening, there was no posting or competitive application process for this position. Adams selected Miller, a white male contemporary of Sanders, for the position. It is undisputed that Miller's appointment to the position could not be approved by the Provost without obtaining an EEOC/AA waiver because Adams had not used a competitive process. This required Adams to provide a written explanation to support his decision to hire Miller. The initial explanation provided by Adams was: "Full professor, tenured, in Boise, works well with Dillion, willing to serve. Lacks admin experience." Sanders also met all of these qualifications, including working well with Dillion. Adams later added Miller's excellent service in organizing a law review symposium as a qualification for the position. However, Sanders had also organized two such symposiums as well as a regional national moot court competition that Adams knew was rated as a "great success" by participants.

Sanders has more than established a prima facie case of discrimination in relation to the failure to hire and/or consider her for the associate dean position.

Defendants have provided evidence that Sanders was not hired for the position because Adams spoke with a number of faculty members to gauge their level of support for Sanders' candidacy and heard little (if any) support; that Adams met with Sanders to discuss her interest in the position in 2017 and, during the meeting, Adams told Sanders that she lacked the leadership and effective communication skills needed for the position, offered to pay for Sanders to attend leadership training so that she would be a viable candidate for a leadership position in the future, and told her she should apply again in a couple of years. As to the 2018 position, Defendants presented evidence that Adams did not select Sanders because she again received only tepid support from faculty members and because she did not follow through on his offer of leadership training. These reasons provide legitimate, non-discriminatory reasons for rejecting Sanders' application. Accordingly, the burden shifts back to Sanders to present evidence that the reasons articulated by Defendants are pretextual.

The evidence Sanders provided in support of her prima facie case is sufficient to raise a genuine issue of material fact as to pretext. As noted, this evidence shows that in 2017, Defendants hired a white male who did not seek out

the position and did not meet the minimum qualifications for the position, and that they rejected Sanders even though she met the minimum qualifications for the position and was the only candidate that expressed interest in and sought out the position. The evidence also shows that Defendants failed to consider Sanders for the position in 2018 even though Adams knew she was interested in the position; that they hired a white male for the position rather than Sanders; and that the articulated reasons for this white male candidate's qualifications for the position were qualifications that Sanders also met or exceeded.

Finally, the evidence shows that Sanders had leadership experience and raises a genuine factual dispute as to whether the statement that she lacked leadership experience was pretextual. For example, Sanders has chaired the Diversity and Human Rights Committee (2013-2014); served on the College of Law admissions committee (2014-2018); served and chaired the Administrative Hearing Board (2016-2018); was faculty advisor for the Crit Law Journal (2014-2018); was Symposium Coordinator (2017-2018); coached moot court teams (2013-2016); coordinated the regional moot court competition (2017); has been treasurer (2017), vice-chair (2018) and chair (2019) of the American Association of Law Schools section on constitutional law; was secretary treasurer (2016-2018), vice-president (2018-2019), and president (2019-2020) of the American Inns of

Court; and was chair of the Idaho State Advisory Committee to the U.S. Commission on Civil Rights (2018-2020).[10]

In sum, the evidence submitted by Sanders is more than sufficient to raise a genuine issue of material fact as to whether the reasons articulated by Defendants for not hiring Sanders as associate dean were pretextual.

### b. Summer Stipend

Sanders alleges that the failure of Defendants to provide her a summer stipend in 2018 was the result of discrimination on the basis of race and/or gender.

The evidence demonstrates that, with the exception of the summer of 2018, all eligible applicants for summer stipends have been funded every year, even in those years when funds were short. For example, in 2017, there were only supposed to be 12 stipends available. However, when Adams receive 16 applications, he decided to fund all 16 applicants. Notably, Sanders did not apply in 2017 because she was teaching summer school.

The following year, in 2018, Sanders submitted an application for a summer stipend. Her application was rejected, even though she had a viable application. Three other applications were rejected in 2018. However, Sanders was the most

---

[10] The Court recognizes that some of these leadership positions were held by Sanders after the relevant time in 2018.

junior applicant rejected, which must be viewed in light of the fact that summer stipends are intended to support scholarly work, particularly for less senior professors. Further, Sanders' two white male contemporaries were both funded as were three other professors (two white women and one white male) who had more seniority than Sanders. This evidence is sufficient to establish a prima facie case of discrimination on the basis of Sanders' race and/or gender.

Defendants have submitted the following evidence in support of their contention that the decision not to provide the summer stipend to Sanders was legitimate and nondiscriminatory: (1) the College of Law did not have sufficient funding in 2018 to provide stipends to all who applied; (2) Adams rated other applicants more highly than Sanders based on applicable criteria, including the longstanding policy of giving priority to junior faculty members and to those members who have demonstrated extraordinary service (and Defendants contend that Sanders had asked for a lighter committee load the following year); and (3) applications from not only Sanders, but from several other faculty members (all tenured full professors, one of which was a white male) were not selected. This evidence appears to be sufficient to provide a legitimate, nondiscriminatory basis for rejecting Sanders' application for funding. Thus, the burden shifts back to Sanders to demonstrate the stated basis is pretextual.

The evidence submitted in support of Sanders' prima facie case meets her burden of demonstrating pretext. This evidence, as noted above, is that three white professors with more seniority than her were funded, even though those with less seniority are to be given priority for funding, and that she was the most junior applicant rejected. This evidence also shows that Sanders' two white male contemporaries—who were at the same seniority level as Sanders—were funded, even though she was rejected. There is also evidence that Sanders had not asked for a reduction in her service load, as claimed by Defendants, but had instead asked for a "fairer load" in light of her overwhelming committee service, and that Associate Dean Cosens said that this request for a fairer load was warranted. Further, there is evidence that Adams had stated in his 2017 performance evaluation of Sanders that "she's doing quite a bit of service." Finally, there is evidence that, in contemporaneous documents, Adams rejected Sanders on the ground that she was going on sabbatical, yet two other white professors who received funding were either going on or returning from sabbaticals.

The evidence submitted by Sanders is more than sufficient to raise a genuine issue of material fact as to whether Defendants' stated reasons for declining to fund Sanders with a summer 2018 stipend is pretextual.

