ERIKA BIRCH (Bar No.7831)
T. GUY HALLAM, JR. (Bar No. 6101)
**STRINDBERG SCHOLNICK BIRCH
HALLAM HARSTAD THORNE**
1516 W. HAYS STREET
BOISE, ID 83702
(t) 208.336.1788
(f) 208.344.7980
erika@idahojobjustice.com
guy@idahojobjustice.com

Attorneys for Plaintiff

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

---

| | |
|---|---|
| **SHAAKIRRAH R. SANDERS,**<br><br>        Plaintiff,<br><br>vs.<br><br>**THE UNIVERSITY OF IDAHO, a public university governed by the BOARD OF REGENTS OF THE UNIVERSITY OF IDAHO aka the STATE BOARD OF EDUCATION, an executive department of the STATE OF IDAHO, and MARK ADAMS, former Dean of the College of Law, in his official and individual capacity, and JERROLD LONG, interim Dean, in his official and individual capacity**<br><br>        Defendants. | **THIRD AMENDED COMPLAINT (JURY DEMANDED)**<br><br>Civil No. 3:19-CV-00225-BLW<br>Judge Winmill |

Plaintiff ("Professor Sanders"), by and through her attorneys, hereby complains against the

Regents of the University of Idaho ("University"), a public university governed by the State Board

of Education also known as the Board of Regents of the University of Idaho, a constitutional

corporate body, former Dean Mark Adams, ("Dean Adams") and Interim Dean Jerrold Long ("Dean Long") (collectively, "Defendants") as follows:

## I.    NATURE OF THE CLAIMS

1.    This suit is brought by a black female law professor who has been subjected to race and gender discrimination and retaliation by Defendants in violation of: Title VII of the Civil Rights Act of 1964, as amended and codified at 42 U.S.C. § 2000e, *et seq*. ("Title VII"); Title VI of the Civil Rights act, as amended and codified at 42 U.S.C. § 2000d ("Title VI"); the Civil Rights Act of 1866, as amended and codified at 42 U.S.C. § 1981 ("§ 1981"); Title IX, 20 U.S.C. § 1681 et seq. ("Title IX"); and under 42 U.S.C. § 1983 ("§ 1983") for violating her rights under the Equal Protection clause of the United States Constitution.  Defendants also retaliated against Plaintiff in violation of Idaho Protection of Public Employees Act, I.C. § 6-2101 et seq. And, violated Plaintiff's academic freedom in violation of the Constitution of the University Faculty, University policies on academic freedom and shared governance, and the Amended and Restated Bylaws, Procedures and Rules of the University of Idaho college of Law.

2.    Plaintiff seeks all available remedies including damages, attorneys' fees, costs, and interest, and compensatory damages.

## II.    PARTIES

3.    Professor Sanders resides in the State of Idaho, Ada County, and is and was employed by the University at all times relevant to the allegations in this Complaint.

4.    Defendant the Regents of the University of Idaho, is an educational institution under the governance of the State Board of Education, an executive department of the State of Idaho pursuant to Idaho Code § 33-101 and a constitutional corporation pursuant to Title IX

Section 10 of the Idaho State Constitution.  At all times relevant to this Complaint, this Defendant was an employer pursuant to the pertinent laws and received federal financial assistance.

5.      Defendant Mark Adams served as the Dean of the University of Idaho College of Law ("College of Law") from June of 2014 until approximately June of 2018. He is being sued in his official and individual capacity and either made or ratified employment decisions that impacted Professor Sanders.

6.      Defendant Jerrold Long is the interim Dean of the College of Law, having taken that role over after Dean Adams stepped down. He is being sued in his official and individual capacity and either made, recommended or ratified employment decisions that impacted Professor Sanders.

### III.     JURISDICTION AND VENUE

7.      This Court has original jurisdiction under the provisions of 28 U.S.C. § 1331 with respect to Plaintiff's claims arising under federal law. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper with this Court as the Defendants' business is within the jurisdiction of the Court and the alleged illegal conduct that occurred was within the jurisdiction of the Court.

9.      With regard to the claims arising under Title VII, Professor Sanders has complied with the administrative requirements set forth in 42 U.S.C. § 2000e-5.  Professor Sanders filed a Charge of Discrimination with the EEOC, received a right to sue notice, and has filed this Complaint within the 90 days.

## IV.    GENERAL ALLEGATIONS

10.    Professor Sanders graduated from Loyola University New Orleans College of Law in 2001. Her legal career has included serving as a federal court law clerk at the district court and appellate court levels, working for private law firms as an associate, working as a public defender, and eventually entering into legal academia.

11.    After serving as a visiting professor at Seattle University School of Law, Professor Sanders was hired by the University of Idaho College of Law as a tenure track associate professor in June of 2011. She earned tenure in 2016 and became the first African-American and second person of color to achieve the rank of full professor at the College of Law in 2018.

12.    Professor Sanders focuses her teaching and research in areas of criminal procedure, the First Amendment, and torts. She has published scholarship in various law reviews/journals and has contributed to and/or edited various publications and collections.  For example, she has publications forthcoming in 2019 regarding tort law (Cambridge University Press) and First Amendment law (Cornell Law Review).

13.    Professor Sanders is regularly invited to speak at colloquium, symposium and legal conferences. She has developed a nationally recognized reputation in her area of academic expertise and has appeared in or contributed to news stories in *The New York Times*, *Washington Press*, *Associated Press*, and *Al Jazeera America* among others. She has appeared on local and regional television and radio news programs.

14.    Professor Sanders has also taken on various service-oriented special assignments and leadership positions for the College of Law and the University. During the 2016-18 academic years, she served as Chair of the University's Administrative Hearing Board. She co-coached the National Moot Court competition teams the fall semesters of the 2013-16 academic years, and in

2017, she organized the regional National Moot Court Competition in Boise. She served as faculty advisor for the Idaho Critical Legal Studies Journal during the 2014-18 academic years, and, in the spring semesters of 2017-18 academic years, she helped students plan symposiums. In addition, Professor Sanders was a member of the College's Admissions Committee from 2014-17, and the only faculty member to serve on that committee from the Boise campus during that time.

