ERIKA BIRCH (Bar No.7831)
T. GUY HALLAM, JR. (Bar No. 6101)
**STRINDBERG SCHOLNICK BIRCH**
**HALLAM HARSTAD THORNE**
1516 W. HAYS STREET
BOISE, ID 83702
(t) 208.336.1788
(f) 208.344.7980
erika@idahojobjustice.com
guy@idahojobjustice.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| **SHAAKIRRAH R. SANDERS,**<br><br>     Plaintiff,<br><br>vs.<br><br>**THE UNIVERSITY OF IDAHO, COLLEGE OF LAW, a public university governed by the STATE BOARD OF EDUCATION, et al.**<br><br>     Defendants. | **MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Civil No. 3:19-CV-00225-BLW<br>Judge Winmill |

Plaintiff, Shaakirrah R. Sanders ("Sanders"), by and through her undersigned attorneys, hereby submits this *Memorandum in Opposition to Defendants' Motion For Partial Summary Judgment*. Filed concurrently are *Plaintiff's Statement of Disputed Facts* ("SOF") supported by the *Declaration of Shaakirrah R. Sanders* and by the evidence in and attached to the *Declaration of Erika Birch*.

### I.     INTRODUCTION

As set forth in Plaintiff's *Motion to Strike (Dkt. #105)*, much of Defendants' current motion for summary judgment is simply an attempt to reargue their earlier summary judgment motion,

**1 | MEMORANDUM IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

which was denied by the Court (in large part) in August of 2021. Given the Court's earlier rulings, it was clear that this summary judgment briefing was to be limited to: 1) the individual capacity claims against Defendant Long added by the Court's granting of Plaintiff's motion to file her *Third Amended Complaint*; and 2) the events occurring in 2021 (after summary judgment had been filed) added by the Court's grant of Plaintiff's motion to file her *Fourth Amended Complaint*. In fact, the Court's most recent Order specified that the parties shall file dispositive motions regarding "the new allegations and including any dispositive motion regarding Defendant Long's individual capacity, within 45 days of the Court's Order." Dkt. #98, p. 14. With respect to these issues, Defendants have not alleged qualified immunity shields Defendant Long from Plaintiff's individual capacity discrimination/retaliation claims brought under §§1983, 1981. Thus, those claims must proceed to trial as per the Court's earlier Order.

Additionally, as set forth below there are sufficient facts for Plaintiff's violation of academic freedom claim against Defendant Long to proceed to trial. Finally, Defendants' motion for summary judgment on Plaintiff's claims based on the more recent events alleged in her *Fourth Amended Complaint* must also be denied as a reasonable jury could find Defendants' actions were motivated by discriminatory and/or retaliatory animus.

## II. ARGUMENT

In deciding whether there is a genuine dispute of material fact, the Court must view the facts in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) ("Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.") The Ninth Circuit has held that "any indication of discriminatory motive ... may

suffice to raise a question that can only be resolved by a factfinder," and for that reason "summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a Title VII dispute is the elusive factual question of intentional discrimination." *Warren v. City Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995)(internal quotation marks omitted).

### A. A Reasonable Jury Could Find Dean Long Interfered with Plaintiff's Academic Freedom in Violation of University/COL Policy.

The Court granted the University Defendant summary judgment on Eleventh Amendment grounds as to Plaintiff's Academic Freedom Claim. Dkt. #79, p.88. However, because the Court granted Plaintiff's Motion to add Defendant Long in his individual capacity, this state law claim survived against him personally. *Id.* at n. 19 (the Court makes no determination as to the merits of the academic freedom claim ground against Defendant Long in his individual capacity.)

In their Motion, Defendants once again misrepresent this claim on multiple grounds. First, as set forth in Plaintiff's *Motion to Strike*, Defendants attempt to confuse this claim as a constitutional claim pursuant to §1983.[1] Dkt. #104-1, pp. 9-11. These immaterial arguments can thus be disregarded. *See* Dkt. #105-1, p. 8.

Second, Defendants mischaracterize Plaintiff's claim as alleging that she was contractually entitled to "teach whatever materials, or courses she chooses." Dkt. #104-1, p. 11. That is certainly not the basis of Plaintiff's claim. Instead, as set forth in Plaintiff's *Opposition* to the first summary judgment, a reasonable jury could determine that the dean does not have the authority under University and COL policy, bylaws and the faculty Constitution, to require Sanders to teach specific content in her Constitutional Law II course. Dkt. #52, pp. 37-38.

