ERIKA BIRCH (Bar No.7831)
T. GUY HALLAM, JR. (Bar No. 6101)
**STRINDBERG SCHOLNICK BIRCH
HALLAM HARSTAD THORNE**
1516 W. HAYS STREET
BOISE, ID 83702
(t) 208.336.1788
(f) 208.344.7980
erika@idahojobjustice.com
guy@idahojobjustice.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **SHAAKIRRAH R. SANDERS,**<br><br>    Plaintiff,<br><br>vs.<br><br>**THE UNIVERSITY OF IDAHO, COLLEGE OF LAW, a public university governed by the STATE BOARD OF EDUCATION, et al.**<br><br>    Defendants. | **PLAINTIFF'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br>**(Dkt. #104)**<br><br>Civil No. 3:19-CV-00225-BLW<br>Judge Winmill |

Plaintiff, Shaakirrah R. Sanders, by and through her undersigned attorneys, hereby submits this *Statement of Disputed Facts in Opposition to Defendants' Motion for Partial Summary Judgment (Dkt. #104)*. The materials cited here in are contained within or attached to the *Declaration of Erika Birch* unless otherwise stated.

## STATEMENT OF DISPUTED FACTS

Defendants include various facts that were already developed and presented as part of the parties' original motions for summary judgment filed in late 2020. This includes Defendants' Statement of Facts (SOF) ¶¶1-8, 10. See Dkt. #104-7.  Plaintiff has already disputed/responded to

**1 | PLAINTIFF'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

those facts in the earlier summary judgment submissions, which have been ruled upon by the Court. Plaintiff will set forth disputed facts regarding post-summary judgment submissions as amended into her Complaint by the November 10, 2021 *Fourth Amended Complaint*. Dkt. #99.

## 2020 Performance Evaluation & Letters of Reprimand

1.      On or about February 9, 2021, Dean Long gave Professor Sanders a letter of reprimand which included disciplining her for failure to video record/post her lectures and for missing certain faculty meetings. Long Dep. 490:4-8; Dkt. #104-3, pp.2-4 (1.52425-27).

2.      No other professors received a reprimand from Long regarding recording/posting recordings in 2020-21 or for missing faculty meetings. Long Dep. 460:11-18; 464:3-10.

3.      In her 2020 evaluation, also provided February 2021, Long rated Sanders' overall performance as not meeting expectations. Long Dep. 499:22-24.

4.      Because of this poor rating, Sanders did not qualify for a pay increase in 2021. Long Dep. 513:17-20. Thus, she now makes $7,534.80 less than her white, male counterpart. *See Exhibit D to the Declaration of Erika Birch*.

5.      In the afternoon of his second to last day as Dean for the College of Law (COL), Long provided Sanders with a Second Letter of Reprimand again falsely accusing her of failing to video record her lectures. Long Dep. 501:13-502:19; 503:18-504:7; Dkt. #104-3, pp. 6-8 (1.52429-31); Exh. E, p. SANDERS4450.

### *Remote Teaching During the Pandemic*

6.      When the COVID-19 pandemic hit, the COL professors were told that they needed to "immediately learn (1) how to record classes that are held live in the building; (2) how to provide students access to recordings in a FERPA compliant manner; and (3) how to teach classes via Zoom if the University cancels in-person classes." Sanders Dep. 9:25-10:8; Exh. F.

7.      After spring break 2020, Sanders began teaching remotely via Zoom and was recording audio of her lectures throughout the rest of the Spring 2020 semester. Sanders Dep. 8:17-24. The protocol for accommodating students prior to the pandemic had always been to provide for audio (not video) recording of classes. Sanders Dep. 35:13-19.

8.      There was no formal COL policy regarding teaching during the pandemic or recording/posting recordings of classes. The faculty did not formally discuss or vote on how to handle recording remote classes. Several Professors objected to recording/posting recordings of their courses. Long knew Sanders had concerns about video recording lectures based on privacy concerns that she, and several of her students, had raised. Long Dep. 480:18-481:18; 494:11-13.

9.      Long knew that not all professors recorded their courses in the Spring of 2020. Long Dep. 483:6-13; Exh. G.

10.      On May 13, 2020, Long asked IT to provide him with a final report indicating who video recorded and shared their classes. In making this request to IT, Long said, "Since i [sic] already know Shaakirrah resisted, please make sure you're thorough with what she did. But I need to treat everyone the same (*i.e.*, i [sic] need to double-check what everyone did)." Exh. G, p. 1.52762.

