UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHAAKIRRAH R. SANDERS, | |
| Plaintiff, | Case No. 3:19-CV-00225-BLW |
| v. | |
| THE UNIVERSITY OF IDAHO, a public university governed by the BOARD OF REGENTS OF THE UNIVERSITY OF IDAHO aka THE STATE BOARD OF EDUCATION, an executive department of the STATE OF IDAHO, and MARK ADAMS, former Dean of the College of Law, in his official and individual capacity, and JERROLD LONG, former dean, in his official and individual capacity, | **MEMORANDUM DECISION AND ORDER** |
| Defendants. | |

**INTRODUCTION**

Plaintiff Shaakirrah R. Sanders is an African-American female professor of law at the University of Idaho (UI) College of Law. Since her hiring as a tenure-track professor in June 2011, Sanders alleges she has endured a culture of racism and sexism at the College of Law and has faced numerous discriminatory and

retaliatory acts perpetuated primarily by Defendant Mark Adams, who served as dean of the College of Law from June 2014 to June 2018, and later by Defendant Jerrold Long, who served as interim dean from June 2018 to May 2021.

In December 2020, Defendants filed a motion for summary judgment seeking dismissal of all of Sanders' claims. The Court largely denied Defendants' motion, allowing Sanders to proceed on the bulk of her claims, including all claims against Mark Adams and Jerrold Long in their official capacities. In this same decision, the Court also granted Sanders leave to amend her complaint to add individual capacity claims against Defendant Long. Following that ruling, the Court permitted Sanders to file a fourth amended complaint, which includes the individual capacity claims against Long under 42 U.S.C. §§ 1981 and 1983 and for a violation of her academic freedom rights under state law, as well as describes even more recent events that Sanders alleges are "part and parcel" of the continuing pattern of discrimination, harassment, and retaliation she has experienced since her hiring and under Defendant Long, specifically.

To alleviate any undue prejudice caused by granting Sanders leave to amend after the dispositive motion deadline, the Court allowed Defendants to file a second summary judgment aimed specifically at the individual capacity claims against Long and the recent events added in the Fourth Amended Complaint. This second motion for summary judgment (Dkt. 104) is currently pending before the Court.

MEMORANDUM DECISION AND ORDER - 2

Also before the Court are Sanders' motion to strike (Dkt. 105) and motion to reconsider the Court's Order dismissing her IPPEA Claim (Dkt. 118).

The Court heard oral argument on May 23, 2022. For the reasons discussed below, the Court will grant Defendants' motion for partial summary judgment in part and deny it in part. Specifically, the Court will dismiss the state law academic freedom claim against Long in his individual capacity but will allow Sanders to proceed to trial on her individual capacity claims against Long under 42 U.S.C. §§ 1983 and 1981 for unlawful discrimination, hostile work environment, and retaliation. The Court will further deny Sanders' motion to strike and motion for reconsideration.

## MOTION TO STRIKE

Sanders asks the Court to strike "any and all" portions of Defendants' second summary judgment motion that attempt to reargue claims the Court already decided in its decision on Defendants' first summary judgment motion. Specifically, Sanders ask the Court to strike (1) Defendants' arguments pertaining to the official capacity claims against Adams and Long, (2) their arguments for the dismissal of the discrimination/retaliation claims based on events already argued to the Court in the first summary judgment, including Sanders' 2019 performance evaluation and raises in 2020 and the hostile work environment claims that included the recordings Defendant Long made of Sanders. In addition, Sanders

asks the Court to disregard Defendants' arguments addressing a "non-existent" constitutional academic freedom claim and "non-existent" First Amendment retaliation claim.

Rather than simply striking these arguments, the Court will address them in the context of the summary judgment motion and will give each argument the credence due considering the Court's previous ruling on summary judgment.

## MOTION FOR SUMMARY JUDGMENT

### 1. Background

Since filing her initial complaint in June 2019, Sanders has remained employed as a tenured professor at the College of Law. She alleges she continued to face discrimination, harassment, and unlawful retaliation at the hands of Defendant Long while he served as the dean of the law school, a role that he officially occupied from June 2018 to May 2021.

Long officially assumed the position of interim Dean in August 2018, after Dean Adams was asked to step down by the Provost due to concerns regarding Adams' leadership in relation to the culture and climate at the College of Law, including issues of racial, gender, and disability discrimination. The gravity of the concerns regarding Dean Adams' leadership came to light after the UI Provost's office directed UI Human Resources to perform a Climate & Culture Review of the law school. The Provost, Dean, and HR initiated this process after becoming aware

of multiple complaints. During this review, HR interviewed 32 College of Law faculty and staff, including Sanders, and HR sent the Provost a report of its review. The report detailed a string of concerns related to gender and racial bias and prompted the request for Dean Adams' resignation. No one explained to Long why Adams stepped down.

After Adams stepped down as dean, the Provost passed on to Dean Long responsibility for addressing in the issues in the HR report. But, according to Sanders, instead of remedying the issues concerning gender and racial bias raised in the report, the race and gender-based hostile work environment Sanders experienced under Adams escalated when Long became Dean. In its prior decision, the Court detailed the ongoing culture of discrimination and retaliation Sanders maintains she endured under Dean Long through the end of 2020. *Memorandum Decision and Order*, pp. 14-16, 29-40, Dkt. 79.

### A. *Long's Conduct Through the End of 2020*

As detailed and addressed in the Court's prior decision, Sanders alleges Long personally discriminated and retaliated against her by secretly recording an open forum on diversity issues moderated by Sanders in January 2020, without obtaining Sanders' or the participants' consent, and then failing to address her or the students' concerns about the undisclosed recording, and by giving Sanders her first negative evaluation in her ten-plus years at the College of Law in March 2020.

In addition to these two specific incidents, Sanders also presented evidence of various other allegedly discriminatory or retaliatory incidents involving Long, which were detailed in the Court's previous decision on summary judgment. Some of those incidents include the following:

- Long's specifically mentioning that Sander had filed an EEOC charge and discounting the issues she raised in this charge in her 2018 performance review.

- Long's response to Sanders' raising concerns about bias filtering into the faculty's hiring process and asking what she should do. Specifically, Long publicly stated that Sanders' act of raising her concerns of bias was "unprofessional, demeaning, and potentially dishonest." He also, in response, reported to the OCRI that Sanders had "slandered" two fellow faculty members and asked the OCRI how "unfounded allegations of bias are considered or investigated."

