Erika Birch (ID Bar No. 7831)
T. Guy Hallam (ID Bar No. 6101)
**STRINDBERG SCHOLNICK BIRCH**
**HALLAM HARSTAD THORNE**
1516 West Hays Street
Boise, ID 83702
Telephone: (208) 336-1788
Facsimile: (208) 287-3708
Erika@idahojobjustice.com
Guy@idahojobjustice.com
Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **SHAAKIRRAH R. SANDERS,**<br><br>     Plaintiff,<br><br>vs.<br><br>**THE UNIVERSITY OF IDAHO, a public university governed by the BOARD OF REGENTS OF THE UNIVERSITY OF IDAHO aka the STATE BOARD OF EDUCATION, an executive department of the STATE OF IDAHO, et al.,**<br><br>     Defendants. | **PLAINTIFF'S TRIAL BRIEF**<br><br>Case No.: 3:19-cv-00225-BLW<br><br>Judge Winmill |

Pursuant to the Court's *Order Setting Trial* (Dkt. 120) and Local Rule 16.3, Plaintiff submits the following Trial Brief.

## INTRODUCTION

Defendants University of Idaho, Mark Adams, and Jerrold Long have engaged in a lengthy pattern of discriminatory and retaliatory acts against Plaintiff Shaakirrah R. Sanders. Since her

hire, Professor Sanders has been a consistent voice at the College of Law in support of diversity, inclusion, and anti-discrimination whether it be for faculty, students, staff, prospective hires, or on her own behalf.

The culture and climate at the College of Law ("COL") has been averse to women and people of color, among others, for years. The American Bar Association visited in 2011 and reported climate concerns related to the treatment of women at the law school. The University Office of Civil Rights and Investigations ("OCRI") has recorded more than sixty complaints of race discrimination, gender discrimination, or retaliation at the COL since 2011. In 2018, Human Resources ("HR") interviewed 32 faculty and staff and reported that "some of the concerns raised during the course of the Climate & Culture Review could rise to the level of what is considered discrimination, retaliation, gender or sex discrimination." Unsurprisingly, culture and climate issues have continued at the COL, as the administration's attempts to remediate those issues have been tepid at best, or retaliatory when concerns regarding the same have been raised by Professor Sanders and others.

## EXPECTED TRIAL FACTS

The wealth of expected trial facts has been laboriously outlined by the Plaintiff in prior filings and this Court in its *Memorandum Decision and Order* related to Defendants' First Motion for Summary Judgment (Dkt. #79) and more recent *Memorandum Decision and Order* (Dkt. #133) denying Defendants' Second Motion for Summary Judgment. As a result, Professor Sanders will not include an additional recitation of the expected trial facts herein, other than highlighting some of the pertinent facts relevant to the analysis of Plaintiff's legal claims below.[1]

---

[1] Professor Sanders is happy to provide greater detail regarding expected trial facts if this Court would prefer such detail.

## PLAINTIFF'S LEGAL CLAIMS

Professor Sanders asserts claims for gender and/or race discrimination and retaliation against the University pursuant to Title VII, for gender and/or race discrimination against Defendants Adams and Long in their individual capacities pursuant to 42 U.S.C. §1983, and for retaliation against the individual Defendants pursuant to 42 U.S.C. §1981.[2]

### I. PLAINTIFF'S BURDEN

**a.    Discrimination Claims**[3]

To establish her discrimination claims at trial, Professor Sanders must prove by a preponderance of evidence that (1) she suffered an adverse employment action; (2) because of her gender and/or race. *See* Ninth Circuit Model Civil Jury Instructions, § 10.1 (2017 ed., updated Mar. 2022).[4] The discrete adverse employment actions at issue here include denial of promotions to the Associate Dean of Faculty positions in 2017 and 2018; denial of stipends in 2018 and 2020; and denial of a pay increase for 2021.[5] Professor Sanders can prove that she suffered the adverse actions because of her gender and/or race using a variety of evidence as outlined below and including that similarly situated employees were treated more favorably, that Defendants' rationales for their decisions are pretextual; and, that Defendants have engaged

