Erika Birch (ID Bar No. 7831)
T. Guy Hallam (ID Bar No. 6101)
**STRINDBERG SCHOLNICK BIRCH**
**HALLAM HARSTAD THORNE**
1516 West Hays Street
Boise, ID 83702
Telephone: (208) 336-1788
Facsimile: (208) 287-3708
Erika@idahojobjustice.com
Guy@idahojobjustice.com

Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| **SHAAKIRRAH R. SANDERS,**<br><br>     Plaintiff,<br><br>vs.<br><br>**THE UNIVERSITY OF IDAHO, a public university governed by the BOARD OF REGENTS OF THE UNIVERSITY OF IDAHO aka the STATE BOARD OF EDUCATION, an executive department of the STATE OF IDAHO, et al.,**<br><br>     Defendants. | **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE**<br><br>Case No.: 3:19-cv-00225-BLW<br><br>Judge Winmill |

Plaintiff Shaakirrah R. Sanders ("Professor Sanders"), by and through her undersigned attorneys, hereby submits this *Memorandum in Support of Plaintiff's Motion for Sanctions for Spoliation of Evidence.*

As set forth below, the University of Idaho (the "University") destroyed probative records that were clearly relevant to Professor Sanders' discrimination and retaliation claims. It destroyed these records shortly after they were created, in contravention of the University's three-year

**1 |** MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE

retention policy, even though it knew or should have known that they would be relevant to anticipated litigation. As such, Professor Sanders seeks an adverse inference instruction that the records, if produced, would have been adverse to Defendants and favorable to Professor Sanders' claims.

## STATEMENT OF FACTS

### College of Law Climate & Culture Review

1.) Leading up to the Winter of 2018, the University of Idaho administration received "multiple complaints" about the climate, culture and work environment of the College of Law. These complaints included "disrespectful, uncivil and abusive communication[s]" during meetings and other interactions, and there was an "overarching concern that gender bias and/or sex discrimination play[ed] a role by disproportionately affecting female faculty and staff negatively." *Ex. A, April 17, 2018 College of Law – Climate & Culture Review ("C&C Review" or "Climate & Culture Review")*[1].

2.) Jennifer Cossel, a University Human Resources Business Partner at the time, testified that the complaints "had to do with Mark Adams specifically; his leadership and his bias in his handling of overall practices within the College of Law." *Ex. B, Cossel Dep. 9:12-14, 85:1-20.*

3.) As a result of these complaints, the University's Provost ordered that a Climate & Culture Review be conducted at the College of Law. As part of that Review, Ms. Cossel and another HR Business Partner interviewed 32 College of Law faculty and staff members (including Professor Sanders and two other people of color), wherein the employees "shared personal

---

[1] Exhibit A is being filed concurrently with a *Motion to Seal*, as it is designated as a confidential document.

**2** | MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE

perceptions [and] experiences . . . working within the College of Law." *Ex. A, C&C Review, at 1; Ex. B., Cossel Dep. 36:1-37:14, 53:6-56:5, 68:11-18*.

4.) During those interviews, "[a] number of participants identified potential racial bias within the College of Law" and "provided examples of times where they perceived there to be bias." Several participants also "witnessed concerning student evaluations of professors of color," evaluations which may have been shared with the promotion and tenure committee. *Ex. A, C&C Review, at 4; Ex. B, Cossel Dep. 59:4-20*.

5.) Additionally, during Ms. Cossel's interviews, "[s]everal faculty members [felt] strongly that females are disproportionately 'shut down' or admonished by those in the senior leadership group," including Defendant Mark Adams. *Ex. A, C&C Review, at 5; Ex. B, Cossel Dep. 63:1-9*.

6.) Finally, Ms. Cossel noted that during her interviews, "[s]everal participants discussed the concern of gender bias as it relates to the lack of female or diverse senior leadership with the college," with "some attributing this deficit to intentional bias or implicit bias." *Ex. A, C&C Review, at 6-7*.

7.) Ms. Cossel testified that gender and/or racial bias was a "theme" during her interviews, and she felt that it was important for the College of Law to address these gender and racial bias issues. *Ex. B, Cossel Dep. 64:10-17*.

8.) After a month of interviews, Ms. Cossel drafted the College of Law Climate & Culture Review, which was finalized on April 17, 2018. *Ex. A, C&C Review, at 1; Ex. B, Cossel Dep. 68:1-21*.