### c.  Hostile Work Environment Claim

"To establish sex [or race] discrimination under a hostile work environment

theory, a plaintiff must show she was subjected to sex-based [or race-based] harassment that was sufficiently severe or pervasive to alter the conditions of employment, and that her employer is liable for this hostile work environment." *Christian v. Umpqua Bank*, 984 F.3d 801, 809 (9th Cir. 2020). "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998). Further, " 'what might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character, causing a worker to feel demeaned, humiliated, or intimidated on account of her [race and/or] gender.' " *Christian*, 984 F.3d at 810 (quoting *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1109 (9th Cir. 1998)).

Sanders provides evidence of numerous incidents that have lasted over many years that she contends demonstrate that she was subjected to a race- and/or gender-based hostile work environment. She explains that these incidents began after Adams was hired as the Dean in 2014 and escalated once Long became Dean in August 2018, after Sanders filed her EEOC charge. Some of the incidents include the following:

- Resistance to Sanders' requests to be considered for the same course release as her white colleagues. Although she eventually obtained the course release, it took years of her advocacy, as well as the intervention of others, including the ombudsmen, to obtain it.

- Administrators' continuing interference with her teaching package in ways inconsistent with the practices of the College and the understanding that courses should not be removed from a professor's package absent special circumstances; and Associate Dean Cosens' confirmation that some of the changes to Sanders' teaching package were "odd."

- An array of attacks on Sanders' performance including summaries of her teaching evaluations going from positive to focusing on the negative, and ignoring clear racism underlying an evaluation until years later when Associate Dean Cosens demanded the racist evaluation be removed from Sanders' file.

- Repeated wrongful accusations that Sanders was misusing travel funds; denial of a travel request with insinuations that Sanders lied about attendance at conferences; and imposition of novel reimbursement policies for Sanders.

- Disrespectful treatment of Sanders by Adams including in

communications with her, such as Adams being dismissive and hostile towards her at a faculty retreat to an extent that others in attendance noticed and commented, and Adams refusing to communicate with Sanders about the denial of her 2018 summer stipend and the resulting pay disparity.

- Long's attitude and conduct towards Sanders including recording her on three occasions without notice or consent; asking associate deans to document their conversations with Sanders; and making derogatory comments about Sanders, including calling her a bitch, demanding, incompetent, aggressive, and dishonest, and disparaging her intellect.

- Administrators' accusations of Sanders as being unprofessional, selfish, and creating a negative atmosphere even though faculty voted to award Sanders the diversity award for her engagement in productive dialogue and the University President and College of Law faculty affirming that combatting racism requires uncomfortable conversations.

- Adams telling Sanders she was being selfish and "sowing bad feelings and distrust" by asking about course release and changes to course assignments.

- Long's warning to Sanders that her communications were creating a

negative culture and climate and also accusing her of being
unprofessional.

- An associate dean telling a colleague that Sanders' lawsuits "cast a
  shadow over everything" and makes hiring a new dean a "difficult sell."

- Sanders' silencing herself after Long made it clear that he had used her
  communications to negatively rate her performance.

There is also evidence that there were incidents that contributed to an
environment of racial and sexual hostility in the broader context of the College of
Law, including the following:

- In 2019, during the Bellwood Lecture, a student asking about genocide as
  a solution to climate change. In response, Long focused on the First
  Amendment rights of the speakers and did not address the racist nature of
  the comments or that Equal Protection rights may have been violated by
  the comments.

- Racial slurs, including the n-word, being used in class on multiple
  occasions, including in 2019, without faculty interference.

- Students' use of language and actions displaying antisemitism, racism,
  and sexism, including sexual violence.

- The administrations' response, or lack of response, to the above events.

- Other female faculty members' concerns about Long's disparate treatment of women; and concerns about bias in hiring against women, and against women and men of color.

In viewing this evidence in the light most favorable to Sanders, the Court also takes into consideration the context and setting. Specifically, these and other alleged incidents occurred at a law school and involve conduct by legal scholars and law students. In this context and setting, discriminatory comments and actions may be especially subtle, and the Court must "analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating [the] hostile work environment claim." *Cardenas v. Massey*, 269 F.3d 251, 262 (3d Cir. 2001). The Court finds that the evidence is more than sufficient to raise a genuine issue of material fact as to whether Sanders was subjected to a race- and/or gender-based hostile work environment.

This finding does not, however, end the inquiry because, "even if a hostile working environment exists, an employer is only liable for failing to remedy harassment of which it knows or should know." *Fuller v. City of Oakland, Cal*., 47 F.3d 1522, 1527 (9th Cir. 1995), *as amended* (Apr. 24, 1995); *see also Folkerson v. Circus Circus Enterprises, Inc*., 107 F.3d 754, 756 (9th Cir. 1997) ("[A]n

employer may be held liable for sexual harassment on the part of a private

individual . . . where the employer either ratifies or acquiesces in the harassment by

not taking immediate and/or corrective actions when it knew or should have known

of the conduct."). However, an employer's remedial action must be "reasonably

calculated to end the harassment" and "should persuade individual harassers to

discontinue unlawful conduct." *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir.

1991). "In evaluating the adequacy of the remedy, the court may also take into

account the remedy's ability to persuade potential harassers to refrain from

unlawful conduct." *Id.*

Here, Defendants contend that they took sufficient remedial actions and are

thus not liable for Sanders' hostile work environment claim. They point to

evidence demonstrating that, following the April 2018 HR Report, they attempted

to bring in a consultant to address the diversity issues raised in the Report, but

those efforts were not successful. However, the evidence shows that the reason for

the lack of success in bringing in the consultant was that the consultant cost too

much money and, specifically, that the Provost would not provide the funding

needed to hire a consultant. This is true, even though the Provost relied on Long to

address the issues raised in the HR Report. Further, Defendants admit that they

were trying to hire a consultant to look at broader organizational issues rather than

just the diversity and EEO issues, and that they did not pursue hiring a consultant for the diversity/EEO issues only. A more limited scope of diversity/EEO issues for the consultant presumably would have cost significantly less and been within the available budget.