15.     Professor Sanders also serves in various law-related leadership positions outside of the University. For example, she serves as Chair of the Idaho State Advisory Committee to the U.S. Commission on Civil Rights; she has been an officer and will serve as President (2019-20) for the Richard C. Fields Inn of Court; she has and continues to hold leadership positions within the American Association of Law Schools. She is on the Board of Directors of the Idaho American Civil Liberties Union and the Idaho Black History Museum.

16.     In June of 2014, nearly three (3) years after her hire at the University, Mark Adams became the new Dean of the College of Law. At the time, there were approximately three professors of color, of which two were female. As of the 2018-2019 academic year, Professor Sanders is the second female professor of color who has the rank of full professor.

17.     In July of 2014, Dean Adams informed Professor Sanders that he intended to change her teaching package for the 2014-2015 academic year, such that Professor Sanders would be teaching 13 credit hours as opposed to the expected 12 credits per semester. Professor Sanders agreed to the additional credit based on the needs of the College but also inquired as to additional compensation or a future course release. Importantly, 2014-2015 year was the year prior to when Professor Sanders qualified to apply for tenure.  As a result, it was a critical year for her to work on completing her tenure application and its requirements.

18.     Dean Adams told Professor Sanders that he could not offer additional compensation or course release for a one-credit overload. However, Professor Sanders was aware of another white professor who was promised a future course release based on a one-credit overload for the same academic year. When she questioned Dean Adams about this, he confirmed that she was correct but explained that the overload of the other professor was "different" such that in his view, it "justif[ied] the release."

19.     This was the beginning of a pattern of disparate terms and conditions of employment that Defendants subjected Professor Sanders to at the College of Law. As further described below, she raised concerns about this disparate treatment and the lack of clear and objective criteria for making decisions that negatively impacted her as a woman of color. Unfortunately, instead of addressing her concerns, the College chose to retaliate against Professor Sanders.

20.     For example, in February of 2015, Professor Sanders learned that her teaching load for the 2015-2016 academic year would include an additional credit hour, and that there would be no release credit provided to her despite the fact that release credits had been or were being provided to others.  Additionally, 2015-2016 was the year when Professor Sanders would apply for tenure, putting her on similarly-situated terms with the white female colleague who was promised a future course release based on a one-credit overload in the fall of 2014. So, for two years in a row, the College of Law proposed to assign Professor Sanders to teaching packages that resulted in credit overloads and proposed to deny to Professor Sanders the same or similar type of compensation or course release as provided to those who also taught an overload.

21.     In communicating with Dean Adams and Associate Dean Richard Seamon about this issue, Professor Sanders pointed out how the lack of neutral criteria to assign and assess faculty

workloads led to results lacking in fundamental fairness. She also clearly told them that the justifications provided insufficiently explained the different treatment between similarly-situated faculty members. Professor Sanders also explained her concern that these decisions reflected a bias that was being ignored by the leaders.

22.     Less than 24-hours later, Professor Sanders was told that instead of teaching Constitutional Law I, she would be assigned to teach her normal package of 12 credits. It was clear from the communication from the Deans that this change was not provided in recognition that the original assignment was inappropriate or unfair. Instead, Professor Sanders' concerns were challenged. The Deans wrote that Professor Sanders actually had not been keeping pace with her colleagues during her first three years of teaching. This allegation was not factually correct, something Professor Sanders explained to both Dean Adams and Associate Dean Seamon. She reiterated that she just wanted to be treated the same as her similarly-situated junior colleagues. Professor Sanders also told them that she was willing and happy to teach Constitutional Law I but believed that a course release or other compensation was appropriate. Dean Adams made clear in response that she would not be teaching Constitutional Law I.

23.     Further, except for disagreeing with Professor Sanders' articulated concerns about discrimination, the Deans did not address or forward her complaint for any investigation. Instead, she was chastised for not complaining "forthrightly" enough and challenged to make a written complaint to the University-wide Office of Human Rights Access and Inclusion.

24.     Unfortunately, this was not the end of the College's interference with Professor Sanders' teaching-package assignments. She was again initially passed over for assignment of Constitutional Law I in the following year (2016-17) despite the fact that she had taught Constitutional Law I before and she had expressed the willingness and desire to teach that course

again. Additionally, Constitutional Law I was a class in her area of academic research. That course was first offered to a white professor with less seniority, who had not taught the class, did not have scholarship in that area, and did not want to teach it. Similarly, the University then reassigned the First Amendment class from Professor Sanders to a white, male visiting professor, who had not taught the subject and who was allowed to teach it remotely from Moscow, something Professor Sanders had been told she was not allowed to do. Then, Advanced Criminal Procedure, also in her area of academic research, was removed from her teaching package for 2017-18 without any discussion regarding the same and provided to a white professor with less tenure and experience.

25.     Professor Sanders continued to raise concerns about these assignments and to request clarity on the criteria used in making decisions. Dean Adams chastised her for doing so, telling her that her "continue efforts to get what you want with little concern for the impact of [sic] the effect of any changes on your colleagues or the College sows bad feelings and distrust by continuing to spread a false narrative."

26.     The College also subjected Professor Sanders to other disparate terms and conditions of employment such as: denying her work related travel requests; accusing her of being dishonest about attendance to conferences; taking away travel funds; assigning her an office that was segregated from other faculty; delaying her sabbatical by one year; assigning her to less attractive committees; denying her reimbursement for travel; questioning the use of the p-card on her behalf; focusing on negative versus positive feedback in her student reviews (including an obviously racially-tinged comment from a student that said, "STOP HIRING BASED ON AFFIRMATIVE ACTION").

27.     In May of 2017, the College had a faculty retreat. During this retreat, faculty were told that the College was creating two (2) Associate Dean of Faculty Development positions – one

in Moscow and one in Boise. During the retreat, Professor Sanders expressed concern about the lack of female leadership within the College and asked Dean Adams how he planned to make sure there was gender representation in the College of Law leadership. Dean Adams was extremely dismissive of Professor Sanders and her concerns to the point that several faculty members expressed dismay at his treatment of her afterwards.

28.     On May 23, 2017, Professor Sanders emailed Dean Adams to let him know that she wanted to be considered for the Associate Dean position and that she was willing to delay her sabbatical planned for 2018-19 for another year so that she could serve in that position for two academic years.