---

[1] As set forth in Plaintiff's *Opposition* to the first summary judgment, this claim is based on Defendant Long's violation of Professor Sanders' academic freedom which is contractually provided for in the Constitution of the University Faculty, the COL ByLaws, and University policy. *See* Dkt. #52, p. 36-38.

**3 | MEMORANDUM IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

Specifically, the Constitution of the University Faculty clearly vests curricular decisions with the faculty. Dkt. #52-1, at ¶104. Likewise, the COL Bylaws recognize that the faculty must have primary control over the educational program, and that faculty have the right to vote on decisions affecting curriculum. *Id.*, at ¶106. Indeed, the COL has a Curriculum Committee which is charged with examining and making recommended improvements and changes to curriculum. *Id.* Finally, University Policy explicitly provides that faculty are "entitled to freedom in the classroom in discussing their subjects." *Id.*, at ¶107.

In this case, the University hired Professor Sanders to teach constitutional law. Early in her career, it became clear that there was not sufficient time in the Constitutional Law II course to adequately cover the First Amendment. *Id.*, at ¶108. Thus, Sanders advocated for formal adjustments to the Con Law II curriculum. First, she was successful in gaining approval to add a Freedom of Speech and Press Seminar in 2012 and then, a more comprehensive First Amendment seminar in 2014. *Id.*, at ¶110. In doing so, Professor Sanders went through the proper channels and garnered the appropriate faculty support (*i.e.*, through the curriculum committee, to a vote by the COL faculty, and finally a vote by the University curriculum committee). *Id.* Thus, since 2014, Sanders has only covered First Amendment topics lightly in her Con Law II class. Despite the above, in February of 2019, Dean Long told Sanders that she needed to incorporate First Amendment into her Con Law II class (albeit without direction regarding which parts of the First Amendment or what content she should sacrifice to do so). *Id.*, at ¶¶112-113. Professor Sanders objected to doing so on multiple grounds. *Id.*, at ¶116.

In February 2020, Long provided Sanders with a negative performance evaluation based in part on her "continued refusal" to cover the First Amendment which he called "unreasonable." Dkt. #52-1, at ¶86; Dkt. #38-19, p. 6. Additionally, recently produced chat messages reflect that

Dean Long has continued to look for ways to interfere with Sanders' academic freedom. In August 2020, Dean Long asked his associate deans "if we didn't have Shaakirrah teach Con Law II, are there other critical needs she could fill? That could include a need created by having someone else teach Con Law II." *See Plaintiff's Statement of Facts* filed herewith (SOF) at ¶91. A reasonable jury could interpret this communication as an expression of motive to reassign Con Law II away from Professor Sanders and as further interference with her academic freedom to teach the course which had appropriately been approved by the COL/University processes and within her academic freedom as a professor.

Finally, Long's interference with Sanders' teaching should also be considered as part of the hostile work environment and disparate treatment claims already ruled upon by the Court. Without citation to any factual support, Defendants argue that there is no support that Long's actions were discriminatory[2] because: (1) the COL is a small school with limited resources; (2) asking a professor to teach bar exam tested materials is unremarkable; and (3) virtually all of Sanders' peers have been asked to sacrifice their teaching preferences. Dkt. #104-1, pp 12-13.

These arguments ignore Plaintiff's material facts which support a conclusion that Long indeed was singling Sanders out for this type of persistent interference with her teaching including the following: (1) Long has permitted Professor Seamon (white, male) to teach the same course in Moscow with an overemphasis on the First Amendment without interference (Dkt. #52-1, ¶¶112, 116); (2) Long admits there are a number of bar tested topics that are not part of required courses at the COL (*Id.*, at ¶115); (3) Long was aware that many comparable colleges offer First Amendment in a separate course (*Id.*, at ¶109); and, (4) Long was unwilling to engage in a serious dialogue with Sanders about why she believed his demand was misplaced, including her concerns

---

[2] Defendants do not address retaliation.