11.      IT reported that there were ten (10) other professors with no posted videos and that Sanders had videos posted for her classes on April 15, 17 and 22, 2020. *Id.*

12.      In fall 2020, Sanders continued to teach remotely and provided audio recordings of her lectures (and when zoom made it an available option, the transcripts as well). Sanders Dep. 12:10-12:2; 34:14-21.

13.      Because of the lack of engagement with students caused by teaching remotely, Sanders attempted to change the way she taught in fall 2020 to increase engagement and learning

with her students. For example, she transitioned to using a whiteboard (instead of PowerPoint) during her lectures and also provided preparation videos each week. Sanders Dep. 15:11-17:9.

14.     Sanders did not receive complaints from students about the lack of video recording of her lectures. Sanders Dep. 18:9-12. In fact, most of the feedback she received from students was overwhelmingly positive as set forth below in ¶¶ 22-23.

15.     In fall 2020, Long again asked IT for classes without video recordings posted. As reported by IT, multiple professors did not have videos posted. Exh. G; Long Dep. 486:1-487:4.

16.     On November 9, 2020, in response to Long's emails insisting that she video record her lectures, Sanders told him that she would "continue to post audio recordings of her classes given the open issues about unauthorized recordings by students and the privacy concerns expressed to me by students because of those unauthorized recordings. It is unclear why audio recordings are distressing to or have a negative effect on students." Exh. H; Long Dep. 487:11-488:8. Long did not respond to Sanders. Sanders Dep. 87:21-88:10.

17.     The purpose behind Long's requirement that professors video record lectures purportedly focused on student participation and learning. Long Dep. 482:12-15.

18.     Sanders was not aware of any student complaints about not having video recordings of her classes; indeed, few if any students accessed the audio recordings of her lectures. Sanders Dep. 18:9-12; Long Dep. 493:23-494:13.

19.     In late 2020, the President of the University approved an "emergency action" to allow faculty to opt-out of having 2020 student evaluations considered as part of their performance record because of the disruption caused by the pandemic and transitioning to teaching on-line. Long Dep. 488:20-489:4; Exh. I.

20.     Some COL professors opted out, but Sanders did not. Long Dep. 489:5-7.

21.     Associate Dean Wendy Couture provided a summary of Sanders' 2020 teaching evaluations as part of the performance evaluation process. Long read the summary and agreed that it was complimentary of Sanders' teaching remotely. Long Dep. 493:8-12.

22.     Indeed, Associate Dean Couture's summary reflects that either "all" or "almost all" students praised Sanders' classroom presentation and her engagement/enthusiasm across all four courses she taught. It went on to capture students' comments such as:

    a.  "Prof. Sanders is a very engaging lecturer and she routinely provides context for the material that the casebook does not, which is helpful. . . . Seems very knowledgeable on the topic; nimbly and thoughtfully answers student questions."

    b.  "the way Sanders engages with the class is above and beyond."

    c.  "Sanders is INCREDIBLY knowledgeable on the subject matter and always prepared for class."

    d.  "outstanding preparation and knowledge of the subject matter."

    e.  "I loved that even though we were by Zoom the entire semester, Sanders made it feel like a real classroom experience."

    f.  "She makes pre-class videos that are always extremely insightful."

    g.  "I very much appreciated her letting us sign up for cases in this odd time of being in law school."

    h.  "Her energy kept me engaged the entire class which other classes via zoom fail to do."

    i.  "I like the frank realness and open discussions."

    j.  "She can answer student questions and hypotheticals with ease."[1]

23.     Couture also documented that "many students also expressed appreciation for Sanders' caring and helpfulness (e.g., 'Sanders is so caring for the students and truly was aware of the many obstacles we were facing with the law school online;' 'Sanders is always willing to help

---

[1] Exh. J, p. 1.52460-61

during class and outside of the classroom').” *Id.* Couture noted other expressions of appreciation from students including, “Sanders is one of my favorite professors. She is always so open and helpful” and “I appreciate Sanders and her genuine kindness she has for her students.” *Id.*

24.     Despite these overwhelmingly positive evaluations, Long rated Sanders’ 2020 teaching/advising as not meeting expectations based upon “her refusal to comply with the policy” that she videotape lectures, which Long asserts “has real and immediate negative impacts on our students.” Long Dep. 499:12-16; Exh. J, p. 1.52450.