- Long's attitude and conduct towards Sanders including recording her on three occasions without notice or consent and singling her out for such recording.

- Long's instruction to others to "always take careful notes of your communications with [Sanders] and share them with me," and making derogatory comments about Sanders, including calling her a bitch,

demanding, incompetent, aggressive, and dishonest, and disparaging her intellect.

- Long's warning to Sanders that her communications were creating a negative culture and climate and accusing her of being unprofessional.

- Sanders' silencing herself after Long made it clear that he had used her communications to negatively rate her performance.

- The negative 2019 evaluation given in March 2020, and its temporal proximity to (1) Sanders' communications regarding the need for open forums about the culture and climate issues at the College and (2) Sanders' communications questioning the legality of the recording of the forum without the knowledge or consent of those present at the forum.

Sanders also presented evidence of incidents involving Long that contributed to an environment of racial and sexual hostility in the broader context of the College of Law, including the following:

- In 2019, during the Bellwood Lecture, a student asking about genocide as a solution to climate change. In response, Long focused on the First Amendment rights of the speakers and did not address the racist nature of the comments or that Equal Protection rights may have been violated by the comments.

- Racial slurs, including the n-word, being used in class on multiple

occasions, including in 2019, without Long's interfering.

- Students' use of language and actions displaying antisemitism, racism, and sexism, including sexual violence with no response from Long.  In response to one student's report of extreme antisemitism and racism by classmates, including a report of a classmate throwing up a Nazi salute and saying "Heil Hitler. Throw them up, you little bitches," Long allegedly responded to the recounting of the incident by laughing out loud.

- Other female faculty members' concerns about Long's disparate treatment of women; and concerns about bias against women in hiring decisions, and against women and men of color in general.

Based largely on this evidence, and taking into consideration the "context and setting" in that "these and other alleged incidents occurred at a law school and involve[d] conduct by legal scholars and law students," making it more likely "discriminatory comments and actions may be especially subtle," the Court found that the evidence was "more than sufficient to raise a genuine issue of material fact as to whether Sanders was subjected to a race- and/or gender-based hostile work environment." *Memorandum Decision and Order,* p. 58, Dkt. 79. The Court also considered this evidence in the context of Sanders' retaliation claim and concluded it was sufficient to establish a prima facie case of retaliation and further, "at

minimum, raise a genuine issue of material fact as to whether the reasons stated by Defendants for the adverse employment actions [were] pretextual." *Id.*, p. 65, Dkt. 79.

Sanders maintains that Long's allegedly discriminatory and retaliatory conduct persisted into 2021 until he was replaced as dean in May 2021. As the previous summary judgment motion was filed at the end of 2020, the Court did not consider any of Long's conduct in 2021, and therefore the Court will detail these events below, construing the evidence and all reasonable inferences in Sanders' favor as it must.

### B.    *2020 Performance Evaluation and Reprimands*

#### (1)    Remote Teaching During the Pandemic and Recording of Lectures

When the COVID-19 pandemic hit in the late winter and early spring of 2020, the College of Law professors were told they needed to "immediately learn (1) how to record classes that are held live in the building; (2) how to provide students access to recordings in a FERPA compliant manner; and (3) how to teach classes via Zoom if the University cancels in-person classes." After spring break 2020, Sanders began teaching remotely via Zoom. She recorded audio of her lectures throughout the rest of the Spring 2020 semester. Sanders' decision to record only audio – and not video – of her lectures was consistent with the protocol for accommodating students prior to the pandemic, and the College of Law

adopted no formal policy regarding teaching during the pandemic or for the recording and posting recordings of classes. Similarly, faculty did not formally discuss or vote on how to handle recording remote classes – although several professors objected to recording and posting recordings of their courses. Long knew Sanders had concerns about video recording lectures based on privacy concerns that she, and several of her students, had raised. Long also knew that not all professors recorded their courses in the Spring of 2020.

On May 13, 2020, Long asked IT to provide him with a final report indicating which professors video recorded and shared their classes. In making this request to IT, Long said, "Since i already know Shaakirrah resisted, please make sure you're thorough with what she did. But I need to treat everyone the same (i.e., i need to double-check what everyone did)." IT reported that there were ten other professors with no posted videos and that Sanders had videos posted for her classes on April 15, 17 and 22, 2020.

In fall 2020, Sanders continued to teach remotely and provided audio recordings of her lectures (and when Zoom made it an available option, the transcripts as well). Because of the lack of engagement with students caused by teaching remotely, Sanders attempted to change the way she taught in fall 2020 to increase engagement and learning with her students. For example, she transitioned to using a whiteboard (instead of PowerPoint) during her lectures and provided

preparation videos each week. Sanders did not receive complaints from students about the lack of video recording of her lectures. In fact, most of the feedback she received from students was overwhelmingly positive.

In fall 2020, Long again asked IT for classes without video recordings posted. As reported by IT, multiple professors did not have videos posted. On November 9, 2020, in response to Long's emails insisting that she video record her lectures, Sanders told him that she would "continue to post audio recordings of her classes given the open issues about unauthorized recordings by students and the privacy concerns expressed to me by students because of those unauthorized recordings. It is unclear why audio recordings are distressing to or have a negative effect on students." Long did not respond to Sanders.

Long's purpose in requiring professors to video record lectures purportedly focused on student participation and learning. Sanders was not aware of any student complaints about not having video recordings of her classes; indeed, few, if any, students accessed the audio recordings of her lectures. Nor did Sanders receive any complaints in her student evaluations about not having video recordings of classes.[1] To the contrary, most student evaluations were very

---

[1] In late 2020, the President of the University approved an "emergency action" to allow faculty to opt-out of having 2020 student evaluations considered as part of their performance record because of the disruption caused by the pandemic and transitioning to teaching on-line. Some College of Law professors opted out, but Sanders did not.

complimentary of Sanders' teaching remotely, which Long has acknowledged. As captured by Associate Dean Wendy Couture in a summary she provided of Sanders' 2020 teaching evaluations as part of the performance evaluation process, either "all" or "almost all" students praised Sanders' classroom presentation and her engagement and enthusiasm across all four courses she taught:

- "Prof. Sanders is a very engaging lecturer, and she routinely provides context for the material that the casebook does not, which is helpful. . ... Seems very knowledgeable on the topic; nimbly and thoughtfully answers student questions."