---

[2] Professor Sanders seeks damages under 42 U.S.C. §1981 solely related to retaliation.
[3] Professor Sanders is withdrawing her Title IX claim as it appears damages available under Title IX now are less than damages available under Title VII following the recent United States Supreme Court decision in *Cummings v. Premier Rehab Keller PLLC*, ___ U.S. ___, 142 S.Ct. 1562 (2022).
[4] *McDonnell Douglas* burden-shifting instruction should not be given in a Title VII case. *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 855 (9th Cir. 2002) (en banc), *aff'd*, 539 U.S. 90 (2003) ("[I]t is not normally appropriate to introduce the *McDonnell Douglas* burden-shifting framework to the jury.") *See* Introductory Comments to Ninth Circuit Model Title VII jury instructions.
[5] In order to prevail on her Section 1983 discrimination claims, Sanders must also prove that Defendants Adams and/or Long acted under color of state law (a fact which is not in dispute) and Defendants Adams and/or Long acted, or failed to act, in a manner that deprived Sanders of her right to be free from race and/or gender discrimination.

in other similar discriminatory acts.

Importantly, the introductory comment to Title VII in the Ninth Circuit Model Jury Instructions, which were just recently updated, details the "because of" and "but-for" causation standard pre- and post- *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). The instructions and comments (introductory and in § 10.3) make clear that post-*Bostock*:

> "Because of" means "by reason of" or "on account of." This is sometimes referred to as "but-for causation." This form of causation is shown whenever a particular outcome would not have happened "but for" the purported cause. It is a reason without which the [*state adverse employment action*] would not have occurred.
>
> A but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a "but-for cause." Often, events have multiple but-for causes. For example, if a car accident occurred both because the defendant ran a red light and because the plaintiff failed to signal his turn at the intersection, we might call each a "but-for cause" of the collision.
>
> In the context of this claim, a defendant cannot avoid liability just by citing some other factor that contributed to the challenged employment decision. So long as the plaintiff's [race] [color] [religion] [sex] [national origin] was one but-for cause of that decision, that is enough to trigger the law. A "but-for cause" does not mean the sole cause or even a primary cause.

1. **Evidence of Discrimination in Failure to Promote.**

Professor Sanders applied for the associate dean position in 2017 by expressing interest in the position orally and in writing. She met the minimum qualifications for the position. However, her application for the position was rejected by Dean Adams, who initially informed her that she did not have adequate leadership experience for the position. After her rejection, Dean Adams solicited interest from others by tapping them on the shoulder until he found a reluctantly willing volunteer – Professor Lee Dillion. Ultimately, Mark Adams gave the promotion to Professor Dillion, a white male professor who did not meet the minimum qualifications for the position.

In 2018, Dean Adams knew that Professor Sanders was still interested in the Associate Dean position in Boise, which was again available because Professor Dillion retired after

serving for a single year. However, Dean Adams did not approach Professor Sanders about the open position; instead, Dean Adams again sought out other candidates. Consistent with his process for the 2017 opening, Dean Adams did not post the position or engage in any competitive application/interview process. Instead, Dean Adams tapped Stephen Miller, a white male contemporary of Professor Sanders, for the position. The Provost's office initially questioned approving Professor Miller's appointment to the Associate Dean position without obtaining an EEO/AA waiver because Dean Adams had not used a competitive process.

As part of the EEO/AA waiver, Dean Adams provided a written explanation to support his decision to hire Professor Miller. The initial explanation provided by him was: "Full professor, tenured, in Boise, works well with Dillion, willing to serve. Lacks admin experience." Professor Sanders met all these same qualifications, including working well with Dillion as admitted by Dean Adams. Dean Adams later added comments about Professor Miller's service in organizing a law review symposium as a qualification for the position. However, Professor Sanders had also organized two such symposiums, along with a regional national moot court competition. In short, the evidence will show that Dean Adams ignored Professor Sanders' interest and qualifications in order to promote a white man to Associate Dean two years in a row.[6]

   2. **Evidence of Discrimination in Failure to Award Summer Stipend.**

Defendants also discriminated against Professor Sanders by failing to provide her with a summer stipend in 2018. With the exception of the summer of 2018, all eligible applicants

---

[6] Had Professor Sanders been selected as Associate Dean in 2017, she would have had the same administrative experience at the COL as Jerry Long (who also became an Associate Dean in 2017). Thus, Professor Sanders would have had a colorable opportunity to serve as interim Dean, the position that Long was selected for and held until June of 2021. Therefore, Gary Couillard, our economic expert will be prepared to testify to damages as a result of this lost opportunity.

for summer stipends at the COL had been funded every year, even in those years when funds were short. For example, in 2017, there was only funding expected for 12 stipends available, but Adams decided to fund all 16 applicants.