9.) The April 17, 2018 Review acknowledged the severity of some of the allegations of race and/or gender discrimination that were raised during Ms. Cossel's interviews, stating:

"some of the concerns raised during the course of the Climate & Culture Review could rise to the level of what is considered discrimination, retaliation, gender or sex discrimination." As such, it noted that a referral to the University's Office of Civil Rights and Investigations (OCRI) was appropriate for many of the complaints/allegations raised during the interviews. *Ex. A, C&C Review, at 1, 13*.

10.)   "The Office of Civil Rights & Investigations (OCRI) is responsible for ensuring compliance with federal and state laws related to discrimination or harassment based on a protected class." *https://www.uidaho.edu/ocri*. Indeed, when HR or any other department receives a report of discrimination, harassment or retaliation, it is referred to OCRI, and OCRI "collaborate[s] together . . . with general counsel on how to resolve that." *Ex. B., Cossel Dep. 24:21-25:11*.

### The University's Spoliation of Documents

11.)   Ms. Cossel took notes of the interviews that she held with the 32 College of Law faculty and staff members (including Professor Sanders and two other people of color). *Ex. B., Cossel Dep. 56:7-25*.

12.)   After Ms. Cossel finalized the Climate & Culture Review on April 17, 2018, she provided her interview notes to the University's Human Resources Director. *Ex. B., Cossel Dep. 56:7-25*.

13.)   On June 26, 2018, approximately two months after the Climate & Culture Review was published, Professor Sanders filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging race and gender discrimination by the University and Dean Adams. In the Charge, Professor Sanders discussed her interview with Ms. Cossel, stating: "During my interview in March of 2018, I expressed my concerns about Mark Adam's hostility toward me and the basis of my belief for that hostility (*i.e.*, discrimination and retaliation

. . . .).". In the Charge, Professor Sanders also outlined the retaliation that followed that interview. *See Ex. C, Sanders June 26, 2018 Charge of Discrimination.*

14.)   A year later, on June 19, 2019, Professor Sanders filed her federal Complaint, alleging race and gender discrimination by the University and Dean Adams. Notably, the Complaint references the April 17, 2018 Climate & Culture Review, and it specifically outlines what Professor Sanders discussed during her interview with Ms. Cossel and the retaliation that followed thereafter. *Complaint, Dkt. #001, at ¶¶36, 38-42.*

15.)   On December 4, 2019, Professor Sanders issued discovery requests, asking for all materials relating to the April 17, 2018 Climate & Culture Review. *Ex. D, Sanders Discovery Requests, Request for Production ("RFP") No. 1.*

16.)   For several months, Defendants indicated that they were "in the process of obtaining additional responsive information, if any exists, regarding the April 17, 2018 College of Law Climate & Culture Review, and will supplement accordingly." *See, e.g., Ex. E, Defendants' January 3, 2020 Responses to Discovery, RFP No. 1.*

17.)   Pursuant to the University's Record Retention Policy, Ms. Cossel's interview notes were supposed to be maintained for a minimum of three years after they were created/used. Because the Climate & Culture Review was published on April 17, 2018, Ms. Cossel's notes should have been maintained **until at least April 17, 2021**. *See Ex. F, Administrative Procedures Manual 65.02.C.b. Unit/ Administrative Records (informal records should be destroyed "3 years after close of fiscal year of creation"); Ex. G, State of Board of Education – Public Higher Education Records Retention Schedule ("Institutional Research . . . regarding agency performance" should be maintained for a minimum of three years after creation).*

18.) Despite this, on November 16, 2020, the University confirmed the destruction of the notes in writing stating:

> [T]he notes and/or raw data used to compile the final culture and climate report were not retained. The 2018 HR culture and climate review report was finalized on April [1]7, 2018. The raw data and/or notes used to create this April [1]7, 2018 report were shredded approximately one-week after the finalization and distribution of the 2018 HR culture and climate report. . . . It should be noted that these actions occurred prior to the filing of this instant lawsuit.

*Ex. H, Nov. 16, 2020 Ltr.*

## ARGUMENT

**I.   The University Spoliated Ms. Cossel's Interview Notes.**

"Spoliation of evidence is the destruction or significant alteration of evidence, or the failure to properly preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Balla v. Idaho State Bd. of Correction*, 119 F. Supp. 3d 1271, 1282 (D. Idaho 2015) (quotations and citations omitted). Although the Ninth Circuit has not set forth a precise standard for determining when spoliation sanctions are appropriate,

> [T]he majority of trial courts have adopted the following test: (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the [evidence] w[as] destroyed with a culpable state of mind; and (3) the evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*State Farm Fire & Cas. Co. v. General Motors, LLC*, 542 F. Supp. 3d 1124, 1128 (D. Idaho 2021) (J. Winmill) (quotations and citations omitted). As set forth below, Professor Sanders proves all of these elements.