Defendants also cite to evidence demonstrating that gender and race discrimination issues were taken up by the culture and climate review, and that Long was working on revising the College's diversity plan, implemented implicit bias training for faculty and students, and added a required diversity and inclusion statement from all prospective employees.  However, these actions did not occur until after Sanders filed her charge of discrimination with the EEOC.

Defendants also point out that Long allowed Sanders to conduct two forums following the 2019 Bellwood lecture genocide comments. However, the evidence also shows that Defendants wanted to have someone other than Sanders moderate the second forum; that Defendants recorded the second forum without notice or permission of those in attendance, making many of those in attendance uncomfortable when the recording was discovered; and that when Sanders tried to get to the bottom of the basis for the non-consensual recording, she was ignored, not given an honest answer, and ultimately reprimanded for her speaking out and objecting to the recording and the way in which it was handled.

Moreover, there is evidence that Associate Dean Cosens has consistently advocated that the College of Law needs a trained and designated EEO/HR officer who can help advise and address the issues of race and gender discrimination at the College. Her recommendations date back to 2017 and have yet to be implemented. Cosens also wrote the "most difficult email" in 2020 to the Chief Diversity Officer in which she raised concerns that Long treats women less than men and raised issues related to Sanders. Yet no one followed up with Cosens.

Finally, Sanders has submitted evidence that her expert witness will opine that Defendants' responses to the race- and gender-based hostile work environment at the College do not meet the standard of care, are not consistent with a commitment to diversity, and reflect lack of understanding of implicit bias and intersectional discrimination. Indeed, this expert has opined: "Defendants' actions discouraged Sanders from raising concerns, were punitive and critical in nature and served to isolate and stigmatize Sanders rather than encouraging her as they should have done." (Dkt. 52-19 at 18-19.)

The Court finds that the evidence, viewed in the light most favorable to Sanders, raise genuine issues of material fact as to whether Defendants took prompt remedial actions reasonably calculated to deter future race- and/or gender-based discrimination.

*d.  Retaliation Claim*

A retaliation claim under Title VII requires a plaintiff to show

"(1) involvement in a protected activity, (2) an adverse employment action and (3)

a causal link between the two." *Brooks v. City of San Mateo*, 229 F.3d 917, 928

(9th Cir. 2000) (citing *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir.

1997)). Once the plaintiff has made that showing, "the burden of production shifts

to the employer to present legitimate reasons for the adverse employment action.

Once the employer carries this burden, plaintiff must demonstrate a genuine issue

of material fact as to whether the reason advanced by the employer was a pretext."

*Id.*

Here, the evidence, viewed in the light most favorable to Sanders, shows that

she engaged in protected activity by raising concerns about discrimination—both

unique to her own situation and on a broader scale at the college. The evidence

also shows that Sanders experienced adverse employment actions including the

2018 rejection of her for the Associate Dean position; the rejection of her

application for a 2018 summer stipend; a 2019 negative performance evaluation—

her first ever; and other incidents discussed previously. All of these adverse actions

were primarily perpetrated by Defendants Adam and Long.

Finally, as to the causal link, the Court notes that the previously discussed

evidence of pretext also supports a finding that there is a causal link between the

adverse employment actions and Sanders' engagement in the protected activity of raising concerns about discrimination. Additional evidence of a causal link includes the following:

- Associate Dean Seamon's frustration with and reaction to Sanders' complaints of unfair treatment, including calling her complaints passive aggressive, calling her less than truthful in her assertions, and telling her that the term "bias" was a loaded term and that she should charge bias forthrightly if she was claiming bias.

- Adams' response when Sanders raised concern about the lack of women in leadership and commented publicly on the visual of an all-male leadership team.[11]

- Longs' response to Sanders' raising concerns about bias filtering into the faculty's hiring process and asking what she should do.[12]

---

[11] Adams stated in an email sent out to all faculty, in response to Sanders' complaints of unfair treatment, "I hope we can approach the shared goals and challenges by listening with openness and respect and mutual good faith, refraining from the insidious gossip and efforts to 'stir things up' that lead to a toxic atmosphere and discourage people from serving."

[12] Long publicly stated that Sanders' act of raising her concerns of bias "unprofessional, demeaning, and potentially dishonest." He also, in response, reported to the OCRI that Sanders had "slandered" two fellow faculty members (Continued)

- Longs' recording of his telephone conversations with Sanders without Sanders' knowledge or consent and the singling out of Sanders for such recording, and Longs' instructions to others to "always take careful notes of your communications with [Sanders] and share them with me."

- Seamon's less favorable summary of Sanders' 2015 teaching evaluations, and Seamon's and Adams' failure to flag or remove a student evaluation that clearly reflected racial bias, even after Sanders objected.

- Seamon and Adams being the only two faculty members to not support Sanders for tenure.

- The temporal proximity between the negative 2019 evaluation and (1) Sanders' communications regarding the need for open forums about the culture and climate issues at the College and (2) Sanders' communications questioning the legality of the recording of the forum without the knowledge or consent of those present at the forum.[13]

---

and asked the OCRI how "unfounded allegations of bias are considered or investigated."

[13] During the performance evaluation, Long raised concerns regarding Sanders' communications about Long having the forum recorded, and specifically mentioned Sanders' inclusion of others on the communications, such as the President and the OCRI, in her emails questioning the legality of the recording. (Continued)

This evidence is sufficient to establish a prima facie case of retaliation on the basis of Sanders' engagement in protected activity. The burden therefore shifts to Defendants to articulate a legitimate, nondiscriminatory reason for their adverse actions.

Defendants merely cite to the reasons they previously provided for their actions, which, as discussed above, are legitimate and nondiscriminatory. However, as also discussed above, the evidence submitted by Sanders is sufficient to, at minimum, raise a genuine issue of material fact as to whether the reasons stated by Defendants for the adverse employment actions are pretextual.

### E.     Title IX Claims

Sanders also brings claims under Title IX, which provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C.A. § 1681.