29.     On June 7, 2017, Dean Adams sent out a document that set forth the qualifications for the Associate Dean positions which included the following: that the candidate be tenured or tenure-tracked, preferably tenured full professor, and a two-year commitment preferred. Professor Sanders met the listed qualifications as she was a tenured professor up for full professor in 2018 and willing to commit to two years.

30.     Upon information and belief, Dean Adams approached several white and/or male professors about serving in the Associate Dean position in Boise. Dean Adams did not approach Professor Sanders despite her earlier email.

31.     On June 26, 2017, Dean Adams sent an email faculty wide indicating that one individual in each location had expressed a *willingness* to serve as the Associate Dean. Both individuals were white men. The individual selected for the Boise associate deanship was a not tenured track professor and was set to retire as of December 2018. Thus, the email indicated that he would only serve in that position for one, instead of two years.

32.     On June 29, 2017, Professor Sanders responded to the announcement of the two men selected for Associate Dean positions by making a point that this selection meant all of the College of Law Deans were men. In response, several other faculty members also expressed concerns about the lack of female leadership.

33.     On July 6, 2017, Dean Adams send out another faculty wide email. He admitted that he had discussed the associate dean positions with many faculty -- female and male. However, he had not, in fact, discussed the position with Professor Sanders, the only female professor of color, and someone who had explicitly expressed interest.

34.     Dean Adams also not so subtly called Professor Sanders out for her concern about the gender disparity noted above by saying that he hoped faculty could refrain from the "insidious gossip and efforts to 'stir things up' that lead to a toxic atmosphere and discourage people from serving."

35.     After the July 6, 2017 email, Professor Sanders requested an in-person meeting with Dean Adams. When he asked the purpose of the meeting request, she explained that she would like a formal explanation of why she was not chosen for the Associate Dean position.

36.     During a meeting with Dean Adams on October 31, 2017, in which he also invited the new Associate Dean who had been selected instead of Professor Sanders, she asked why she was not considered and for any insight on what she could do to be a successful candidate in the future. Dean Adams told Professor Sanders that there were three reasons she was not considered: 1) he did not believe she was serious; 2) her committee service was not strong enough; 3) he did not want to interrupt her sabbatical plans.

37.     In early February 2018, University Human Resources initiated a "climate review" of the College of Law. This review was allegedly the result of multiple complaints brought to

leadership. Upon information and belief, several dozen faculty and staff were interviewed. Professor Sanders was interviewed in March of 2018. During her interview, she raised concerns about gender and racial equity.

38.    In February 2018, Dean Adams also announced that another white, male professor was selected to become the Boise Associate Dean for the following academic year (*i.e.,* 6 months later). Notably, this white male professor was hired at the same time as Professor Sanders and was on sabbatical at the time the announcement was made. As was the case in 2017, Dean Adams chose not to discuss this position with Professor Sanders despite the fact that he knew she was interested.

39.    In April of 2018, Professor Sanders applied for a summer stipend to support her academic scholarship. In the past, qualifying professors had been provided with a stipend with priority going to those who had not yet attained full professor status. Professor Sanders had received a stipend in 2016 but taught summer school in 2017 and hence did not apply for a stipend in that year.

40.    The criteria for awarding the stipends included: years of service, project proposed (*i.e.,* extraordinary effort listed as two law review length articles, or one article plus work on a casebook, etc.); and service to the college (including, notably, serving as an Associate Dean).

41.    Professor Sanders' application indicated that she expected to author two full-length law review articles and a book chapter. She also planned to present a two-hour CLE at the Idaho State Bar's Annual Meeting, and outlined additional work that was planned for the summer. Professor Sanders also outlined her College and University service which was substantial in the 2017-2018 years.

42.     Professor Sanders was informed via a group email in May 2018 that she was not among those selected for the stipend. Two professors who started the same time as her and were of equal rank, both white men, were granted stipends.

43.     Professor Sanders asked Dean Adams for an explanation on why she was not granted a stipend. Dean Adams said that first priority is given to junior faculty and that the other priority is given to those will a heavy service load, like the Associate Dean position that she was passed over for. However, there were several tenured full professors, white and/or white and male, who received the stipend and who did not serve in those positions. When Professor Sanders raised some of these points, Dean Adams told her that because she was raising issues of pay disparity and disparate impact he would not be responding further via email. Professor Sanders then asked how her concern would be addressed if not via email. There was no further response from Dean Adams on this topic.

44.     On June 8, 2018, it was announced that Dean Adams was stepping down as Dean and would go back to being a regular faculty member.

45.     An Executive Summary of the climate and culture review of the College of Law, dated September 20, 2018, documented that leadership was aware of multiple complaints including concerns of "disrespectful, uncivil and abusive communication, gender bias and/or sex discrimination, poor leadership, lack of transparency in process, a perception of favoritism in the allocation of resources and poor morale amongst staff and faculty members." The Executive Summary noted that the review had been sent to John Wiencek, Provost & Executive Vice President in April of 2018.

46.     The Executive Summary documented a perception that "racial diversity is not highly valued by the College of Law administration and faculty body," and gender bias specific to

communication issues and lack of female or diverse senior leadership within the College.  Despite recognizing the assertions of racial/gender bias, human resources divested itself of the "purview . . . to make an overall judgment on," and instead referenced referring those issues to the Office of Civil Rights and Investigations "as appropriate."

47.     In November of 2018 the Executive Summary was shared with the College of Law faculty by Interim Dean Jerry Long ("Dean Long" or "interim Dean") along with a cover letter from Dean Long. The cover letter was characterized by him as "a 'moving forward' document," and listed out goals or ideals the College might have moving forward. This letter contained no recognition of any issues with racial or gender disparities or biases and instead focused largely on the divisions between the two campuses – Boise and Moscow. The goals and ideals did not include any racial or gender diversity or anti-discrimination topics.

48.     During a faculty meeting on November 14, 2018 regarding this same topic, there was only minimal discussion of the race/gender concerns, which were presented as "perceptions" versus realities. Dean Long essentially told Faculty that they needed to take those issues to the University's Office of Civil Rights and Investigations.