**5 | MEMORANDUM IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

about having to sacrifice important content about equal protection law, and he continually refused to indicate which portions of the First Amendment he wanted her to teach. (*Id.*, at ¶¶113-114). In addition, these facts must be considered as part of the totality of circumstances[3] including the "numerous incidents that have lasted over many years" summarized in the Court's initial summary judgment Order, along with the incidents reflecting racial/sexual hostility in the broader context of the COL. Dkt. #79, pp. 54-57. A reasonable jury could rely on all the above to conclude that Defendants' purported rationales for Long's interference with Sanders' teaching are pretextual for discrimination/retaliation.

Given the above, the Court should permit both Plaintiff's academic freedom claim and her discrimination/retaliation claims, of which these facts as part and parcel, to proceed to trial.

### B. A Reasonable Jury Could Find Defendants Liable regarding the Newly Added Events.

Defendants did not move for summary judgment regarding the two letters of Reprimand Long gave to Sanders in 2021. *See Fourth Amended Complaint* (Dkt. #99), at ¶¶86, 89. Thus, those events, which are part and parcel of her hostile work environment/terms and conditions claims, must be left to the jury for determination.

However, Defendants do argue they are entitled to summary judgment regarding Long's 2020 poor performance evaluation of Professor Sanders.[4] Notably, the evaluation is premised on the same grounds as the letters of reprimand – mainly, Dean Long's assertion that Professor Sanders failed to meet teaching/advising expectations because she did not video record her lectures

---

[3] The impact of work behavior "often depends on a constellation of surrounding circumstances, expectations, and relationships." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998). *See also Harris v. Forklift Systems,* 510 U.S. 17, 23 (1993)(requiring a look at the totality of the circumstances in hostile work environment cases).

[4] Defendants also reargue their motion regarding Long's 2019 evaluation admitting that they are "aware that the Court has previously considered many of these same facts and found they present triable issues." Dkt. #104-1 p. 17. Pursuant to Plaintiff's *Motion to Strike*, Defendants attempt to get the Court to reconsider is unsupported and inappropriate.

6 | MEMORANDUM IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

in 2020, and failed to meet her service/leadership expectations because she missed one regular faculty meeting and several special faculty meetings which conflicted with other obligations she had, including events in this litigation like depositions.

The only discernable support offered for Long's poor 2020 review is that "Long noted that many of the same issues had persisted, and also specifically found that Plaintiff's performance was unsatisfactory in that year because Plaintiff – almost entirely alone amongst her colleagues – had refused to follow the College's novel, Covid-19 pandemic related recording policy. . .." Dkt. #104-1, pp. 17-18 n. 9. This argument ignores numerous facts placing Long's motivation for downgrading Sanders' performance in question.

Again, this evaluation must be considered within the totality of circumstances including the evidence supporting Long's discriminatory/retaliatory motive that identified in Plaintiff's *Opposition* to Defendants' first motion and the Court's August 2021 ruling. That includes for example, evidence such as Long singling Sanders out for recording their telephone conversations without her consent and telling others to "always take careful notes of your communications with [Sanders] and share them with me." Dkt. # 79, p. 64.

Additionally, Defendants' position ignores the following: As admitted by Long, there was no official policy requiring video recording of classes, and faculty were never allowed to weigh in on this requirement. SOF at ¶8. Instead, it was Long's imposed preference, which evidences a clear focus on using this issue against Sanders, as captured in his May 2020 chat message ("Since i [sic] already know Shaakirrah resisted, please make sure you're thorough with what she did. But I need to treat everyone the same (*i.e.*, i [sic] need to double-check what everyone did)."). SOF at ¶10. Long knew that Sanders (and at least one other long-time professor) objected to the requirement of providing video recordings of the lectures. SOF at ¶8. Long understood that

7 | MEMORANDUM IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

Sanders' concerns arose out of privacy issues, given that she and her students were all participating in class from their private homes. SOF at ¶8. Long knew that Sanders was providing audio recordings of her lectures and was told by IT that she had indeed provided video of several of her classes in April 2020. Long also knew that there were many professors in spring 2020, and several throughout fall 2020, who were still not posting video recordings. ¶¶11, 15-16.