25.     As noted above, Long also reprimanded Sanders for failure to video record/post her lectures. SOF ¶ 1. Long’s reprimand cited a “refusal to record and share video of your classes negatively affects our students’ ability to learn effectively and may negatively affect any students with approved, legally mandated accommodations.” Dkt. #104-3, p. 2 (1.52425).

26.     Long cannot identify any specific evidence demonstrating that students were struggling because of the lack of video recordings of Sanders’ lectures. Long Dep. 491:12-492:12.

27.     Long’s written reprimand directed Sanders to videotape her lectures or face further discipline “up to and including termination.” Dkt. #104-3, p. 4 (1.52427).

28.     Sanders responded to this reprimand in writing, noting she was “once again being singled out for punishment and harassment by way of this Reprimand and the threat of termination that comes with it.” Exh. K, p. 1.52434.

29.     After receiving the reprimand, Sanders felt she had no choice but to video record her lectures despite the privacy concerns. Sanders Dep. 34:23-35:19; 65:15-24.

30.     At the end of his second to last day as actively serving as Dean of COL, Long sent Sanders a Second Letter of Reprimand accusing her of failing to video record her lectures. Long did not speak with Sanders about whether she had been video recording her lectures prior to

sending the reprimand. Long Dep. 501:13-502:19; 503:18-504:7; Exh. E, p. SANDERS4450; Dkt. #104-3, pp. 6-8 (1.52429-31).

31.    Had he done so, she would have told him that she had been recording and sharing her videos with her students (as she told him on May 13, 2021). Exh. E, p. SANDERS4450.

32.    Instead of taking Sanders at her word, Long insisted, on his last day as acting Dean, that Sanders prove to him that she had video recorded her classes by providing him a link. Sanders Dep. 67:13-19; 68:20-69:2; Exh. E, pp. SANDERS4448-49.

33.    Sanders knew that administrators had access to her SharePoint/OneDrive folder which is how IT directed her to post her video recordings. Sanders Dep. 65:15-66:10; 68:1-12.

34.    The new dean, Dean Johanna Kalb, had already been hired and was involved in communications with Sanders, including being copied on the communications regarding this second reprimand. Exh. E. Additionally, Long refused to meet with Sanders regarding her 2020 performance evaluation/2021 performance expectations as directed by the Vice Provost. Long Dep. 500:12-501:1; Sanders Dep. 69:21-70:3.

35.    Sanders chose to communicate with the new Dean about the video recording issues. Sanders Dep. 68:25-69:2.

36.    On September 8, 2021, Dean Kalb confirmed Sanders' SharePoint included video recordings of her lectures beginning in February of 2021. Exh. L.

37.    Long refused to rescind or revise his Second Letter of Reprimand, which remains a part of Sanders' official personnel file. Long Dep. 505:8-505:10.

38.    Dean Kalb permits professors teaching remotely to choose between video or audio recording their lectures. Sanders Dep. 35:6-12.

*2020 Faculty Meetings*

39.     Sanders attended all but one regular faculty meeting in 2020.[2] She also attended the vast majority of the special faculty meetings in 2020, even when adequate notice pursuant to the COL bylaws was not provided. Specifically, there were 23 special faculty meetings (several occurring on the same day), and Sanders attended 16 of them. Long was the first to make attendance mandatory for these special faculty meetings.[3] Sanders Dep. 57:11-60:15; 61:23-25; 62:7-12; 63:10-17; Long Dep. 496:24-498:23. Many meetings were scheduled with short notice and not in compliance with the bylaws. Sanders Dep. 61:6-25.

40.     Sanders missed several special meetings because of obligations related to this litigation (preparation for her deposition, attending Mark Adams' deposition, attending an OCRI interview, etc.). Long Dep. 496:24-498:23. Long characterized her absences as missing meetings for "personal reasons" (*i.e.*, unexcused). Exh. J, p. 1.52449.