- "the way Sanders engages with the class is above and beyond."

- "Sanders is INCREDIBLY knowledgeable on the subject matter and always prepared for class."

- "outstanding preparation and knowledge of the subject matter."

- "I loved that even though we were by Zoom the entire semester, Sanders made it feel like a real classroom experience."

- "She makes pre-class videos that are always extremely insightful."

- "I very much appreciated her letting us sign up for cases in this odd time of being in law school."

- "Her energy kept me engaged the entire class which other classes via zoom fail to do."

- "I like the frank realness and open discussions."

- "She can answer student questions and hypotheticals with ease."

Couture also documented that "many students also expressed appreciation for Sanders' caring and helpfulness (e.g., 'Sanders is so caring for the students and truly was aware of the many obstacles we were facing with the law school online;' 'Sanders is always willing to help during class and outside of the classroom')." Couture noted other expressions of appreciation from students including, "Sanders is one of my favorite professors. She is always so open and helpful" and "I appreciate Sanders and her genuine kindness she has for her students."

Despite these positive evaluations, in February 2021, Long rated Sanders' overall performance as not meeting expectations and specifically rated Sanders' 2020 teaching/advising as not meeting expectations based upon "her refusal to comply with the policy" that she videotapes lectures, which Long asserts "has real and immediate negative impacts on our students." Because of this poor rating, Sanders did not qualify for a pay increase in 2021. Thus, she now makes $7,534.80 less than her white, male counterpart.

In addition to the negative evaluation, also in February 2021, Long gave Sanders a Letter of Reprimand, which included disciplining her for failing to video record and post her lectures. In his reprimand, Long stated Sanders' "refusal to record and share video of [her] classes negatively affects our students' ability to

learn effectively and may negatively affect any students with approved, legally mandated accommodations." Long's written reprimand directed Sanders to videotape her lectures or face further discipline "up to and including termination." Long, however, admits that he cannot identify any specific evidence demonstrating that students were struggling because Sanders did not post video recordings of her lectures.

Sanders responded to this reprimand in writing, noting she was "once again being singled out for punishment and harassment by way of this Reprimand and the threat of termination that comes with it." After receiving the reprimand, Sanders felt she had no choice but to video record her lectures despite the privacy concerns.

Although Sanders had begun video recording her lectures, at the end of his second to last day as Dean, Long sent Sanders a Second Letter of Reprimand accusing her of failing to video record her lectures. Long did not speak with Sanders about whether she had been video recording her lectures prior to sending the reprimand. Had he done so, she would have told him that she had been recording and sharing her videos with her students – as she told him on May 13, 2021. Instead of taking Sanders at her word, Long insisted, on his last day as acting Dean, that Sanders prove to him that she had video recorded her classes by providing him a link even though he had access to her SharePoint/OneDrive folder,

which is how IT directed her to post her video recordings.

Rather than continuing to spar with Dean Long on this issue, as it was his last day and the new dean, Dean Johanna Kalb, had already been hired and was involved in communications with Sanders, including being copied on the communications regarding this second reprimand, Sanders opted to discuss the video recording issues with Dean Kalb. On September 8, 2021, Dean Kalb confirmed Sanders' SharePoint included video recordings of her lectures beginning in February of 2021. Nonetheless, Long refused to rescind or revise his Second Letter of Reprimand, which remains a part of Sanders' official personnel file. Dean Kalb permits professors teaching remotely to choose between video or audio recording their lectures.

### (2)    2020 Faculty Meetings

Sanders attended all but one regular faculty meeting in 2020. She also attended the vast majority of the special faculty meetings in 2020, even when adequate notice pursuant to the College of Law bylaws was not provided. Specifically, there were 23 special faculty meetings, including several occurring on the same day, and Sanders attended 16 of them. Long was the first to make attendance mandatory for these special faculty meetings; yet many meetings were scheduled with short notice and not in compliance with the bylaws. Sanders missed several special meetings because of obligations related to this litigation

(preparation for her deposition, attending Mark Adams' deposition, attending an OCRI interview, etc.), and Long characterized her absences as missing meetings for "personal reasons" (i.e., unexcused). Long knew other faculty were also missing faculty meetings.

Long's February 2021 Letter of Reprimand included a statement that her "poor attendance at faculty meetings has continued to be a problem . . .." Long, however, refused to provide Sanders with the specific dates of meetings she allegedly missed. She was eventually able to receive a list from Couture and verified that at least one of the meetings Long said she missed was inaccurate. Long did not give any other faculty a letter of reprimand for missing faculty meetings. Additionally, after reprimanding Sanders, Long scheduled another special faculty meeting at a time when he knew Sanders would be teaching a class remotely to students at Brooklyn Law School (an opportunity approved by him and the University).

Long also rated her as not meeting expectations for her University Service and Leadership in 2020 based on her attendance at faculty meetings. His evaluation failed to account for the fact that during 2020, Sanders served on the: Deans' Advisory Committee; Curriculum Committee; Faculty Appointments Committee; and chaired the Tenure and Promotion Committee. She also served on two Third year Review Committees. Sanders helped form the University's Black Faculty

Staff Association, and in the summer of 2020, she gave lectures as part of the University's Black Lives Matter Series. Additionally, Sanders was selected by faculty to receive the Diversity Award in 2020 for her leadership on issues of culture and climate at the College of Law.

### C. OCRI Investigations Against Sanders

From 2011 through September 1, 2020, OCRI received at least 35 complaints of race, national origin, or gender discrimination or retaliation at the College of Law. OCRI has never conducted a formal investigation although Sanders has raised concerns about discrimination on multiple occasions. On at least three occasions, Long has been a respondent to complaints of discrimination at the College of Law. OCRI never conducted a formal investigation into any of those complaints.

Sanders on the other hand has been listed as a respondent to accusations of discrimination on two occasions. In both circumstances, OCRI hired an external investigator. Between the two investigations, Sanders has been under investigation for more than a year (September 2020 through November 2021).