In 2018, Professor Sanders submitted an application for a summer stipend. Her application was rejected, even though she had a viable application. In fact, Professor Sanders was the most junior faculty applicant rejected, although summer stipends are intended to support scholarly work for less senior professors. Further, Professor Sanders' two white male contemporaries were both funded, as were three other professors (two white women and one white male) who had *more* seniority than Professor Sanders. In sum, three white professors with more seniority, and two white male professors with the same seniority, were provided a stipend for summer 2018, even though professors with less seniority are to be given priority for funding. The contemporaneous documents indicate that Professor Sanders was passed over because she was going on a sabbatical. However, another more senior professor was also going on a sabbatical, yet she was funded, and her contemporary was returning from a sabbatical, yet he was funded.

Moreover, the following year Dean Long suggested he might not award Professor Sanders a summer stipend, even though Dean Adams had promised that she receive priority for a 2019 stipend. Ultimately, Dean Long was discouraged by his associate deans from singling her out, and Professor Sanders did receive a stipend. However, the following year Professor Sanders was so discouraged by the ongoing discrimination and retaliation by Dean Long, which by that time included having received her first ever negative evaluation, that she believed applying for a summer stipend in 2020 would be futile.

3. **Hostile Work Environment Claim and Evidence.**

"To establish sex [or race] discrimination under a hostile work environment theory, a

plaintiff must show she was subjected to sex-based [or race-based] harassment that was sufficiently severe or pervasive to alter the conditions of employment, and that her employer is liable for this hostile work environment." *Christian v. Umpqua Bank*, 984 F.3d 801, 809 (9th Cir. 2020); *see also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Specifically, Professor Sanders has the burden to prove:

1. she was subjected to hostile, humiliating, insulting, or discriminatory conduct affecting her gender and/or race;
2. The conduct was unwelcome;
3. The conduct was sufficiently severe or pervasive to alter the conditions of Professor Sanders' employment, making it more difficult for her to do her job, to take pride in her work, and to desire to stay in her position;
4. Professor Sanders perceived the working environment to be abusive or hostile; and
5. A reasonable Black woman in Professor Sanders' circumstances would consider the working environment to be abusive or hostile.

*See* Ninth Circuit Model Civil Jury Instructions, § 10.5 (2017 ed., updated Mar. 2022) (modified); *See also*, *Fuller v. Idaho Department of Corrections*, 865 F.3d 1154, 1161 (9th Cir. 2017) (citing *Little v. Windermer Relocations, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002)).

"The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998). Further, "'what might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character, causing a worker to feel demeaned, humiliated, or intimidated on account of her [race and/or] gender.'" *Christian*, 984 F.3d at 810 (quoting *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1109 (9th Cir. 1998)).[7]

---

[7] The elements of a hostile work environment claim based on equal protection violations under §1983 and

The hostile work environment began after the College of Law hired Adams as the Dean in 2014 and escalated further once Long became Dean in August 2018, after Professor Sanders filed her EEOC charge in June 2018. Evidence of the hostile work environment in this case is varied and includes the following: (a) resistance to her requests to be considered for the same course release as her white colleagues; (b) administrators' continuing interference with Professor Sanders' teaching package; (c) negative attacks on her performance; (d) repeated wrongful accusations that Sanders was misusing travel funds along with insinuations that Professor Sanders lied about attendance at conferences and imposition of individualized reimbursement policies for her; (e) negative and disrespectful treatment of Professor Sanders by Dean Adams, such as Dean Adams telling Professor Sanders she was being selfish and "sowing bad feelings and distrust" by asking about course release and changes to course assignments; (f) Dean Long's similar negative attitude and conduct towards Professor Sanders including recording her on three occasions without notice or consent, asking associate deans to document their conversations with her, making derogatory comments about her, including calling her a bitch, demanding, incompetent, aggressive, and dishonest, and disparaging her intellect, and continuing to interfere with her academic freedom related to Con Law II curriculum; (g) administrators' manufactured accusations of Professor