**A.   Defendants had a Duty to Preserve Ms. Cossel's Interview Notes.**

"A party must preserve evidence it knows or should know is relevant to a claim or defense of any party, or that may lead to the discovery of relevant evidence." *Bown v. Reinke*, No. 1:12-

CV-00262-BLW, 2016 WL 107926, at *5 (D. Idaho Jan. 8, 2016). The duty to preserve arises "not only during litigation, but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation." *Id.* In determining whether a party has a duty to preserve, Idaho federal courts have considered whether the spoliating party's policies required that the documents be retained/preserved, especially if the documents were supposed to be preserved to aid in an internal investigation. *See*, *e.g.*, *Johnson v. Bonner Cnty*, No. 2:18-CV-00244-DCN, 2021 WL 5828025, at *5-*6 (D. Idaho Dec. 8, 2021).

Here, the University clearly had a duty to preserve Ms. Cossel's interview notes, because its own retention policies and the State Board of Education Higher Education Retention Schedule required it to maintain "Institutional Research . . . regarding agency performance" for a period of three years (*i.e.*, until April 2021). *See Exs. F, G*. However, even absent these retention policies, the University had a duty to preserve these notes because it should have reasonably known that the notes would be relevant to anticipated litigation. Indeed, the Climate & Culture Review indicated that during Ms. Cossel's interviews, "several participants" provided examples of race and gender discrimination, noting that this discrimination may have been the result of intentional or implicit bias and further noting that this discrimination was possibly affecting the tenure, promotions and advancement of women and people of color into senior leadership at the College of Law. The Climate & Culture Review further noted that some of the allegations that came to light during the interviews warranted referral to OCRI because the allegations could "rise to the level of" illegal discrimination and retaliation. Furthermore, once OCRI received the allegations, OCRI and the University's general counsel were to "collaborate together" on how to resolve them.

In sum, the University acknowledged that OCRI, in collaboration with the University's attorneys, should have resolved some of the discrimination complaints outlined during Ms.

**7 |** MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE

Cossel's interviews. As such, it is axiomatic that the University should reasonably have known that Ms. Cossel's interview notes may be relevant to anticipated litigation and the University therefore had a duty to preserve those notes.

### B. The Notes were Destroyed with a Culpable State of Mind.

"The Ninth Circuit has instructed that sanctions for spoliation may be imposed upon 'simple notice of potential relevance to the litigation,' and a finding of bad faith is not required." *State Farm Fire & Cas. Co.*, 542 F. Supp. 3d at 1130 (J. Winmill) (*quoting Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993)).[2] Here, as set forth above, the Climate & Culture Review was issued on April 17, 2018. Two months later, in June 2018, Professor Sanders filed an EEOC Charge of Discrimination, and she filed her Complaint a year later (in June 2019). In both the EEOC Charge and the Complaint, Professor Sanders alleged race and gender discrimination by the University and Dean Adams, and in both documents, she specifically discussed her Climate & Culture interview with Ms. Cossel and the retaliation that followed thereafter. In other words, the University had "notice" of the potential relevance of Ms. Cossel's interview notes to the litigation. Yet, the University destroyed the interview notes in violation of its own retention policies and the retention policies of the State Board of Education. Based on the foregoing, this Court should find that the University destroyed Ms. Cossel's notes with a culpable state of mind.

---

[2] For instance, in *Evans v. Avista Corp.*, No. 10-473-N-REB, 2012 WL 4140649 (D. Idaho Sept. 19, 2012), Judge Bush held that sanctions were warranted because "[t]hough there is no evidence that the [evidence] was ever discarded in bad faith to gain some sort of tactical advantage relative Plaintiffs' claims . . . , there is no dispute that it was nonetheless discarded intentionally." *Id*. at 13. The Court further noted that "due to the destruction of the [evidence], Plaintiffs are hamstrung – through no fault of their own – in fleshing such details out in their favor," and ruled that a non-rebuttable presumption in Plaintiff's favor on liability was the appropriate sanction. *Id*. at 15.

### C. The Interview Notes were Relevant to Professor Sanders' Discrimination and Retaliation Claims, Such that a Reasonable Trier of Fact Could Find that they Would Support those Claims.

The exact content of the notes is unascertainable because the notes were destroyed, but it is likely the notes offer specifics and context to the concerns of discrimination and retaliation. Because "the relevance of…[destroyed] documents cannot be clearly ascertained because the documents no longer exist, a party can hardly assert any presumption of irrelevance as to the destroyed documents." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (quotations and citations omitted).