Defendants seek summary judgment on Sanders' Title IX claim. They do not

---

Long expressed the view that Sanders' communications negatively impacted the climate and culture at the College. Sanders responded to and rebutted the evaluation but Long submitted the evaluation without change to be part of Sanders' official personnel file.

deny that they are subject to Title IX but contend that Title VII is the exclusive

remedy for Sanders' claim of employment discrimination.

The Ninth Circuit has not yet expressly addressed whether a plaintiff can

bring employment discrimination claims under both Title IX and Title VII. In

*Campbell v. Hawaii Dept. of Educ.*, 892 F.3d 1005, 1023 (9th Cir. 2018), the Ninth

Circuit noted that the plaintiff's Title IX claims for sex discrimination "mirror

those she raised under Title VII," and that federal courts "generally evaluate

employment discrimination claims brought under both statutes identically. . . ." *Id.*

at 1023. The Ninth Circuit thus concluded that the plaintiff's Title IX

discrimination claims failed for the same reason as her Title VII claims failed. *Id.*

at 1024. This holding indicates that the Ninth Circuit does not view Title VII as the

exclusive remedy for claims of employment discrimination. However, the Ninth

Circuit did not explicitly address whether a plaintiff can proceed under both Title

IX and Title VII.

There is also a split among those circuits that have explicitly addressed this

issue. The First, Third, Fourth, Sixth, and Eighth Circuits have found that a

plaintiff can proceed on employment discrimination claims under both Title VII

and Title IX. *See, e.g., Lipset v. Univ. of Puerto Rico*, 864 F.2d 881, 896 (1st Cir.

1988) (finding that Title VII and Title IX prohibit the same conduct, and allowing

an employment discrimination case brought under Title IX to proceed, utilizing the

standards for Title VII as "the most appropriate analogue" for the Title IX case);

*Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 564 (3rd Cir. 2017) ("we confirm

that a private retaliation claim exists for employees of federally-funded education

programs under Title IX notwithstanding Title VII's concurrent applicability");

*Preston v. Commonwealth of Virginia ex rel. New River Community College*, 31

F.3d 203, 205-206 (4th Cir. 1994) ("An implied private right of action exists for

enforcement of Title IX," separate from Title VII and this right "extends to

employment discrimination on the basis of gender by educational institutions

receiving federal funds"); *Ivan v. Kent State Univ.*, 1996 WL 422496, at *2 (6th

Cir. 1996) (unpublished) (allowing plaintiff to proceed with a Title VII claim as

well as an independent Title IX cause of action for employment discrimination);

*Brine v. University of Iowa*, 90 F.3d 271, 276 (8th Cir. 1996) (acknowledging that

a private right of action exists under Title IX and that the standards for providing

discrimination under Title VII apply to claims under Title IX).

        In contrast, the Fifth and Seventh Circuits have held that Title VII is the

exclusive remedy for employment discrimination, and that a plaintiff cannot

maintain an action under both Title VII and Title IX. *See, e.g., Lakowski v. James,*

66 F. 3d 751, 753 (5th Cir. 1995) ("Title VII provides the exclusive remedy for

individuals alleging employment discrimination on the basis of sex in federally

funded educational institutions."); *Waid v. Merrill Area Public Schools*, 91 F. 3d

857, 862 (7th Cir. 1996) (finding Title VII preempted Title IX for claims of

equitable relief*), abrogated on other grounds by Fitzgerald v. Barnstable Sch.

Comm*., 555 U.S. 246 (2009)

The Court agrees with the majority of circuits to address the issue and finds

that Sanders' Title VII claims do not bar her Title IX claims. As the Third Circuit

explained in *Mercy*, "a private retaliation claim exists for employees of federally-

funded education programs under Title IX notwithstanding Title VII's concurrent

applicability" and "[w]hether that person could also proceed under Title VII is of

no moment, for Congress provided a 'variety of remedies, at times overlapping, to

eradicate' private-sector employment discrimination." 850 F.3d at 563-64.

Finally, Title IX and Title VII claims are analyzed under the same standards.

*See Campbell*, 892 F.3d 1023-24. Thus, for the reasons discussed above in

addressing Sanders' Title VII claim, there is a genuine issue of material fact as to

whether Defendants have violated Title IX.

F.    **Section 1983 Claims**[14]

---

[14] Sanders brings claims both under 42 U.S.C. § 1981 and § 1983. Because
(Continued)

UI seeks summary judgment on Sanders' § 1983 claims, contending (1) that the claims are barred by the Eleventh Amendment; (2) that Sanders' § 1983 claims are barred by the statute of limitations; (3) that Sanders cannot use the same factual basis to support claims under § 1983 and Titles VI, VII, and XI; and (4) that Defendant Adams is entitled to qualified immunity from individual capacity claims.

    1.  <u>Eleventh Amendment</u>

Defendants contend that UI is immune from liability under the Eleventh Amendment, as are both Adams and Long for claims brought against them in their official capacity. Defendants therefore seek dismissal of Sanders' § 1983 claims against UI and against Adams and Long in their official capacity.

Sanders responds that Defendants have waived their Eleventh Amendment immunity defense and, alternatively, that her claims for prospective relief, as well as her claims against Defendants Adams and Long in their individual capacity,[15]

---

§ 1983 provides the exclusive remedy for violation by state governmental units of the rights guaranteed in § 1981, the Court's conclusion as to Sanders' § 1983 claims also apply to her § 1981 claims. *See Cerrato v. San Francisco Cmty. Coll. Dist.*, 26 F.3d 968, 972 (9th Cir. 1994). Accordingly, the Court will not separately analyze Sanders' § 1981 claims.

    [15] Because the Court is granting Sanders' motion to amend, the Court will (Continued)

are not barred by the Eleventh Amendment.

       *a.  Waiver*

"A state waives its Eleventh Amendment immunity if it 'unequivocally evidence[s its] intention to subject itself to the jurisdiction of the federal court.' " *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1021–22 (9th Cir. 2010) (citation omitted). "A state may waive its sovereign immunity through 'conduct that is incompatible with an intent to preserve that immunity.' " *Id*. The Ninth Circuit has found that "state defendants engaged in conduct 'incompatible with' an intent to preserve sovereign immunity when they raised a sovereign immunity defense only belatedly, after extensive proceedings on the merits."