49.     Additionally, during the 2017 faculty retreat and thereafter, Professor Sanders and others were led to believe that the College was working on hiring a consultant who would review and perhaps train the College on race, gender and perhaps other diversity issues. Just prior to this November 2018 faculty meeting and thereafter, it became clear that any consultant hired would address broader operations and culture issues, instead of a diversity consultant. The University further noted that only after working through the climate and culture review would it determine if further efforts on diversity might be warranted.

50.     In other words, the University and College of Law specifically were willing to have the diversity and discrimination concerns that clearly existed at the college take a seat at the back of the bus until after they could sort through other concerns.

51.     During Professor Sanders' February 2019 performance review, the interim Dean specifically referenced her EEOC charge on more than one occasion. He specifically told her that his opinion was that certain incidents were the result of miscommunications rather than serious problems. The interim Dean also specifically questioned Professor Sanders about whether she was attempting to get a permanent job at the law school where she was serving as a visiting professor during part of her sabbatical.

52.     The interim Dean made clear during the review and in his written performance evaluation that he did not believe that Professor Sanders should have received a course release in the spring of 2018 and that he would not grant course releases going forward except in rare circumstances. Professor Sanders felt obligated to justify her course release, which only came about as a result of negotiations with the University Ombudsman Barbara Beatty and then Associate Dean Barbara Cosens. The performance review also acknowledged Professor Sanders' interest in leadership positions within the College. The interim Dean noted that the "transition for faculty to administration . . . requires a set of skills, attitudes, and perspectives that often aren't required of faculty."

53.     Merit raises were provided by the interim Dean in the spring of 2019. Professor Sanders did not receive a merit increase. According to the interim Dean, he used excellence in teaching and service to the College beyond what is normally required as his two criteria. Professor Sanders' February 2019 review noted that she "is an excellent teacher and scholar, and we value

her contributions to the College of Law." Professor Sanders was on sabbatical in 2018-19 and hence did not have service obligations that year.

54.     In the fall of 2019, several events occurred at the law school related to concerns about student diversity issues. Specifically, students raised concerns about racially offensive remarks at the College of Law.

55.     This topic was discussed amongst the faculty and staff via emails and during a diversity committee meeting on October 7, 2019.

56.     Former U.S. Secretary of the Interior Ken Salazar spoke to the public as part of the University sponsored Bellwood Lecture in late October 2019. During a question and answer session, a law student asked whether we should consider culling or genocide as a solution to climate change.

57.     This led to additional discussions amongst the students, and amongst faculty and staff regarding the appropriate way to address the student's question/comment, which was unquestionably offensive to some on racial, ethnic, religious and national origin grounds.

58.     For example, in emails amongst faculty and staff one professor said she was "ashamed" of the question and that she could hear gasps in the audience. Another professor said that she could not "take talk about 'culling' humans lightly," and suggested that the student:

> should at least be made aware that his language was interpreted by some as suggesting genocide, or something akin to genocide, as a means of addressing climate change. It seems to me that it would be a disservice not to tell the student about how his question was being heard . . . . I am happy to talk to students about my experience working with genocide survivors in Africa and Asia and about the role of language in inciting genocidal actions.

59.     Dean Long responded to the faculty and staff on October 24, 2019 with his own email that stated, among other things that:

> The student might have wanted to be intentionally shocking, by suggesting that unless real changes are made, reducing our population will be the only remaining option. This is a legitimate point to make. Carrying capacity is a critical component of any ecological system. . . . The Sierra Club once had a zero immigration policy . . . . This also is a perfectly legitimate argument . . . . It is the very purpose of the Bellwood Lectures to engage in difficult conversations, conversations that matter, and conversations that a times might make us uncomfortable. Our goal must be to help our students learn how to navigate those difficulties.

60.     Dean Long then sent a college wide email to all faculty staff and students expressing appreciation for a successful Bellwood Lecture and mentioned how Mr. Salazar left "thoroughly impressed with this College and our community." His email did not raise the issue about any of the concerns voiced regarding the student's comment.

61.     Another professor and former Associate Dean then supported the call that "[o]ur job as faculty is to pick that student up, explain to them the importance of words and the horrific history their term raised (both the holocaust and the treatment of Native Americans by settlers), and have a conversation with that student about how to approach these very sensitive topics in a respectful way – because that is their ethical duty."

62.     Later in the day, Dean Long sent another email, subject line: "The Bellwood Lecture and our 1st Amendment responsibilities," that went to all students which included, among other comments, the following:

> Our country's commitment to an open marketplace of ideas means that we will often be confronted with speech that we do not like, or even speech that is offensive and hurtful. Sometimes the offensive speech is intentionally so, lacking many other redeeming qualities. The world does have its jerks after all. . . . In your professional lives, you will be confronted on a regular basis with speech you find offensive, or with people you find distasteful. . . . Trying to silence or shout down or bully those bad ideas only causes them to be spoken more forcefully. . . . At this University, and this College, we are committed to ensuring that you have a safe place – if not always a comfortable place – to study and learn. If you ever feel physically threatened, please let us know, and we will do everything we can to address whatever threat exists.

16

63.     A student of color reached out to Professor Sanders to express her feelings about Dean Long's response and agreed to allow her comments to be shared with the faculty without being identified. The student said, among other things that:

> As a first-generation college student and a woman of color; I've heard egregious comments about my race, ethnicity, gender, etc. my whole life. To get an email from the Dean of the College telling students that this is just something that happens in life was frankly ignorant and belittling to people who have had to put up with this our whole lives and will continue to put up with these sort of comments. If the college was truly committed to creating a safe environment for every student; this would have been taken more seriously. . . .

64.     Another professor shared with the faculty that a few students made similar comments to him including asking "if this student genuinely believes in culling and genocide, what honestly, is to keep him from coming to school and carrying that act out himself?" This professor expressed that several students are "legitimately afraid," and suggested that "at minimum, a conversation with the student is in order."

65.     The faculty continued to discuss these issues via email. As a result of these and other events, Professor Sanders moderated an open forum for students to participate in and voice their concerns and/or experiences about culture and climate issues within the law school. Professor Sanders also invited the University's Office of Civil Rights and Investigations to the forum.

66.     The first open forum took place on November 14, 2019, and some students, faculty and staff attended. Students raised concerns regarding discriminatory incidents at the law school including issues of race, gender and disability based discrimination. Dean Long attended the forum.