Moreover, Long's stated rationale for requiring video recordings was to "aid the students" in their learning during remote teaching. SOF at ¶17. Yet, Long disregarded the fact that Sanders' student evaluations reflected that "all" or "almost all" of her students praised her classroom presentation and her engagement/enthusiasm across all four classes. SOF at ¶22. Indeed, students commented on Sanders' ability to make it "feel like a real classroom experience," despite being on zoom, and noted that she "kept me engaged the entire class which other classes via zoom failed to do," among many other complimentary comments. SOF at ¶¶22-23. Notably, her positive evaluations were during a time when the University President allowed professors to opt-out of having their reviews considered as part of their performance record, presumably because so many had a difficult time adjusting to teaching remotely. SOF at ¶¶19-20.

Despite these facts, Long still rated her as failing to meet expectations in her teaching/advising saying that her lack of video recordings "has real and immediate negative impacts on our students." SOF at ¶24. Long cannot identify any specific evidence demonstrating that students were struggling because of lack of video recordings in Sanders' lectures, and Sanders was not aware of any complaints. SOF at ¶26. Worse yet, he gave Sanders a Letter of Reprimand for the lack of video recordings, even though no other professor received a reprimand. SOF at ¶25.

Additionally, during this same time period, Long refused to follow the Vice Provost's directive that he meet with Sanders about his negative evaluation and her seven-page written

**8 | MEMORANDUM IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

response to the same. SOF at ¶34. Yet on May 13, 2021, in the last days of his tenure as Dean, and without speaking to Sanders directly about whether she had video recorded her courses after receipt of his first Reprimand, Long provided Sanders with a Second Letter of Reprimand accusing her of failing to video record her lectures. SOF at ¶30. When Sanders told him he was mistaken and confirmed that she had posted video recordings of her courses (which admin had access to), Long refused to believe her. SOF at ¶31-32. The new Dean confirmed that there were video recordings of Sanders' courses starting in February 2021. SOF at ¶36. Yet, Long's Second Reprimand remains, unaltered, and part of her performance record, as does his negative evaluation. SOF at ¶37.

Long also downgraded Sanders' service and leadership based on what he said was failing to regularly attend faculty meeting[s]. SOF at ¶¶42, 46. In reality, Sanders only missed one regular faculty meeting because she confused the dates (a genuine mistake). SOF at ¶39. Out of the 23 special faculty meetings, Sanders attended 16 of them. *Id*. Of the special meetings she missed, most of her absences were caused by conflicts with events related to this lawsuit, such as depositions/deposition preparation and an OCRI investigation interview, which she explained to Long. SOF at ¶40. Long was unwilling to provide Sanders with the list of dates of meetings she allegedly missed while he was disciplining her. SOF at ¶43. He was aware that there were other faculty missing meetings, yet Sanders was the only one to receive a written reprimand. SOF at ¶41. Many meetings were scheduled on short notice, not compliant with the bylaws, and on at least one occasion, scheduled during a time that Long knew Sanders would be unavailable because she was teaching remotely at another law school. SOF at ¶39.

Moreover, Long's poor rating of Sanders' leadership/service ignored that she served on the Deans' Advisory Committee; Curriculum Committee; Faculty Appointments Committee; and

chaired the Tenure and Promotion Committee. She also served on two Third-year Review Committees. Sanders helped form the University's Black Faculty Staff Association, and in the summer 2020, she gave lectures as part of the University's Black Lives Matter Series. Additionally, Sanders was selected by faculty to receive the Diversity Award in 2020 for her leadership on issues of culture and climate at the COL. SOF at ¶46.

Because of her downgraded evaluation, Sanders did not receive a pay increase for 2021. SOF at ¶4. Thus, according to University records, she now makes $ 7,534.80 less than one of her white, male contemporaries. *Id.*

In addition to the above evidence, there is more evidence from which a jury could conclude that Long's actions vis-à-vis Sanders were based on discriminatory/retaliatory motivations.[5] This includes the disparaging chat messages he exchanged/condoned with Affirmative Action Coordinator Mike Nugen. The chats include comments that Sanders is a complainer and on a "crusade to right wrongs she makes up to have something to do," and an admission that Long "rants" about her "somewhat regularly." SOF at ¶89. A jury could also find it telling that during Longs' tenure as Dean, another female professor left reluctantly based on Long's actions, and Long identified a large number of other female professors/staff who have also left the COL. SOF at ¶¶87-88.