41.     Long knew other faculty were also missing faculty meetings. Long Dep. 496:17-19. For example, the following faculty were absent from the May 1, 2020, special faculty meeting: Adams, Cover, Couture, Etheridge, Macfarlane, Miller, Seamon, and Telesetsky. Exh. M.

42.     Long's February 2021 Letter of Reprimand included an allegation that her "poor attendance at faculty meetings has continued to be a problem . . .." Dkt. #104-3, p. 2 (1.52425).

43.     Long refused to provide Sanders with the specific dates of meetings she allegedly missed when requested. She was eventually able to receive a list from Couture and verified that at least one of the meetings Long alleged she missed was inaccurate. Exh. K, p. 1.52435-37.

---

[2] Sanders missed the November meeting because she mixed up the dates, a genuine mistake. Sanders Dep. 55:19-21.
[3] The special faculty meetings involve faculty candidates giving their job talks as well as the faculty discussing candidates and making hiring decisions.

44.     Long did not give any other faculty a letter of reprimand for missing faculty meetings. Long Dep. 460:11-18; 463:16-21.

45.     Additionally, after reprimanding Sanders, Long scheduled another special faculty meeting at a time when he knew Sanders would be teaching a class remotely to students at Brooklyn Law School (an opportunity approved by him/University). Exh. N, p. SANDERS4445.

46.     Long also rated her as not meeting expectations for her University Service and Leadership in 2020 based on her attendance at faculty meetings. Long Dep. 499:17-21. His evaluation failed to account for the fact that during 2020, Sanders served on the: Deans' Advisory Committee; Curriculum Committee; Faculty Appointments Committee; and chaired the Tenure and Promotion Committee. She also served on two Third year Review Committees. Sanders helped form the University's Black Faculty Staff Association, and in the summer of 2020, she gave lectures as part of the University's Black Lives Matter Series. Additionally, Sanders was selected by faculty to receive the Diversity Award in 2020 for her leadership on issues of culture and climate at the COL. Exh. J, pp. 1.52448-49.

### OCRI Investigations Against Sanders

47.     From 2011 through September 1, 2020, OCRI received at least 35 complaints of race, national origin, or gender discrimination or retaliation at the COL. The Director of OCRI, Erin Agidius, is a 2011 graduate of the COL. Agidius Dep. 91:6-11. Exh. O.

48.     OCRI has never conducted a formal investigation when Sanders has raised concerns about discrimination on multiple occasions. Exh. O; Agidius Dep. 86:21-87:22.

49.     On at least three occasions, Long has been a respondent to complaints of discrimination at the COL. OCRI never conducted a formbackal investigation into any of those complaints. Exh. O; Agidius Dep. 88:10-90:19.

50.     Sanders on the other hand has been listed as a respondent to accusations of discrimination on two occasions. In both circumstances OCRI hired an external investigator. *Id.*; Agidius Dep. 87:23-88:9.

51.     Between the two investigations, Sanders has been under investigation for more than a year (September 2020 through November 2021). Sanders Dec. ¶ 6.

*The Schorr Investigation – Fall 2020*

52.     During a 2020 faculty hiring meeting, "one person said they didn't want to hire a person (the Chinese woman) because, to paraphrase, 'I can't really explain it, but there's just something about her.'" Exh. P; Long Dep. 470:7-22.

53.     Affirmative Action Coordinator, Mike Nugen, characterized the COL's hiring training as "it's like all the other online trainings, just play the video, hit continue now and then, answer some easy questions." Exh. Q; Long Dep. 469:23-470:6. Nugen told Long "[i]t's about an hour and can be done in the background." Exh. P. Long admits that Nugen's comments are "unfortunate" because in Long's words "you'd like to think that the trainings are more serious than that." Long Dep. 472:1-5. Long never told Nugen that his comments were unfortunate or otherwise indicated a lack of serious commitment to engage in those trainings. *Id*. 472:22-473:13.

54.     In fall 2020, Sanders raised concerns to the full faculty about the need for more training regarding anti-discrimination/bias in hiring. Exh. R, pp. 1.50016-17. Sanders was on one of the hiring committees along with Professors Pimentel and Newton. *Id.*

55.     During the hiring committee meeting, Pimentel made comments about candidate(s)' geographic ties to the Northwest. Pimentel admits that he believes a candidate's geographic ties is an important factor of "getability." Agidius Dep. 43:20-44:15.