### (1) The Schorr Investigation – Fall 2020

During a 2020 faculty hiring meeting, "one person said they didn't want to hire a person (the Chinese woman) because, to paraphrase, 'I can't really explain it, but there's just something about her.'" Affirmative Action Coordinator, Mike

Nugen, characterized the College of Law's hiring training as "it's like all the other online trainings, just play the video, hit continue now and then, answer some easy questions." Nugen told Long "[i]t's about an hour and can be done in the background." Long described Nugen's comments as "unfortunate" because, in Long's words, "you'd like to think that the trainings are more serious than that."

In fall 2020, Sanders raised concerns to the full faculty about the need for more training regarding anti-discrimination/bias in hiring. Sanders was on one of the hiring committees along with Professors Pimentel and Newton. During the hiring committee meeting, Pimentel made comments about candidate(s)' geographic ties to the Northwest. Pimentel has stated he believes a candidate's geographic ties is an important factor of "getability."

After participating in this meeting, Sanders reiterated concerns about bias influencing hiring decisions and asked what she should do if she thought prioritizing candidates with geographic ties to the northwest was code switching. Office of Civil Rights and Investigations Director Erin Agidius agrees that discussing a candidate's geographic ties could adversely impact diverse candidates. Long was not present during the committee meeting. Pimentel acknowledged to Long that during the meeting, Sanders said, "well according to the training, we're not supposed to take anything like that."

Long reported Sanders' concerns about bias in hiring to OCRI – which he

categorized as accusing the other committee members of racism and sexism and accusing her of "slandering" them. Long also publicly announced to the faculty that he reported Sanders' email to OCRI and encouraged others to do the same. Long said that making allegations of bias is "unprofessional, demeaning, and potentially dishonest." The two other professors involved in the hiring process (Pimentel and Newton) filed race/gender discrimination complaints with OCRI as encouraged by Long. Long did not encourage Sanders to file a complaint with OCRI.

Within two days of receiving the complaints, the University President and general counsel authorized the immediate hire of an external investigator, and in doing so superseded the normal bid requirements. After Long sent his email, Pimentel (who was an Associate Dean at the time) sent his own email to all faculty. After sending the emails, Pimentel engaged in a chat with Long, which included the statement: "Soon to be a new actions series. 'Associate Dean: The Administration Strikes Back!'"

OCRI retained New York attorney Dan Schorr to investigate. The University paid Schorr $375 an hour and over $20,000 in total. While Pimentel and Newton were told by OCRI directly that Schorr had been hired to investigate their reports about Sanders, OCRI told Sanders that the investigator was hired to "look into allegations of discrimination at the college of law." When Sanders inquired,

through her attorney, about whether she was a complainant or a respondent and asked what accusations were being investigated, Schorr reported that there were no complainants or respondents. This representation was made after consulting with OCRI about how to respond. Schorr sent OCRI a final report on December 28, 2020.

On March 11, 2021, OCRI sent the final report to the Provost – nearly three months after Schorr sent the final report. Director Agidius does not know a reason for the delay. OCRI adopted Schorr's findings. Schorr's findings included "Sanders' questions and concerns regarding the hiring process generally were raised in good faith, as was her August 31 email regarding her concerns about the Tax and Wills hiring committee meeting and the manner in which it demonstrated the possible need for additional faculty training." The findings also said "[i]t is important to note that if individuals who want to raise good faith complaints about potential discriminatory practices find themselves the subject of an investigation, this will likely result in a dangerous deterrent of future reporting by others who are aware of potential violations of the University policies."

At the time, Long was still Dean and Sanders' supervisor. OCRI did not inform Long, or direct anyone else to inform him, that the investigator found that Sanders' email raised concerns of bias in good faith. No one informed Long of the investigator's finding that reporting someone to OCRI for raising concerns of

discrimination or bias could be a dangerous deterrent to others. Likewise, Sanders did not receive a copy of Schorr's report; nor was she told that her communications were found to be made in good faith. Instead, she was simply informed on March 11, 2021, that "[b]ased on the available evidence, the investigators found that there is insufficient evidence of misconduct to proceed with a full investigation of any potential policy violations raised by these events."

### (2)    The Guidepost Investigation – Spring 2021

On March 10, 2021, Sanders reported a concerning interaction with a student, K.R., to OCRI and informed K.R. of the same. K.R. had been previously reported to OCRI. In fall 2020, another law student had reported K.R. was "creating a hostile and toxic school culture and climate for students." Importantly, one of the examples provided was K.R.'s attacks on Sanders for sharing her thoughts on the murder of George Floyd. The student reported K.R. "seems to set an imaginary standard as to when and how we as professional women of color can speak-a-message that is troubling and deeply rooted in racist ideology."

In response to Sanders' complaint, Agidius asked her to meet with OCRI. Sanders responded that she was not looking for disciplinary action against the student and that she did not feel safe speaking further because she had already been reprimanded by Long regarding her interactions with this student. Sanders told Director Agidius that the student's emails to her "are also indicative of the type of

treatment that some faculty, including women and people of color, often report but goes unaddressed." She expressed the "hope [that] the University will soon see the benefit of diversity consultants for the students, faculty and staff." OCRI did not investigate Sanders' concerns about K.R. or her concerns about retaliation by Long.

On May 3, 2021, Sanders was informed that OCRI had hired an external investigator, Guidepost Solutions, to investigate complaints K.R. had made that Sanders discriminated against him because of his race. Guidepost did not investigate Sanders' allegations of misbehaviors by K.R., which included allegations of discrimination and retaliation. K.R. made his complaint of discrimination against Sanders the day after she informed him she had reported his behavior to OCRI. K.R. told investigators that "he wouldn't have gone beyond complaining to dean if she [Sanders] hadn't sent an email regarding him/race." Agidius estimated that they paid Guidepost between $30,000-$40,000 to investigate Sanders.

Guidepost did not find sufficient evidence to sustain the discrimination allegations made by K.R. against Sanders. However, Guidepost also investigated, and concluded, that Sanders had violated other unrelated University policies not within the purview of OCRI or disclosed to Sanders. While OCRI did not formally adopt those findings, it referred them to Sanders' supervisory chain to address.