---

§1981 for race-based harassment mirror the elements of Title VII. *See Manatt v. Bank of Am., NA*, 339 F.3d 792, 797 (9th Cir. 2003). For Long or Adams to be personally liable under § 1983 for creating a hostile work environment, Sanders must show that Long personally participated in the alleged rights deprivation: there is no respondeat superior liability under § 1983. *Jones*, 297 F.3d at 934 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). Personal participation or involvement, within the meaning of this concept, "is not limited to direct participation by the supervisor in the challenged conduct," *Hayut v. State Univ. of New York*, 352 F.3d 733, 753 (2d Cir. 2003), but may also be established by evidence of an official's "own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Starr*, 652 F.3d at 1207-1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir.1998) (cleaned up)). "The law clearly allows actions against supervisors under section 1983 as long as a sufficient causal connection is present, and the plaintiff was deprived under color of law of a federally secured right." *Id.* (citation omitted).

Sanders as being unprofessional, selfish, and creating a negative atmosphere despite all evidence to the contrary; (h) Dean Long's warning to Professor Sanders that her communications were creating a negative culture and climate and also accusing her of being unprofessional resulting in her silencing herself after Dean Long made it clear that he had used her communications to negatively rate her performance. Additionally, Dean Long issued two unfounded letters of Reprimand to Professor Sanders in 2021 and gave Professor Sanders her first negative performance evaluations during her career at the College of Law for 2019 and 2020 (given to her in 2020 and 2021 respectively). As a result of these negative performance evaluations, Professor Sanders now receives at least $7,534.80 less in salary than a white, male colleague. Further, Dean Long and the University took additional hostile actions against Professor Sanders by encouraging/conducting various outside investigations into Professor Sanders, including both the Schorr and Guidepost investigations.

All of this evidence must be considered in light of the environment of racial and sexual hostility at the College of Law, which included everything from comments about genocide, racial slurs, antisemitism, sexism and sexual violence, and a complete dearth of prompt and effective responses by the Administration. Further, other female faculty members expressed concerns about both Adam's and Long's disparate and/or retaliatory treatment of women.

Moreover, because the hostility was created, maintained, and condoned by Deans Long and Adams, who are unquestionably "supervisors," the University can be held vicariously liable for the hostile environment. *See* Ninth Circuit Model Civil Jury Instructions, § 10.6 (2017 ed., updated Mar. 2022); *Vance v. Ball State University,* 133 S. Ct. 2434 (2013).[8]

---

[8] A "supervisor" is someone who is empowered by the employer to take tangible employment actions regarding the employee, such as hiring, firing, failing to promote, reassigning with significantly different responsibilities, or significantly changing benefits.

Additionally, for any hostility created by non-supervisors, the University can be held liable if a member of the defendant's management knew, or should have known, of the harassment and failed to take prompt, effective remedial action reasonably calculated to end the harassment. Amy Oppenheimer, an expert regarding best practices in handling reports of employment discrimination, will testify as to how the Defendants have not met the standard of care established in the human resource field for preventing workplace discrimination and retaliation and for responding to complaints of harassment, discrimination, and retaliation.

Thus, we expect that the jury will be instructed based on vicarious liability and likely liability based on negligence as well.

b. **Retaliation Claims**

A retaliation claim under Title VII[9] requires a plaintiff to show "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (citing *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997)). Professor Sanders need not prove her underlying discrimination claims to succeed on her retaliation claims. *See, e.g., Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994) ("a plaintiff does not need to prove that the employment practice at issue was in fact unlawful under Title VII).

Here, there is no question that Professor Sanders engaged in protected activity by: 1) raising concerns about race and gender discrimination—both unique to her own situation and on a broader

---

[9] As noted above, in order to prevail on her Section 1981 retaliation claim, Professor Sanders must prove that Deans Adams and/or Long acted under color of state law (again an element/fact that is not disputed by Defendants) and that the acts and/or failures to act by Deans Adams and/or Long deprived Professor Sanders of her right to be free from retaliation. Professor Sanders must prove that Defendants retaliated against her because of her protected activities, including complaints or communications about race discrimination such as her charge and this lawsuit.

scale at the college; 2) filing her EEOC charge; and 3) filing this lawsuit.[10] Thus, the jury should be instructed that this element has been stipulated to or determined as met by the Court.