Here, a brief review of the Climate & Culture Study demonstrates why the interview notes are relevant to the litigation. For example, in the "Leadership" section of the Review, Ms. Cossel outlined several positive and negative things that interviewees said about Defendant Dean Adams. For example, "several participants" told Ms. Cossel that they believed that Dean Adams was "supportive of the staff," was easy to get ahold of and had a "good working relationship" with staff, and was "receptive to [employees'] feedback and suggestions." Conversely, other participants told Ms. Cossel that there was "infrequent" or "no communication" from the Dean, he "misse[d] or reschedule[d] a lot of meetings" and had "zero follow through" on employees' concerns, and he "avoid[ed] interacting" with certain staff. Notably, one participant noted that Dean Adams "snaps at people" and another felt that he "admonishes or snaps back at females who engage in dysfunctional communication more often and more severely than the males." *C&C Review at 7-8*.

These comments were taken from Ms. Cossel's interviews, and then were amalgamated for purposes of the Climate & Culture Review. As such, there is no indication of who said what. However, knowing who said what would be relevant to Professor Sanders'

9 | MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE

discrimination and retaliation claims (and indeed, could possibly help to prove those claims). For example, it would be useful to know if the majority of the positive comments about Dean Adams came from White male faculty, while the majority of the negative comments came from employees of color or employees who had reported discrimination or other unethical conduct by the Dean. As such, Ms. Cossel's interview notes were relevant to Professor Sanders' discrimination and retaliation claims, and the University's failure to preserve them constitute spoliation.

II.     **As a Result of the University's Spoliation, the Court Should Issue an Adverse Inference Instruction that if Produced, the Interview Notes would have been Adverse to Defendants and Favorable to Professor Sanders' Claims.**

"Spoliation of evidence raises a presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it." *Bown v. Reinke*, 2016 WL 107926, at *5 (quotations omitted). As such, a trial court "has the broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior." *Glover*, 6 F.3d at 1329. "[T]he choice of appropriate spoliation sanctions must be determined on a case-by-case basis, and should be commensurate to the spoliating party's motive or degree of fault in destroying the evidence and the degree of prejudice suffered by the movant." *Balla v. Idaho State Bd. of Correction*, 119 F. Supp. 3d 1271, 1282 (D. Idaho 2015) (quotations omitted).

Here, the Court should issue an adverse inference instruction stating that Ms. Cossel's interview notes, if produced, would have been adverse to Defendants and favorable to Professor Sanders. This instruction is commensurate with the University's degree of fault in destroying the evidence. Indeed, as set forth above, the University destroyed notes that were clearly relevant (and likely probative) to Professor Sanders' discrimination and retaliation claims. Furthermore, it did

so in contravention of its retention policy, even though it had a duty to preserve those records because it knew or should have known that the notes would be relevant to anticipated litigation. As such, an adverse inference instruction is appropriate here.

The adverse inference instruction should also be commensurate with the prejudice that Professor Sanders suffered as a result of the University's spoliation.

> Prejudice can be hard to measure in the spoliation context, given that the documents that would show prejudice most clearly are, by definition, destroyed. However, once spoliation is shown, prejudice can be presumed, shifting the burden to the spoliator to show that the destruction of evidence did not prejudice the movant.

*Balla*, 119 F. Supp. 3d at 1282. Here, as set forth above, Professor Sanders has been significantly prejudiced by the University's destruction of Ms. Cossel's notes, and an adverse inference instruction is appropriate because it would minimize that prejudice.

## CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that the Court issue an adverse inference instruction, stating that if produced, Ms. Cossel's interview notes would have been adverse to Defendants and favorable to Professor Sanders' claims.

DATED this 13th day of September, 2022.

Respectfully submitted,

**STRINDBERG SCHOLNICK BIRCH HALLAM HARSTAD THORNE**

/s/ Erika Birch
Erika Birch
T. Guy Hallam, Jr.

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

      I hereby certify that on September 13, 2022 a true and correct copy of the foregoing pleading was served on the following via the Court's CM/ECF system:

Bentley G. Stromberg
Tully Fitzmaurice
Sonyalee Nutsch
CLEMENTS, BROWN & McNICHOLS, P.A.
321 13th Street
Post Office Box 1510
Lewiston, Idaho 83501
*bstromberg@clbrmc.com*
*tfitzmaurice@clbrmc.com*
*snutsch@clbrmc.com*

                                       /s/ Dunja Subasic
                                       Dunja Subasic