       In the present case, there have not been extensive proceedings on the merits of the case and the Court does not find that Defendants have raised their Eleventh Amendment sovereign immunity defense only belatedly. To the contrary, Defendants raised the Eleventh Amendment as an affirmative defense in their answer to Sanders' second amended complaint. (Dkt. 27 at 25.) Further, the present cross motions for summary judgment are the first time that the Court has been presented with and examined the merits of this case. Thus, this is not a case in

---

consider the issue of whether Defendant Long is immune from liability for the claims against him in his personal capacity as set forth in the to-be-filed TAC.

which Defendants have only belatedly raised the sovereign immunity defense after

extensive proceedings on the merits. *Cf. Hill v. Blind Indus. & Servs. of Md.*, 179

F.3d 754, 758 (9th Cir. 1999) (state waived sovereign immunity when it did not

raise defense until opening day of trial after it had filed two motions to dismiss, an

answer that did not assert the defense, consented to have a magistrate judge try the

case, conducted discovery, moved to compel discovery and for sanctions,

participated in a pre-trial conference, and filed trial materials); *In re Bliemeister*,

296 F.3d 858, 862 (9th Cir. 2002) (state waived immunity when it filed a limited

response, answer, and motion for summary judgment; attended oral hearing and

presented argument on the merits; and heard the court announce its preliminary

leanings, all without raising the defense of sovereign immunity). The Court

accordingly finds that Defendants have not waived their Eleventh Amendment

immunity.

### b.  Merits of Eleventh Amendment Immunity Defense

"The Eleventh Amendment bars suits against the State or its agencies for all

types of relief, absent unequivocal consent by the state." *Krainski v. Nevada ex rel.*

*Bd. of Regents of Nevada Sys. of Higher Educ.*, 616 F.3d 963, 967-68 (9th Cir.

2010) (citation and quotation marks omitted). This jurisdictional bar applies

regardless of the nature of relief sought by the plaintiff and extends to state

instrumentalities, agencies, and official capacity claims against state officials. *Id.*

(citing *Papasan v. Allain*, 478 U.S. 265, 276 (1986); *Central Reserve Life of N. Am. Ins. Co. v. Struve*, 852 F.2d 1158, 1160-61 (9th Cir. 1988)).

There is, however, a narrow exception to the Eleventh Amendment bar to suit "where the relief sought is prospective in nature and is based on an ongoing violation of the plaintiff's federal constitutional or statutory rights." *Id.* at 967-68 (citations omitted). Thus, "a plaintiff may . . . maintain a federal action to compel a state official's prospective compliance with the plaintiff's federal rights." *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 660 (9th Cir. 2009) (citations omitted). Moreover, the Eleventh Amendment "does not bar suits seeking to impose *personal* liability against state officers sued in their individual capacities for alleged violations of federal constitutional or statutory rights." *Central Reserve*, 852 F.2d at 1161.

Here, Sanders brings claims under § 1983 against UI and against Adams and Long in both their official and individual capacities. Sanders' § 1983 claims for damages against Defendants Adams and Long in their personal capacity are not barred by the Eleventh Amendment. *See id.* Further, to the extent Sanders seeks only prospective relief against Defendants, her § 1983 claims are not barred by the

Eleventh Amendment.[16] *See Krainski,* 616 F.3d at 967-68. However, to the extent

Sanders seeks anything other than prospective relief against UI or against

Defendants Adams and Long in their official capacity, her § 1983 claims are

barred. *See id.*

       2.  <u>Statute of Limitations</u>

Defendants also contend that Sanders' § 1983 claims are barred by the

statute of limitations to the extent the claims are based on alleged conduct that

occurred prior to June 19, 2017.

For claims under § 1983, the statute of limitations is the same as the personal

injury statute of limitation for the state in which the claim is brought. *Wilson v.*

*Garcia*, 471 U.S. 261 (1985). For Idaho, the limit is two years. *See* I.C. § 5-219(4);

*Hallstrom v. Garden City*, 991 F.2d 1473, 1476 (1993). Discrete, discriminatory

acts or wrongs that occurred outside of this two-year limitations period cannot

---

[16] In their reply brief, Defendants contend that Sanders has not shown an ongoing or continuous violation that would warrant prospective relief. (Dkt. 59 at 8-9.) Defendants did not make this argument in their opening brief, despite the clear law that holds that prospective relief is not barred by the Eleventh Amendment and despite Sanders' explicit allegations in her SAC and TAC that she is seeking prospective relief for the alleged § 1983 violations. Under these circumstances, the Court declines to address Defendants' new prospective relief argument. *See Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160, 1166 n.8 (9th Cir. 2012) ("[A]rguments raised for the first time in a reply brief are waived.").

support a claim for liability under § 1983. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 102 (2002) (addressing Title VII claims); *Carpinteria Valley Farms, Ltd. v. Cnty. of Santa Barbara*, 344 F.3d 822, 829 (9th Cir.2003) (applying *Morgan* to § 1983 action). Thus, Sanders can recover damages under § 1983 only for discrete acts or wrongs that occurred after June 19, 2017.

However, Sanders also brings a hostile work environment claim under § 1983.[17] A hostile work environment claim that includes acts or wrongs outside the two-year limitations period is not time-barred "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the [statute of limitations]." *Morgan*, 536 U.S. at 122; *see id.* at 115 ("[T]he 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its

---

[17] "Discriminatory harassment in the form of a hostile work environment may be actionable through a 42 U.S.C. § 1983 claim based on a violation of the Fourteenth Amendment's equal protection clause." *Cooper v. Cate*, Case No. 1:10–cv–899 AWI DLB, 2011 WL 5554321, at *6 (E.D. Cal. Nov. 5, 2011); *see Hartmann v. California Dep't of Corrections and Rehabilitation*, 707 F.3d 1114, 1123 (9th Cir. 2013) ("To prevail on an Equal Protection claim brought under § 1983," a plaintiff must show that the defendant " 'acted with an intent or purpose to discriminate against [her] based upon membership in a protected class.' " (citation omitted)).

own."); *id* at 117 ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."); *see also Moody v. Oklahoma Dep't of Corrections*, 879 F. Supp. 2d 1275, 1284 (N.D. Okla. 2012) (§ 1983 hostile-work-environment claim based on sexual harassment timely because the alleged actions were "part of a greater culture of sexual harassment" occurring both pre-and-post limitations period that involved frequent incidents "that went virtually unchecked by the facility's chain of command").