67.     Professor Sanders reported to University President Green some of the students' concerns, specifically reports about the use of racial slurs in the classroom. On January 9, 2020,

President Green emailed the College of Law faculty proposing a review team composed of internal members of the University to examine the culture and climate of the law school.

68.     A second open forum took place on January 23, 2020. Once again Professor Sanders moderated the forum with students, faculty and staff in attendance. As was the case with the first forum, the second forum was connected via video conference between the Boise and Moscow campuses. Dean Long was not in attendance during this forum.

69.     At some point during the forum, Professor Sanders and others in attendance noticed from the video conferencing screen that it appeared that the forum was being recorded. Many appeared to be shocked and uncomfortable. Professor Sanders inquired as to whether anyone had consented to the recording and no one responded in the affirmative.

70.     No one had discussed recording with Professor Sanders to either request permission or provide notice. Professor Sanders has participated in many, many University related meetings including committee meetings, faculty meetings, student club meetings, and other University sponsored public events and, to her knowledge, none of these meetings had ever been recorded without explicit notice and consent. She was concerned that this particular forum was being recorded and seemingly without notice or consent to any of those in attendance. Other students in attendance also expressed their concern about the clandestine recording to Professor Sanders.

71.     Later that day, Professor Sanders received an email from Dean Long confessing that he had directed that the meeting be recorded but had forgotten to tell Professor Sanders. Professor Sanders emailed Dean Long and the other Associate Deans and expressed concern about the lack of notice or consent to record a meeting on culture and climate, "especially given the lack of trust students in the meeting consistently express" on these issues. Professor Sanders asked a

series of questions about the recording, including how a request to record is made and considered, and how to address the failure to notify participants or gain their consent.

72.     Dean Long did not respond to these questions.

73.     Instead, the following day (January 24, 2020), Dean Long sent out an email copying all students, all faculty and all staff to explain that he had recorded the meeting but had forgotten to inform Professor Sanders because it was a "forget-to-eat-lunch kind of day," and he apologized for his misstep.

74.     Professor Sanders responded to this group email and again inquired as to whether future meetings would be recorded, whether there was a policy on recording, and commented again on the concern about the recording and lack of consent. She thanked the Dean in advance for responding to these questions, stating that "I am sure this will be a topic for discussion at our next meeting."

75.     Once again, Dean Long did not respond. Later in the day, Professor Sanders sent another email excluding students, but including the faculty, the OCRI, and the President informing the Dean that several students had approached her about singling out the culture and climate meetings for recording, her concerns about how that could have a chilling effect on the speech of the participants, and again asking for responses to her questions. In this communication, Professor Sanders also asked the Dean to attach sections of Idaho code, Idaho rules or University protocol that supported his response.

76.     Dean Long did not respond to this email.

77.     A few days later, on January 31, 2020 Dean Long emailed Professor Sanders about her upcoming performance review meeting and outlined a number of issues he intended to discuss with her. Among, the items for discussion was her:

use of the community list-serves, specifically student list-serves. Your recent emails have caused a number of our students to question what is appropriate in our profession. Your approach to communicating with me is having a negative effect on our climate and culture, and falls short of the standards of professionalism we expect of our faculty. As we discussed in your evaluation last year, I do want the College of Law to be a place where you feel valued and comfortable but these communications are harming your relationships with the students, your colleagues, and this entire legal community.

78.     On February 6, 2020, Professor Sanders responded to Dean Long's email regarding the listed issues he previewed regarding her performance and questioned why none of the supposed concerns had been raised with her earlier and why she had not been afforded an opportunity to provide a response before the Dean seemingly prejudged her as guilty. Dean Long's email and Professor Sanders' response, also raised issues of academic freedom regarding what topics Professor Sanders was required to teach as part of one of her courses.

79.     In response to receiving Professor Sanders' email, Dean Long postponed his performance review meeting with Professor Sanders which was scheduled for that same day, February 6, 2020.

80.     After an inquiry from Professor Sanders, Dean Long finally met with Professor Sanders regarding her performance review on February 25, 2020. During this meeting Dean Long made several troubling remarks, including but not limited to the following:

    a.   That "we are not in a space where we feel like it is working" and that things had become "increasingly complicated" since Professor Sanders' return from sabbatical and that it was "difficult to know how to act."

    b.   That as Dean he had the discretion to dictate changes and content of courses.

    c.   On several occasions, he mentioned that he was upset and disappointed that Professor Sanders had raised concerns about his recording of the open forum with the OCRI, the Provost and the President. He indicated that he would have preferred

that she keep the recording between Dean Long and herself. Professor Sanders explained why she was troubled by the recording, including that she and several students felt unsafe after discovering the meeting was being recorded. She told Dean Long that she believed notice and consent was required before recording to which Dean Long said he had discretion to record meetings at his will.

81.    The next day, on February 26, 2020 Professor Sanders received her written review with an attachment. The attachment begins with the following:

> Professor Sanders has had a challenging 2019. Unfortunately, throughout the year it became increasingly apparent that Professor Sanders is uninterested in working with the College administration on many important aspects of her position description. This has continued in 2020, where the simple sharing of information in preparation for the evaluation process is met with hostility and claims of retaliation.

For the first time in her career at the University, she was rated as does not meet expectations in several categories including teaching and advising, university service and leadership, and for her overall rating in meeting performance expectations. Dean Long also said her rating for scholarship for the spring was to be determined despite her placement in the Cornell Law Review.

82.    Specific to the evaluation of her teaching, Dean Long relied on the fact that Professor Sanders "has been directed to include some coverage of the First Amendment in her section of Constitutional Law II" but failed to do so. Dean Long opined that it was "entirely appropriate to include the First Amendment in the required curriculum of law students . . ." and that Professor Sanders refusal to do so is "unreasonable." The review indicates that while "Professor Sanders is an engaging teacher who connects with many of her students. . . she has grown increasingly intransigent, and at times insubordinate."

83.    On March 3, 2020 Professor Sanders submitted a 10-page written rebuttal to Dean Long, asking for reconsideration of her 2019 evaluation and raising concerns about retaliation and

discrimination. Professor Sanders anticipated that the Dean would respond to her rebuttal and/or forward the same up the chain of command to the Provost for response.