---

[5] As set forth in Plaintiff's *Motion to Strike*, Defendants attempt to reargue components of her hostile work environment claim based on the events already presented in the first summary judgment, which should be stricken. To be sure, Long can be held liable for the discriminatory comments/conduct occurring within the law school for which he chose not to condemn or worse yet condoned. For example, in response to racist rhetoric by students, Long chose to communicate that those impacted needed to learn how to handle such harassment. In contrast, the new Dean told students in the fall 2021 that "[w]e are committed, both by our own values, but also by state and federal law, to ensuring that every student who chooses to join our community has the benefit of an environment conducive to learning." Her email went on to remind students of their obligations not to make threats or derogatory comments that impact another member of the community. SOF ¶92.

**10 | MEMORANDUM IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

When viewing Long's 2020 performance evaluation in a light most favorable to Sanders, and within the totality of the circumstances, the Court must find that a reasonable jury could conclude the evaluation was discriminatory or retaliatory.[6]

### C. A Reasonable Jury Could Find that the OCRI investigations against Sanders were Discriminatory/Retaliatory.

As set forth in the SOF, since filing her lawsuit, OCRI has hired two (different) external investigators to investigate allegations of discrimination **against** Sanders. In doing so, the University has spent approximately $50,000 -$60,000. SOF ¶¶64, 80. Yet, none of Sanders' allegations of discrimination/retaliation have been assigned to external investigators; neither have the multiple discrimination complaints lodged against Long. SOF at ¶¶48-49. Instead, those complaints have been disposed of by OCRI[7] without a formal investigation. *Id*. Between these two investigations, Sanders has been under investigation for more than a year (September 2020 through November 2021). SOF at ¶50-51.

#### 1. *Schorr's Investigation*

The first OCRI investigation was part of the facts presented during the first summary judgment briefing, but the results were not provided to Sanders until March 2021 (after the briefing), and even then, she was not provided a copy of the investigative report. SOF ¶72. As the Court already found, Long's response to Sanders' raising concerns about possible bias in hiring,[8] publicly calling it "unprofessional, demeaning, and potentially dishonest," and reporting to OCRI that she "slandered" her colleagues, could be considered evidence of retaliation. Dkt. #79, p. 63,

---

[6] If the jury so finds, then it is axiomatic that the failure to provide her a raise, which was based on her poor performance evaluation, was also discriminatory/retaliatory.
[7] OCRI's Director, Erin Agidius, is a 2011University of Idaho COL graduate. SOF at ¶47.
[8] Interestingly, the COL puts so little value in appropriate hiring procedures that the Affirmative Action Coordinator, Mike Nugen, informed Long that the COL hiring training could be run "in the background" and just like all of the other COL online trainings, "just play the video, hit continue now and then, answer some easy questions." SOF at ¶53. Although he did not say anything to Nugen at the time, Long now seems to acknowledge that Nugen's comments were inappropriate and indicated that he did not take the trainings seriously. SOF at ¶53.

**11 | MEMORANDUM IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

n.12. The evidence garnered after the Court's decision further bolsters that conclusion, including the following: (1) the investigator concluded that Sanders' raised her concerns in good faith; (2) the investigator also warned that if those who "raise good faith complaints about possible discriminatory practices find themselves the subject of an investigation, this will likely result in a dangerous deterrent of future reporting by others who are aware of potential violations of the University policies;" (3) despite those findings, no one relayed that information to Long, who was the Dean and Sanders' supervisor at the time, even though he reported her to OCRI, encouraged two other professors to do the same, and accused her of slander, unprofessionalism, and dishonesty; and (4) although the investigator provided his final report to OCRI on December 28, 2020, OCRI did not forward the report to the Provosts, or inform the parties that the investigation had concluded, until March 10, 2021. SOF ¶¶67-71. These facts further support the Court's earlier ruling that Long's report to OCRI, and the way in which it was handled by OCRI, can be considered retaliatory by the jury.

### 2. Guidepost's Investigation

Sanders reported harassing behaviors by a student (K.R.) to OCRI on March 10, 2021. The next day, K.R. reported that Sanders discriminated against him on the basis of his race (white). SOF at ¶73, 79. While OCRI did not investigate Sanders' reports, even though it was aware that others had reported harassing behaviors by K.R., it hired an external investigator (Guidepost)[9] to investigate K.R.'s race discrimination allegations against Sanders. SOF at ¶¶74-76. Neither OCRI nor the COL notified Sanders of K.R.'s complaint, or the external investigation, until May 2021. SOF at ¶77. K.R. admitted that he would not have pursued a complaint but for Sanders' "email regarding him/race," direct evidence of his discriminatory intent. SOF at ¶79.