56.     After participating in this meeting, Sanders reiterated concerns about bias influencing hiring decisions and asked what she should do if she thought prioritizing candidates with geographic ties to the northwest was code switching. Exh. R, p. 1.50015.

57.     Office of Civil Rights and Investigations Director Agidius agrees that discussing a candidate's geographic ties could adversely impact diverse candidates. Agidius Dep. 44:16-23.

58.     Long was not present during the committee meeting. Long Dep. 466:18-467:13.

59.     Pimentel admitted to Long that during the meeting, Sanders said, "well according to the training, we're not supposed to take anything like that." Exh. S; Long Depo. 467:7-13.

60.     Long reported Sanders' email raising concerns about bias in hiring to OCRI which he categorized as accusing the other committee members of racism and sexism and accusing her of "slandering" them. Long Dep. 465:25-466:08; Exh. R, p. 1.50013.

61.     Long also publicly announced to the faculty that he reported Sanders' email to OCRI and encouraged others to do the same. Long Dep. 465:4-21; Exh. T. Long said that making allegations of bias is "unprofessional, demeaning, and potentially dishonest."[4] *Id.*

62.     The two other professors involved in the hiring process (Pimentel and Newton) filed race/gender discrimination complaints with OCRI as encouraged by Long. Long Dep. 465:16-21; 467:22-468:02; Agidius Dep. 25:1-7. Long did not encourage Sanders to file a complaint with OCRI. Long Dep. 468:08-11.

63.     Within two days of receiving the complaints, the University President and general counsel authorized the immediate hire of an external investigator superseding any bid requirements. Exh. V, p. 1.50985; Agidius Dep. 11:13-12:6.

---

[4] After Long sent his email, Pimentel (who was an Associate Dean at the time) sent his own email to all faculty. After sending the emails, Pimentel chatted to Long: "Soon to be a new actions series. 'Associate Dean: The Administration Strikes Back!'" Exh. U.

**11 | PLAINTIFF'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

64.     OCRI retained New York attorney Dan Schorr to investigate. The University paid Schorr $375 an hour and over $20,000 in total. Agidius Dep.12:14-13:2.

65.     While Pimentel and Newton were told by OCRI directly that Schorr had been hired to investigate their reports, OCRI told Sanders that that an investigator was hired to "look into allegations of discrimination at the college of law." Agidius Dep. 27:6-28:05.

66.     When Sanders inquired, through her attorney, about whether she was a complainant or a respondent and asked what accusations were being investigated, Schorr reported that there were no complainants or respondents. Agidius Dep. 31:22-32:10 This representation was made after consulting with OCRI about how to respond. Exhs. W, X.

67.     Schorr sent OCRI a final report on December 28, 2020. On March 11, 2021, OCRI sent it to the Provosts. Exh. Y; Agidius Dep. 36:19-24. Director Agidius does not know a reason for the delay. 20:15-20. OCRI adopted Schorr's findings. 38:24-39:19.

68.     Schorr's findings included "Sanders' questions and concerns regarding the hiring process generally were raised in good faith, as was her August 31 email regarding her concerns about the Tax and Wills hiring committee meeting and the manner in which it demonstrated the possible need for additional faculty training." Agidius Dep. 45:3-12; Exh. Z, p. 6 (1.50315).

69.     The findings also said "[i]t is important to note that if individuals who want to raise good faith complaints about potential discriminatory practices find themselves the subject of an investigation, this will likely result in a dangerous deterrent of future reporting by others who are aware of potential violations of the University policies." Agidius Dep. 45:13-46:01; Exh. Z, p. 7 (1.50316).

70.     At the time, Long was still Dean and Sanders' supervisor. OCRI did not inform Long, or direct anyone else to inform him, that the investigator found that Sanders' email raised concerns of bias in good faith. Long Dep. 469:7-21.

71.     No one informed Long of the investigator's finding that reporting someone to OCRI for raising concerns of discrimination or bias could be a dangerous deterrent to others. *Id.*

72.     Likewise, Sanders did not receive a copy of Schorr's report; nor was she told that her communications were found to be made in good faith. Agidius Dep. 39:2- 40:1; Sanders Dec. ¶ 4. Instead, she was simply informed on March 11, 2021, that "[b]ased on the available evidence, the investigators found that there is insufficient evidence of misconduct to proceed with a full investigation of any potential policy violations raised by these events."[5] Dkt. #104-4.