OCRI claims it was not initially aware that Guidepost broadened its investigation to include these non-EEO policy violations. Normally, OCRI would have to be given permission to investigate (or have an agent like Guidepost investigate) non-EEO violations, and Agidius does not remember obtaining that authority. Guidepost's findings that Sanders violated non-EEO policies were based explicitly, in part, on Sanders' reporting K.R. to OCRI and her email implying that K.R.'s decision to remove her as a Federalist Society co-advisor was based on her race. OCRI agrees that these are protected activities.

Sanders maintains that Guidepost's report is replete with misinformation and inaccuracies. Despite this, OCRI did not ask Guidepost to investigate further and instead chose to adopt Guidepost's findings, which remained the same after receiving Sanders' response.

### D. *Additional Evidence of Hostility or Discriminatory/Retaliatory Intent*

Professor Katherine MacFarlane recently left the College of Law and in doing so, made clear that she was leaving reluctantly, and that Dean Long's actions informed her decision to leave. The following female faculty and staff have left the College of Law in the last three years: Monique Lillard, Maureen Laflin, Liz Brandt, Barb Cosens, Barb Lock, (first name unknown) Marcom, Rebekah Cude, Nancy Luebbert, Diana DeJesus, Anastasia Telesetsky and Annemarie Bridy.

 Long exchanged multiple chat messages with the College of Law's

Affirmative Action Coordinator that were disparaging about Sanders including the following:

- Nugen to Long: "far be it from me to take aware anyone's ability to create an environment for complaining. Some people would not know what to do without it."

- Nugen to Long: "if she was miserable, she would actual do something. NO, she is a talk show host on a crusade to right wrongs that she makes up to have something to do."

- Long to Nugen: "I'm sure Sanders will still complain she was treated differently."

- Long to Nugen: "Reality doesn't matter to her."

- Long to Nugen: "no worries. I rant about her somewhat regularly."

- Nugen to Long: "she thinks everyone is looking up to her for salvation." Long did not convey to Nugen that his comments about Sanders were inappropriate in any way.

In August of 2020, Dean Long asked his associate deans "if we didn't have Shaakirrah teach Con Law II, are there other critical needs she could fill? That could include a need created by having someone else teach Con Law II."

The new Dean, Johanna Kalb, told students in the fall 2021 that "[w]e are committed, both by our own values, but also by state and federal law, to ensuring

that every student who chooses to join our community has the benefit of an environment conducive to learning." Her email went on to remind students of their obligations not to make threats or derogatory comments that impact another member of the community.

## 2. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-49 (1986).

In deciding whether there is a genuine dispute of material fact, the Court must view the facts in the light most favorable to the nonmoving party. *Id.* at 255; *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) ("Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.") (citing *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000) (en banc)). The court is prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

### 3. Discussion

### *A.     Official Capacity Claims Against Adams and Long*

In her Fourth Amended Complaint, Sanders brings claims under 42 U.S.C. § 1983 and § 1981 against Mark Adams and Jerrold Long in their individual and official capacities. Defendants seek dismissal of the official capacity claims against Adams and Long because neither continue to hold the office of the deanship. As the Supreme Court has explained, a claim against a government officer in their official capacity is, and should be treated as, a claim against the entity that employs the officer. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). An official-capacity suit "is not a suit against the official personally, for the real party in interest is the entity." *Id.* at 166. For this reason, an official-capacity claim against a person who no longer holds the office "has no meaning." *Mathie v. Fries*, 121 F.3d 808, 818 (2d Cir. 1997).

In fact, as both parties acknowledge, Federal Rule of Civil Procedure 25(d) provides for the automatic substitution of a public official's successor when the public officer sued in their official capacity "dies, resigns, or otherwise ceases to hold office":

> An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded. The court may order substitution at any

time, but the absence of such an order does not affect the substitution. Fed. R. Civ. P. 25(d). Naming Adams and Long in their official capacity is therefore improper as the former officials are automatically replaced by their successor by operation of Rule 25. Thus, any reference to claims against Adams and Long in their official capacity shall be removed and the appropriate official substituted in future filings with the Court.

To the extent Defendants seek dismissal of the official capacity claims in their entirety, the Court denies such a request, however. Consistent with the Court's previous ruling, any official capacity claims for prospective relief may proceed and are not barred by the Eleventh Amendment. *See, e.g., Central Reserve Life of N. Am. Ins. Co. v. Struve*, 852 F.2d 1158, 1160-61 (9th Cir. 1988). Likewise, as previously held, Sanders' §§ 1983 and 1981 claims against Adams and Long in their personal capacity are not barred by the Eleventh Amendment. *Id.*

## B.   *Sanders' Claims Against Long in his Individual Capacity under § 1983 and § 1981*

As mentioned, Sanders brings claims under §§ 1983 and 1981 against Long in his individual capacity, alleging that he violated her rights by intentionally discriminating and retaliating against her and by subjecting her to a racially and sexually hostile work environment. At oral argument, Defendants conceded that issues of fact exist with respect to the intentional discrimination and retaliation claims against Long in his individual capacity, but Defendants continue to assert

that the OCRI investigations should not be used as evidence of unlawful discrimination or retaliation by Long in his individual capacity because he had no personal involvement in either the Schorr or Guidepost investigation. In addition, Long does not concede the hostile work environment claim against him in his individual capacity under § 1983.

### (1) Hostile Work Environment

To establish her claim against Long under § 1983 for a hostile work environment, Sanders is required to prove that (1) Long acted under color of state law, and (2) Long's conduct resulted in the deprivation of Sander's Fourteenth Amendment right to equal protection of the law and/or her statutory rights under § 1981 to be free from race-based harassment. *Barber v. Cnty. of Ventura*, 45 F. App'x 725, 728 (9th Cir. 2002) (citing *Jones v. Williams*, 297 F.3d 930, 932 (9th Cir. 2002). No dispute exists that Long, as Dean of the College of Law, acted under color of state law at all relevant times. The dispute in this case centers on whether Long personally participated in creating a discriminatory and retaliatory hostile work environment in violation of § 1981 and the Equal Protection Clause.