There is a plethora of evidence showing that Professor Sanders experienced retaliatory adverse employment actions. Notably, adverse employment actions for purposes of retaliation are defined as an action which "a reasonable employee would have found. . . materially adverse, which means it might have dissuaded a reasonable worker from engaging in the protected activity." *See* Ninth Circuit Model Civil Jury Instructions, § 10.10 (2017 ed., updated Mar. 2022); *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006). Here, the adverse actions can include all of the same actions supporting her claims for discrimination and hostile work environment including, but not limited to: the 2017 & 2018 rejections of her for the Associate Dean position; the rejection of her application for a 2018 summer stipend; a 2019 negative performance evaluation— her first ever; followed by two unsupported letters of reprimand and another negative performance evaluation in 2020; and the hostility she experienced. See Comment to Ninth Circuit Model Civil Jury Instructions, § 10.10 outlining the caselaw regarding adverse actions.

Some other notable examples of the retaliation Professor Sanders expects to present include: (1) Associate Dean Seamon's negative reactions to Professor Sanders' complaints of unfair treatment and his unfavorable summary of Sanders' teaching evaluations (along with Seamons and Adams allowing a racially-biased student evaluation to remain in Sanders' file); (2) Dean Adams' responses when Professor Sanders raised concerns about the lack of female leadership at the College of Law; (3) Dean Long's responses after Professor Sanders raised concerns about biases in faculty hiring; (4) Dean Long's secret recording of conversations with

---

[10] Informal as well as formal complaints or demands are protected activities under Title VII. *See Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000)

Professor Sanders and instructions to others to take notes of their communications with Sanders (and instructions to share those notes with Dean Long); (5) Adams and Seamon's votes against Sanders' tenure application; (6) the Schorr and Guidepost investigations into Professor Sanders which both came immediately on the heels of Sanders' protected activity regarding concerns about bias in faculty hiring and communications about a concerning interaction with a student respectively; (7) chat messages between Dean Long and Mr. Nugen, the College of Law's Affirmative Action Coordinator, regarding Professor Sanders; (8) efforts by Dean Long to change Professor Sanders' teaching package and/or interfere with her academic freedom; and (9) evidence of the broader climate at the College of Law where women and people of color are marginalized by the Defendants and administration and punished for speaking out on issues of discrimination.

The evidence supporting the causal link between Professor Sanders' protected activity and the adverse employment actions is not only found in the timing/temporal proximity of many of the adverse actions, but also in admissions showing direct evidence of retaliatory motive, and a showing that Defendants' rationales are pretextual, that is: unbelievable, untrue, unsupported, and uneven when compared to similarly situated individuals.

    c.    **Defendants Affirmative Defenses**

There are no noteworthy Affirmative Defenses raised by Defendants which merit inclusion in this Trial Brief or which have not otherwise been addressed by the Court at the summary judgment stage of this matter.[11]

---

[11] Although Defendants' *Answer to Fourth Amended Complaint and Demand for Jury Trial* (Dkt. #100) contained an Affirmative Defense suggesting that mitigation of damages may be an issue (*See* Affirmative Defense, IX, at page 28, "Further investigation and discovery may reveal that plaintiff has failed to mitigate her damages, if any."), Defendants have not produced any factual basis, documents, or expert testimony related to the same. As a result, Professor Sanders does not address that issue herein as it does not appear to be an affirmative defense which will be at issue during trial.

## DAMAGES

Professor Sanders seeks economic damages – back and front pay; compensatory damages; and punitive damages. There are no caps to back or front pay. *See Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 848 (2001). *See also Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1020 (9th Cir. 2000) (defining front pay and back pay). Even though in the Ninth Circuit, the Court is entitled to render a decision on back and front pay, we understand that the Court is likely to ask the jury to do so as an advisory finding, and Plaintiff has drafted instructions and verdict forms accordingly.