Sanders' § 1983 hostile work environment claim includes alleged conduct that occurred both within the two-year statutory period and outside the two-year period. The claim is accordingly not time barred.

### 3. Same Factual Basis for both § 1983 claims and claims under Titles VII and IX

Defendants contend that Sanders cannot rely on the same alleged conduct to support both a § 1983 claim and claims under Titles VII and IX, and that, "[a]bsent factual independence, such claims can be pursued only under the applicable discrimination statutes . . . and cannot be brought as independent § 1983 causes of action." (Dkt. 40-1 at 13-14.) The Court disagrees.

The Ninth Circuit long ago held that actions under Title VII and § 1983 are not mutually exclusive and that Title VII does not preempt an action under § 1983

for violation of the Fourteenth Amendment. *Roberts v. Coll. of the Desert*, 870

F.2d 1411, 1415 (9th Cir. 1988). Although the Ninth Circuit has not explicitly

addressed the exact question at issue here—whether a Title VII plaintiff can

maintain a claim under § 1983 and Title VII even if the claims arise from the same

factual allegations—other circuits have addressed the question and have answered

it in the affirmative, holding that a Title VII plaintiff alleging her constitutional

rights were violated may bring claims under both § 1983 and Title VII. *See, e.g.,*

*Notari v. Denver Water Dep't*, 971 F.2d 585, 587 (10th Cir. 1992) (holding "a Title

VII plaintiff who alleges that his equal protection rights were violated, and requests

remedies for those alleged violations under § 1983 has stated an independent basis

for [his § 1983] claim . . . even if the claims arise from the same factual allegations

and even if the conduct alleged in the § 1983 claim also violates Title VII");

*Johnston v. Harris Cty. Flood Control Dist.*, 869 F.2d 1565, 1576 (5th Cir. 1989)

(even though Title VII is the exclusive remedy for violation of its own terms, a

plaintiff may pursue remedy under § 1983 as well as under Title VII when public

employer's conduct violates both Title VII and a separate constitutional or

statutory right); *Ratliff v. City of Milwaukee*, 795 F.2d 612, 624 (7th Cir. 1986) ("A

plaintiff may sue her state government employer for violations of the Fourteenth

Amendment through section 1983 and escape Title VII's comprehensive remedial

scheme, even if the same facts would suggest a violation of Title VII") (internal quotation marks and citation omitted); *Grano v. Department of Development*, 637 F.2d 1073, 1075 (6th Cir. 1980) (employee may proceed under both Title VII and § 1983 when the § 1983 violation rests on a claim of infringement of rights guaranteed by the Constitution); *cf. Smith v. City of Chicago*, 820 F.2d 916, 920 (7th Cir. 1987) (claim preclusion applied where single core of operative facts formed basis of both lawsuits and plaintiff neglected to raise § 1983 claim until years after it occurred and not until adverse judgment was rendered on cause of action for employment discrimination); *Fleming v. Travenol Labs., Inc.*, 707 F.2d 829, 834 (5th Cir. 1983) (claim preclusion applied where factual basis for Title VII claim was same as factual basis for § 1983 claim raised earlier; even though legal theory was different, plaintiff sought to vindicate the same wrong in each instance and could have amended in prior action to include Title VII claim).

District courts within the Ninth Circuit have also held that an employee may bring both a § 1983 claim and a Title VII claim even when both claims are based on the same factual allegations. *See, e.g., Haynes v. City & Cty. of San Francisco*, No. CV 13-1567 MEJ, 2013 WL 3456932, at *4 (N.D. Cal. July 9, 2013) ("an employment discrimination plaintiff asserting a violation of a constitutional right may bring suit under both Title VII and § 1983, even if the claims arise from the

same factual allegations"); *Irish v. City of Sacramento*, No. CIV.S-04-1813FCDPAN, 2006 WL 224436, at *5 (E.D. Cal. Jan. 30, 2006) ("Employees may bring both Title VII and § 1983 claims even when both claims are based on the same set of operative facts."); *but see Gao v. Hawaii Dep't of Atty. Gen.*, No. CV 09-00152DAE-LEK, 2009 WL 2849140, at *4 (D. Haw. Sept. 2, 2009) ("Second, at least two of Plaintiff's section 1983 claims, 'illegal employment discrimination' and 'non-discriminatory state employment' are barred because of the comprehensive remedial scheme available under Title VII. Plaintiff asserts the same facts and broad allegations for this section 1983 as for his Title VII claim.").

Finally, the cases cited by Defendants are inapposite. In *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 378 (1979), the Supreme Court held, in a case that did not include a claimed violation of constitutional rights, that "§ 1985(3) may not be invoked to redress violations of Title VII." Similarly, in the other cases cited by Defendants—*Rivera v. City of Wichita Falls*, 665 F.2d 531, 534 (5th Cir. 1982); *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 982 (10th Cir. 1991); and *Day v. Wayne Cty. Bd. of Auditors*, 749 F.2d 1199, 1205 (6th Cir. 1984)—none of the plaintiffs raised a claim that their employer had violated their constitutional rights. Thus, these courts held that the plaintiffs could not maintain a § 1983 or § 1985 action. *Ibid.*

Moreover, the Sixth Circuit explicitly recognized in *Day* that "an employee may sue her public employer under both Title VII and § 1983 when the § 1983 violation rests on a claim of infringement of rights guaranteed by the Constitution." 749 F.2d at 1205. Thus, "[w]here an employee establishes employer conduct which violates both Title VII and rights derived from another source—the Constitution or a federal statute—which existed at the time of the enactment of Title VII, the claim based on the other source is independent of the Title VII claim, and the plaintiff may seek the remedies provided by § 1983 in addition to those created by Title VII." *Id.*

### 4.  Qualified Immunity—Adams

Defendants contend that Defendant Adams is entitled to qualified immunity from Sanders' individual capacity claims against him because he did not violate a clearly established statutory or constitutional right.