84.     Professor Sanders heard nothing in response to her rebuttal until she followed up with an Associate Dean, who on May 11, 2020, told her that she should not expect to hear back from Dean Long regarding the performance evaluation.

85.     On May 20, 2020, the College Diversity and Human Rights Committee awarded Professor Sanders the Boise faculty award and noted her "work this academic year in promoting meaningful dialogue among faculty, staff, and students around culture and climate issues."

### FIRST THROUGH FIFTH CLAIMS FOR RELIEF
[Discrimination in the Terms and Conditions of Employment in Violation of: 1) § 1981; 2) § 1983; 3) Title IX; 4) Title VI; and 5) Title VII]

86.     Plaintiff realleges and incorporates by reference all paragraphs set forth above.

87.     The University operates an educational program and receives federal financial assistance.

88.     The University, by and through its administrators, acted under color of law with respect to the employment related decisions it made vis-à-vis Professor Sanders as outlined herein.

89.     Those decisions were made and/or ratified by the Dean of the College of Law.

90.     The University acted with deliberate indifference toward its obligation to provide a workplace free from race and gender discrimination.

91.     Defendants treated Professor Sanders differently because of her race and/or gender in the terms and conditions of her employment. This includes but is not necessarily limited to:

   a.   Changes to her teaching package – added course credits, removing and/or changing the courses she taught or requested to teach;

   b.   denying her work-related travel requests;

    c.   accusing her of being dishonest about attendance to conferences;

    d.   assigning her to office space segregated from the other professors;

    e.   taking away travel funds;

    f.   delaying her sabbatical by one year;

    g.   assigning her to less attractive committees;

    h.   denying her reimbursement for travel;

    i.   questioning the use of the p-card on her behalf;

    j.   focusing on negative versus positive feedback in her student reviews;

    k.   demanding she teach certain content in her courses without regard to her academic freedom, and ignoring her concerns about the same as set forth below;

    l.   accusing her of misdeeds, including failing to hold office hours with students, failing to respond to student emails, and providing the student evaluations selectively; chastising her for communications related to the culture and climate issues at the law school; and accusing her of being insubordinate;

    m.   downgrading and failing to complete her 2019 performance review.

92.    Professor Sanders has suffered and has damages such as lost compensation and benefits and emotional harm.

93.    Plaintiff seeks only prospective and/or injunctive relief under §1981 and §1983 against Defendants Adams and Long in their official capacity, unless other relief if permitted by law. Plaintiff seeks all available damages including punitive damages against Defendants Adams and Long in their personal capacity under §1981 and §1983 as their actions were taken in reckless disregard for Plaintiff's civil rights.

## SIXTH THROUGH TENTH CLAIMS FOR RELIEF
### [Failure to Promote in Violation of: 6) § 1981; 7) § 1983;
### 8) Title IX; 9) Title VI; and 10) Title VII]

94.     Plaintiff realleges and incorporates by reference all paragraphs set forth above.

95.     The University operates an educational program and receives federal financial assistance.

96.     The University, by and through its administrators, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

97.     Those decisions were made and/or ratified by the Dean of the College of Law.

98.     The University acted with deliberate indifference toward its obligation to make employment decisions including promotions without regard to race and/or gender.

99.     Defendants discriminated against Professor Sanders based on her race and/or gender by failing to consider for promotion and/or promote her to the Associate Dean position in favor of a white men.

100.     Professor Sanders suffered and has damages such as lost compensation and benefits and emotional distress.

101.     Plaintiff seeks only prospective and/or injunctive relief under §1981 and §1983 against Defendants Adams and Long in their official capacity, unless other relief if permitted by law.

102.     Plaintiff seeks all available damages including punitive damages against Defendants Adams and Long in their personal capacity under §1981 and §1983 as their actions were taken in reckless disregard for Plaintiff's civil rights.

**ELEVENTH THROUGH FIFTEENTH CLAIMS FOR RELIEF**
**[Pay Discrimination in Violation: 11) § 1981; 12) § 1983; 13) Title IX; 14) Title VI; and 15)**
**Title VII]**

103.    Plaintiff realleges and incorporates by reference all paragraphs set forth above.

104.    The University operates an educational program and receives federal financial
assistance.

105.    The University, by and through its administrators, acted under color of law with
respect to the employment related decisions such as the pay decisions outlined herein.

106.    Those decisions were made and/or ratified by the Dean of the College of Law.

107.    The University acted with deliberate indifference toward its obligation to make
employment decisions including pay decisions without regard to race and/or gender.

108.    Defendants denied Professor Sanders a summer stipend in 2018 and a consideration
for merit increases in 2016-2018 because of her race and/or gender and race.

109.    Professor Sanders has suffered and has damages such as lost compensation and
benefits and emotional harm.

110.    Plaintiff seeks only prospective and/or injunctive relief under §1981 and §1983
against Defendants Adams and Long in their official capacity, unless other relief if permitted by
law.

111.    Plaintiff seeks all available damages including punitive damages against
Defendants Adams and Long in his personal capacity under §1981 and §1983 as their actions were
taken in reckless disregard for Plaintiff's civil rights.

**SIXTEETH THROUGH TWENTIETH CLAIMS FOR RELIEF**
**[Hostile Work Environment in Violation of 16) § 1981; 17) § 1983;**
**18) Title IX; 19) Title VI; and, 20) Title VII]**

112.    Plaintiff realleges and incorporates by reference all paragraphs set forth above.

113.    The University operates an educational program and receives federal financial assistance.

114.    The University, by and through its administrators, acted under color of law with respect to creating, maintaining and/or condoning a hostile work environment for Professor Sanders based on her race and/or gender and/or in retaliation for her protected activities.

115.    These actions and in actions were made and/or ratified by the Dean of the College of Law.

116.    The University acted with deliberate indifference toward its obligation to not subject employees to a hostile work environment on the basis of race, gender and/or for retaliatory reasons.

117.    Professor Sanders was subjected to insulting, humiliating and/or discriminatory conduct related to her gender or race. Such conduct was unwelcomed.

118.    The discriminatory and hostile acts described here in were severe and/or pervasive and altered Professor Sanders' conditions of her employment making it more difficult for her to do her job, take pride in her work and to desire to stay in her position.