---

[9] Notably, it did not hire Schorr, who made findings favorable to Sanders and was familiar with relevant issues within the COL, to investigate.

**12 | MEMORANDUM IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

Ultimately, the investigators found that there was insufficient evidence to support K.R.'s allegations of discrimination. SOF at ¶81. Despite this, Guidepost investigated unalleged and unauthorized[10] non-EEO policy violations against Sanders and concluded that she violated policy by "harassing" a student. SOF at ¶¶82-83. These findings were explicitly based, in part, on Sanders' protected activities in reporting K.R. to OCRI and raising concerns about his actions towards her being motivated by her race, again direct evidence of retaliation. SOF at ¶84. These findings were forwarded to Sanders' supervisory chain, which included the new Dean. SOF at ¶82. Guidepost's investigatory report documents are filled with numerous inaccuracies and mistruths. SOF at ¶85. Yet, OCRI did not ask Guidepost to reopen its investigation and continued to rubber stamp its conclusions, which remained unchanged despite Sanders' response pointing out the numerous inaccuracies and issues. SOF at ¶86.

When viewed in context and in light of the facts in the record, a reasonably jury could certainly find that this investigation, and OCRI's rubber stamp of its conclusions, was further harassment of Sanders based on retaliatory or discriminatory motive.[11] Moreover, Sanders has not been told what, if anything, her supervisory chain intends to do about Guidepost's findings, but it clearly does not reflect well on her.

Given the above, summary judgment related to both of these OCRI investigations against Sanders should be denied. There is a plethora of facts to support that the initiation of the Schorr

---

[10] OCRI has to obtain permission to investigate non-EEO violations and did not do so in this investigation. SOF at ¶83.

[11] Defendants assert that Long cannot be held personally liable for this investigation, and Plaintiff agrees that there are not currently facts showing that he was involved in the OCRI investigation. Long did however, admonish Sanders for her communications re: K.R. which included her concerns that K.R.'s ousting of her as a co-advisor was motivated by her race or her speech about racism. This was ignored by OCRI. SOF at ¶¶75-76. Regardless, the University can be found liable for OCRI's actions, and Plaintiff seeks prospective relief in the form of having Guidepost's conclusion that she violated University Policy removed from her performance record. Additionally, even without any specific liability as to this investigation, the facts surrounding this investigation are relevant regarding Defendants' retaliatory/discriminatory motive against Sanders and the University's impotence in taking effective remedial measures.

13 | MEMORANDUM IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

investigation, which was prompted by Long's reports, was retaliatory for Sanders' good faith complaint about possible bias in hiring decisions and the need for more robust training. Additionally, there is direct evidence of K.R.'s retaliatory motive in asserting a discrimination complaint about Sanders, which was ignored by both Guidepost and OCRI. Moreover, these investigations should be viewed in the broader context which includes the fact that OCRI has never formally investigated complaints lodged against Defendant Long and has failed to adequately handle numerous complaints raised by Sanders.

### III.   CONCLUSION

For the aforementioned reasons, and those contained in the previously filed *Motion to Strike*, Defendants' *Motion for Partial Summary Judgment* should be DENIED.

DATED this 13th day of January 2022.

STRINDBERG SCHOLNICK BIRCH
HALLAM HARSTAD THORNE

/s/ Erika Birch
Erika Birch
T. Guy Hallam Jr.
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

      I hereby certify that on the above referenced date a true and correct copy of the forgoing pleading was served on the following via the CM/ECF system:

Bentley G. Stromberg  
Tully Fitzmaurice  
Sonyalee R. Nutsch  
CLEMENTS, BROWN & McNICHOLS, P.A.  
Attorneys at Law  
321 13th Street  
Post Office Box 1510  
Lewiston, Idaho 83501  
bstromberg@clbrmc.com  
snutsch@clbrmc.com  
tfitzmaurice@clbrmc.com  

                                            /s/ Dunja Subasic  
                                            Dunja Subasic, of the firm