*The Guidepost Investigation – Spring 2021*

73.     On March 10, 2021, Sanders reported a concerning interaction with a student, K.R., to OCRI and informed K.R. of the same.[6] Exh. AA, p. SANDERS4393.

74.     K.R. had been previously reported to OCRI. In fall 2020, another law student had reported K.R. was "creating a hostile and toxic school culture and climate for students." Exh. CC. Importantly, one of the examples provided was K.R.'s attacks on Sanders for sharing her thoughts on the murder of George Floyd. The student reported K.R. "seems to set an imaginary standard as

---

[5] While OCRI maintains that this was simply an initial inquiry (as opposed to a full investigation), it is undisputed that Schorr interviewed at least six (6) witnesses and compiled a 56-page report. Exh. Z. A reasonable jury could find that this was de facto an investigation.

[6] The interaction stemmed from K.R.'s sudden email notification to Professor Sanders, a long-time faculty co-advisor for the Federalist Society student group, that it would be "inappropriate" for her to act as an advisor due to "what appears to be irreconcilable disagreements between [her] and FedSoc's beliefs and purpose." Exh. AA.  Professor Sanders reported this to the faculty and the National office of the Federalist Society. The National office said that the organization recommends against applying a "jurisprudential litmus test" to determine suitability of its advisors and said they would speak to the student.  Exh. BB. K.R. told investigators that his desire not to have her as an advisor was based on her "political/ideological" views. Dkt. #104-3, p. 1.52553-54.

to when and how we as professional women of color can speak-a-message that is troubling and deeply rooted in racist ideology." *Id.*

75.     In response to Sanders' complaint, Agidius asked her to meet with OCRI. Sanders responded that she was not looking for disciplinary action against the student and that she did not feel safe speaking further because she had already been reprimanded by Long regarding interactions with this student. Exh. AA, p. SANDERS4392. Sanders told Director Agidius that the student's emails to her "are also indicative of the type of treatment that some faculty, including women and people of color, often report but goes unaddressed." She expressed the "hope [that] the University will soon see the benefit of diversity consultants for the students, faculty and staff." *Id.* p. SANDERS4391.

76.     OCRI did not investigate Sanders' concerns about K.R. or her concerns about retaliation by Long. Agidius Dep. 52:1-4; 54:1-18.

77.     On May 3, 2021, Sanders was informed that OCRI had hired an external investigator, Guidepost Solutions, to conduct an investigation of complaints K.R. made that she discriminated against him on the basis of his race.[7] Exh. DD; Agidius Dep. 55:07-18.

78.     Guidepost did not investigate Sanders' allegations of misbehaviors by K.R., which included allegations of discrimination and retaliation. Agidius Dep. 63:24-64:10; Dkt. #104-3, p. 1.52478.

79.     K.R.'s alleged discrimination by Sanders the day ***after*** she informed him she had reported his behavior to OCRI. K.R. told investigators that "he wouldn't have gone beyond

---

[7] While one of K.R.'s complaints was that Sanders "said in her classes that she sees and responds to the world through the lens of race, which is an express statement of racism," Exh. DD. K.R. was admittedly never a student in any of Professor Sanders' classes. In fact, he admitted to investigators on several occasions that his opinions of her were based on hearsay (*e.g.*, he heard from students she is a Marxist – and he told investigators BLM is a Marxist Organization.); Dkt. #104-3, p. 100-101 (1.52553-54).

complaining to dean if she [Sanders] hadn't sent an email regarding him/race." Dkt. #104-3, p.
101 (1.52554).

80.     Agidius estimated that they paid Guidepost between $30,000-$40,000 to
investigate Sanders.[8] Agidius Dep. 76:17-19.

81.     Guidepost did not find sufficient evidence to sustain the discrimination allegations
made by K.R. against Sanders. Agidius Dep. 69:10-23.

82.     However, Guidepost also investigated, and concluded, that Sanders had violated
other unrelated University policies not within the purview of OCRI or disclosed to Sanders. While
OCRI did not formally adopt those findings, it referred them to Sanders' supervisory chain to
address. Agidius Dep. 69:24-70:7.