The elements of a hostile work environment claim based on an equal protection violation under § 1983, as well as her claim under § 1981 for race-based harassment, mirror those under Title VII. *Manatt v. Bank of Am., NA*, 339 F.3d 792, 797 (9th Cir. 2003). A hostile work environment claim is actionable if the

alleged conduct amounts to "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 21 (1993); *see also Christian v. Umpqua Bank*, 984 F.3d 801, 809 (9th Cir. 2020). "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 81-82 (1998). Further, "what might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character, causing a worker to feel demeaned, humiliated, or intimidated on account of her [race and/or] gender." *Christian*, 984 F.3d at 810 (quoting *Draper v. Coeur Rochester, Inc*., 147 F.3d 1104, 1109 (9th Cir. 1998) (internal quotation marks omitted).

For Long to be personally liable under § 1983 for creating a hostile work environment, Sanders must show that Long personally participated in the alleged rights deprivation: there is no respondeat superior liability under § 1983. *Jones*, 297 F.3d at 934 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). Personal participation or involvement, within the meaning of this concept, "is not limited to direct

participation by the supervisor in the challenged conduct," *Hayut v. State Univ. of New York*, 352 F.3d 733, 753 (2d Cir. 2003), but may also be established by evidence of an official's "own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Starr*, 652 F.3d at 1207-1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir.1998) (internal alteration and quotation marks omitted)). "The law clearly allows actions against supervisors under section 1983 as long as a sufficient causal connection is present, and the plaintiff was deprived under color of law of a federally secured right." *Id.* (citation omitted).

In this case, the Court previously found questions of fact exist with respect to whether Sanders was subjected to a hostile work environment at the College of Law because of her race and gender, and Sanders has presented sufficient evidence that Long personally participated in or sanctioned conduct by others, which Sanders contends contributed to creating a discriminatory and retaliatory work environment. While Sanders explains the incidents she alleges created the hostile work environment began after Adams was hired as Dean in 2014, she says they escalated once Long became Dean in August 2018, after Sanders filed her EEOC charge. Specifically, Sanders testified Long's communications have been

"inhospitable, have been disrespectful, and have borderline been accusatory of improper behavior without any follow-up or evidence to back it up." Long's attitude toward Sanders can further be captured by the following facts: (1) he recorded her on three occasions without providing notice or consent (two phone calls and the open forum);(2) he asked the associate deans to document their conversations with her for him; and (3) he admits that he could have made derogatory comments about Sanders including calling her a bitch, demanding, incompetent, aggressive, dishonest, and disparaging her intellect.

Nor did Long's negative attitude toward Sanders appear to change after Defendants filed their first summary judgment motion. Indeed, Long issued two letters of Reprimand to Sanders in 2021 because of her supposed failure to video record her lectures, and gave Sanders her first negative performance evaluation in her ten-year career at the College of Law based on this purported failure to video record lectures and because Sanders missed one regular faculty meeting and several special faculty meetings that conflicted with Sanders' other obligations, including events in this litigation like depositions. Sanders has submitted evidence from which a jury could conclude that Long singled out Sanders in issuing the reprimands and giving her a negative performance evaluation. Other faculty members failed to post video recordings of their lectures or missed faculty meetings; yet none of these faculty received a formal reprimand because of these

issues. As a result of Long's negative performance evaluations, Sanders did not receive a pay increase for 2021. She therefore now makes $7,534.80 less than at least one of her white, male contemporaries.

Sanders has also presented evidence that Long attempted to interfere with Sanders' "academic freedom" in her decision not to cover the First Amendment in her Constitutional Law II class, as she had determined there was not sufficient time in this course to adequately cover the First Amendment. Sanders gained faculty approval for formal adjustments to the Con Law II curriculum and to add a Freedom of Speech and Press Seminar in 2021 and then a more comprehensive First Amendment seminar in 2014. Despite gaining approval for these adjustments, Long gave Sanders a negative performance evaluation in part because of her "continued refusal" to cover the First Amendment, calling it "unreasonable."

Additionally, Sanders has provided evidence that Long was instrumental in prompting the "Schorr Investigation" relating to Sanders' raising concerns about the College of Law's hiring practices, and that Long exchanged negative chat messages about Sanders with Affirmative Action Coordinator Mike Nugen. There is also evidence that another female professor left reluctantly because of Long and his failing to remedy other incidents that contributed to an environment of racial and sexual hostility in the broader context of the College of Law, as detailed in the Court's prior decision.

Defendants argue it is unclear "how or why" Long "should be personally liable for insensitive, derogatory, or offensive comments made at various times by other UI faculty members he supervised while he was the Dean (much less students)." *Defs.' Opening Br.*, p. 18-19, Dkt. 104-1. But, as explained above, "personal involvement" includes not only direct participation in the alleged violation but also a supervisor's "setting in motion series of acts by others or knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr*, 652 F.3d at 1207-1208 (internal citations, quotation marks, and brackets omitted). A jury could conclude that Long knew or reasonably should have known of the culture of discrimination detailed in the culture and climate review and failed to remedy, and, in fact, fostered and exacerbated this culture when he served as Dean, and this culture of discrimination was a moving force behind the harm caused to Sanders. *Id.* (citing *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1448 (9th Cir. 1991)).

All this evidence, when viewed in a light most favorable to Sanders, creates genuine issues of fact regarding Sanders' hostile work environment claim under § 1983 against Long individually.

### (2)   OCRI Investigations

As explained above, Defendants concede that issues of fact exist regarding

Sanders' retaliation claim against Long individually but argue that neither OCRI investigation "plausibly demonstrate[s] a triable § 1983 claim against Long." *Defs' Reply Br.*, p. 6, Dkt. 114. With respect to the Schorr Investigation, however, the Court already found that Long's response to Sanders' raising concerns about possible bias in hiring, publicly calling it "unprofessional, demeaning, and potentially dishonest," and reporting to OCRI that she "slandered" her colleagues, could be considered evidence of retaliation. *Memorandum Decision and Order*, p. 63, n.12. Dkt. 79. Given this evidence of Long's personal involvement in the Schorr Investigation, a jury could reasonably hold Long personally liable for his participation in this investigation, and therefore the Court will allow Sanders to present evidence at trial of the Schorr Investigation in support of her claims against Long.

With regard to the Guidepost Investigation, at oral argument, Sanders' counsel acknowledged that evidence at this stage of Long's personal involvement in this particular investigation is "fairly slim" but maintains recently produced documents show that Long may have participated more directly in the investigation than previously believed. Sanders therefore requests that the Court reserve ruling on this issue to allow Sanders to review the "literally thousands" of recently produced documents, and depending on how the evidence comes in at trial, decide at that juncture whether the issue should go to the jury. Because evidence of the

Guidepost Investigation will likely be presented at trial in support of Sanders'

other claims against the College of Law, the Court sees no harm in reserving its

ruling on this issue until a later date.