Under Title VII, Professor Sanders' compensatory damages as against the University are capped at $300,000. However, there is no such cap on compensatory damages as against the individual Defendants under Section 1983[12] or Section 1981. As a result, the proposed verdict form has separate lines for the jury to determine these damages as to each Defendant.

Likewise, the jury is entitled to award punitive damages against the individual Defendants under Section 1983 and Section 1981 upon an appropriate finding that Defendants' conduct that harmed Professor Sanders was malicious, oppressive or in reckless disregard of the Plaintiff's rights. *See* Ninth Circuit Model Civil Jury Instructions, § 5.5. Punitive damages are available even when the plaintiff is unable to show compensable injury. *Smith v. Wade*, 461 U.S. 30, 55 n.21 (1983).

Finally, upon a finding of discrimination by the jury, Professor Sanders is entitled to prospective, injunctive relief against the University based on official capacity/*Ex parte Young* liability. Prospective relief is something we foresee the Court addressing in post-trial motion should Professor Sanders obtain a successful verdict. *See Rizzo v. Goode*, 423 U.S. 362, 378-79

---

[12] Indeed, compensatory damages are mandatory for a plaintiff who establishes liability for deprivations of constitutional rights actionable under Section 1983. *See Smith v. Wade*, 461 U.S. 30, 52 (1983).

(1976) (discussing generally the scope of a district court's equitable powers to remedy past wrongs).

## ANTICIPATED EVIDENTIARY ISSUES

Professor Sanders has filed *Motions in Limine* regarding (1) excluding undisclosed witnesses, (2) excluding the EEOC's Dismissal form and evidence thereof, and (3) preventing Defendants from presenting undisclosed expert testimony. Otherwise, she anticipates that there will be evidentiary objections associated with some not insubstantial portion of the exhibits proposed by Defendants including on hearsay grounds, relevance, and under Rule 403.

While not subject to a motion in limine, Plaintiff intends to object to the admission of the investigative reports (at least in full) of Guidepost Investigations. This report written by the Guidepost investigators, who are not witnesses,[13] is 164 pages long and contains 26 exhibits. Professor Sanders' response is 34 pages long and contains 7 exhibits. Guidepost then "responded" to Professor Sanders' response in a 42-page document. While this investigation is likely relevant, as it is one of the adverse actions supporting Plaintiff's hostile work environment/retaliation claims, admission of the Guideposts reports (and Professor Sanders's response) creates the risk of creating a mini-trial and taking up an inordinate amount of time of what is, but one of many, adverse actions. *See* F.R.E. 403; F.R.C.P. 1. Thus, Plaintiff did not disclose any of the Guidepost investigation reports/responses as a trial exhibit and plans to ask witnesses about some basic facts regarding this investigation, the complaint that led to it, and the resulting findings.

Finally, Defendants have disclosed an inordinate number of exhibits dealing with travel-related issues. Again, some of these exhibits may be relevant as wrongful accusations that Professor Sanders was misusing travel funds, lied about attendance at a conference, and/or

---

[13] Defendants have listed Matthew Zandi, one of the investigators as a trial witness, but as set forth in Plaintiff's *Motion in Limine*, Mr. Zandi was not properly disclosed and must be excluded.

imposition of individualized reimbursement policies for Professor Sanders as part of her hostile work environment/retaliation claims. Yet again, the issue of travel reimbursement is one small portion of her overall claims and at some point, the relevance of these exhibits will clearly be outweighed by the danger of causing "undue delay, wasting time, or needlessly presenting cumulative evidence." F.R.E. 403.

DATED this 13th of September, 2022

Respectfully submitted,

**STRINDBERG SCHOLNICK BIRCH HALLAM HARSTAD THORNE**

/s/ Erika Birch
Erika Birch
T. Guy Hallam, Jr.

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2022 a true and correct copy of the foregoing pleading was served on the following via the Court's CM/ECF system:

Bentley G. Stromberg
Tully Fitzmaurice
Sonyalee Nutsch
CLEMENTS, BROWN & McNICHOLS, P.A.
321 13th Street
Post Office Box 1510
Lewiston, Idaho 83501
bstromberg@clbrmc.com
tfitzmaurice@clbrmc.com
snutsch@clbrmc.com

/s/ Dunja Subasic
Dunja Subasic, of the firm