The doctrine of qualified immunity protects state officials from personal liability for on the job conduct so long as the conduct is objectively reasonable and does not violate clearly established federal rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To determine whether an individual is entitled to qualified immunity, the Court must determine (1) whether the facts alleged, viewed in the light most favorable to the plaintiff, establish a violation of a statutory or constitutional right, and (2) whether that right was clearly established given the state of the law at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

A right is clearly established for purposes of qualified immunity when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This standard does not require that there be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741.

Defendants contend that the only conduct at issue relating to Defendant Adams is the failure to offer Sanders the Boise Associate Dean positions, and that "Plaintiff cannot establish that she had a clearly established constitutional right to that position, and cannot identify a case where a law school dean acting under similar circumstances was held to have violated a professor's constitutional rights." (Dkt 40-1 at 14.) Defendants also contend that there is no clearly established federal law that is violated "each and every time a minority employee is told 'no' "

or that entitles that employee to the particular benefits that Sanders contends Adams denied her. (Dkt. 59 a 10.) Defendants contend that Adams is accordingly entitled to qualified immunity. The Court disagrees.

First, the rights at issue here are not whether Sanders had a constitutional right to the position of Associate Dean, or that she was entitled to any particular benefit. Rather, the rights at issue are Sanders' rights to (1) be free from race and/or gender discrimination and retaliation in employment decisions including promotions, pay, and terms and conditions; and (2) to be free from a race and gender-based hostile work environment. As discussed above, viewing the facts in the light most favorable to Sanders, there is at minimum a genuine issue of material fact as to whether Adams violated these rights.

Second, these rights have been clearly established for decades. *See, e.g., Lindsey v. Shalmy*, 29 F.3d 1382, 1386 (9th Cir. 1994) ("A reasonable official in [the defendant's] position in 1988 would have understood that unfavorably altering [the plaintiff's] job assignments, preparing unfavorable performance evaluations of her work and displaying a hostile attitude toward her causing others in the department to ostracize her, violated her clearly established federal constitutional rights—provided, of course, that [the defendant] took these actions against [the plaintiff] because of her gender," and thus, the plaintiff "had a clearly established

federal constitutional right to be free of gender discrimination at the hands of a state actor in 1988."); *Lowe v. City of Monrovia*, 775 F.2d 998, 1011 (9th Cir. 1985), *amended*, 784 F.2d 1407 (9th Cir. 1986) ("When the conduct that Lowe challenges took place [in 1982-83] it was well established that Lowe had a constitutional right not to be refused employment as a police officer because of her race or sex.").

Defendants appear to argue that, for a right to be clearly established, there must be previous cases with fundamentally or materially similar facts. However, as the U.S. Supreme Court has explained, "officials can still be on notice that their conduct violates established law even in novel factual circumstances," and "expressly rejected a requirement that previous cases be 'fundamentally similar.' " *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quoting *United States v. Lanier*, 520 U.S. 259 (1997)). Thus, "[a]lthough earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with 'materially similar' facts." *Id.*

The salient question is whether the state of the law at the time of the challenged conduct gave the defendants "fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Id.*  The Court finds that the rights to be

free from race and gender discrimination and retaliation in employment decisions, and to be free from a race and gender-based hostile work environment have been clearly established for many years, and thus were clearly established at the time Adams engaged in the challenged conduct. Defendant Adams is therefore not entitled to qualified immunity.

### G.    IPPEA Whistleblower Claim

Sanders also brings a claim under the whistleblower provision of the Idaho Protection of Public Employees Act (IPPEA), Idaho Code § 6-2104. Defendants seek summary judgment on this claim, contending that the claim is barred by the Eleventh Amendment.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). The Eleventh Amendment's protection extends both to " 'actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities.' " *Beentjes v. Placer Cty. Air Pollution Control Dist.*, 397 F.3d 775, 777 (9th Cir. 2005) (quoting *Regents of*

*the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997)).

### 1. UI is an Arm of the State

This Court has previously found that the state's public universities, including UI, are instrumentalities of the state and are thus entitled to the protection of the Eleventh Amendment. *See Mazur v. Hymas*, 678 F. Supp. 1473, 1476 (D. Idaho 1988) (holding that University of Idaho is an instrumentality of the state and the Eleventh Amendment precluded suit); *Sadid v. Idaho State University*, 837 F.Supp.2d 1168, 1174 (D. Idaho Aug. 10, 2011) (holding that Idaho State University is an arm of the state and that Eleventh Amendment immunity precluded suit); *see also University of Idaho v. Great American Ins. Co., Inc*., 2005 WL 2367538 (D. Idaho Sept. 27, 2005) (holding that the University of Idaho is an arm of the state for diversity jurisdiction purposes). Thus UI is entitled to sovereign immunity under the Eleventh Amendment against claims for violation of state law, such as Sanders' IPPEA claim, when that claim is brought in federal court, as it is here.

### 2. UI has not Waived the Eleventh Amendment

Sanders contends that Defendants have waived the protections of the Eleventh Amendment by failing to raise it as an affirmative defense earlier in this action, such as when Sanders sought to file an amended complaint that included the IPPEA claim.

"A state may waive its sovereign immunity through 'conduct that is incompatible with an intent to preserve that immunity.' " *Id*. (citation omitted). For example, in *Hill v. Blind Indus. & Servs. of Md.*, 179 F.3d 754, 756, 758 (9th Cir.1999), the Ninth Circuit found that the state waived sovereign immunity when it did not raise the defense until the opening day of trial, which had been preceded by the state filing two motions to dismiss and an answer that did not assert the defense, consenting to have a magistrate judge try the case, conducting discovery and moving to compel discovery and for sanctions, participating in a pretrial conference, and filing trial materials.