119.    Professor Sanders perceived the environment to be abusive or hostile.

120.    A reasonable black woman in her circumstances would consider the environment to be abusive or hostile.

121.    The University is vicariously liable to the hostile environment created, maintained and/or condoned by its supervisors including Dean Adams.

122.    Professor Sanders has suffered and has damages such as emotional harm.

123.    Plaintiff seeks only prospective and/or injunctive relief under §1981 and §1983 against Defendants Adams and Long in their official capacity, unless other relief if permitted by law.

124.    Plaintiff seeks all available damages including punitive damages against Defendants Adams and Long in their personal capacity under §1981 and §1983 as their actions were taken in reckless disregard for Plaintiff's civil rights.

## TWENTY-FIRST THROUGH TWENTY-FOURTH CLAIMS FOR RELIEF
### [Retaliation in Violation of: 21) § 1981; 22) Title IX; 23) Title VI; and, 24) Title VII]

125.    Plaintiff realleges and incorporates by reference all paragraphs set forth above.

126.    The University operates an educational program and receives federal financial assistance.

127.    The University, by and through its administrators, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

128.    Those decisions were made and/or ratified by the Dean of the College of Law.

129.    The University acted with deliberate indifference toward its obligation to not subject employees who engage in protected activity to adverse actions.

130.    As early as July of 2014, Professor Sanders raised concerns about unequal treatment, discrimination and bias.  Since then, Professor Sanders has continued to raise concerns about employment related decisions she suspected, in good faith, were discriminatory because of race and/or gender. For example:

   a.   At various times beginning after the fall of 2015 Professor Sanders spoke to the University Ombudsman about concerns of discrimination/retaliation;

   b.   In June of 2017, Professor Sanders pointed out the lack of female leadership in response to the news that the Dean had found two white men willing to fulfill the

27

role of Associate Deans, even though Professor Sanders had specifically indicated interest in doing the same;

c. In March of 2018, Professor Sanders was interviewed as part of Human Resources Climate and Culture review;

d. In June of 2018, Professor Sanders filed a charge of discrimination with the Equal Employment Opportunity Commission.

131.   In response to raising these concerns, she has been subjected to a pattern of retaliatory behaviors including but not limited to the following:

a. disparate treatment in the terms and conditions of her employment such as teaching assignments, denying her work related travel requests; accusing her of being dishonest about attendance to conferences; taking away travel funds; delaying her sabbatical by one year; assigning her to less attractive committees; denying her reimbursement for travel; questioning the use of the p-card on her behalf; focusing on negative versus positive feedback in her student reviews, chastising her to having received a course release;

b. insults, demeaning behaviors, and, otherwise being subjected to hostile terms and conditions which negatively impacted her work atmosphere;

c. being passed over for promotion, pay increases and summer stipend;

d. demanding she teach certain content in her courses without regard to her academic freedom, and the by-laws of the College that vest the faculty with a right to vote on all decisions regarding curricular changes which must first proceed through the Curriculum Committee as further set forth below;

e.   accusing her of misdeeds including failing to hold office hours with students, failing to respond to student emails, and providing the student evaluations selectively; chastising her for communications related to the culture and climate issues at the law school; and accusing her of being insubordinate;

f.   downgrading and failing to complete her 2019 performance review.

132.   There is a causal link between Professor Sanders' protected activity and the adverse actions, pattern of discrimination and harassment she has suffered.

133.   Professor Sanders has suffered and has damages such as lost compensation and benefits and emotional harm. Plaintiff seeks only prospective and/or injunctive relief under §1981 and §1983 against Defendants Adams and Long in his official capacity, unless other relief if permitted by law.

134.   Plaintiff seeks all available damages including punitive damages against Defendants Adams and Long in their personal capacity under §1981 and §1983 as their actions were taken in reckless disregard for Plaintiff's civil rights.

### TWENTY FIFTH CLAIM OF RELIEF AGAINST UNIVERSITY
### (Retaliation in violation of the Idaho Protection of Public Employee Act)

135.   Plaintiff realleges and incorporates by reference all paragraphs set forth above.

136.   On or about January 23 and 24, 2020, Professor Sanders communicated concerns about a suspected violation of law when she emailed Interim Dean Long about the secret recording of the open forum she moderated regarding student concerns about the culture and climate at the College.

137.   Under Idaho law, one party to a communication must be aware that the communication is being recorded. Dean Long admitted that he directed the forum be recorded and admitted he did not attend, and did not disclose that it was being recorded.

138.     Under state and federal law, a government may not record your communications without consent unless it has obtained a warrant and/or has probable cause.

139.     Professor Sanders reasonably believed that Interim Dean Long's secret recording of the forum was illegal, and she communicated the same to him and to several others in administration including the President of the University in good faith.

140.     On January 31, 2020, Dean Long emailed Professor Sanders previewing concerns he had regarding her performance and specifically calling out her protected communications. During their performance review meeting on February 25, 2020, Dean Long chastised Professor Sanders for reporting his clandestine recording to OCRI, the Provost and the President. He also told her that he had the discretion to recording meetings at will.

141.     In her 2019 Performance Evaluation she received on February 26, 2020, she was rated as not meeting performance expectations overall and in specific categories and once again her protected activity was noted. She submitted a rebuttal to this evaluation on March 4, 2020, and she was told on May 10, 2020 that she should not expect any further response from the administration regarding her evaluation or concerns about retaliation.

142.     Professor Sanders suffered adverse actions including: the negative performance review, which has the potential of impacting her future pay and promotional opportunities; and being forced to silence her speech regarding climate and culture concerns and the legality of secretly recording the forum.

143.     The adverse actions were taken because of her protected activity.

144.     Professor Sanders has suffered emotional damage and may suffer economic losses as a result of the Defendant's retaliation against her for her whistleblowing activities.

## TWENTY SIXTH CLAIM OF RELIEF AGAINST UNIVERSITY
### (Violation of Academic Freedom in violation of the Constitution of the University Faculty, University Policy, and College of Law Bylaws and Policy)

145. Plaintiff realleges and incorporates by reference all paragraphs set forth above.

146. The Constitution of the University Faculty provides that faculty are charged with the authority to create and approve courses of instruction and make/approve curricula decisions. *See* Article IV Sec 3.

147. The Constitution also provides that the constituent faculty of each college is authorized to establish its own curriculum in accordance with its bylaws. *See* Article I, Sec. 4, clause A.