83.     OCRI claims it was not initially aware that Guidepost broadened its investigation
to include these non-EEO policy violations. Normally, OCRI would have to be given permission
to investigate (or have an agent like Guidepost investigate) non-EEO violations, and Agidius does
not remember obtaining that authority. Agidius Dep. 60:10-24; 62:8-63:4.

84.     Guidepost's findings that Sanders violated non-EEO policies were based explicitly,
in part, on Sanders' reporting K.R. to OCRI and her email implying that K.R.'s decision to remove
her as a Federalist Society co-advisor was based on her race. OCRI agrees that these are protected
activities. Agidius Dep. 71:4-23.

85.     Guidepost's report is replete with misinformation and inaccuracies. Exh. EE.

86.     Despite this, OCRI did not ask Guidepost to investigate further and instead chose
to adopt Guidepost's findings, which remained the same after receiving Sanders' response. Exh.
FF.

---

[8] Plaintiff has requested the payments made to Guidepost in her last set of discovery which the Court ordered
Defendants to respond to. Dkt. #103. However, Defendants' responses are not due until 01/24/22.

**Additional Evidence of Hostility or Discriminatory/Retaliatory Intent**

87.     Professor Katherine MacFarlane recently left the COL and in doing so, made clear that she was leaving reluctantly, and that Dean Long's actions informed her decision to leave. Exh. GG.

88.     The following female faculty and staff have left the COL in the last three years: Monique Lillard, Maureen Laflin, Liz Brandt, Barb Cosens, Barb Lock, (first name unknown) Marcom, Rebekah Cude, Nancy Luebbert, Diana DeJesus, Anastasia Telesetsky and Annemarie Bridy. Long Dep. 510:25-511:19.

89.     Long exchanged multiple chat messages[9] with the COL's Affirmative Action Coordinator that were disparaging about Sanders including the following:

    a.  Nugen to Long: "far be it from me to take aware anyone's ability to create an environment for complaining. Some people would not know what to do without it." Exh. HH, p. 1.51914

    b.  Nugen to Long: "if she was miserable, she would actual do something. NO, she is a talk show host on a crusade to right wrongs that she makes up to have something to do." Exh. HH, p. 1.51961.

    c.  Long to Nugen: "I'm sure Sanders will still complain she was treated differently." Exh. HH, p. 1.49930

    d.  Long to Nugen: "Reality doesn't matter to her." Exh. HH, p. 1.51918

    e.  Long to Nugen: "no worries. I rant about her somewhat regularly." Exh. HH, p. 1.51936

---

[9] These chat messages were requested during the discovery period but were not produced by Defendants until after discovery. Indeed, with one exception (¶ 89.c.) these chats were just produced in October of 2021 after Plaintiff spent months conciliating this discovery issue with Defendants.

      f.   Nugen to Long: "she thinks everyone is looking up to her for salvation." Exh. HH,

p. 1.51963

90.     Long did not convey to Nugen that his comments about Sanders were inappropriate in any way. Long Dep. 475:6-9; 476:1-3.

91.     In August of 2020, Dean Long asked his associate deans "if we didn't have Shaakirrah teach Con Law II, are there other critical needs she could fill? That could include a need created by having someone else teach Con Law II." Long Dep. 508:16-21.

92.     The new Dean, Johanna Kalb, told students in the fall 2021 that "[w]e are committed, both by our own values, but also by state and federal law, to ensuring that every student who chooses to join our community has the benefit of an environment conducive to learning." Her email went on to remind students of their obligations not to make threats or derogatory comments that impact another member of the community. Exh. II.

DATED this 13th day of January, 2022.

                                      **STRINDBERG SCHOLNICK BIRCH HALLAM HARSTAD THORNE**

                                      /s/ Erika Birch
                                      Erika Birch
                                      T. Guy Hallam Jr.
                                      Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the above referenced date a true and correct copy of the forgoing pleading was served on the following via the CM/ECF system:


Bentley G. Stromberg
Tully Fitzmaurice
Sonyalee R. Nutsch
CLEMENTS, BROWN & McNICHOLS, P.A.
Attorneys at Law
321 13th Street
Post Office Box 1510
Lewiston, Idaho 83501
bstromberg@clbrmc.com
snutsch@clbrmc.com
tfitzmaurice@clbrmc.com


/s/ Dunja Subasic
Dunja Subasic, of the firm