### C.   *Academic Freedom Claim*

Sanders also asserts a state law claim for violation of her academic freedom

against Long in his individual capacity. In its previous decision on summary

judgment, the Court concluded the Eleventh Amendment barred Sanders' state law

academic freedom claim against Defendants UI and Adams and Long in their

official capacities, but it made no determination regarding "the merits of the

academic freedom claim brought against Defendant Long in his individual capacity

in the to-be-filed third amended complaint." *Sanders*, 552 F. Supp. 3d at 1032, n.

19. While the Eleventh Amendment does not bar Sanders' academic freedom claim

against Long in his individual capacity, Sanders has failed to articulate a

cognizable legal basis for the claim under state law.

Sanders contends that her academic freedom is "contractually provided for"

in the Constitution of the University Faculty, the College of Law Bylaws, and

University policy, and Long violated his authority under these documents by

requiring Sanders to teach specific content in her Constitutional Law II course.[2]

---

[2] Sanders also argues that "Long's interference with Sanders' teaching should also be
(Continued)

Long, however, was not a party to any employment contract between Sanders and UI, and thus cannot be personally liable for any alleged breach of that contract. *C.f., Minnesota Mut. Life Ins. Co. v. Ensley*, 174 F.3d 977, 981 (9th Cir. 1999) (holding "an insurance agent cannot be held liable for breach of contract or breach of the implied covenant of good faith and fair dealing because he is not a party to the insurance contract"). The academic freedom against Long individually based on a breach of contract theory therefore fails as a matter of law. *Id.*

## MOTION FOR RECONSIDERATION

Sanders asks the Court to reconsider its Order dismissing her whistleblower claims under the Idaho Protection of Public Employees Act (IPPEA), Idaho Code § 6-2101, *et seq.*, based on Eleventh Amendment immunity.

### 1. Background

After Sanders filed this lawsuit in June 2019, Sanders offered to host a forum to allow College of Law students to discuss concerns about the school's culture and climate. She hosted the first forum in November 2019. A second forum was scheduled for January 23, 2020, and Long instructed IT personnel to record the meeting without providing notice to Sanders or other participants. After it was

---

considered as part of the hostile work environment and disparate treatment claims already ruled upon by the Court." The Court agrees and will allow Sanders to present evidence of Long's alleged interference in her teaching in support of her other claims against UI and Long individually.

discovered that the forum had been recorded without Sanders and the participants' consent, Sanders raised concerns about the legality of Long's unconsented recording. She alleges that she subsequently "suffered a series of adverse employment actions including, but not limited to, a negative performance evaluation given to her in late-February 2020." *Pl's Br. re Mot. for Reconsideration*, p. 2, Dkt. 118-1.

On June 4, 2020, Sanders filed a motion for leave to file a second amended complaint, seeking to add a whistleblower claim under the IPPEA. Defendants filed a notice of non-objection to the motion for leave, and the Court granted the motion. Sanders therefore filed her Second Amended Complaint adding an IPPEA whistleblower claim. *See* Dkt. 26. Defendants filed their Answer on July 21, 2020. Defendants' Answer to the Second Amended Complaint did plead the Eleventh Amendment as an affirmative defense (as they had in their prior answers), but the Answer did not specifically plead it as a defense to the IPPEA claim. When Defendants filed their Answer, Sanders' IPPEA claims fell within the 180-day statute of limitations set forth in Idaho Code § 6-2105.

After conducting discovery on all their claims, both parties filed timely motions for summary judgment. In their motion for summary judgment, Defendants argued that Sanders' IPPEA claim was barred by Eleventh Amendment immunity. Sanders opposed dismissal of her IPPEA claim on Eleventh

Amendment immunity grounds, arguing that UI had waived immunity by failing to specifically plead it as a defense to this claim. The Court rejected this argument, concluding that no such pleading rule exists, and that the manner in which Defendants had raised the defense did not warrant a finding of waiver. The Court specifically did not find evidence "that the delay in raising the Eleventh Amendment immunity defense to the IPPEA claim was a tactical decision." *Memorandum Decision and Order,* p. 87, Dkt. 79. Sanders did not point out in her opposition to summary judgment that the statute of limitations had run on her IPPEA claim and that she could not re-file in state court if the claim was dismissed.

After the Court issued its decision on summary judgment, Sanders filed a motion for clarification to ensure that the Court had dismissed the IPPEA claim without prejudice. During a conference with the Court's clerk, defense counsel indicated that Defendants had no objection to Plaintiff's Motion for Clarification, and the Court entered an Order on August 25, 2021, clarifying the dismissal was without prejudice such that Plaintiff could refile her claim in state court pursuant to 28 U.S.C. § 1367(d). Sanders filed her IPPEA claim in state court the following day.

On January 31, 2022, Defendants filed a Motion to Dismiss the state court matter, arguing that Sanders' whistleblower claim was untimely because the statute

of limitations was not tolled by 28 U.S.C. § 1367(d) (citing the Supreme Court's decision in *Raygor v. Regents of the Univ. of Minnesota*, 534 U.S. 533 (2002)). Sanders has filed a voluntarily dismissal of her state court action. She now brings this motion asking the Court to reconsider its decision dismissing Sanders' IPPEA claim on Eleventh Amendment immunity grounds.

## 2. Legal Standard

A court may grant a party relief from a final judgment under Rule 60(b) for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud, misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; or (6) any other reason that justifies relief. Fed. R. Civ. P. 60(b). Rule 60(b) should be used "sparingly as an equitable remedy to prevent manifest injustice" and only in "extraordinary circumstances*." Lal v. California*, 610 F.3d 518, 524 (9th Cir.2010) (citing *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir.1993)).