In In re *Bliemeister*, 296 F.3d 858, 862 (9th Cir. 2002), the Ninth Circuit found that the state waived its Eleventh Amendment immunity when it filed a limited response, an answer, and a motion for summary judgment without raising the defense; attended a hearing and argued the merits of the case without raising the defense; and heard the court announce its preliminary leanings, which were initially unfavorable to the state, without raising the defense. The Ninth Circuit agreed with the district court's determination that the state's delay in asserting the immunity defense "was clearly a tactical decision." *Id.*

In *Johnson*, 623 F.3d at 1022, the Ninth Circuit found that a state entity waived its Eleventh Amendment immunity when it "engaged in extensive

proceedings in the district court without seeking dismissal on sovereign immunity grounds"; and although it asserted in its Answer that it was "immune from liability pursuant to the provisions of the Eleventh Amendment of the United States Constitution," it "litigated the suit on the merits, participated in discovery, and filed a motion to dismiss and a summary judgment motion without pressing a sovereign immunity defense." *Id.* The Ninth Circuit explained: "In circumstances like these, we deem the defendant to have made a tactical decision to delay asserting the sovereign immunity defense. Such tactical delay 'undermined the integrity of the judicial system[,] . . . wastes judicial resources, burdens jurors and witnesses, and imposes substantial costs upon the litigants." *Id.* (alterations in original) (quoting *Hill*, 179 F.3d at 756). "Having chosen 'to defend on the merits in federal court,' the District will 'be held to that choice.' " *Id.* (quoting *Hill,* 179 F.3d at 758).

Here, Defendants failed to raise Eleventh Amendment immunity as an affirmative defense when Sanders sought to file her second amended complaint, which added a claim under the IPPEA or when Defendants filed an answer to

Sanders' second amended complaint.[18] However, Defendants raised Eleventh Amendment immunity as a defense to Sanders' IPPEA claim in their motion for summary judgment as well as in their opposition to Sanders' motion for partial summary judgment on the IPPEA claim. (*See* Dkt. 40-1 at 28; Dkt. 50 at 11; Dkt. 59 at 2-3.) Thus, although Defendants did not raise the Eleventh Amendment in relation to the IPPEA claim in its answer, this is not a situation where Defendants have failed to raise the defense when litigating the case on the merits. Further, the Court does not find evidence that the delay in raising the Eleventh Amendment immunity defense to the IPPEA claim was a tactical decision.

The Court does not find that UI waived its Eleventh Amendment immunity defense. Accordingly, UI is immune from suit in federal court for any alleged violations of the IPPEA.

### H.    Academic Freedom Claim

Finally, Defendants contend that Sanders' state law claim for Violation of Academic Freedom is also barred because UI is entitled to Eleventh Amendment immunity on that claim as well. As with the IPPEA, Sanders contends that

---

[18] As noted above, Defendants raised Eleventh Amendment immunity in relation to Sanders' §§ 1981 and 1983 claims. Defendants but did not, however, raise Eleventh Amendment immunity in relation to Sanders' IPPEA claim. (*See* Dkt. 27 at 25-26.)

Defendants have waived their Eleventh Amendment immunity.

For the same reasons discussed above in relation to the IPPEA claim, the Court does not find that Defendants waived Eleventh Amendment immunity in relation to Sanders' state law academic freedom claim. Accordingly, Defendants are immune from suit in federal court on Sanders' state law academic freedom claim. [19]

The Court also rejects Sanders' argument that the Eleventh Amendment does not bar her claim to the extent she seeks prospective or injunctive relief. As the U.S. Supreme Court explained many years ago, suits in federal court brought by a citizen against an unconsenting state based on violation of state law are barred by the Eleventh Amendment regardless of the nature of relief sought, i.e., regardless of whether the suit seeks damages or injunctive relief. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100-01 (1984) (citations omitted).

---

[19] The Court makes no determination as to the merits of the academic freedom claim brought against Defendant Long in his individual capacity in the to-be-filed third amended complaint. Instead, the Court rules only that the claim is barred as to UI, as well as to Adams and Long in their official capacity. *See Halderman*, 465 U.S. 89, 101 ("The Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest.' ").

## ORDER[20]

**IT IS ORDERED that:**

1.  Plaintiff's Motion to Amend (Dkt. 30) is GRANTED. Plaintiff is
    directed to file her Third Amended Complaint within seven days of
    entry of this order.

2.  Plaintiff's Motion for Partial Summary Judgment (Dkt. 36) is
    DENIED.

3.  Defendants' Motion for Summary Judgment (Dkt. 40) is GRANTED
    in part and DENIED in part as follows:

    a.  Summary Judgment is GRANTED in favor of Defendants on
        Plaintiff's Title VI claims.

    b.  Summary Judgment is DENIED on Plaintiff's Title VII claims.

    c.  Summary Judgment is DENIED on Plaintiff's Title IX claims.

    d.  Summary Judgment is GRANTED in part and DENIED in part
        on Plaintiff's claims under §§ 1981 and 1983 as follows:

        i.  Summary Judgment is granted in favor of Defendants
            only to the extent Plaintiff seeks damages or

---

[20] The Court has considered all of the arguments raised by the parties,
whether or not such arguments have been explicitly addressed herein.

retrospective declaratory relief against Defendant UI, or against Defendants Adams and/or Long in their official capacity;

    ii.    Summary Judgment on Plaintiff's claims under §§ 1981 and 1983 is otherwise denied.

e.    Summary Judgment is GRANTED in favor of Defendants on Plaintiff's state law IPPEA claims.

f.    Summary Judgment is GRANTED in favor of Defendants on Plaintiff's state law Academic Freedom claim.

4.    Plaintiff's Unopposed Motion to Seal (Dkt. 35) is **GRANTED.**

5.    Defendant's Unopposed Motion to Seal (Dkt. 41) is **GRANTED**.

6.    Plaintiff's Unopposed Motion to Seal (Dkt. 53) is **GRANTED.**

DATED: August 3, 2021

_____

B. Lynn Winmill
U.S. District Court Judge

**MEMORANDUM DECISION AND ORDER - 90**