148. The College of Law Amended and Restated Bylaws, Procedures and Rules have the following relevant provisions:

    a. That to "ensure compliance . . .with the Articles of Association of the Association of American Law Schools and the American Bar Association Standards for Approval of the Law Schools" the law faculty must have "primary and substantial control of the education program of the law school." *See* Art. I Sec. B.

    b. "The right of the Faculty to participate in the management of the affairs of the College of Law (College) is fully recognized. The right of the Faculty includes, without limitation, the right to vote on all major policy decision and the right to be consulted on all decisions affecting the affairs of the College. The affairs of the College include, without limitation, . . . curriculum . . .." *See* Art. I Sec. C.

    c. "The Curriculum Committee shall lead curricular planning and development of proposals for curricular change, shall provide a forum for investigation and discussion of innovation in teaching, and shall consider any proposals for changes

31

to the curriculum developed independently of the Committee." *See* Art. II, Sec. G.6.b.

d. "The curriculum of the College shall consist of such courses as may be designated by the Faculty. The adding or dropping of courses . . . require Faculty approval." *See* Art. XI, Sec. A.

e. The Curriculum Committee is "charges with continuing examination of the curriculum with a view to initiating and recommending improvements and changes and with the study of all suggested changes." *See* Art. XI, Sec. B.

149.    The University Policy on Academic Freedom, Rights and Responsibility states the following: "Teachers are entitled to freedom in the classroom in discussing their subjects, but they should be careful not to introduce into their teaching controversial matter that is unrelated to their subjects." *See* Policy 3160 at B-2.

150.    In 2011, the College of Law went through the process to successfully modify the course description for Constitutional Law II to remove specific reference to substantive areas including "freedom of speech and religion under the First Amendment." The rationale provided to the University Curriculum Committee for this change included: "the substantive material removed from the course description was unnecessarily detailed and tied the faculty to teach particular constitutional provisions and statutory material."

151.    The following year, Professor Sanders was successful in gaining approval to add a 3 credit course titled Freedom of Speech and the Press, which was part of the teaching package she was hired to cover. The rationale provided to the University Curriculum Committee included that teaching these subjects in the current constitutional law course was impractical.

152.    In 2014, Professor Sanders was successful in gaining approval to change the Freedom of Speech and Press course to one that covered the full spectrum of First Amendment rights – a First Amendment Seminar, and to make this a permanent course offered. The reason Professor Sanders lobbied for this change was because she found it nearly impossible to teach the religious establishment and free exercise clauses segregated from the other First Amendment principles, so she wanted to combine them into on comprehensive course in order to provide the students with a better understanding of the legal concepts. When presenting this change for faculty approval, she also explained that there was insufficient time in the Constitutional Law courses to cover First Amendment in depth if at all. Another Professor expressed the possibility that First Amendment concepts could be encompassed within Constitutional Law I.

153.    For each of these changes, the College followed the process outlined in its Bylaws including vetting these changes through the Curriculum Committee and presenting them to the faculty as a whole, and then presenting them to the University Curriculum Committee for final approval.

154.    In early 2019, Dean Long asked the Curriculum Committee to do a comprehensive review of how bar-tested subjects are covered across all three years of curriculum, with the goal of trying to increase efficiency and consistency.

155.    At or near this same time, during Professor Sanders' 2018 performance review, Dean Long expressed his opinion that First Amendment should be covered in Constitutional Law II. Professor Sanders raised several issues with this request including how the decision could affect enrollment in the First Amendment Seminar, whether her course was being singled out when there were other stand alone courses on bar tested subjects that might be incorporated into required

courses, and what subjects should be removed in order to accommodate First Amendment. Professor Sanders did not receive a response to these concerns.

156.    Nothing more was discussed regarding this topic until August 26, 2019, when Professor Sanders again raised concerns to Dean Long about how adding First Amendment topics would impede her from covering other topics including equal protection issues on race and gender. The only mandatory law school course that discusses the Fourteenth Amendment Equal Protection Clause and its protection of race, gender and fundamental rights is Constitutional Law II.  She also referenced the history above regarding changing the description for Constitutional Law II and adding First Amendment Seminar, and she opined that it should be the faculty to make substantive changes that would require her to skip coverage on race and gender equal protection cases. She welcomed a discussion on the topic at a faculty meeting.

157.    Dean Long responded that he expected Professor Sanders to include First Amendment in Constitutional Law II course. When Professor Sanders again indicated that the decision needed to be vetted by the faculty, the Dean indicated that he would ask the Curriculum Committee to look at the issue, but it did not change his expectation that she would follow his directive in the meantime.

158.    Dean Long never responded to her legitimate questions and concerns about how his demand would impact the course, and in fact, did not address this issue with Professor Sanders further until it was in the context of her 2019 performance review. In fact, he never asked Professor Sanders if she had taught any First Amendment subjects as part of her Constitutional Law II course.

159.    During the performance review meeting on February 25, 2020, Dean Long told Professor Sanders that he had the discretionary authority to dictate the content of any and all courses.  Professor Sanders performance was rated as not meeting expectations in her 2019 review

because she failed to follow the Dean's directive about what topics to teach in Constitutional Law II.

160.    Dean Long's actions in dictating what topics must be taught in Professor Sanders' Constitutional Law II curriculum violated her right to academic freedom and recognition of shared governance vested in the faculty as set forth in the above documents and policies of the University and the College of Law.

161.    Professor Sanders has been damaged by this breach in that her performance evaluation was downgraded and her professional reputation has been tarnished. This could have continuing impacts on her pay, promotional and other professional opportunities.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants, and award the following relief:

a.    Back pay, in amounts to be determined at trial;

b.    Compensatory and consequential damages;

c.    Front pay;

d.    Injunctive and/or declaratory relief;

e.    Prospective relief;

f.    Punitive damages;

g.    Pre-judgment and post-judgment interest at the highest lawful rate;

h.    Attorneys' fees and costs of this action, including expert witness fees, as appropriate; and

i.    Any such further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 10th day of August, 2021.

**STRINDBERG SCHOLNICK BIRCH HALLAM HARSTAD THORNE**

/s/ Erika Birch
Erika Birch
Guy Hallam
*Attorneys for Plaintiff*