Rule 60(b)(3) "is aimed at judgments which were unfairly obtained, not at those which are factually incorrect." *In re M/V Peacock*, 809 F.2d 1403, 1405 (9th Cir.1987). The catch-all provision of Rule 60(b)(6) should only be granted "as an equitable remedy to prevent manifest injustice," *United States v. Washington*, 98 F.3d 1159, 1163 (9th Cir.1996) (internal quotation marks omitted), or where the

movant shows extraordinary circumstances justifying relief. *Gonzalez v. Crosby*,

545 U.S. 524, 536 (2005).

### 3. Discussion

Sanders maintains that UI "was strategic in waiting until after the short

statute of limitations had run on her IPPEA claim to raise eleventh amendment

immunity as a way to prevent her from having her day in *any* court," and therefore

suggests that relief from summary judgment dismissing her IPPEA claim is

warranted under Rule 60(b)(3). Rule 60(b)(3) permits a losing party to move for

relief from judgment based on "fraud, ... misrepresentation, or other misconduct of

an adverse party." Fed. R. Civ. P. 60(b)(3). To prevail, Sanders "must establish by

clear and convincing evidence" that the order dismissing her IPPEA claim "was

obtained by fraud, misrepresentation, or misconduct, and that the conduct

complained of prevented the moving party from fully and fairly presenting the

[claim]." *Lafarge Conseils Et Etudes, S.A. v. Kaiser Cement & Gypsum Corp*., 791

F.2d 1334, 1338 (9th Cir. 1986): *see also De Saracho v. Custom Food Machinery,*

*Inc*., 206 F.3d 874, 880 (9th Cir. 2000).

Sanders' cite the following facts as evidence of UI's misconduct in

strategically waiting to assert its Eleventh Amendment immunity defense: (1) UI

"affirmatively" chose not to object to Sanders' motion for leave to amend to add

the IPPEA claim; (2) UI chose not to raise immunity as an affirmative defense in

its answer; (3) UI engaged "extensive discovery" regarding the IPPEA claim; (4) UI argued the merits of the IPPEA claim in their summary judgment motion in addition to arguing Eleventh Amendment immunity; and (5) UI did not raise any objections to Sanders' request that her IPPEA claim be dismissed without prejudice so she could refile the claim in state court. *Pls' Opening Br. re Mot. for Reconsideration*, p. 2, Dkt. 118-1.

None of these actions constitute misconduct warranting relief from the order dismissing Sanders' IPPEA claim under Rule 60(b)(3). First, with exception to UI's not objecting to Sanders request that her IPPEA claim be dismissed without prejudice, Sanders was aware of, and indeed argued, each of these facts at summary judgment to support her contention that UI waived Eleventh Amendment immunity with respect to the IPPEA claim; she therefore cannot claim now that UI's conduct somehow prevented her from fully and fairly presenting her arguments relating to her IPPEA claim. Second, as Sanders acknowledges, numerous courts have found that waiting to assert Eleventh Amendment immunity at summary judgment – or even later – does not automatically constitute waiver; it is therefore difficult to apprehend how conduct that does not even constitute waiver somehow establishes by clear and convincing evidence that UI obtained dismissal of Sanders' IPPEA claim by fraud, misrepresentation, or other misconduct.

Sanders' attempt to gain relief under Rule 60(b)(6) also fails. "Relief upon these grounds is very difficult to obtain because Rule 60(b)(6) is reserved for exceptional circumstances, where denial of relief would be unjust." *Brown v. Valdez*, No. 2:07-CV-00296-BLW, 2012 WL 3149261, at *3 (D. Idaho Aug. 1, 2012) (citing *U.S. v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir.1993)). No such exceptional circumstances exist here.

Sanders contends this case involves "unique facts" and suggests these unique facts equate to exceptional circumstances. *Pl's Opening Br. re Motion to Reconsider*, p. 6, Dkt. 118. Among these "unique facts" is that UI waited until summary judgment – and after the statute of limitations had run – to raise its immunity defense to the IPPEA claim. "Depriving the parties of a merits disposition is serious business." *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 739 (7th Cir. 1998). And UI's conduct in this case could be construed as a tactical decision to deny Sanders her day in court given it waited until the statute of limitations had run on the IPPEA claim before asserting immunity. *See Duffin v. Idaho State Univ.*, No. 4:16-CV-00209-BLW, 2017 WL 6543873, at *3 (D. Idaho Dec. 21, 2017) (concluding the state's decision to wait until the dispositive motion deadline and after the statute of limitations had run in state court to assert Eleventh Amendment immunity "was a tactical attempt to deny [the plaintiff] his day in Court).

The problem Sanders faces, however, is that she could have raised this argument at summary judgment – the Supreme Court decided nearly two decades ago that tolling under 28 U.S.C. § 1367(d) was not available for claims dismissed on Eleventh Amendment immunity grounds. *Raygor*, 534 U.S. at 541. Alternatively, she could have voluntarily dismissed the IPPEA claim and refiled in state court, instead of opposing its dismissal at summary judgment, and gained the benefit of § 1367(d)'s tolling provision. *Id.* But she did not pursue either potentially claim-saving option. No "exceptional circumstances" or "manifest injustice" exists where a party fails to present arguments that could have been raised before entry of judgment. *C.f. Kamden-Ouaffo v. Idahoan Foods, LLC*, No. 4:15-CV-00129-BLW, 2018 WL 832846, at *1 (D. Idaho Feb. 12, 2018) (citing *School Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc.,* 5 F.3d 1255, 1263 (9th Cir. 1993)).

It also bears mentioning that Sanders is not foreclosed from presenting evidence and seeking redress at trial for Long's conduct in recording the forum without Sanders and the participants' consent. As noted, Sanders may present evidence at trial relating to this conduct in support of her retaliation and hostile work environment claims. Thus, Sanders may still have her day in court on this conduct – just not through an IPPEA claim.

## ORDER

**IT IS ORDERED that:**

1.      Defendants' Motion for Partial Summary Judgment (Dkt. 104) is **GRANTED in part and DENIED in part**. Sanders will be allowed to proceed against Long individually on her claims for intentional discrimination, retaliation, and hostile work environment under §§ 1983 and 1981. The state law academic freedom claim is dismissed.

2.      Plaintiff's Motion to Strike (Dkt. 105) is **DENIED.**

3.      Plaintiff's Motion for Reconsideration of Court's Order Dismissing IPPEA Claim (Dkt. 118) is **DENIED**.

DATED: July 28, 2022

B. Lynn Winmill
U.S. District Court Judge